UNITED STATES DISTRICT COURT OF APPEALS

ELEVENTH CIRCUIT

CASE NO. 18-13452-B

MARIA DEL ROCIO BURGOS GARCIA and LUIS A. GARCIA SAZ,

     Appellants,

vs.

CHURCH OF SCIENTOLOGY FLAG SERVICE ORGANIZATION, INC. and CHURCH OF SCIENTOLOGY FLAG SHIP ORGANIZATION, INC.

     Appellees.

_____/

## **INITIAL BRIEF OF APPELLANTS**

On appeal from the United States District Court, Middle District of Florida

| | |
|---|---|
| Babbitt & Johnson, P.A. | BURLINGTON & ROCKENBACH, P.A. |
| 1641 Worthington Road, Suite 100 | 444 West Railroad Avenue, Ste. 350 |
| West Palm Beach, FL  33409 | West Palm Beach, FL  33401 |
| tedbabbitt@babbitt-johnson.com | (561) 721-0400 |
|    and | Attorneys for Appellants |
| GRAYROBINSON, P.A. | pmb@FLAppellateLaw.com |
| 401 E. Jackson Street, Suite 2700 | kbt@FLAppellateLaw.com |
| Tampa, FL 33601 | |
| rjohnson@gray-robinson.com | |
| valerie.taylor@gray-robinson.com | |

Garcia v. Church of Scientology, et al., No. 18-13452-B

## **CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT**

Appellants, MARIA DEL ROCIO BURGOS GARCIA and LUIS A. GARCIA SAZ, pursuant to E.R.P. 26.1, and 11th Cir. R. 26.1-3, hereby submit this Certificate of Interested Persons and Corporate Disclosure Statement, as follows:

Babbitt, Theodore – Counsel for Appellants

Babbitt & Johnson, P.A. – Counsel for Appellants

Burlington & Rockenbach, P.A – Counsel for Appellants

Burlington, Philip M. – Counsel for Appellants

Church of Scientology Flag Service Organization, Inc. – Appellee

Church of Scientology of Flag Ship Service Organization, Inc. – Appellee

Deixler, Bert H. – Counsel for Appellees

Garcia, Maria Del Rocio Burgos – Appellant

Johnson, Pope, Bokor, Ruppel & Burns, LLP – Counsel for Appellees

Johnson, Robert E. – Counsel for Appellants

GrayRobinson, P.A. – Counsel for Appellants

Lieberman, Eric M. – Counsel for Appellees

Rabinowitz, Boudin, Standard, Krinsky & Lieberman – Counsel for Appellees

Pope, F. Wallace, Jr. – Counsel for Appellees

Potter, Robert Vernon – Counsel for Appellees

Garcia v. Church of Scientology, et al., No. 18-13452-B

Saz, Luis A. Garcia – Appellant

Weil, Quaranta, McGovern, P.A. – Counsel for Appellants

Weil, Ronald P.  – Counsel for Appellants

Weil, Snyder, Schweikert & Ravindran, P.A. – Counsel for Appellants

Whittemore, James D. – U.S. Middle District Court Judge

## STATEMENT REGARDING ORAL ARGUMENT

Appellants believe that oral argument would benefit the Court. This appeal involves multiple issues regarding the enforceability of an arbitration agreement and whether the arbitration award should be vacated. The issues were extensively litigated and the record is massive. Additionally, there is the added issue of whether the First Amendment barred the trial court from considering the substantive unconscionability of the arbitration provisions, or prevented the court from vacating the arbitration award.

## <u>TABLE OF CONTENTS</u>

CERTIFICATE OF INTERESTED PERSONS
AND CORPORATE DISCLOSURE STATEMENT ...........................................C1

STATEMENT REGARDING ORAL ARGUMENT ............................................... i

TABLE OF CONTENTS.......................................................................................... ii

TABLE OF CITATIONS ........................................................................................v

JURISDICTIONAL STATEMENT .........................................................................1

STATEMENT OF THE CASE AND FACTS .........................................................2

SUMMARY OF ARGUMENT ..............................................................................16

ARGUMENT ..........................................................................................................19

POINT I...................................................................................................................19

      THE TRIAL COURT ERRED IN COMPELLING
      ARBITRATION BECAUSE THE ARBITRATION
      AGREEMENT IS PROCEDURALLY AND
      SUBSTANTIVELY UNCONSCIONABLE.

    Standard of Review.........................................................................19

    Merits ..............................................................................................19

    A.    The Arbitration Agreement is Procedurally Unconscionable ............21

    B.    The Arbitration Agreement is Substantively Unconscionable............29

      1.    The Parties Were Not Mutually Obligated to Arbitrate......................30

      2.    The Arbitration Provision Was Inherently Unfair to
          Plaintiffs .............................................................................................32

3.    The Trial Court was not Precluded from Considering Plaintiffs' Claims of Substantive Unconscionability by the First Amendment ........................................................................37

POINT II ...........................................................................................42

THE   TRIAL   COURT   ERRED   IN   DENYING PLAINTIFFS'   MOTION   TO   VACATE   THE ARBITRATION AWARD.

Standard of Review.........................................................................42

Merits ................................................................................................42

A.    The Arbitration Award Should have Been Vacated Because there was Evident Partiality or Corruption of the Arbitrators.............42

B.    The Arbitration Award Should Have Been Vacated Because the Arbitrators Were Guilty of Misconduct ........................................46

1.    The Arbitrators Refused to Hear Any Evidence Critical of Scientology and Allowed the IJC to Present Evidence Outside Plaintiffs' Presence ................................................46

2.    The Arbitrators Committed Misconduct in Limiting Consideration of Plaintiffs' Claims in Violation of Defendants' Prior Representations to the Court...................................53

a. Defendants framed the issue opposite of how it told the trial court it would in defending its right to arbitrate ................................53

b. Defendants refused to allow Plaintiffs' counsel to participate in the proceedings ................................................................54

c. Defendants failed to provide written findings of the arbitrators despite assuring the trial court that such would be provided ............................................................................55

C.    The First Amendment Did Not Prevent Vacatur of the Arbitration Award ...........................................................................57

CONCLUSION ......................................................................................................57

CERTIFICATE OF COMPLIANCE WITH RULE 32(a) ....................................58

CERTIFICATE OF SERVICE ..............................................................................59

SERVICE LIST......................................................................................................60

## <u>TABLE OF CITATIONS</u>

<u>CASES</u>                                                    <u>PAGE</u>

<u>American Fed'n of Gov't Employees, Local 3721 v. District of Columbia</u>,
  563 A.2d 361 (D.C.1989)                                        41

<u>Basulto v. Hialeah</u>,
  Auto., 141 So.3d 1145 (Fla. 2014)                      20, 21, 30

<u>Bellsouth Mobility LLC v. Christopher</u>,
  819 So.2d 171 (Fla. 4th DCA 2002)                              31

<u>Cannon v. South Atlanta Collision Center, LLC</u>,
  2012 WL 2012 WL 1004914 (N.D. Ga. 2012)                        35

<u>Cantwell v. Connecticut</u>,
  310 U.S. 296 (1940)                                            39

<u>Carter v. Cathedral Ave. Coop., Inc.</u>,
  566 A.2d 716 (D.C.1989)                                        41

<u>Church of Scientology Flag Service Organization, Inc. v. City of Clearwater</u>,
  2 F.3d 1514 (11th Cir. 1993)                                   39

<u>Club West v. Tropigas of Fla.</u>,
  514 So.2d 426 (Fla. 3rd DCA 1987)                              35

<u>Commonwealth Coatings Corp. v. Cont'l Cas. Co.</u>,
  393 U.S. 145 (1968)                                            44

<u>Creative Tile Mktg., Inc. v. SICIS Int'l, S.r.L.</u>,
  922 F.Supp. 1534 (S.D. Fla. 1996)                              23

<u>Doctor's Associates, Inc. v. Casarotto</u>,
  517 U.S. 681 (1996)                                            19

<u>Dye v. Tamko Building Products, Inc.</u>,
  908 F.3d 675 (11th Cir. 2018)                                  19

Fonte v. AT&T Wireless Services, Inc.,
    903 So.2d 1019 (Fla. 4th DCA 2005)                                    22

Frazier v. CitiFinancial Corp., LLC,
    604 F.3d 1313 (11th Cir. 2010)                                        43

G & N Construction Co. v. Kirpatovsky,
    181 So.2d 664 (Fla. 3d DCA 1966)                                      23

Gaines Construction Co. v. Carol City Utilities,
    164 So.2d 270 (Fla. 3rd DCA 1964)                                  34, 35

Gainesville Health Care Center, Inc. v. Weston,
    857 So.2d 278 (Fla. 1st DCA 2003)                                     21

Gore v. State,
    706 So.2d 1328 (Fla. 1997)                                            35

Greenbrook NH, LLC v. Estate of Sayre, ex rel. Raymond,
    150 So.3d 878 (Fla. 2d DCA 2014)                                   23, 26

Hooters of Am., Inc. v. Phillips,
    173 F.3d 933 (4th Cir. 1999)                                       36, 37

Hoteles Condado Beach, La Concha & Convention Ctr. v. Union De Tronquistas
    Local 901,
    763 F.2d 34 (1st Cir. 1985)                                48, 52, 53, 54

Inetianbor v. CashCall, Inc.,
    768 F.3d 1346 (11th Cir. 2014)                                     27, 28

International Ins. Co. v. Schrager,
    593 So.2d 1196 (Fla. 4th DCA 1992)                                    34

Jackson v. Payday Financial, LLC,
    764 F.3d 765 (7th Cir. 2014)                                   27, 28, 29

Jones v. Wolf,
    443 U.S. 595 (1979)                                                39, 40

Lambert v. Austin Ind.,
  544 F.3d 1192 (11th Cir. 2008)                                19

Malone & Hyde, Inc. v. RTC Transp., Inc.,
  515 So.2d 365 (Fla. 4th DCA 1987)                         23

McMullen v. Meijer, Inc.,
  355 F.3d 485 (6th Cir. 2004)                             36

Meshel v. Ohev Sholom Talmud Torah,
  869 A.2d 343 (D.C. 2005)                           38, 40, 41

Middlesex Mut. Ins. Co. v. Levine,
  675 F.2d 1197 (11th Cir. 1982)                          44

Morelite Constr. Corp. v. New York City Dist. Council Carpenters Benefit Funds,
  748 F.2d 79 (2d Cir. 1984)                            44

Murray v. United Food & Commercial Workers Intern. Union,
  289 F.3d 297 (4th Cir. 2002)                         36, 37

Nitro District Club, Inc. v. Alticor, Inc.,
  2005 WL 6936246 (W.D. Mo. 2005)                   35, 45

Palm Beach Motor Cars Limited, Inc. v. Jeffries,
  885 So.2d 990 (Fla. 4th DCA 2004)                   30, 31

Peacock Hotel, Inc. v. Shipman,
  103 Fla. 633, 138 So. 44 (1931)                        20

Pendergast v. Sprint Nextel Corp.,
  592 F.3d 1119 (11th Cir. 2010)                         21

Pokorny v. Quixtar, Inc.,
  601 F.3d 987 (9th Cir. 2010)                         35, 45

Powertel v. Bexley,
  743 So.2d 570 (Fla. 1st DCA 1999)                 20, 21, 22

Puri v. Khalsa,
  844 F.3d 1152 (9th Cir. 2017)      38

Rosensweig v. Morgan Stanley & Co., Inc.,
  494 F.3d 1328 (11th Cir. 2007)      47, 48, 52

Schmitz v. Zilveti,
  20 F.3d 1043 (9th Cir. 1994)      47

Serbian E. Orthodox Diocese v. Milivojevich,
  426 U.S. 696 (1976)      38, 39

Spicer v. Tenet Florida Physician Services, LLC,
  149 So.3d 163 (Fla. 4th DCA 2014)      23

Steinhardt v. Rudolph,
  422 So.2d 884 (Fla. 3d DCA 1982)      20

Tempo Shain Corp. v. Bertek, Inc.,
  120 F.3d 16 (2d Cir. 1997)      52, 53

Thompson v. Sunbelt Credit Corp. of Florida,
  2015 WL 11197762 (S.D. Fla. 2015)      31

U.S. E.E.O.C. v. Taco Bell of Am., Inc., 8:06CV1792 T30MAP,
  2007 WL 809660 (M.D. Fla. Mar. 15, 2007)      30

Univ. Commons-Urbana, Ltd. v. Universal Constructors, Inc.,
  304 F.3d 1331 (11th Cir. 2002)      44

Voicestream Wireless Corp. v. US Communications, Inc.,
  912 So.2d 34 (Fla. 4th DCA 2005)      8, 21, 22

Williams v. Walker–Thomas Furniture Co.,
  350 F.2d 445 (D.C.Cir.1965)      20

Statutes

9 U.S.C. §10(a)(2)      14, 17, 43
9 U.S.C. §10(a)(3)      17

9 U.S.C. § 1                                                                   19
9 U.S.C. § 2                                                                   19
9 U.S.C. § 10                                                                  44
9 U.S.C. § 10(a)                                                              43
28 U.S.C. §1291                                                                 1
D.C.Code §§ 16–4301, 16–4302(a) (2001)                                        41
Fla. Stat. § 501.201                                                           2
U.S. Const. Amend. I                                                          38

## **RULES**

11th Cir. R. 26.1-3                                                            1
Federal Rule of Appellate Procedure 32(a)(7)(B)                               59

## <u>JURISDICTIONAL STATEMENT</u>

This is an appeal from a final order as authorized by 28 U.S.C. §1291.

## <u>STATEMENT OF THE CASE AND FACTS</u>

Plaintiffs, Luis A. Garcia Saz, and his wife, Maria Del Rocio Burgoes Garcia, sued the Church of Scientology Flag Service Organization, Inc. ("Flag") the Church of Scientology Flag Ship Organization, Inc. ("Ship") and three other Scientology related entities[1] alleging breach of contract, fraud, misrepresentation, and unfair and deceptive sales practices as defined in sections 501.201, Florida Statutes, et. seq. (DE1). Plaintiffs are former members of the Church of Scientology, and they sought damages from Defendants for three categories of payments they made while they were members (DE1).

One category of damages arose from payments made for the "Super Power Project," a Scientology facility in Clearwater, Florida which was commenced in 1995, but still not completed 17 years later when the complaint was filed (DE114 at 8-12). Plaintiffs alleged that the Super Power Project was maintained in an incomplete state to induce contributions from members based on false representations (DE114 at 8-12). While it was initially estimated to cost $40 million, at least $200 million dollars had been raised, although less than half of that was spent on its construction (DE114 at 8).

Plaintiffs alleged that between October 1998 and January 2004, Defendants solicited them for 13 different donations for the Super Power Project, emphasizing

---

[1] The three other entities were later dropped as defendants in the operative Amended Complaint (DE114).

2

the imminent need for funds to complete it and offering various inducements (DE114 at 9-10). During that time, Plaintiffs donated a total of $218,500 to the Super Power Project, and it was alleged that those contributions were solicited by false representations (DE114 at 24-28).

Additionally, in August 2005, Defendants asked Plaintiffs to make another $65,000 contribution to purchase a large cross of scientology to be affixed to the top of the Super Power Project building. Plaintiffs were told that contractors were standing by to do the work once payment was received (DE114 at 10-11). Plaintiffs made that contribution, yet the cross was not affixed to the building until five years later (DE114 at 10). Plaintiffs alleged that the representations made to them for their contributions for the Super Power Project were knowingly false when made and they relied on them to their detriment (DE114 at 12).

The second category of payments for which Plaintiffs sought damages were contributions made to Defendants based on false representations regarding specific scientology activities (DE114 at 14-23). Plaintiffs identified eight different contributions made which Defendants represented were to be used to help, inter alia, starving children in Africa, help tsunami victims in the Pacific, and a campaign to eliminate child pornography (DE114 at 14-23). Plaintiffs alleged that those projects either did not actually exist, or that only a small fraction of the money raised was spent to create the appearance of extensive humanitarian

3

activities used as inducements to obtain contributions from members (DE114 at 14-23). The contributions in that category of damages was approximately $40,000.

The third category of damages involved pre-payments made by Plaintiffs for counseling and training sessions, as well as related food and accommodations (DE114 at 12-14). These deposits were solicited by Defendants upon the express understanding that any unused funds would be returned upon demand (DE114 at 13). Scientology represented to the Internal Revenue Service that its refund policy was that if someone was not happy with Scientology, they only had to request their donations back and agree to forgo further services and the donations would be returned (DE114 at 13-14). Nonetheless, despite Plaintiffs satisfying those prerequisites, Defendants refused to refund money (DE114 at 13-14).

Defendants moved to compel arbitration (DE8, 120). Plaintiffs responded by arguing that the arbitration provisions could not be enforced because they were unconscionable (DE30, 170). A non-evidentiary hearing was held on the issue (DE 120, 126), after which the court set an evidentiary hearing "limited to the issues of the defense of unconscionability and existence of Arbitration procedures of the Church of Scientology International applicable to the Plaintiffs" (DE137).

The facts relating to the arbitration issue were largely undisputed. Plaintiffs are former long-term members of the Church of Scientology. For example, Luis Garcia joined when he was 23 years old in 1982, and remained a member until

2010 (DE137). During that time, Plaintiffs prepaid for services involving training and counseling. When they traveled to Clearwater, Florida from California to obtain those services, they were required to execute "Enrollment Agreements" as a prerequisite to accessing those services (DE195 at 14). Over the course of his involvement with the Church of Scientology, Luis Garcia signed many Enrollment Agreements (DE195 at 15). The agreements contained arbitration provisions that were essentially the same, with the trial court quoting an example in its March 13, 2015 order:

> 6. d.  In accordance with the discipline, faith, internal organization, and ecclesiastical rule, custom, and law of the Scientology religion, and in accordance with the constitutional prohibitions which forbid governmental interference with religious services or dispute resolution procedures, **should any dispute, claim or controversy arise between me and the Church**, any other Scientology church, any other organization which espouses, presents, propagates or practices the Scientology religion, or any person employed by any such entity, **which cannot be resolved informally by direct communication, I will pursue resolution of that dispute, claim or controversy solely and exclusively through Scientology's Internal Ethics, Justice and binding religious arbitration procedures**, which include application to senior ecclesiastical bodies, including, as necessary, final submission of the dispute to the International Justice Chief of the Mother Church of the Scientology religion, Church of Scientology International ("IJC") or his or her designee.
>
> e.    **Any dispute, claim or controversy which still remains unresolved after review by the IJC shall be submitted to binding religious arbitration in accordance with the arbitration procedures of Church of Scientology International, which provide that:**
>
> i.     I will submit a request for arbitration to the IJC and to the

person or entity with whom I have the dispute, claim or controversy;

ii.    in my request for arbitration, I will designate one arbitrator to hear and resolve the matter;

iii.    within fifteen (15) days after receiving my request for arbitration, the person or entity with whom I have the dispute, claim or controversy will designate an arbitrator to hear and resolve the matter. If the person or entity with whom I have the dispute, claim or controversy does not designate an arbitrator within that fifteen (15) day period, then the IJC will designate the second arbitrator;

iv.    the two arbitrators so designated will select a third arbitrator within fifteen (15) days after the designation of the second arbitrator. If the arbitrators are unable to designate a third arbitrator within the fifteen (15) day period, then the IJC will choose the third arbitrator;

v.    consistent with my intention that the arbitration be conducted in accordance with Scientology principles, and consistent with the ecclesiastical nature of the procedures and the dispute, claim or controversy to which those procedures relate, it is my specific intention that all such arbitrators be Scientologists in good standing with the Mother Church. [E.S.]

(DE189).

It was undisputed that the Enrollment Agreements were not subject to negotiation or modification by church members (DE195 at 18, 36). Luis Garcia testified that he believed the arbitration provisions related only to services he was obtaining from the Church of Scientology (DE195 at 43-44).

In 2010, Luis Garcia published a letter of resignation expressing his disillusionment with the church organization (DE195 at 36). He circulated the

letter to several Scientology friends and acquaintances because he was concerned about the Scientology policy that members who left were declared "suppressive" persons, and all Scientologists were required to "disconnect" from them (DE195 at 37). It is established doctrine of Scientology that "suppressive" persons relinquish all rights as Scientologists and may not receive the benefit of the codes of the church (DE195 at 11). They are considered to be insane and psychotic and are regarded as enemies with whom Scientologists are at war (DE30 at 14; DE188-3 at 46; DE196 at 65).

Testimony was presented from two former members who had been declared "suppressive" (DE196 at 46-68). Both testified that the church directed family members who remained Scientologists to have absolutely no contact with them (DE196 at 46-68). Subsequent to their resignation letter, Plaintiffs were declared suppressive by Scientology. Thereafter, they filed this lawsuit. It was noted in testimony that filing suit against Scientology is considered a "high crime" against the church (DE196 at 66).

In considering whether to require arbitration, one of the primary issues noted by the trial court was that the arbitration agreement, while lengthy, did not provide any information about the rules or procedures for arbitration, other than the selection of arbitrators (DE189 at 15). Defendants argued that an internal conflict resolution structure known as the "Committee on Evidence" constituted the rules

and procedures governing the arbitration (DE166 at 1-10). Defendants presented the testimony of Allan Cartwright, the Legal Director for the Church of Scientology International, who has authority over all legal matters. He testified that he was relying solely on a 1963 policy letter written by L. Ron Hubbard to support his contention that the Committee of Evidence provided the rules that applied to arbitration (DE196 at 41). Cartwright admitted there had never been any arbitrations in the history of Scientology (DE196 at 24). Defendants also assured the trial court that Plaintiffs would be able to present witnesses and evidence in support of their case (DE188-3 at 176-78).

The trial court granted Defendants' Motion to Compel Arbitration (DE 189). The court applied Florida contract law[2], which requires a determination of procedural and substantive unconscionability, *albeit* on a "sliding scale" analysis (DE189 at 5-6). The court found that the Enrollment Agreements were contracts of adhesion which was "a strong indicator that the contract is procedurally unconscionable because it suggests an absence of meaningful choice, … [but] the presence of an adhesion contract alone does not require a finding of procedural unconscionability" (DE189 at 10-11)(quoting *Voicestream Wireless Corp. v. US Communications, Inc.*, 912 So.2d 34, 39 (Fla. 4th DCA 2005)).

---

[2] Plaintiffs contended that California law applied to the contract formation issues, but noted that the relevant legal standard was essentially the same (DE186 at 6, n.5).

Plaintiffs had contended that the failure of the Enrollment Agreements to identify the rules or procedures for arbitration was an element of the unconscionability (DE189 at 11). The trial court rejected Defendants' reliance on the Committee on Evidence, stating: "Defendants failed to present any convincing evidence supporting their strained contention that the Committee on Evidence constitutes the rules and procedures governing arbitration" (DE189 at 12). The court noted that the arbitration provisions make no reference to the Committee on Evidence, and that the word "arbitration" cannot be found in the Committee on Evidence or in L. Ron Hubbard's writings (DE189 at 12). The court noted that there had never been an arbitration in the history of the church, further supporting Plaintiffs' arguments that no rules and procedures for conducting arbitration existed (DE189 at 14).

Nonetheless, the trial court found that procedures set forth in the Enrollment Agreements were "minimally sufficient," and that Plaintiffs, as committed Scientologists, necessarily would have "some idea" of the arbitration procedures (DE189 at 14).

With respect to substantive unconscionability, the trial court ruled that the First Amendment prohibited him from considering the issue "since it necessarily would require an analysis and interpretation of scientology doctrine." (DE189 at 20). Based on that analysis, the trial court determined that the arbitration

provisions were not procedurally or substantively unconscionable, thereby entitling Defendants to enforce them (DE189 at 20-21).

Plaintiffs filed a Motion for New Trial/Reconsideration of the Order Compelling Arbitration (DE191), which was denied (DE198). Plaintiffs appealed the Order on the Motion to Compel Arbitration; this Court *sua sponte* dismissed the appeal for lack of jurisdiction (DE200, 205).

Thereafter, it took approximately two and half years for the arbitration to occur. Plaintiffs proposed over fifty Scientology members as their chosen arbitrator, and every one was rejected by Defendants as not being "in good standing" or otherwise unavailable (DE235 at 4). Plaintiffs and Plaintiffs' counsel were also informed by Scientology's International Justice Chief ("IJC") that since Plaintiffs were "suppressive" persons, they were prohibited from communicating directly with any Scientologist in good standing regarding being selected. The trial court acknowledged Plaintiffs' difficulty (DE215 at 3-5; DE225 at 2), but attributed it to being a product of the religious agreement, and noted that there was no real definition of a "scientologist in good standing" (DE225 at 2). The court directed the parties to "diligently comply with the procedures for selecting a panel of three arbitrators" (DE215 at 6; DE225 at 3).

Eight months later, the court finally determined that there was an impasse between the parties regarding the selection of arbitrators (DE238). The court held,

and Defendants agreed (DE239), that under the authority of the Federal Arbitration Act, the court had the authority to appoint arbitrators (DE235 at 11; DE238). After the trial court explained that it would select all of the arbitrators, Defendants argued that the trial court could only appoint Plaintiffs' arbitrator. The trial court found this position to be "contrary to their previous position, as well as factually and legally incorrect" (DE243 at 2).

The court ordered Defendants to provide a list of 500 members from which it would choose 20 at random to inquire of their availability (DE238; DE243). The court was required to enter an order compelling compliance with that order (DE242). The court ultimately selected the three arbitrators from a list provided by Defendants. At all stages of the selection process, the trial court expressly precluded Defendants from discussing this matter with the potential arbitrators or contacting them so as to "preserve the integrity of the arbitration" (DE265 at 2 n.3; DE 243 at 4; DE254; DE 262).

As to the conduct of the arbitration, the trial court denied Plaintiffs' request to require the presence of a court reporter at the arbitration, and to rule that the rules of the Committee on Evidence did not apply (DE265). The court stated:

> While the rules governing Scientology arbitration may not be entirely clear on the record, the Church has advised Plaintiffs, through e-mails between counsel, that **[t]he conduct of the religious arbitration will be decided by the IJC at the appropriate time during the arbitration.** [E.S.]

11

(DE265 at 3). The court did note that the IJC had testified that an attorney may be present with Plaintiffs at the arbitration but may not "represent" Plaintiffs (DE265 at 3 n.4).

When the two-day arbitration commenced, the only people allowed in the building were Plaintiffs. Mr. Garcia's assistant, who assisted him with reading because of vision problems (for which he had a letter from his ophthalmologist)(DE272-3 at 22), was denied entry (DE 272-3 at 2-3). Plaintiffs were also told that they were not allowed any witnesses because "their testimony could not possibly be confirmed" (DE272-3 at 3). This directly contradicted their claims to the trial court that Plaintiffs would be able to present witness and other evidence to support their case.

Plaintiffs were immediately put into a room and informed by the IJC, that they would probably not see the arbitrators all day because he "needed to hat them," which is Scientology terminology for training them (DE272-3 at 4). Plaintiffs sat in the room all day while the arbitrators were being "hatted" which included the IJC presenting evidence outside their presence, including a 10-page "Claim Verification Board Report" ("CVB Report"), which Plaintiffs had not seen before that day, which concluded that Plaintiffs were entitled to nothing (DE272-3 at 8, 27-36). The IJC also gave the arbitrators two confidential "Priest/penitent Ethics Rules" on Mr. Garcia, which were entirely irrelevant (DE272-3 at 8)

The IJC took all 900 pages of Plaintiffs' proposed evidence and said he would review it for relevancy and entheta, a Scientology term for anything that is remotely critical of the Church (DE272-3 at 4). Of those 900 pages, the IJC eliminated all but 70 pages, and severely redacted those, including censoring screenshots from Scientology's own website and eliminating its own promotional materials (DE272-3 at 9). Additionally, an accounting summary of the Orange County Ideal Org. was completely redacted, leaving only five lines at the bottom which simply addressed payment of taxes (DE272 at 9, 37-38).

On the second day of arbitration, Plaintiffs were finally brought before the arbitrators. Two of the arbitrators asked whether Plaintiffs had complied with the procedures and forms of the Claims of the Verification Board (CVB), despite the fact that Defendants' counsel had informed the trial court at a prior hearing that Plaintiffs were not subject to those requirements because they had left Scientology (DE272-3 at 11-12).

One of the arbitrators asked Mr. Garcia what had changed when Plaintiffs had sought refunds of donations. As he started to answer, the IJC cut him off stating "What you are saying is entheta" (DE272-3 at 13). The chairman of the arbitration panel also informed Plaintiffs that he did not want to hear anything about fraud because "it has nothing to do with the purpose of this arbitration" (DE272-3 at 14). The IJC cut Mr. Garcia off a second time for "nattering about

13

me" (nattering is a Scientology term that means to criticize) (DE272-3 at 15). Essentially, Plaintiffs were denied any opportunity to present their case, other than to address questions regarding whether they complied with the CVB procedures. They were also lectured by the chairman that they are suppressive persons trying to destroy the Church and they should recant and atone and come back to the Church (DE272-3 at 17-18).

After the arbitration, the arbitrators checked boxes on a "religious arbitration findings form," which described Plaintiffs' claims as solely seeking the return of donations (DE272 Ex.1), and not even acknowledging the claims for misrepresentation, fraud, or breach of contract (DE272 Ex.1). They awarded refunds on accommodations at religious retreats Plaintiffs did not attend in the total amount of $18,495.36 (DE272 Ex.1).

Subsequent to the arbitrators' decision, Plaintiffs' filed an Amended Motion to Vacate Arbitration Awards (DE272). They sought relief based on 9 U.S.C. §10(a)(2), which authorizes vacatur for "evident partiality or corruption in the arbitrators"; and subsection (a)(3), which authorizes vacatur where the arbitrators were "guilty of misconduct … in refusing to hear evidence pertinent and material to the controversy."

After briefing, the court denied Plaintiffs' motion, concluding that their challenges "involve matters of religious doctrine" and relied on "secular notions of

14

due process" (DE282 at 8). The court noted its "narrow scope of review … further limited by the First Amendment." *Id.* Plaintiffs have appealed that order.

# SUMMARY OF ARGUMENT

The trial court erred in compelling arbitration because the arbitration agreement is procedurally and substantively unconscionable. The arbitration provisions were contained in an adhesion contract which, in itself, strongly indicates procedural unconscionability. Additionally, the arbitration provisions did not provide any information as to the rules or procedures applicable to the arbitration. It was undisputed that there had never been an arbitration in the history of Scientology prior to this case, and thus there was no way for Plaintiffs to know what they were agreeing to in the adhesion contract.

The arbitration agreement was also substantively unconscionable because it only bound Plaintiffs to arbitrate their claims; Scientology and its entities were not obligated to arbitrate any claims against Plaintiffs. Additionally, the terms of the arbitration were unfair because, as "suppressive" persons, Plaintiffs could not obtain a fair hearing since the arbitrators had to be Scientologists in good standing. A fundamental church doctrine is that anyone declared "suppressive" has no rights, can be deprived of property or injured without any religious discipline, and are considered insane individuals with whom Scientology is at war.

The trial court was not barred by the First Amendment from determining the substantive unconscionability of the arbitration provisions. That is a legal determination based on contract principles, and did not require the court to resolve

16

any disputed issues of religious doctrine or policy. Additionally, this Court has held that the state has a compelling interest in protecting church members from misconduct in fundraising, and therefore Defendants were not entitled to ecclesiastical immunity on this case.

The trial court erred in denying Plaintiffs' motion to vacate the arbitration award. The arbitration award was the result of evident partiality or corruption in the arbitrators, a basis for vacatur under 9 U.S.C. §10(a)(2). Here, the antipathy of Scientologists to Plaintiffs was clearly and repeatedly demonstrated during the arbitration, as the arbitrators and the IJC, who controlled the arbitration, displayed hostility and a refusal to consider Plaintiffs' contentions or evidence. Other forms of partiality were also demonstrated which requires vacatur of the arbitration award.

The arbitration award should have been vacated under 9 U.S.C. §10(a)(3), since the arbitrators were guilty of misconduct in, *inter alia*, refusing to hear relevant and material evidence. The arbitrators refused to hear any evidence critical of Scientology, even though Plaintiffs' claims of fraud and breach of contract necessarily required such evidence. Additionally, Defendants limited the arbitration to whether the Claim Verification Board procedures were complied with, in direct violation of representations made to the trial court. Additionally, Defendants refused to permit Plaintiffs to present any witnesses, again in violation

17

of prior representations to the court. Defendants also prohibited Plaintiffs' counsel from having any role in the arbitration and the arbitrators failed to provide adequate written findings. These acts of misconduct deprived Plaintiffs of a fundamentally fair opportunity to prevent their claims.

As with the issue of unconscionability of the arbitration agreement, the trial court was not barred by the First Amendment from vacating the arbitration award which was based on evident partiality and gross misconduct.

## **ARGUMENT**

## **POINT I**

THE TRIAL COURT ERRED IN COMPELLING ARBITRATION BECAUSE THE ARBITRATION AGREEMENT IS PROCEDURALLY AND SUBSTANTIVELY UNCONSCIONABLE.

### **Standard of review**

This Court reviews orders compelling arbitration under the *de novo* standard of review. *Dye v. Tamko Building Products, Inc.*, 908 F.3d 675, 680 n.3 (11th Cir. 2018).

### **Merits**

Under the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.,* a written arbitration agreement is enforceable "save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Under the FAA, a party seeking to compel arbitration must demonstrate that "(a) the plaintiff entered into a written arbitration agreement that is enforceable 'under ordinary state-law' contract principles and (b) the claims before the court fall within the scope of that agreement." *Lambert v. Austin Ind.*, 544 F.3d 1192, 1195 (11th Cir. 2008). In making this determination, "generally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements." *Doctor's Associates, Inc. v. Casarotto,* 517 U.S. 681, 687 (1996).

19

Here, Plaintiffs challenged the first element, contending that under Florida law the arbitration provision was invalid because it was unconscionable.

The Florida Supreme Court has recently described the defense of unconscionability as follows:

> Unconscionability is a common law doctrine that courts have used to prevent the enforcement of contractual provisions that are overreaches by one party to gain "an unjust and undeserved advantage which it would be inequitable to permit him to enforce." *Steinhardt v. Rudolph*, 422 So.2d 884, 889 (Fla. 3d DCA 1982) (quoting *Peacock Hotel, Inc. v. Shipman*, 103 Fla. 633, 138 So. 44, 46 (1931)). "Unconscionability has generally been recognized to include an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." *Williams v. Walker–Thomas Furniture Co.*, 350 F.2d 445, 449 (D.C.Cir.1965) (emphasis added). **The absence of meaningful choice when entering into the contract is often referred to as procedural unconscionability, which "relates to the manner in which the contract was entered," and the unreasonableness of the terms is often referred to as substantive unconscionability, which "focuses on the agreement itself."** *Powertel[ Inc. v. Bexley]*, 743 So.2d [570] at 574 [1st DCA 1999].

*Basulto v. Hialeah Auto*., 141 So.3d 1145, 1157–58 (Fla. 2014).

In Florida, to invalidate an arbitration agreement based upon unconscionability, a party must establish both procedural and substantive unconscionability. *Id.* at 1159. However, both elements do not need to be present to the same degree. The Supreme Court adopted a "balancing, or sliding scale, approach." *Id.* The court stated *Id.*:

Under this approach, "a balancing approach is employed allowing one prong to outweigh another provided that there is at least a modicum of the weaker prong."

Here, there are elements of both procedural and substantive unconscionability and, when evaluated together, it is clear that the arbitration provision is enforceable.

## A.    The Arbitration Agreement is Procedurally Unconscionable.

As noted above, the primary consideration in determining whether an arbitration agreement is procedurally unconscionable "is whether the complaining party lacked a meaningful choice when entering into the contract." *Basulto,* 141 So.3d at 1157 n.3. This Court has stated:

> To determine whether a contract is procedurally unconscionable under Florida law, courts must look to: (1) the manner in which the contract was entered into; (2) the relative bargaining power of the parties and whether the complaining party had a meaningful choice at the time the contract was entered into; (3) whether the terms were merely presented on a 'take-it-or-leave-it' basis; and (4) the complaining party's ability and opportunity to understand the disputed terms of the contract.

*Pendergast v. Sprint Nextel Corp.*, 592 F.3d 1119, 1135 (11th Cir. 2010)(citing *Powertel*, 743 So.2d at 574; *Murphy*, 944 So.2d at 1134).

"The fact that a contract is one of adhesion is a strong indicator that the contract is procedurally unconscionable because it suggests an absence of meaningful choice." *Gainesville Health Care Center, Inc. v. Weston*, 857 So.2d

278, 285 (Fla. 1st DCA 2003); *Voicestream Wireless Corp. v. U.S. Communications, Inc.*, 912 So.2d 34, 40 (Fla. 4th DCA 2005).

> Florida courts define adhesion contracts, as follows:

> Generally, an adhesion contract is defined as a standardized contract form offered to consumers of goods and services on essentially a 'take it or leave it' basis without affording the consumer a realistic opportunity to bargain and under such conditions that the consumer cannot obtain the desired product or services except by acquiescing in the form contract.

*Fonte v. AT&T Wireless Services, Inc.*, 903 So.2d 1019, 1026, n.2 (Fla. 4th DCA 2005) (citing *Powertel*, 743 So.2d at 574).

Here, it is undisputed that the terms of the enrollment agreements, which included the arbitration provisions, were form contracts and non-negotiable. The enrollment agreements were presented on a "take-it-or-leave-it" basis. A Scientologist's failure or refusal to sign the application would prevent receipt of the services **which the member had already paid for**.

Plaintiffs recognize that "the presence of an adhesion contract alone does not require a finding of procedural unconscionability." *VoiceStream Wireless Corp.,* 912 So.2d at 40. There must be an aspect of the agreement, other than their adhesive nature, that makes them procedurally unconscionable.

Here, there are sufficient additional grounds to compel the conclusion that this provision was procedurally unconscionable. In addition to being an adhesion contract, the enrollment agreements are procedurally unconscionable because they

contained no rules or procedures governing the arbitration, and there was no means for a member to determine such rules or procedures.

Generally, in Florida, "[p]rovisions in a contract providing for arbitration must be definite enough so that the parties at least have some idea as to what particular matters are to be submitted to arbitration and set forth some procedures by which arbitration is to be effected." *Malone & Hyde, Inc. v. RTC Transp., Inc.,* 515 So.2d 365, 366 (Fla. 4th DCA 1987)(emphasis added) (citing *G & N Construction Co. v. Kirpatovsky,* 181 So.2d 664 (Fla. 3d DCA 1966)); *see also Spicer v. Tenet Florida Physician Services, LLC,* 149 So.3d 163, 165–66 (Fla. 4th DCA 2014); *Creative Tile Mktg., Inc. v. SICIS Int'l, S.r.L.,* 922 F.Supp. 1534, 1539 (S.D. Fla. 1996). The essential terms of an enforceable arbitration agreement include "**the form and procedure for arbitration**, the number of arbitrators, how the arbitrators were to be selected, or ... the issues to be decided by arbitration." *Greenbrook NH, LLC v. Estate of Sayre, ex rel. Raymond,* 150 So.3d 878, 881 (Fla. 2d DCA 2014) (quoting *Malone & Hyde, Inc.,* 515 So.2d at 366)(emphasis added). These factors are not exhaustive. *Greenbrook,* 150 So.3d at 881.

Here, the arbitration provisions do not provide a single detail about the form or procedures applicable to any arbitration. The only details about the arbitration were: (1) the arbitration procedure was binding; (2) the three arbitrators would be

members of Scientology; and (3) there is no appeal or approval necessary for their decision. While there is a reference in the enrollment agreements to Scientology rules of arbitration, there were no such rules, prior to this case, there had never been a single Scientology arbitration.

Defendants contended that Scientology's "Committee on Evidence" provides the rules and procedures governing Scientology arbitration. This contention was unsupported and was rejected by the trial court (DE189 at 11-14). First, the arbitration provisions make no reference to the Committee on Evidence (DE189 at 3-4). Also, the Committee on Evidence's governing documents never mention arbitration (DE189 at 12). Moreover, as the trial court noted, "numerous irreconcilable inconsistencies exist between" the procedures outlined in the Committee on Evidence and the few details provided in the arbitration provision (DE189 at 13-14).

For instance, under the Rules of the Committee on Evidence, the finding of the Committee is only a recommendation and is not final until approved by an employee of Scientology (DE 188-2 at 38-41; DE196 at 63; DE195 at 53). The Committee is made up of four to six members, including a chairman who does not vote unless there is a deadlock; and the members are chosen by an employee of Scientology and the parties cannot object to the membership (DE188-2 at 46, 51; DE195 at 52). The Committee on Evidence deals only with members' offenses and

their only findings can be guilty or not guilty, or a mitigation of sentence (DE196 at 63; DE188-3 at 3; DE188-3 at 19-20). Finally, the findings are reviewable through several layers of hierarchy (DE188-3 at 13-16).

Defendants argued that the Committee on Evidence provides that it is "for use in all matters of justice in Scientology" (DE166 at 2). However, "justice" in that context is defined narrowly, and does not include the type of claim or remedy sought by the Plaintiffs here. Scientology's founder, L. Ron Hubbard, established the definition of justice in his book, Introduction to Scientology Ethics, as follows: "When an individual fails to put in his own ethics, the group takes action against him and that is called justice"[3] (DE170 at 4-5). That definition of "justice" is consistent with the content of the Committee on Evidence, which deals with the disciplining of members when they commit offenses. It is not consistent with a former member suing Scientology entities for fraud or seeking reimbursement of money that has been advanced to them.

Notwithstanding its finding that the arbitration provision here did not contain any procedures and that the Committee on Evidence rules could not apply,

---

[3] That definition applies to the Committee on Evidence pursuant to Introduction to Scientology Ethics which states:

> The ecclesiastical justice procedures of the Church of Scientology are understood by all members of the religion to have been set down as policy by the Scientology's founder, L. Ron Hubbard defines "justice" in his book, INTRODUCTION TO SCIENTOLOGY ETHICS".

the trial court found that the enrollment agreements satisfied "the essential requirements of an enforceable arbitration agreement under Florida law…" (DE189 at 14). The court based this upon a determination that Plaintiffs had "some idea of what disputes were subject to arbitration and the procedures by which arbitration was to be effected." *Id.* This conclusion is not supported by the evidence.

It is undisputed here that in the history of Scientology, there had never been an arbitration brought pursuant to the enrollment agreements. In fact, there had never been any arbitration of any kind in the Church of Scientology's history. Neither the Committee on Evidence, nor Hubbard's governing book, *Introduction to Scientology Ethics*, ever mentions arbitration. Furthermore, as the court noted, the rules of the Committee on Evidence are "irreconcilabl[y] inconsistent" with arbitration (DE189 at 13). The trial court relied on the fact that Mr. Garcia completed an "'Ethics Specialist Course', during which he studied, among other things, the Committee on Evidence and its procedures, as well as the Scientology Justice System." (DE189 at 16). However, for the reasons discussed above, that training would not inform Plaintiffs of any procedures applicable to arbitration within Scientology, and Defendants produced no evidence to the contrary.

Under very similar circumstances, this Court and the Seventh Circuit have refused to enforce arbitration provisions. In a pair of cases involving challenges to

26

arbitration provisions in the context of transactions involving small high interest loans to individuals, i.e. "payday" loans, the arbitration provisions were deemed inadequate to justify enforcement. In *Inetianbor v. CashCall, Inc.*, 768 F.3d 1346 (11th Cir. 2014) and *Jackson v. Payday Financial, LLC*, 764 F.3d 765 (7th Cir. 2014), individual borrowers brought actions against the lenders challenging payday loans. However, their loan agreements contained a provision that all disputes arising from the agreements:

> [W]ill be resolved by Arbitration, which shall be conducted by the Cheyenne River Sioux Tribal Nation by an authorized representative in accordance with its consumer dispute rules and the terms of this Agreement.

*Jackson*, 764 F.3d at 769. Additionally, the arbitration provisions stated that the borrowers could choose whether to have one arbitrator (a "tribal elder") or three arbitrators ("members of the tribal council") preside over the dispute.

In both *Inetianbor* and *Jackson*, it was demonstrated that the Cheyenne River Sioux Tribal Nation did not authorize arbitration, did not involve itself in hiring arbitrators, and had no "consumer dispute rules." Based on those significant deficiencies this Court, and the Seventh Circuit, ruled that the arbitration provisions were unenforceable.

In *Inetianbor*, the majority held that the arbitral forum was not available, although it was integral to the arbitration scheme, and thus, the trial court properly denied the defendant's motion to compel arbitration.

In a concurring opinion, Judge Restani reached the same result for a different reason (768 F.3d at 1355):

> Because the processes and rules were non-existent, it was impossible for Mr. Inetianbor to understand the provision of the agreement to arbitrate specifying the Tribe, together with its set of rules, as the arbitral forum. *See id*. Accordingly, the clause is procedurally unconscionable.

Judge Restani followed the reasoning of the Seventh Circuit in *Jackson*, *supra*, which found the arbitration provision to be both procedurally and substantively unconscionable. With respect to procedural unconscionability, the *Jackson* court stated (764 F. 3d at 778):

> Turning first to procedural unconscionability, although the district court held on remand that the substantive commercial law of the Cheyenne River Sioux Tribe was reasonably ascertainable, it did not reach this conclusion with respect to tribal rules for conducting arbitrations. Indeed, the record establishes that such procedures do not exist. **The Tribe has neither a set of procedures for the selection of arbitrators nor one for the conduct of arbitral proceedings. Consequently, it was not possible for the Plaintiffs to ascertain the dispute resolution processes and rules to which they were agreeing.** [E.S.]

Similarly, the record here demonstrates that Plaintiffs had no means of determining the rules and procedure for the (nonexistent) arbitration proceedings in Scientology. The trial court specifically found that the Committee on Evidence did not provide such information and that there had never been an arbitration in the history of Scientology. Its conclusion that Plaintiffs still had some means of determining the rules and regulations for a nonexistent forum is unreasonable and

28

unsupported by the record. The manner in which the arbitration was handled, as discussed in the Statement of Facts above, and Point II, below, clearly reflected the lack of procedures and ad hoc nature of the proceedings.

First, the trial court had to take over the selection of the arbitrators. Then, the IJS basically made up the rules and procedures as the arbitration occurred and contravened Defendants' prior representations to the court as to how the arbitration would be handled. This aspect of procedural unconscionability is interdependent with the substantive unconscionability, as discussed *infra*, pp. 32-37. Therefore, consistent with *Inetianbor* and *Jackson*, *supra*, this Court should find the arbitration provisions in this case procedurally unconscionable.

In summary, this was a contract of adhesion forced upon Plaintiffs after they had already paid for the services at issue, thus eliminating any bargaining power they might have had. It contained absolutely no description of the procedures which were to be used in conducting the arbitration and there were no means for Plaintiffs to determine those procedures. These two facts combine to establish that Plaintiffs had no meaningful choice and therefore, the arbitration provisions are procedurally unconscionable.

**B.    The Arbitration Agreement is Substantively Unconscionable.**

An arbitration agreement is substantively unconscionable when "the terms of the contract are 'unreasonably favorable' to the other party and [when] the terms of

the contract are so unfair that enforcement should be withheld." *Basulto*, 141 So.3d at 1158 n.4 (citation omitted). Florida courts have explained that "[i]n determining whether an agreement or provision is substantively unconscionable, courts consider whether the disputed terms limit available remedies, exclude punitive damages, prevent equitable relief, impose substantial costs, or lack mutuality of obligation with respect to the arbitration of disputes." *U.S. E.E.O.C. v. Taco Bell of Am., Inc.*, 8:06CV1792 T30MAP, 2007 WL 809660, at *1 (M.D. Fla. Mar. 15, 2007)(citing *Palm Beach Motor Cars Limited, Inc. v. Jeffries*, 885 So.2d 990, 992 (Fla. 4th DCA 2004)). Here, the arbitration provision was substantively unconscionable because: 1) the parties were not mutually obligated to arbitrate their claims; and 2) it contains terms unreasonably favorable to Scientology and which were inherently unfair to Plaintiffs.

### 1.    The Parties Were Not Mutually Obligated to Arbitrate

Under Florida law, it is substantively unconscionable for one party to be obligated to arbitrate all its claims while the other party is not obligated to arbitrate all its claims. Here, the arbitration provision required only Plaintiffs to arbitrate their claims against Scientology entities and imposed absolutely no obligation on Scientology entities, such as Defendants, to arbitrate any claims against Plaintiffs. Such a disparity has been held to constitute substantive unconscionability

30

sufficient, with coexisting procedural unconscionability, to render an arbitration agreement enforceable.

In *Bellsouth Mobility LLC v. Christopher*, 819 So.2d 171 (Fla. 4th DCA 2002), the trial court's order compelling arbitration was reversed and remanded for an evidentiary hearing, based on the appellate court's finding that there were indications of substantive unconscionability that required consideration. The court stated (819 So.2d at 173):

> [T]he substance of the arbitration provision seems unduly unfair. Although customers are bound to arbitration, Bellsouth still has the option of pursuing court action in some instances, including the collection of a debt. In short, the clause gives Bellsouth an unfair advantage.

Similarly, in *Palm Beach Motor Cars Ltd., Inc. v. Jeffreys*, 885 So.2d 990 (Fla. 4th DCA 2004), the court affirmed the denial of a defendant's motion to compel arbitration, finding that there was procedural and substantive unconscionability. The finding of substantive unconscionability was based solely on the fact that the arbitration provision bound only the customer to arbitrate all her disputes with the dealership, while the dealership was not required to arbitrate all its claims against her.

Additionally, in *Thompson v. Sunbelt Credit Corp. of Florida*, 2015 WL 11197762 (S.D. Fla. 2015), the court denied a motion to compel arbitration, finding substantive unconscionability as follows:

31

More, the Thompsons have made a strong showing that the ADR Agreement was substantively unconscionable. In particular, the language of that agreement shows that the requirement to arbitrate claims is one-sided: **Paragraphs (1) and (2) ostensibly require both sides to arbitrate any claims relating to the loan, but paragraph (5) allows Sunbelt (in the event of default) to bring any claims in court. This absence of mutual obligation on the key point of the agreement—forcing loan-related claims into arbitration—is exactly the kind of one-sided, oppressive arrangement to which consumers without bargaining power are vulnerable.** [E.S.] (Internal citations omitted).

Similarly, here, it is only Plaintiffs who are compelled to arbitrate any and all claims they have against Scientology, its organization, or its members; the Scientology entities are free to pursue any legal remedy against Plaintiffs. Under Florida law, that is the type of one-sided agreement, which is considered substantially unconscionable.

### 2.    The Arbitration Provision Was Inherently Unfair to Plaintiffs

As noted above, after Plaintiffs left Scientology, they were declared "Suppressive "Persons." Suppressive Persons are former Scientologists engaged in conduct defined as hostile to Scientology. Defendants identified Plaintiffs as Suppressive Persons for, in relevant part: (1) Committing the "high crime of publicly departing this Church"; (2) retaining legal counsel to pursue these claims and; (3) seeking relief in court.

Persons deemed "suppressive", are treated, as follows:

- Suppressive Persons or groups relinquish their rights as Scientologists by their very actions and may not receive the benefit of the Codes of the Church;

- Suppressive Persons have no rights as Scientologists;

- They are considered insane individuals ("true psychotics no matter how 'sane' they sound.." and "…are just very sick people.") and are regarded as enemies with whom Scientologists are at war.

- A Suppressive Person may be deprived of property or injured by any means by any Scientologist without discipline from Scientology.

(DE30 at 14)

Scientologists who associate with Suppressive Persons also face stiff penalties within the church. Church doctrine makes clear that retaliation and harassment will follow any unauthorized contact with a Suppressive Person:

> It is a suppressive act to deal with a declared suppressive person unless you are the named terminal to deal with the SP…continued adherence to a person or group accurately pronounced a suppressive person or group by HCO is a suppressive act.
>
> **To maintain a line with, offer support to, or in any way grant credence to such a [suppressive] person** indicated nothing more than agreement with that person's destructive intentions and acts. Such dealings in fact act as covert or overt attempt [sic] to undermine and negate the ethics and justice strengths of our ecclesiastical structure...to deal with a suppressive is a suppressive act."
>
> **…[T]o deal with [a Suppressive Person] constitutes no less than a Suppressive Act.** Such an act is cause to have levied against you the

33

same per [sic] policy church justice procedures afforded any Suppressive Person. **Full ethics penalties will be applied.** [E.S]

(DE30 at 15).

The significance of these published doctrines is clear since the only requirement of an arbitrator is that he or she must be a Scientologist in good standing. In addition to the obvious hostility such a member is compelled to have against the Plaintiffs, how can a claimant communicate with any such member to select them to be an arbitrator? This was a problem here, as discussed above, was one reason the trial court was required to select the arbitrators.

Defendants claimed that the arbitrators could be neutral because they would be instructed to be fair. It defies common sense to believe that three members of the Church could determine the claims at issue fairly when there is such a deep-rooted doctrinal antipathy and active hostility towards Suppressive Persons. There is no legal principle which would allow for arbitration with arbitrators who are required by religious doctrine to consider Plaintiffs "insane" enemies, not entitled to any rights or benefits as opposed to what they might otherwise employ with non-suppressive persons.

Under Florida law, arbitrators are required to be "no less impartial than a juror sitting in the trial of a cause." *International Ins. Co. v. Schrager*, 593 So.2d 1196 (Fla. 4th DCA 1992), (quoting, *Gaines Construction Co. v. Carol City Utilities*, 164 So.2d 270, 272 (Fla. 3rd DCA 1964)). And like jurors, arbitrators are

disqualified if there are circumstances tending to bias that judgment. *Id.* When jurors indicate grounds for partiality, their assurances that they can be impartial are "properly viewed with some skepticism. *Gore v. State*, 706 So.2d 1328, 1339 (Fla. 1997) (quoting, *Club West v. Tropigas of Fla.*, 514 So.2d 426, 427 (Fla. 3rd DCA 1987)). The same skepticism is mandated here.

Furthermore, in order to be neutral, the arbitrators would not only need to set aside this deep-rooted bias but be willing to risk their own fate within Scientology and within their families. That is because based upon church policies, siding with or granting credence to a suppressive person could subject the arbitrator to being classified as suppressive. While Defendants claim they would instruct the arbitrators to be neutral, they did not say they would be immune from Church sanctions if they granted credence to the Plaintiffs.

Much weaker circumstances indicating bias have been ruled to invalidate a an arbitration agreement. *See Pokorny v. Quixtar, Inc.*, 601 F.3d 987 (9th Cir. 2010) (requiring arbitrators to undergo three-day orientation, which cast defendants in a favorable light, was "decidedly unfair" and substantively unconscionable); *Nitro District Club, Inc. v. Alticor, Inc.*, 2005 WL 6936246 (W.D. Mo. 2005); affirmed on other grounds, 453 F.3d 995 (8th Cir. 2006)(same); *Cannon v. South Atlanta Collision Center*, LLC, 2012 WL 2012 WL 1004914

(N.D. Ga. 2012) (requiring two of three arbitrators to be employees of defendant "grossly unfair" and unconscionable).

Courts have not hesitated to find arbitration agreements unconscionable which were far less biased and one-sided. For instance, in *Hooters of Am., Inc. v. Phillips*, 173 F.3d 933 (4th Cir. 1999), the defendant employer required its employees to arbitrate all disputes with the company. The defendant established arbitration procedures which included allowing each party to select an arbitrator and then those two would select a third. However, all three arbitrators had to be selected from a list established by the defendant. The procedures also allowed the defendant to modify the rules whenever it wished without notice to employees. The Fourth Circuit held that the procedures established by the defendant were a "sham system unworthy even of the name of arbitration …" *Id.* at 940. The court concluded that the system created by the defendant did not allow for the fair resolution of claims by an impartial third party, which is the goal of arbitration. *See also McMullen v. Meijer, Inc.*, 355 F.3d 485 (6th Cir. 2004); *Murray v. United Food & Commercial Workers Intern. Union*, 289 F.3d 297 (4th Cir. 2002).

Here, the situation is far more problematic than that in *Hooters* because Defendants had no procedures for arbitration. As a result, Defendants were free to make up the rules as they go, the very problem condemned in *Hooters*. The problem with the selection of arbitrators is even more pronounced here than in

*Hooters*. Here, all three arbitrators must be selected from a group of Scientologists in good standing who by definition are inherently prejudiced against Plaintiffs pursuant to church doctrine. The absence of defined rules or procedures governing the substantive work of the arbitration panel, coupled with the inherent bias to Plaintiffs as Suppressive Persons, is the very definition of an arbitrary process which offers an illusory remedy, and is therefore unenforceable.

Refusing to enforce this unconscionable arbitration scheme is entirely consistent with the congressional policy underlying the Federal Arbitration Act. While parties may trade the complexities of litigation for the relative simplicity of arbitration, "They do not forego their right to have their dispute resolved by an impartial third party." *Murray v. United Food and Comm. Workers Int. Union*, 289 F.3d 297, 3036 (4th Cir. 2002). As noted in *Hooters* (173 F.3d at 947):

> By promulgating this system of warped rules, Hooters so skewed the process in its favor that Phillips has been denied arbitration in any meaningful sense of the word. To uphold the promulgation of this aberrational scheme under the heading of arbitration would undermine, not advance, the federal policy favoring alternative dispute resolution. This we refuse to do.

The same conclusion should be reached here.

### 3. The Trial Court was not Precluded from Considering Plaintiffs' Claims of Substantive Unconscionability by the First Amendment

Despite the inherent unfairness of Scientology's arbitration scheme, the trial court determined that it could not find substantive unconscionability because to do

so would "constitute a prohibited intrusion into religious doctrine, discipline, faith, and ecclesiastical rule, custom, or law by the court" (DE189 at 20). However, the trial court's reliance on the First Amendment is misplaced.

The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof...." U.S. Const. Amend. I. These provisions limit the role of civil courts in the resolution of internal disputes involving religious organizations. The United States Supreme Court has held that the First Amendment prevents courts from resolving internal church disputes that would require adjudication of questions of religious doctrine. *See Serbian E. Orthodox Diocese v. Milivojevich,* 426 U.S. 696, 708–09 (1976). In other words, civil courts must accept "the decisions of the highest judicatories of a religious organization of hierarchical polity on matters of discipline, faith, internal organization, or ecclesiastical rule, custom, or law." *Id.* at 713. This is referred to as the ecclesiastical abstention doctrine.

However, plaintiffs are not categorically prohibited from ever seeking redress from the courts solely because a religious organization is involved in a dispute. *See Puri v. Khalsa*, 844 F.3d 1152, 1164 (9th Cir. 2017). It is well-established that "the church is not above the law." *Meshel v. Ohev Sholom Talmud Torah*, 869 A.2d 343, 354 (D.C. 2005)(citation omitted). This Court has stated in

*Church of Scientology Flag Service Organization, Inc. v. City of Clearwater*, 2 F.3d 1514, 1544 (11th Cir. 1993):

> **We conclude that the state does indeed have a compelling interest in protecting church members from affirmative, material misrepresentations designed to part them from their money.**
>
> …
>
> The same interests are not diminished by the fact that victims may be voluntary members of a religious association.
>
> …
>
> This is so whether the ill-gotten funds are used for a "legitimate" religious purpose (however that might be defined by civil authorities), for the personal benefit of church leaders or for some other ends.

*See also Cantwell v. Connecticut*, 310 U.S. 296, 306 (1940) ("Nothing we have said is intended event remotely to imply that, under the cloak of religion, persons may, with impunity, commit frauds upon the public.").

Courts are permitted to address such activities of religious organizations without violating the First Amendment. "Specifically, civil courts may resolve disputes involving religious organizations as long as the courts employ 'neutral principles of law' and their decisions are not premised upon their 'consideration of doctrinal matters, whether the ritual and liturgy of worship or the tenets of faith.'" *Mershel, supra, 868 A.2d at 354.* (quoting *Jones v. Wolf*, 443 U.S. 595, 602-04 (1979). Resolution of a dispute would have to involve "extensive inquiry" into "religious law and polity" before the First Amendment would bar a secular court from adjudicating a civil dispute. *See Milivojevich*, 426 U.S. at 709 (1976). Thus, when a church-related dispute can be resolved by applying neutral principles of

39

law without inquiry into religious doctrine and without resolving a religious controversy, the civil courts may adjudicate the dispute. *Jones*, 443 U.S. at 602.

The issue presented here is whether that provision is procedurally and substantively unconscionable under Florida law, which is determined by the circumstances of the execution of the agreement and its terms. Those factors do not require the court to resolve any disputed issue of inquiry into religious doctrine. Here, the treatment of Suppressive Persons by Scientology and its members is undisputed and the court is not being asked to resolve any religious controversy involving it. The only issue related to that was whether, those beliefs being what they are, the arbitrators had the requisite impartiality to decide Plaintiffs' claims.

The District of Columbia Circuit Court of Appeal's decision in *Meshel v. Ohev Sholom Talmud Torah*, 869 A.2d 343 (D.C. 2005) is illustrative here. There, the court considered a motion to compel arbitration between a religious organization and some of its members. The court explained:

> We are fully satisfied that a civil court can resolve appellants' action to compel arbitration according to objective, well-established, neutral principles of law. Although the underlying dispute between the parties goes to the heart of the governing structure of Ohev Sholom and therefore may be beyond the jurisdiction of a civil court, **the resolution of appellants' action to compel arbitration will not require the civil court to determine, or even address, any aspect of the parties' underlying dispute. Instead, the court will have to do no more than make the two findings that are required any time a court considers an action to compel arbitration** pursuant to the District of Columbia Uniform Arbitration Act—namely, **whether the parties have an enforceable agreement to arbitrate and, if so,**

40

> **whether the underlying dispute between the parties falls within the scope of the agreement.** *See Carter v. Cathedral Ave. Coop., Inc.*, 566 A.2d 716, 717–19 (D.C.1989); D.C.Code §§ 16–4301, 16–4302(a) (2001). Each of these determinations is governed by traditional principles of contract law, *American Fed'n of Gov't Employees, Local 3721 v. District of Columbia*, 563 A.2d 361, 362 (D.C.1989), principles that are not only objective and well-established but entirely secular in nature and eminently familiar to lawyers and civil court judges alike.

*Id.* at 354 (emphasis added).

In *Mershel*, the court rejected the contention that consideration of the motion to compel arbitration would impermissibly entangle the court in ecclesiastical matters. The court explained that there was "no material dispute between the parties over the meaning of any of these [religious] terms…" *Id.*

Here, the court was not asked to determine whether Plaintiffs are or should have been declared Suppressive Persons. There is also no dispute as to how Suppressive Persons viewed and treated by Scientology and its members. Plaintiffs only asked the court to determine whether Plaintiffs could receive a fair adjudication in an arbitration given those undisputed facts. Just as in *Meshel*, this could have been done applying neutral principles of law that are "not only objective and well-established but entirely secular in nature and eminently familiar to lawyers and civil court judges alike." *Id.*

Therefore, the First Amendment does not bar the court from considering the substantive unconscionability issue.

## POINT II

### THE TRIAL COURT ERRED IN DENYING PLAINTIFFS' MOTION TO VACATE THE ARBITRATION AWARD.

### Standard of Review

In reviewing orders denying motions to vacate arbitration awards, this Court reviews the district court's findings of fact for clear error and its legal conclusions *de novo. Frazier v. CitiFinancial Corp., LLC*, 604 F.3d 1313, 1321 (11th Cir. 2010).

### Merits

The Federal Arbitration Act ("FAA") provides that a federal district court can vacate an arbitration award in several circumstances. 9 U.S.C. § 10(a). A party has a statutory right to vacate an arbitration, where, *inter alia*:

> (2) there was evident partiality or corruption in the arbitrators, or either of them;
>
> (3) the arbitrators were guilty of misconduct in … refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced.

9 U.S.C. § 10(a); *see also Frazier,* 604 F.3d at 1321.

### A. The Arbitration Award Should have Been Vacated Because there was Evident Partiality or Corruption of the Arbitrators.

As noted above, an arbitration award should be vacated "where there was evident partiality or corruption in the arbitrators." 9 U.S.C. § 10(a)(2). "This rule is

42

meant to be applied stringently" because courts are "'even more scrupulous to safeguard the impartiality of arbitrators than judges, since the former have completely free rein to decide the law as well as the facts and are not subject to appellate review.'" *Univ. Commons-Urbana, Ltd. v. Universal Constructors, Inc.*, 304 F.3d 1331, 1338 (11th Cir. 2002) (quoting *Commonwealth Coatings Corp. v. Cont'l Cas. Co.*, 393 U.S. 145, 149 (1968)).

Evident partiality is shown if "either (1) an actual conflict exists, or (2) the arbitrator knows of, but fails to disclose, information which would lead a reasonable person to believe that a potential conflict exists." *Id.* at 1339. In other words, "'evident partiality' within the meaning of 9 U.S.C. § 10 will be found where a reasonable person would have to conclude that an arbitrator was partial to one party to the arbitration." *Morelite Constr. Corp. v. New York City Dist. Council Carpenters Benefit Funds*, 748 F.2d 79, 84 (2d Cir. 1984); *see also Middlesex Mut. Ins. Co. v. Levine*, 675 F.2d 1197, 1200-02 (11th Cir. 1982) (affirming an order vacating an arbitration award where the arbitrator failed to disclose a substantial dispute with a party that resulted in a bar grievance against the arbitrator). The premise of course is that "any tribunal permitted by law to try cases and controversies not only must be unbiased but also must avoid even the appearance of bias." *Commonwealth Coatings*, 393 U.S. at 149.

43

As discussed thoroughly in Point I above, the partiality of the arbitrators was a foregone conclusion given the fact that all arbitrators were active members of Scientology and Plaintiffs had been declared "suppressive" persons. The partiality was exacerbated at the outset of the arbitration when IJC Mike Ellis spent significant time "training" the arbitrators outside Plaintiffs' presence (DE272-3 at 4-5, 12). During that ex parte conference, the IJC admittedly "hatted" the arbitrators and provided documents to review, including church policies, and a 10-page report from the CVB (which had never been provided to Plaintiffs) (DE272-3 at 8; DE275-3). The IJC also gave the arbitrators two reports from Mr. Garcia's confidential "Priest/penitent Ethics file" (DE 272-3 at 8-9). Those reports were completely irrelevant to the issues in arbitration and intended only to prejudice Plaintiffs in the eyes of the arbitrators.

The fact that the IJC had such unfettered ex parte contact with the arbitration panel demonstrates the evident partiality of the arbitrators. Much more indirect "training" has been ruled to create improper partiality sufficient to invalidate arbitrator selection procedures. *Pokorny v. Quixtar, Inc.*, 601 F.3d 987 (9th Cir. 2010); *Nitro District Club, Inc. v. Alticor, Inc.*, 2005 WL 6936246 (W.D. Mo. 2005) affirmed on other grounds, 453 F.3d 995 (8th Cir. 2006).

Additionally, as discussed above, Plaintiffs had no opportunity to present evidence or their case to the arbitration panel (DE 272 at 4-5, 9-10, 13-15 & 17).

44

Plaintiffs brought several claims, including fraud, violations of the Deceptive and Unfair Trade Practices Act, and breach of contract, some of which involved the Ideal Org program (DE114). The Chairman of the arbitration panel, Peter Sokoloff also told Plaintiffs that once they were declared Suppressive Persons, they ceased to have any rights as Scientologists (DE 272-3 at 16). Before the arbitration began, Chairman Sokoloff stated he was "**a big supporter of the Ideal Org program**" (DE272-3 at 12).

At the end of the arbitration, Mr. Garcia protested that Plaintiffs had not been allowed to present any evidence, witnesses, or their own experiences because the arbitrators did not want to hear about "alleged fraud" (DE 272-3 at 17). Mr. Garcia explained in his affidavit:

> Chairman Sokoloff then exploded in a long platitude that lasted almost five minutes. He kept talking on and on without the slightest interruption by Mr. Ellis. Here are some things Mr. Sokoloff said:
>
>> I am the wrong guy to talk to about that. You don't know anything about me. **I am a big proponent of the Ideal Org program** and when you showed us that **flyer I know what it says is true. I know the numbers! I know the Truth!** We are making a better planet! For some stroke of luck the judge chose me out of a list of 500 people.  And I know what is happening here: **there are a lot of SPs [Suppressive Persons] out there trying to destroy our church** and one of those SPs has fed you all these lies.  **One of your compadres, Ned McCrink, sent me a bunch of sh\*t. I checked it out and it was sh\*t! It was sh\*t!** [I distinctly recall he said that word three times. I had no idea what he was referring to, and "Compadres" means friend in Spanish]. So don't you go

45

telling me that I don't know what is going on because I do know! You have been sold a bill of goods! **What you should do is recant and atone, come back to the church and support it like before!**

(DE272-3 at 17-18)(emphasis added). Chairman Sokoloff's statements demonstrate his evident partiality, which in itself, requires vacatur of the arbitration order. *Schmitz v. Zilveti*, 20 F.3d 1043, 1049 (9th Cir. 1994) ("A finding of evident partiality in one arbitrator generally requires vacaturs of the arbitration award.").

The arbitrators were inherently prejudiced against Plaintiffs and in favor of Defendants as their own immortal souls, livelihoods, relations with friends and family were at risk in deciding this case (DE188-4 at 199). Evidence shows the arbitrators had no ability to be fair and impartial and were unquestionably prejudiced against Plaintiffs before the arbitration ever started. Thus, the trial court erred in refusing to vacate the arbitration based on the evident partiality of the arbitrators.

**B.     The Arbitration Award Should Have Been Vacated Because the Arbitrators Were Guilty of Misconduct.**

> **1.     The arbitrators refused to hear any evidence critical of Scientology and allowed the IJC to present evidence outside Plaintiffs' presence.**

In making evidentiary determination, arbitrators must give the parties "a fundamentally fair hearing." *Rosensweig v. Morgan Stanley & Co., Inc.*, 494 F.3d

1328, 1333 (11th Cir. 2007). This Court must vacate an award when the arbitrator's "refusal to hear pertinent and material evidence prejudices the rights of the parties." *Id.* (quoting *Hoteles Condado Beach, La Concha & Convention Ctr. v. Union De Tronquistas Local 901*, 763 F.2d 34, 40 (1st Cir. 1985). Here, Plaintiffs did not receive a fundamentally fair hearing, as virtually all their evidence was completely ignored.

The trial court prohibited both parties from contacting the arbitrators before the start of arbitration. The trial court warned that it would not countenance either side attempting to influence the arbitrators before the arbitration. Despite this warning, on the day before the arbitration hearing, it is undisputed that Defendants spent also the entire day with the arbitrators, outside the presence of Plaintiffs.

The IJC told Plaintiffs he had to "hat" the arbitrators, a scientology term for training. During the "hatting", the IJC gave the arbitrators numerous documents to review, including the report from the CVB which was dated that day. Plaintiffs had never seen it before. The CVB report stated that the IJC had referred Plaintiffs' request for arbitration to the CVB for response.

The CVB report read like an expert opinion. The CVB report told the arbitration panel, in no uncertain terms, to rule for the church. It provided:

- There is no written evidence supporting the Garcia's claims that their donations for building campaigns were made as a result of false promises;

- Policy is clear that if it is not written it is not true;

- The church is not responsible for statements made by individual staff;

- Luis Garcia seeks a refund for services he elected not to participate in and "admitted he was well aware of the Church's policy on Return of Donations and his responsibility pursuant to the enrollment forms he signed multiple times"; and

- The Garcias failed to follow the steps of dispute resolution set forth in the Enrollment forms and failed to follow the full procedures of the CVB with respect to their claims for refund or repayment of donations for services, and therefore do not qualify for a refund. Building donations and membership donations are not refundable.

(DE272-3 at 27-36). The IJC also gave the arbitrators two reports from Mr. Garcia's confidential "Priest/penitent Ethics File" (DE272-3 at 8) which were completely irrelevant to the arbitration and the IJC intended only to prejudice Plaintiffs.

The IJC's role within Scientology is important in appreciating the importance of his participation in these proceedings and its likely effect on the

48

arbitrators. The IJC is not just another Scientologist. The IJC enforces the dictates of the Church and, on his word alone, any one of the arbitrators could be "declared Suppressive," thereby losing his or her ability to speak to his or her spouse, losing his or her livelihood, and losing all Scientologist friends (DE188 at 1; DE188-3 at 138-41, 157, 159-60, 193; DE188-4 at 184-85, 199).

Given the IJC's unique stature in the hierarchy of Scientology, it was hugely inappropriate, in addition to being a violation of the trial court's order, for the IJC to have extensive ex parte communications with the arbitrators and "train" them outside the presence of Plaintiffs. While the trial court permitted the IJC to instruct the arbitrators on the arbitration process (since there had never been a Scientology arbitration before, the arbitrators had no way of knowing the procedures), the court could not have possibly intended to permit the IJC to have such extreme ex parte contact with the arbitrators. Based on what Defendants represented, the court reasonably expected the IJC would, in the presence of Plaintiffs, tell the arbitrators to be fair, explain the procedures, and then step aside for the arbitrators to take over (DE188-2 at 80-81; DE188-3 at 161, 177; DE184-4 at 222). Instead, the IJC completely controlled the arbitrators and their decision.

Prior to the arbitration, Defendants also told the trial court that Plaintiffs would be given a chance to present their case (DE255 at 13; DE188-3 at 176-78; DE196 at 88, 102). The trial court relied upon these representations in allowing the

arbitration to go forward. (DE265 at 3, n.4) ("For example, [IJC] Ellis has testified that . . . [the Plaintiffs] would be able to 'originate whatever [they] wanted to' in order to present their side of story . . . ."). Yet, the arbitrators refused to allow Plaintiffs to call any witnesses (DE272-3 at 3, 17). In fact, no one other than Plaintiffs were even allowed on the premises (DE272-3 at 2-3, 10, 17; DE 272-5).

During the arbitration, Defendants took the position that the arbitrators were not allowed to hear anything about fraud because it was considered "entheta," despite the fact that Plaintiffs' fraud claim was to be arbitrated (DE272-3 at 4-5, 9-10, 13-15, 17). "Entheta" is a word that means Scientologists cannot hear anything critical of the Church, even if it is true (DE272-3).

Mr. Garcia gave the IJC over 900 pages of documents to present to the arbitration panel (DE272-3 at 5, 7-10). The IJC, redacted all information he felt was "entheta," irrelevant, or otherwise inadmissible, and gave the arbitration panel only 70 of the pages Plaintiffs requested (DE272-3 at 9). Most of the documents the IJC allowed constituted copies of commendations Plaintiffs received for their contributions (DE272-3 at 9). Other pages were highly redacted (DE 272-3 at 9-11; *compare* DE272-3 at 37, unredacted accounting summary of the Orange County Ideal Org. proffered by Plaintiffs, *with* DE 272-3 at 38, the version of this document the IJC redacted and presented to the arbitration panel).

50

When Mr. Garcia was finally permitted to speak to the arbitrators, and mentioned his fraud claims, the IJC cut him off and shouted, "WHAT YOU ARE SAYING IS 'ENTHETA.'" (DE272-3 at 13). The IJC even refused to allow Mr. Garcia to show the arbitration panel a Church flyer as evidence of false statements made in promotional material (DE272-3 at 13, 39). When Mr. Garcia protested that his claims involved fraud, the IJC said they were "**not here to discuss any lawsuit or any claims** in it, but to find out whether or not [Plaintiffs] followed proper church procedure and policy in requesting a refund" (DE272-3 at 13). The Chairman of the arbitration panel admonished Plaintiffs, stating "we **don't want to hear anything about fraud** because it has **nothing to do with the purpose of this arbitration**" (DE272-3 at 14).

The arbitrators excluded all evidence critical of the Church despite its relevancy to Plaintiffs' claims for fraud, deceptive and unfair trade practices, and breach of contract. This deprived Plaintiffs of a fundamentally fair hearing. *See*, *e.g.*, *Rosenweig v. Morgan Stanley & Co.*, 494 F.3d 1328, 1333 (11th Cir. 2007); *Tempo Shain Corp. v. Bertek, Inc.*, 120 F.3d 16, 20 (2d Cir. 1997); *Hoteles Condado Beach, La Concha & Conv. Ctr. v. Union De Tronquistas Local 901*, 763 F.2d 34, 40 (1st Cir. 1985). The decisions in *Tempo Shain*, and *Hoteles*, which this Court cited in *Rosenweig*, demonstrate that the arbitrators' misconduct in excluding evidence requires this Court to vacate the arbitration award.

51

In *Tempo Shain*, the arbitration panel refused to continue the proceedings to allow the testimony of a witness temporarily unavailable due to his wife's illness. 120 F.3d at 17-18. The Second Circuit found this was a sufficient basis to vacate the award in favor of the opposing party. The court explained that "although not required to hear all the evidence proffered by a party, an arbitrator 'must give each of the parties to the dispute an adequate opportunity to present its evidence and argument.'" *Id.* at 20 (quoting *Hoteles*, 763 F.2d at 39). The court concluded that there was no reasonable basis for the panel's conclusion that the testimony would be cumulative especially since no other witness could testify to support the claims.

 The same is true here. The misconduct of the arbitration panel in excluding all evidence critical of the Church left Plaintiffs unable to present any evidence material and relevant to their fraud, breach of contract and unfair consumer practice claims. The arbitrators' misconduct prejudiced Plaintiffs and requires that the award be vacated.

No reasonable person could find that Plaintiffs had a fundamentally fair hearing for their fraud claim when they were precluded from ever mentioning it at arbitration. An arbitration where Plaintiffs' claims could not even be mentioned is certainly not an adequate substitute for a civil action. Upholding this arbitration award would violate the underlying policy of the FAA and would immunize the

Church against any civil wrong that suggest misconduct by the Church. The proceeding here was a sham and the arbitration award must be vacated.

### 2. The Arbitrators Committed Misconduct in Limiting Consideration of Plaintiffs' Claims in Violation of Defendants' Prior Representations to the Court

#### a. Defendants framed the issue opposite of how it told the trial court it would in defending its right to arbitrate.

Before the arbitration, Defendants expressly explained to the trial court that the CVB was not at issue because it did not apply under the facts of the case (DE196 at 88-89). At the beginning of the arbitration, Defendants did a complete 180-degree reversal, telling Plaintiffs that the only issue to be arbitrated was whether Plaintiffs followed the CVB procedures for requesting a refund from the Church (DE272-3 at 11, 13-14). Consistent with this new position, the only questions the arbitrators asked Mr. Garcia pertained to why he did not fill out the CVB form (DE272-3 at 12-18). Furthermore, the so-called findings of the arbitrators refer only to Plaintiffs' failure to fill out the CVB form (DE272-1, 2).

It is undisputed that Plaintiffs could not have filled out the CVB form because they had been declared suppressive persons (DE188-3 at 147-48, 151). The form has to be filled out on church property and once declared Suppressive Persons, Plaintiffs were not permitted on Church property (DE188-3 at 147-48, 151). This "Catch 22" makes it impossible for anyone declared suppressive to follow the CVB procedure (*Id.*; DE272-3 at 16, 25-26).

Defendants also misled the trial court as to the nature of the arbitration proceedings. The court specifically asked Defendants whether it made any sense to order arbitration if Defendants were going to take the position that the failure to fill out that form was dispositive (DE196 at 88-89). Defendants responded that the court should order arbitration because the form was inapplicable (DE196 at 88-89). Yet, that was the only matter the arbitrators considered (DE272-3 at 11, 12-18). This was a fraud on the Court and should not be countenanced by confirming the arbitration awards.

> **b.    Defendants refused to allow Plaintiffs' counsel to participate in the proceedings.**

At his deposition, the IJC testified that while Plaintiffs' counsel would not be permitted to take an active part in the proceedings, he would be able to be present to advise Plaintiffs (DE188-4 at 194-95). The trial court relied on this testimony in granting the Motion to Compel Arbitration (DE 265 at 3 n.3).

Shortly before the arbitration, the Church reversed its position, stating:

The arbitration will be conducted in accordance with Church ecclesiastical justice procedures and **those procedures do not contemplate participation by an attorney.**

The arbitrators will be instructed by the International Justice Chief on the application of Scientology principles to arbitrate this dispute in a neutral and fair manner.

(DE272-5 at 2). A week later, defense counsel reiterated that the Plaintiffs' counsel had no role in the arbitration:

> As we have stated repeatedly and as the court has just reiterated, the arbitration is an "ecclesiastical arbitration" and the conduct and procedures of the arbitration are within the control and discretion of the IJC in accordance with Church ecclesiastical procedures [and] principles." **It is not a matter to be negotiated with between the civil lawyers, who have no role to play at the arbitration**. If Mr. Garcia has a question about the arbitration, he should address it to the IJC at that time.

(DE272-5 at 4). Based on those communications, Plaintiffs' counsel did not attend the arbitration (DE272-3 at 10).

While Plaintiff's attorney did not attend, Attorney Gary Soter, who represented the IJC during his deposition, was present in the building to advise Defendants during the arbitration (DE272-3 at 6-7, 10). It was fundamentally unfair to permit Defendants to have their lawyer present to advise them, but to deny Plaintiffs a similar right to counsel

In addition to prohibiting Plaintiffs from having an attorney present, Defendants refused to allow Mr. Garcia to have an assistant to help him read documents (DE272-3 at 2-3), which, as explained to the ICJ, he needs due to a medical condition (*Id.* at 3 & attached Ex. A). This misconduct prejudiced Plaintiffs, justifying vacatur of the arbitration award.

<blockquote>

c.    **Defendants failed to provide written findings of the arbitrators despite assuring the trial court that such would be provided.**

</blockquote>

During the proceedings on the Motion to Compel Arbitration, Defendants assured the trial court that "a **report is written up** with a binding decision"

(DE196 at 87-89). Defendants reiterated this multiple times, stating "[t]here is a report that comes out of the process" (DE196 at 88), "it does result in a final report and decision" (DE196 at 89), and "they wind up producing a report" (DE255 at 9). Thus, the court was under the impression that there would be formal findings and conclusions for it to review and decide whether there was misconduct or inherent prejudice of the arbitrators.

In fact, no such findings were rendered. To the contrary, the only documents to come out of the arbitration were checklists prepared the day before the arbitration began and signed the day the arbitration ended (DE 272-1, 2). Nothing in the checklists outlines the testimony and evidence received or how the "findings" were determined. Furthermore, the checklists referred only to the CVB procedures, which Defendants represented to the court would **not** be an issue at the arbitration.

The trial court rejected Plaintiffs' request for a court reporter at the arbitration (DE265). Plaintiffs believe the trial court's decision was influenced, in part, by Defendants' multiple representations that the arbitrators would prepare formal findings for the court to review (DE 265; DE 255 at 9; DE 196 at 86). Defendants' false representations fatally infected the trial court's decision not to allow a court reporter. As a result, there is no record of the arbitration proceedings.

This misconduct, coupled with the lack of findings, warrants this Court vacating the arbitration awards.

## C. The First Amendment Did Not Prevent Vacatur of the Arbitration Award

For the reasons explained in part B.3. of Point I, the First Amendment did not compel the trial court to deny Plaintiffs' Motion to Vacate the Arbitration Award. There were no issues of religious doctrine at issue in the arbitrators' decision. Furthermore, this Court has ruled that the state has a "compelling interest" in protecting the public, even church members from misconduct by religious organizations in soliciting funds, *Church of Scientology*, *supra*, 2 F.3d at 1544. The trial court's ruling, if upheld immunizes the Defendants from any regulation of such activity, which cannot be justified under any legal principle. This sham arbitration procedure and fatally flawed result must be rejected and the trial court's order must be reversed.

## CONCLUSION

For the reasons stated above, the orders of the district court should be reversed and the cause remanded for Plaintiffs to litigate their claims against the Defendants.

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a)</u>

Appellants hereby certify that the Initial Brief of Appellants complies with the type-volume limitation set forth in Federal Rule of Appellate Procedure 32(a)(7)(B).  This brief contains 12,834 words.

 /s/ Philip M. Burlington<br>
PHILIP M. BURLINGTON<br>
Florida Bar No. 285862

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true copy of the foregoing has been electronically filed with this Court via CM/ECF and was furnished to all counsel on the attached service list by e-mail on April 3, 2019.

> Theodore Babbitt, Esq.
> Babbitt & Johnson, P.A.
> 1641 Worthington Road, Suite 100
> West Palm Beach, FL  33409
> tedbabbitt@babbitt-johnson.com
>                    and
> Robert E. Johnson, Esq.
> GRAYROBINSON, P.A.
> 401 E. Jackson Street, Suite 2700
> Tampa, FL 33601
> rjohnson@gray-robinson.com
> valerie.taylor@gray-robinson.com
>                    and
> BURLINGTON & ROCKENBACH, P.A.
> 444 West Railroad Avenue, Ste. 350
> West Palm Beach, FL  33401
> (561) 721-0400
> Attorneys for Appellants
> pmb@FLAppellateLaw.com
> kbt@FLAppellateLaw.com
>
> By:/s/ Philip M. Burlington
>      PHILIP M. BURLINGTON
>      Florida Bar No. 285862

/kbt

## <u>SERVICE LIST</u>

<u>Garcia v. Church of Scientology, etc., et al.</u>
Case No. 18-13452-B

**Robert V. Potter, Esq.**
**F. Wallace Pope, Jr., Esq.**
Johnson Pope Bokor
Ruppel & Burns L.L.P.
Post Office Box 1368
Clearwater, FL 33757
(727) 461-1818
bobp@jpfirm.com
wallyp@jpfirm.com
Attorneys for Appellees

**Eric M. Lieberman, Esq.**
Rabinowitz, Boudin, Standard,
Krinsky & Lieberman, P.C.
14 Wall St., Ste. 3002
New York, NY 10005
(212) 254-1111
elieberman@rbskl.com
Attorneys for Appellees