UNITED STATES CIRCUIT COURT OF APPEALS

ELEVENTH CIRCUIT

CASE NO. 18-13452-B

MARIA DEL ROCIO BURGOS
GARCIA and LUIS A. GARCIA SAZ,

     Appellants,

vs.

CHURCH OF SCIENTOLOGY FLAG
SERVICE ORGANIZATION, INC.
and CHURCH OF SCIENTOLOGY
FLAG SHIP ORGANIZATION, INC.

     Appellees.

_____/

## <u>APPENDIX TO INITIAL BRIEF OF APPELLANTS</u>

On appeal from the United States District Court, Middle District of Florida

Babbitt & Johnson, P.A.
1641 Worthington Road, Suite 100
West Palm Beach, FL 33409
tedbabbitt@babbitt-johnson.com
    and
GRAYROBINSON, P.A.
401 E. Jackson Street, Suite 2700
Tampa, FL 33601
rjohnson@gray-robinson.com
valerie.taylor@gray-robinson.com

BURLINGTON & ROCKENBACH, P.A.
444 West Railroad Avenue, Ste. 350
West Palm Beach, FL 33401
(561) 721-0400
Attorneys for Appellants
pmb@FLAppellateLaw.com
kbt@FLAppellateLaw.com

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Appellants, MARIA DEL ROCIO BURGOS GARCIA and LUIS A. GARCIA SAZ, pursuant to E.R.P. 26.1, and 11th Cir. R. 26.1-3, hereby submit this Certificate of Interested Persons and Corporate Disclosure Statement, as follows:

Babbitt, Theodore – Counsel for Appellants

Babbitt & Johnson, P.A. – Counsel for Appellants

Burlington & Rockenbach, P.A – Counsel for Appellants

Burlington, Philip M. – Counsel for Appellants

Church of Scientology Flag Service Organization, Inc. – Appellee

Church of Scientology of Flag Ship Service Organization, Inc. – Appellee

Deixler, Bert H. – Counsel for Appellees

Garcia, Maria Del Rocio Burgos – Appellant

Johnson, Pope, Bokor, Ruppel & Burns, LLP – Counsel for Appellees

Johnson, Robert E. – Counsel for Appellants

GrayRobinson, P.A. – Counsel for Appellants

Lieberman, Eric M. – Counsel for Appellees

Rabinowitz, Boudin, Standard, Krinsky & Lieberman – Counsel for Appellees

Pope, F. Wallace, Jr. – Counsel for Appellees

Potter, Robert Vernon – Counsel for Appellees

Saz, Luis A. Garcia – Appellant

Weil, Quaranta, McGovern, P.A. – Counsel for Appellants

Weil, Ronald P.  – Counsel for Appellants

Weil, Snyder, Schweikert & Ravindran, P.A. – Counsel for Appellants

Whittemore, James D. – U.S. Middle District Court Judge

# INDEX OF APPENDIX

|  | **Docket/Tab #** |
|---|---|
| District Court Docket Sheet | A |
| Complaint, dated January 23, 2013 | 1 |
| Amended Complaint, dated May 12, 2014 | 114 |
| Joint Motion and Memorandum of Served Defendants to Compel Arbitration and to Stay Proceedings, dated March 6, 2013 | 8 |
| Plaintiffs' Response and Memorandum of Law in Opposition to Defendants' Joint Motion to Compel Arbitration and to Stay Proceedings, dated April 22, 2013 | 30 |
| Renewed Motion to Compel Arbitration and to Stay Proceedings of Flag Church and Ship Church Regarding Amended Complaint, dated June 15, 2014 | 120 |
| Order on Motion to Compel Arbitration, dated March 13, 2015 | 189 |
| Plaintiffs' Amended Motion to Vacate Arbitration Awards and Incorporated Memorandum of Law, dated January 23, 2018[1] | 272 |
| Defendants' Opposition to Motion to Vacate Arbitration Awards, dated February 20, 2018 | 275 |
| Order on Motion to Vacate, dated July 17, 2018 | 282 |

---

[1] Exhibits to Docket No. 272 are referenced in Appellant's Initial Brief; however, due to size, they are not included in this Appendix.

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a copy of the foregoing has been electronically filed with this Court via CM/ECF, and has been furnished to all counsel on the attached service list, by email, on April 8, 2019.

> Theodore Babbitt, Esq.
> Babbitt & Johnson, P.A.
> 1641 Worthington Road, Suite 100
> West Palm Beach, FL 33409
> tedbabbitt@babbitt-johnson.com
>      and
> Robert E. Johnson, Esq.
> GRAYROBINSON, P.A.
> 401 E. Jackson Street, Suite 2700
> Tampa, FL 33601
> rjohnson@gray-robinson.com
> valerie.taylor@gray-robinson.com
>      and
> BURLINGTON & ROCKENBACH, P.A.
> 444 West Railroad Avenue, Ste. 350
> West Palm Beach, FL 33401
> (561) 721-0400
> Attorneys for Appellants
> pmb@FLAppellateLaw.com
> kbt@FLAppellateLaw.com
>
> By:/s/ Philip M. Burlington
>     PHILIP M. BURLINGTON
>     Florida Bar No. 285862

/kbt

5

## **SERVICE LIST**

<u>Garcia v. Church of Scientology, etc., et al.</u>
Case No. 18-13452-B

**Robert V. Potter, Esq.**
**F. Wallace Pope, Jr., Esq.**
Johnson Pope Bokor
Ruppel & Burns L.L.P.
Post Office Box 1368
Clearwater, FL 33757
(727) 461-1818
bobp@jpfirm.com
wallyp@jpfirm.com
Attorneys for Appellees

**Eric M. Lieberman, Esq.**
Rabinowitz, Boudin, Standard,
Krinsky & Lieberman, P.C.
14 Wall St., Ste. 3002
New York, NY 10005
(212) 254-1111
elieberman@rbskl.com
Attorneys for Appellees

# U.S. District Court
## Middle District of Florida (Tampa)
## CIVIL DOCKET FOR CASE #: 8:13-cv-00220-JDW-TBM

| | |
|---|---|
| Garcia Saz et al v. Church of Scientology Religious Trust et al | Date Filed: 01/23/2013 |
| Assigned to: Judge James D. Whittemore | Date Terminated: 03/13/2015 |
| Referred to: Magistrate Judge Thomas B. McCoun III | Jury Demand: Plaintiff |
| Case in other court: 11th Circuit, 15-12577-D | Nature of Suit: 190 Contract: Other |
|                 11th Circuit, 18-13452-AA | Jurisdiction: Diversity |
|                 11th Circuit, 18-13452-B | |
| Cause: 28:1332 Diversity-Other Contract | |

**Plaintiff**

**Maria Del Rocio Burgos Garcia**          represented by    **Amanda Sundarsingh**
Babbitt, Johnson, Osborne & Leclainche, PA
Suite 100
1641 Worthington Rd
West Palm Beach, FL 33409
561/684-2500
Email: asundarsingh@babbitt-johnson.com
*TERMINATED: 02/15/2017*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John M Quaranta**
Quaranta PA
255 Alhambra Circle
Suite 1150
Coral Gables, FL 33134
786-372-6522
Fax: 305-350-2525
Email: john.quaranta@quaranta.law
*TERMINATED: 10/26/2018*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert Ernest Johnson**
GrayRobinson, PA
401 E Jackson St Ste 2700
Tampa, FL 33602-5233
813-273-5026
Fax: 813-273-5145
Email: rjohnson@gray-robinson.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ronald P. Weil**
Weil, Quaranta, McGovern, PA

Suite 900
200 S Biscayne Blvd
Miami, FL 33131
305/372-5352
Fax: 305/372-5355
Email: rweil@weillawfirm.net
*TERMINATED: 10/26/2018*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Theodore Babbitt**
Babbitt, Johnson, Osborne & Leclainche,
PA
Suite 100
1641 Worthington Rd
West Palm Beach, FL 33409
561/684-2500
Email: tedbabbitt@babbitt-johnson.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amanda Marie McGovern**
Weil, Quaranta, McGovern, PA
Suite 900
200 S Biscayne Blvd
Miami, FL 33131
305/372-5352
Fax: 305/372-5355
Email: amcgovern@wqmlaw.net
*TERMINATED: 10/26/2018*
*ATTORNEY TO BE NOTICED*

**Jane Kreusler-Walsh**
Kreusler-Walsh, Vargas & Serafin, P.A.
Suite 503
501 S Flagler Dr
West Palm Beach, FL 33401
561/659-5455
Email: janewalsh@kwvsappeals.com
*ATTORNEY TO BE NOTICED*

**Rebecca Mercier Vargas**
Kreusler-Walsh, Vargas & Serafin, P.A.
Suite 503
501 S Flagler Dr
West Palm Beach, FL 33401
561-659-5455
Email: rvargas@kwvsappeals.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Luis A. Garcia Saz**    represented by    **Amanda Sundarsingh**
(See above for address)
*TERMINATED: 02/15/2017*

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John M Quaranta**
(See above for address)
*TERMINATED: 10/26/2018*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph R. Johnson**
Babbitt, Johnson, Osborne & Leclainche,
PA
Suite 100
1641 Worthington Rd
West Palm Beach, FL 33409
561/684-2500
Fax: 561/684-6308
Email: jjohnson@babbitt-johnson.com
*LEAD ATTORNEY*

**Robert Ernest Johnson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ronald P. Weil**
(See above for address)
*TERMINATED: 10/26/2018*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Theodore Babbitt**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amanda Marie McGovern**
(See above for address)
*TERMINATED: 10/26/2018*
*ATTORNEY TO BE NOTICED*

**Jane Kreusler-Walsh**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rebecca Mercier Vargas**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**<u>Defendant</u>**

**Church of Scientology Religious Trust**      represented by **F. Wallace Pope , Jr.**

*a tax exempt trust doing business in Florida*
*TERMINATED: 05/12/2014*

Johnson, Pope, Bokor, Ruppel & Burns,
LLP
911 Chestnut St
PO Box 1368
Clearwater, FL 33757
727/461-1818
Fax: 727-441-8617
Email: wallyp@jpfirm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lee Fugate**
Zuckerman Spaeder, LLP
Suite 1200
101 E Kennedy Blvd
Tampa, FL 33602
813/221-1010
Fax: 813/223-7961
Email: lfugate@zuckerman.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert Vernon Potter**
Johnson, Pope, Bokor, Ruppel & Burns,
LLP
911 Chestnut St
PO Box 1368
Clearwater, FL 33757
727/461-1818
Fax: 727/441-8617
Email: Bobp@jpfirm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jack E. Fernandez , Jr.**
Zuckerman Spaeder, LLP
Suite 1200
101 E Kennedy Blvd
Tampa, FL 33602
813/221-1010
Fax: 813/223-7961
Email: jfernandez@zuckerman.com
*ATTORNEY TO BE NOTICED*

**Mamie Wise**
US Attorney's Office - FLM
Suite 3200
400 N Tampa St
Tampa, FL 33602-4798
813/274-6000
Fax: 813/274-6200
Email: Mamie.Wise@usdoj.gov
*ATTORNEY TO BE NOTICED*

Nathan Michael Berman
Zuckerman Spaeder, LLP
Suite 1200
101 E Kennedy Blvd
Tampa, FL 33602
813/221-1010
Fax: 813/223-7961
Email: nberman@zuckerman.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Church of Scientology Flag Service
Organization, Inc.**
*a Florida nonprofit corporation*

represented by **Bert H. Deixler**
Kendall Brill & Kleiger LLP
10100 Santa Monica Blvd Ste 1725
Los Angeles, CA 90067
310/556-2700
Fax: 310/556-2705
Email: bdeixler@kbkfirm.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**F. Wallace Pope , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert Vernon Potter**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Church of Scientology Flag Ship Service
Organization, Inc.**
*a foreign corporation doing business in
Florida*
doing business as
Magestic Cruise Lines

represented by **Bert H. Deixler**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**F. Wallace Pope , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert Vernon Potter**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**IAS Administrations, Inc.**
*a foreign nonprofit corporation doing*

represented by **F. Wallace Pope , Jr.**
(See above for address)
*LEAD ATTORNEY*

*business in Florida*
*TERMINATED: 05/12/2014*

*ATTORNEY TO BE NOTICED*

**Marie Tomassi**
Trenam Kemker
Suite 1600
200 Central Ave
St Petersburg, FL 33701
727/820-3952
Fax: 727/820-0835
Email: mtomassi@trenam.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert Vernon Potter**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**U.S. IAS Members Trust**
*a tax exempt trust doing business in Florida*
*TERMINATED: 05/12/2014*

represented by **F. Wallace Pope , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Marie Tomassi**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert Vernon Potter**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Material Witness**

**Church of Scientology International and Mike Ellis**

represented by **F. Wallace Pope , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert Vernon Potter**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|------------|---|-------------|
| 01/23/2013 | 1 | COMPLAINT against Church of Scientology Flag Service Organization, Inc., Church of Scientology Flag Ship Service Organization, Inc., Church of Scientology Religious Trust, IAS Administrations, Inc., U.S. IAS Members Trust with Jury Demand (Filing fee $ 350 receipt number TPA-15445) filed by Maria Del Rocio Burgos Garcia, Luis A. Garcia Saz. (Attachments: # 1 Civil Cover Sheet)(DG) (Entered: 01/23/2013) |

| 01/23/2013 | 2 | SUMMONS issued as to Church of Scientology Flag Service Organization, Inc., Church of Scientology Flag Ship Service Organization, Inc., IAS Administrations, Inc. (DG) (Entered: 01/23/2013) |
| --- | --- | --- |
| 01/24/2013 | 3 | NOTICE of designation under Local Rule 3.05 - Track 2 (AO) (Entered: 01/24/2013) |
| 01/25/2013 | 4 | WRONG EVENT CODE NOT A MOTION. Disclosure *Pursuant to Rule 7.1* by Luis A. Garcia Saz. (Johnson, Joseph) Motions referred to Magistrate Judge Thomas B. McCoun III. Modified on 1/31/2013 (BSN). (Entered: 01/25/2013) |
| 02/12/2013 | 5 | SUMMONS issued as to Church of Scientology Religious Trust, U.S. IAS Members Trust. (BSN) (Entered: 02/12/2013) |
| 02/25/2013 | 6 | Joint MOTION for Leave to File Excess Pages *To File Joint Response to Complaint and to Exceed the Twenty-Five (25) Page Limit* by Church of Scientology Flag Service Organization, Inc., Church of Scientology Flag Ship Service Organization, Inc., IAS Administrations, Inc.. (Pope, F.) (Entered: 02/25/2013) |
| 02/26/2013 | 7 | ENDORSED ORDER granting in part and denying in part 6 Joint Motion to File Joint Response to Complaint and to Exceed the Twenty-Five (25) Page Limit. The moving Defendants may file a single joint motion to compel arbitration, with an incorporated memorandum of law, not to exceed 25 pages, including the signature page and certificate of service. Signed by Judge James D. Whittemore on 2/26/2013. (KE) (Entered: 02/26/2013) |
| 03/06/2013 | 8 | Joint MOTION to compel arbitration *and to Stay Proceedings* by Church of Scientology Flag Service Organization, Inc., Church of Scientology Flag Ship Service Organization, Inc., IAS Administrations, Inc.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 1, # 3 Exhibit 1, # 4 Exhibit 1, # 5 Exhibit 2, # 6 Exhibit 2, # 7 Exhibit 2, # 8 Exhibit 2, # 9 Exhibit 2, # 10 Exhibit 2, # 11 Exhibit 2, # 12 Exhibit 2, # 13 Exhibit 3, # 14 Exhibit 4, # 15 Exhibit 5, # 16 Exhibit 6, # 17 Exhibit 7)(Pope, F.) (Entered: 03/06/2013) |
| 03/07/2013 | 9 | NOTICE of Appearance by Marie Tomassi on behalf of IAS Administrations, Inc. (Tomassi, Marie) (Entered: 03/07/2013) |
| 03/13/2013 | 10 | Unopposed MOTION for Extension of Time to File Response/Reply as to 8 Joint MOTION to compel arbitration *and to Stay Proceedings* by Maria Del Rocio Burgos Garcia, Luis A. Garcia Saz. (Quaranta, John) Motions referred to Magistrate Judge Thomas B. McCoun III. (Entered: 03/13/2013) |
| 03/15/2013 | 11 | ENDORSED ORDER granting 10 Motion for Extension of Time to File Response to Joint Motion to Compel Arbitration. Response due by 4/22/2013. Signed by Judge James D. Whittemore on 3/15/2013. (KE) (Entered: 03/15/2013) |
| 04/02/2013 | 12 | NOTICE of Appearance by Lee Fugate on behalf of Church of Scientology Religious Trust (Fugate, Lee) (Entered: 04/02/2013) |
| 04/02/2013 | 13 | NOTICE of Appearance by Mamie Wise on behalf of Church of Scientology Religious Trust (Wise, Mamie) (Entered: 04/02/2013) |
| 04/02/2013 | 14 | NOTICE of Appearance by Nathan Michael Berman on behalf of Church of Scientology Religious Trust (Berman, Nathan) (Entered: 04/02/2013) |
| 04/02/2013 | 15 | MOTION to compel arbitration *and Stay Proceedings* by Church of Scientology Religious Trust. (Berman, Nathan) (Entered: 04/02/2013) |
| 04/02/2013 | 16 | NOTICE of Appearance by Jack E. Fernandez, Jr on behalf of Church of Scientology Religious Trust (Fernandez, Jack) (Entered: 04/02/2013) |
| 04/12/2013 | 17 | NOTICE of Appearance by Marie Tomassi on behalf of U.S. IAS Members Trust |

| | | |
|---|---|---|
| | | (Tomassi, Marie) (Entered: 04/12/2013) |
| 04/12/2013 | 18 | MOTION to compel arbitration *and Memorandum and Stay Proceedings* by U.S. IAS Members Trust. (Attachments: # 1 Exhibit A)(Tomassi, Marie) (Entered: 04/12/2013) |
| 04/22/2013 | 19 | NOTICE by Maria Del Rocio Burgos Garcia, Luis A. Garcia Saz *of Filing* (Attachments: # 1 Affidavit Luis Garcia Pages 1-10)(Quaranta, John) (Entered: 04/22/2013) |
| 04/22/2013 | 20 | NOTICE by Maria Del Rocio Burgos Garcia, Luis A. Garcia Saz *of Filing* (Attachments: # 1 Affidavit Luis Garcia Pages 11-20, # 2 Affidavit Luis Garcia Pages 21-30)(Quaranta, John) (Entered: 04/22/2013) |
| 04/22/2013 | 21 | NOTICE by Maria Del Rocio Burgos Garcia, Luis A. Garcia Saz *of Filing* (Attachments: # 1 Affidavit Luis Garcia Pages 31-40)(Quaranta, John) (Entered: 04/22/2013) |
| 04/22/2013 | 22 | NOTICE by Maria Del Rocio Burgos Garcia, Luis A. Garcia Saz *of Filing* (Attachments: # 1 Affidavit Luis Garcia Pages 41-46)(Quaranta, John) (Entered: 04/22/2013) |
| 04/22/2013 | 23 | NOTICE by Maria Del Rocio Burgos Garcia, Luis A. Garcia Saz *of Filing* (Attachments: # 1 Affidavit Luis Garcia Pages 47-50)(Quaranta, John) (Entered: 04/22/2013) |
| 04/22/2013 | 24 | NOTICE by Maria Del Rocio Burgos Garcia, Luis A. Garcia Saz *of Filing* (Attachments: # 1 Affidavit Luis Garcia Pages 51-54)(Quaranta, John) (Entered: 04/22/2013) |
| 04/22/2013 | 25 | NOTICE by Maria Del Rocio Burgos Garcia, Luis A. Garcia Saz *of Filing* (Attachments: # 1 Affidavit Luis Garcia Pages 55-59)(Quaranta, John) (Entered: 04/22/2013) |
| 04/22/2013 | 26 | NOTICE by Maria Del Rocio Burgos Garcia, Luis A. Garcia Saz *of Filing* (Attachments: # 1 Affidavit Luis Garcia Pages 60-65)(Quaranta, John) (Entered: 04/22/2013) |
| 04/22/2013 | 27 | NOTICE by Maria Del Rocio Burgos Garcia, Luis A. Garcia Saz *of Filing* (Attachments: # 1 Affidavit Randall Wise, # 2 Affidavit Nancy Wise)(Quaranta, John) (Entered: 04/22/2013) |
| 04/22/2013 | 28 | NOTICE by Maria Del Rocio Burgos Garcia, Luis A. Garcia Saz *of Filing* (Attachments: # 1 Affidavit Karry S. Campbell, # 2 Affidavit Scott E. Campbell, # 3 Affidavit Mark Rathbun)(Quaranta, John) (Entered: 04/22/2013) |
| 04/22/2013 | 29 | NOTICE by Maria Del Rocio Burgos Garcia, Luis A. Garcia Saz *of Filing* (Attachments: # 1 Affidavit Donald Koon, # 2 Affidavit Christie Collbran, # 3 Affidavit Bert Schippers, # 4 Affidavit Hadyn James)(Quaranta, John) (Entered: 04/22/2013) |
| 04/22/2013 | 30 | RESPONSE in Opposition re 8 Joint MOTION to compel arbitration *and to Stay Proceedings* filed by Maria Del Rocio Burgos Garcia, Luis A. Garcia Saz. (Quaranta, John) (Entered: 04/22/2013) |
| 04/23/2013 | 31 | NOTICE by Maria Del Rocio Burgos Garcia, Luis A. Garcia Saz *of Filing* (Attachments: # 1 Affidavit Luis Garcia (Corrected))(Quaranta, John) (Entered: 04/23/2013) |
| 04/23/2013 | 32 | NOTICE by Maria Del Rocio Burgos Garcia, Luis A. Garcia Saz *of Filing* (Attachments: # 1 Affidavit Mark Rathbun (Corrected))(Quaranta, John) (Entered: 04/23/2013) |
| 04/24/2013 | 33 | MOTION for leave to file Defendants' Opposed Motion for Leave to File 10 Page Reply Memorandum by Church of Scientology Flag Service Organization, Inc., Church of Scientology Flag Ship Service Organization, Inc.. (Pope, F.) (Entered: 04/24/2013) |
| 04/24/2013 | 34 | RESPONSE in Opposition re 33 MOTION for leave to file Defendants' Opposed Motion for Leave to File 10 Page Reply Memorandum filed by Maria Del Rocio Burgos Garcia, Luis A. Garcia Saz. (Babbitt, Theodore) (Entered: 04/24/2013) |
| 04/25/2013 | 35 | ENDORSED ORDER denying 33 Motion for Leave to File. Signed by Judge James D. |

| | | Whittemore on 4/25/2013. (Whittemore, James) (Entered: 04/25/2013) |
|---|---|---|
| 05/10/2013 | 36 | MOTION to Disqualify Counsel *Motion to Disqualify Plaintiffs' Counsel and Certificate of Compliance wiht Rule 3.01(g)* by Church of Scientology Flag Service Organization, Inc., Church of Scientology Flag Ship Service Organization, Inc.. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit)(Pope, F.) Motions referred to Magistrate Judge Thomas B. McCoun III. (Entered: 05/10/2013) |
| 05/15/2013 | 37 | Joint MOTION to Disqualify Counsel *of Plaintiff by Church of Scientology Religious Trust and* by IAS Administrations, Inc., U.S. IAS Members Trust. (Tomassi, Marie) Motions referred to Magistrate Judge Thomas B. McCoun III. (Entered: 05/15/2013) |
| 05/28/2013 | 38 | MEMORANDUM in opposition re 37 Motion to Disqualify Counsel filed by Maria Del Rocio Burgos Garcia, Luis A. Garcia Saz. (Quaranta, John) (Entered: 05/28/2013) |
| 05/28/2013 | 39 | DECLARATION of Robert Johnson Part 1 re 38 Memorandum in opposition by Maria Del Rocio Burgos Garcia, Luis A. Garcia Saz. (Quaranta, John) (Entered: 05/28/2013) |
| 05/28/2013 | 40 | DECLARATION of Robert Johnson Part 2 re 38 Memorandum in opposition by Maria Del Rocio Burgos Garcia, Luis A. Garcia Saz. (Quaranta, John) (Entered: 05/28/2013) |
| 05/28/2013 | 41 | DECLARATION of Robert Johnson Part 3 re 38 Memorandum in opposition by Maria Del Rocio Burgos Garcia, Luis A. Garcia Saz. (Quaranta, John) (Entered: 05/28/2013) |
| 05/28/2013 | 42 | DECLARATION of Robert Johnson Part 4 re 38 Memorandum in opposition by Maria Del Rocio Burgos Garcia, Luis A. Garcia Saz. (Quaranta, John) (Entered: 05/28/2013) |
| 05/28/2013 | 43 | DECLARATION of Robert Johnson Part 5 re 38 Memorandum in opposition by Maria Del Rocio Burgos Garcia, Luis A. Garcia Saz. (Quaranta, John) (Entered: 05/28/2013) |
| 05/28/2013 | 44 | DECLARATION of Robert Johnson Part 6 re 38 Memorandum in opposition by Maria Del Rocio Burgos Garcia, Luis A. Garcia Saz. (Quaranta, John) (Entered: 05/28/2013) |
| 05/28/2013 | 45 | DECLARATION of Ted Babbitt re 38 Memorandum in opposition by Maria Del Rocio Burgos Garcia, Luis A. Garcia Saz. (Quaranta, John) (Entered: 05/28/2013) |
| 05/28/2013 | 46 | DECLARATION of Ron Weil re 38 Memorandum in opposition by Maria Del Rocio Burgos Garcia, Luis A. Garcia Saz. (Quaranta, John) (Entered: 05/28/2013) |
| 05/28/2013 | 47 | DECLARATION of Mike Rinder re 38 Memorandum in opposition by Maria Del Rocio Burgos Garcia, Luis A. Garcia Saz. (Quaranta, John) (Entered: 05/28/2013) |
| 05/28/2013 | 48 | DECLARATION of Mark Rathbun re 38 Memorandum in opposition by Maria Del Rocio Burgos Garcia, Luis A. Garcia Saz. (Quaranta, John) (Entered: 05/28/2013) |
| 06/25/2013 | 49 | NOTICE of supplemental authority by Church of Scientology Flag Service Organization, Inc., Church of Scientology Flag Ship Service Organization, Inc. (Attachments: # 1 Exhibit A)(Pope, F.) (Entered: 06/25/2013) |
| 06/25/2013 | 50 | ORDER Setting Hearing on Plaintiffs' 36 MOTION to Disqualify Counsel and Certificate of Compliance with Rule 3.01(g). Motion Hearing set for 7/24/2013 at 9:00 AM in Tampa Courtroom 13B before Judge James D. Whittemore. Signed by Judge James D. Whittemore on 6/25/2013. (KE) (Entered: 06/25/2013) |
| 07/03/2013 | 51 | Joint MOTION to Continue *Hearing on Defendants' Motion to Disqualify Plaintiffs' Counsel* by Maria Del Rocio Burgos Garcia, Luis A. Garcia Saz. (Babbitt, Theodore) (Entered: 07/03/2013) |
| 07/08/2013 | 52 | ORDER granting 51 Motion to Continue Hearing. The evidentiary hearing is rescheduled to 9/26/13 at 9:00 A.M. Signed by Judge James D. Whittemore on 7/8/2013. (KE) (Entered: 07/08/2013) |

| | | |
|---|---|---|
| 07/09/2013 | 53 | Unopposed MOTION to Take Deposition from BRIAN CULKIN *Verified Motion of Flag Church and Ship Church for Leave to Take Deposition of Witness Brian Culkin and Certificate of Compliance with Local Rule 3.01(g)* by Church of Scientology Flag Service Organization, Inc., Church of Scientology Flag Ship Service Organization, Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G)(Pope, F.) Motions referred to Magistrate Judge Thomas B. McCoun III. (Entered: 07/09/2013) |
| 07/12/2013 | 54 | NOTICE of supplemental authority *Regarding Defendants' Motion to Compel Arbitration* by Church of Scientology Flag Service Organization, Inc., Church of Scientology Flag Ship Service Organization, Inc. (Attachments: # 1 Exhibit A)(Pope, F.) (Entered: 07/12/2013) |
| 07/12/2013 | 55 | MOTION to quash Subpoenas to produce documents and to appear and testify at a hearing *Sought by Exhibit A to Defendants' Flag and Ship Subpoenas Duces Tecum* by Maria Del Rocio Burgos Garcia, Luis A. Garcia Saz. (Attachments: # 1 Exhibit A Subpoenas for Documents)(Babbitt, Theodore) Motion terminated. Counsel's office notified by telephone on 7/15/13 that this item is to be refiled as an Objection. (Entered: 07/12/2013) |
| 07/15/2013 | 56 | (DOCUMENT TERMINATED) OBJECTION re 53 Unopposed MOTION to Take Deposition from BRIAN CULKIN *Verified Motion of Flag Church and Ship Church for Leave to Take Deposition of Witness Brian Culkin and Certificate of Compliance with Local Rule 3.01(g)* by Maria Del Rocio Burgos Garcia, Luis A. Garcia Saz by Maria Del Rocio Burgos Garcia, Luis A. Garcia Saz. (Attachments: # 1 Exhibit Exhibit A - Correspondence of Ray Jeffrey dated July 12, 2013)(Babbitt, Theodore)(Document terminated per chambers instructions and counsel notified to re-file as response to motion) Modified on 7/25/2013 (AG). (Entered: 07/15/2013) |
| 07/15/2013 | 57 | (DOCUMENT TERMINATED) OBJECTION re 55 MOTION to quash Subpoenas to produce documents and to appear and testify at a hearing *Sought by Exhibit A to Defendants' Flag and Ship Subpoenas Duces Tecum to Replace DE 55* by Maria Del Rocio Burgos Garcia, Luis A. Garcia Saz by Maria Del Rocio Burgos Garcia, Luis A. Garcia Saz. (Attachments: # 1 Exhibit A-1 Subpoenas to law firms, # 2 Exhibit 2-A Subpoenas to individual counsel, # 3 Exhibit A-3 Subpoenas to Michael Rinder, # 4 Exhibit A-4 Subpoenas to Plaintiffs)(Babbitt, Theodore) Modified on 7/26/2013 (Counsel notified to re-file as a motion per chambers' instructions)(AG). (Entered: 07/15/2013) |
| 07/19/2013 | 58 | (DOCUMENT TERMINATED) OBJECTION re 56 Objection *Defendants' Opposition to Plaintiffs' Motion to Strike the Application for De Bene Esse Deposition of Brian Culkin*. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E) (Pope, F.) (Document terminated per chambers instructions; counsel notified to file motion for leave of court to file reply) Modified on 7/25/2013 (AG). (Entered: 07/19/2013) |
| 07/24/2013 | 59 | RESPONSE to Motion re 55 MOTION to quash Subpoenas to produce documents and to appear and testify at a hearing *Sought by Exhibit A to Defendants' Flag and Ship Subpoenas Duces Tecum*, 37 Joint MOTION to Disqualify Counsel *of Plaintiff by Church of Scientology Religious Trust and*, 36 MOTION to Disqualify Counsel *Motion to Disqualify Plaintiffs' Counsel and Certificate of Compliance wiht Rule 3.01(g) Response to Plaintiffs' Motion for Protective Order pursuant to RUle 26(c)(1) and in the alternative Motion to Compel Production of Documents Responsivle to Subpoenas Duces Tecum Served on Luis Garcia, Maria Garcia, Richard Zabak, Robert Johnson, GreyRobinson, Mike Rinder, Christie Rinder, Theodore Babbitt, Ronald Weil, Babbitt Johnson Osborne & LeClainche, Weil & Quaranta* filed by Church of Scientology Flag Service Organization, Inc., Church of Scientology Flag Ship Service Organization, Inc.. |

| | | |
|---|---|---|
| | | (Attachments: # 1 Exhibit Exhibit A, # 2 Exhibit Exhibit B)(Potter, Robert) Added relationship to 60 Modified on 7/30/2013 (DG). (Entered: 07/24/2013) |
| 07/26/2013 | 60 | MOTION for protective order *Regarding Defendants' Request for Production Pusuant to Exhibit A of Defendants' Flag and Ship Subpoena Duces Tecum* by Maria Del Rocio Burgos Garcia, Luis A. Garcia Saz. (Attachments: # 1 Exhibit A-1 Subpoenas to Separate Law Firms, # 2 Exhibit A-2 Subpoenas to Individual Counsel, # 3 Exhibit A-3 Subpoenas to Michael Rinder)(Babbitt, Theodore) Motions referred to Magistrate Judge Thomas B. McCoun III. (Entered: 07/26/2013) |
| 08/01/2013 | 61 | NOTICE OF RESCHEDULING HEARING: The hearing on Defendants' Motion to Disqualify Counsel previously scheduled for 9/26/13 is rescheduled. New date and time: 10/3/2013 at 9:00 AM in Tampa Courtroom 13B before Judge James D. Whittemore. All other previously scheduled deadlines remain the same.(KE) (Entered: 08/01/2013) |
| 08/05/2013 | 62 | **TERMINATED; ATTORNEY NOTIFIED THAT FILING ATTORNEY MUST BE THE SAME ATTORNEY WHO SIGNS THE PLEADING; ATTORNEY NOTIFIED TO RE-FILE CORRECTLY** MEMORANDUM in opposition re 59 Response to motion filed by Maria Del Rocio Burgos Garcia, Luis A. Garcia Saz. (Quaranta, John) Modified on 8/6/2013 (RFK). (Entered: 08/05/2013) |
| 08/06/2013 | 63 | MEMORANDUM in opposition re 59 Response to motion filed by Maria Del Rocio Burgos Garcia, Luis A. Garcia Saz. (McGovern, Amanda) (Entered: 08/06/2013) |
| 08/09/2013 | 64 | NOTICE of telephone hearing on motion 53 Unopposed MOTION to Take Deposition from BRIAN CULKIN *Verified Motion of Flag Church and Ship Church for Leave to Take Deposition of Witness Brian Culkin and Certificate of Compliance with Local Rule 3.01(g)*. Telephone hearing set for 8/12/2013 at 11:00 AM in Tampa Courtroom 12B before Magistrate Judge Thomas B. McCoun III. On the date/time specified, counsel shall call 1-888-684-8852; enter access code 2121806; and the security code 0220 followed by the # (pound) key. (ATL) (Entered: 08/09/2013) |
| 08/12/2013 | 65 | RESPONSE to Motion re 53 Unopposed MOTION to Take Deposition from BRIAN CULKIN *Verified Motion of Flag Church and Ship Church for Leave to Take Deposition of Witness Brian Culkin and Certificate of Compliance with Local Rule 3.01(g) Supplement to Plaintiffs' Objection to "Unopposed" Verified Motion for leave to Take Deposition of Witness, Brian Culkin* filed by Maria Del Rocio Burgos Garcia, Luis A. Garcia Saz. (Attachments: # 1 Exhibit Correspondence from Ray Jeffrey, # 2 Exhibit Emails between Bob Potter and Amanda Sundarsingh, # 3 Exhibit Emails between Wally Pope and Denise Codding)(Babbitt, Theodore) (Entered: 08/12/2013) |
| 08/12/2013 | 66 | Minute Entry. Proceedings held before Magistrate Judge Thomas B. McCoun III: MOTION HEARING held on 8/12/2013 re 53 Unopposed MOTION to Take Deposition from BRIAN CULKIN *Verified Motion of Flag Church and Ship Church for Leave to Take Deposition of Witness Brian Culkin and Certificate of Compliance with Local Rule 3.01(g)* filed by Church of Scientology Flag Service Organization, Inc., Church of Scientology Flag Ship Service Organization, Inc. (DIGITAL) (SRC) (Entered: 08/12/2013) |
| 08/13/2013 | 67 | NOTICE of hearing on motion 60 MOTION for protective order *Regarding Defendants' Request for Production Pusuant to Exhibit A of Defendants' Flag and Ship Subpoena Duces Tecum*. Motion Hearing set for 9/5/2013 at 02:00 PM in Tampa Courtroom 12B before Magistrate Judge Thomas B. McCoun III. Any counsel who wish to appear by telephone shall notify chambers (813-301-5550), at least one day prior to the hearing. On the date/time specified for the hearing, counsel shall call 1-888-684-8852; enter access code 2121806; and the security code 0220 followed by the # (pound) key (ATL) (Entered: 08/13/2013) |

| | | |
|---|---|---|
| 08/13/2013 | 68 | ORDER denying 52 Motion to Take Deposition from Brian Culkin. Signed by Magistrate Judge Thomas B. McCoun III on 8/13/2013. (ATL) (Entered: 08/13/2013) |
| 09/04/2013 | 69 | STATUS report *on the Parties Meet and Confer Conferences on Issues to be Discussed at the Hearing Set for September 5, 2013* by Maria Del Rocio Burgos Garcia, Luis A. Garcia Saz as to Church of Scientology Flag Service Organization, Inc., Church of Scientology Flag Ship Service Organization, Inc., IAS Administrations, Inc., U.S. IAS Members Trust, Church of Scientology Religious Trust. (Attachments: # 1 Exhibit Exhibit A)(McGovern, Amanda) (Entered: 09/04/2013) |
| 09/05/2013 | 70 | Minute Entry. Proceedings held before Magistrate Judge Thomas B. McCoun III: MOTION HEARING held on 9/5/2013 re 60 MOTION for protective order *Regarding Defendants' Request for Production Pusuant to Exhibit A of Defendants' Flag and Ship Subpoena Duces Tecum* filed by Maria Del Rocio Burgos Garcia, Luis A. Garcia Saz. (DIGITAL) (SRC) (Entered: 09/05/2013) |
| 09/13/2013 | 71 | ORDER granting in part and denying in part 60 Motion for Protective Order. Signed by Magistrate Judge Thomas B. McCoun III on 9/13/2013. (ATL) (Entered: 09/13/2013) |
| 09/19/2013 | 72 | Witness List by Maria Del Rocio Burgos Garcia, Luis A. Garcia Saz. (Babbitt, Theodore) (Entered: 09/19/2013) |
| 09/19/2013 | 73 | Witness List by Maria Del Rocio Burgos Garcia, Luis A. Garcia Saz. (Babbitt, Theodore) (Entered: 09/19/2013) |
| 09/19/2013 | 74 | Exhibit List *and Witness List for October Evidentiary Hearing* by Church of Scientology Flag Service Organization, Inc., Church of Scientology Flag Ship Service Organization, Inc., Church of Scientology Religious Trust, IAS Administrations, Inc., U.S. IAS Members Trust.. (Potter, Robert) (Entered: 09/19/2013) |
| 09/20/2013 | 75 | TRANSCRIPT of Motion Hearing held on 09-05-13 before Judge Thomas B. McCoun, III. Court Reporter/Transcriber Bill Jones,Telephone number 813-301-5024. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 10/11/2013, Redacted Transcript Deadline set for 10/21/2013, Release of Transcript Restriction set for 12/19/2013. (HWJ) (Entered: 09/20/2013) |
| 09/20/2013 | 76 | NOTICE to counsel of filing of OFFICIAL TRANSCRIPT. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may purchase a copy from the court reporter or view the document at the clerk's office public terminal. Court Reporter: Bill Jones (HWJ) (Entered: 09/20/2013) |
| 09/23/2013 | 77 | Witness List by Church of Scientology Flag Service Organization, Inc., Church of Scientology Flag Ship Service Organization, Inc., Church of Scientology Religious Trust, IAS Administrations, Inc., U.S. IAS Members Trust. (Potter, Robert) (Entered: 09/23/2013) |
| 10/01/2013 | 78 | MOTION to Compel Compliance with Subpoenas and Order of Sept 13 2013; Request for Continuance of Oct 3 2013 Evidentiary Hearing by Church of Scientology Flag Service Organization, Inc., Church of Scientology Flag Ship Service Organization, Inc.. (Attachments: # 1 Exhibit Exhibit A, # 2 Exhibit Exhibit B, # 3 Exhibit Exhibit C, # 4 Exhibit Exhibit D, # 5 Exhibit Exhibit E, # 6 Exhibit Exhibit F)(Potter, Robert) Motions referred to Magistrate Judge Thomas B. McCoun III. (Entered: 10/01/2013) |

| | | |
|---|---|---|
| 10/02/2013 | 79 | ORDER denying 78 Defendants' Request for Continuance of Oct 3 2013 Evidentiary Hearing. Signed by Judge James D. Whittemore on 10/2/2013. (KE) (Entered: 10/02/2013) |
| 10/03/2013 | 80 | Minute Entry. Proceedings held before Judge James D. Whittemore: denying 36 Motion to Disqualify Counsel; denying 37 Motion to Disqualify Counsel. MOTION HEARING held on 10/3/2013 re 36 MOTION to Disqualify Plaintiffs' Counsel filed by Church of Scientology Flag Service Organization, Inc., Church of Scientology Flag Ship Service Organization, Inc. and re 37 Joint MOTION to Disqualify Plaintiff's Counsel by Church of Scientology Religious Trust, IAS Administrations, Inc., and U.S. IAS Members Trust. Court Reporter: Scott N. Gamertsfelder (AO) (Entered: 10/03/2013) |
| 10/03/2013 | 81 | Evidentiary Hearing Exhibit List by Luis A. Garcia Saz, and Maria Del Rocio Burgos Garcia.(AO) (Entered: 10/03/2013) |
| 10/04/2013 | 82 | ENDORSED ORDER denying as moot 78 Motion to Compel. Signed by Magistrate Judge Thomas B. McCoun III on 10/4/2013. (ATL) (Entered: 10/04/2013) |
| 10/07/2013 | 83 | NOTICE of EXHIBITS placed in the EXHIBIT ROOM (1 Folder-Evidentiary Hearing) (RVB) (Entered: 10/08/2013) |
| 10/08/2013 | 84 | NOTICE of Appearance by Amanda Marie McGovern on behalf of Maria Del Rocio Burgos Garcia, Luis A. Garcia Saz (McGovern, Amanda) (Entered: 10/08/2013) |
| 10/08/2013 | 85 | NOTICE of *Amanda Sundarsingh of* Appearance by Theodore Babbitt on behalf of Maria Del Rocio Burgos Garcia, Luis A. Garcia Saz (Babbitt, Theodore) (Entered: 10/08/2013) |
| 10/16/2013 | 86 | TRANSCRIPT of Motion Hearing held on October 3, 2013 before Judge James D. Whittemore. Court Reporter/Transcriber Scott Gamertsfelder,Telephone number 813.301.5898. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 11/6/2013, Redacted Transcript Deadline set for 11/18/2013, Release of Transcript Restriction set for 1/14/2014. (SNG) (Entered: 10/16/2013) |
| 10/16/2013 | 87 | NOTICE to counsel of filing of OFFICIAL TRANSCRIPT. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may purchase a copy from the court reporter or view the document at the clerk's office public terminal. Court Reporter: Scott N. Gamertsfelder 813.301.5898. (SNG) (Entered: 10/16/2013) |
| 10/17/2013 | 88 | NOTICE by Church of Scientology Flag Service Organization, Inc., Church of Scientology Flag Ship Service Organization, Inc. re 8 Joint MOTION to compel arbitration *and to Stay Proceedings* (Attachments: # 1 Exhibit A)(Potter, Robert) (Entered: 10/17/2013) |
| 10/18/2013 | 89 | ORDER directing Defendants to file a memorandum by October 24, 2013 as to 8 , 15 , and 18 MOTIONS to compel arbitration filed by IAS Administrations, Inc., Church of Scientology Flag Service Organization, Inc., Church of Scientology Flag Ship Service Organization, Inc., U.S. IAS Members Trust, and Church of Scientology Religious Trust. Signed by Judge James D. Whittemore on 10/17/2013. (AO) (Entered: 10/18/2013) |
| 10/21/2013 | 90 | MOTION to dismiss for lack of jurisdiction by Church of Scientology Religious Trust, IAS Administrations, Inc., U.S. IAS Members Trust. (Tomassi, Marie) (Entered: 10/21/2013) |

| | | |
|---|---|---|
| | 91 | RESPONSE re 89 Order concerning arbitration procedures filed by Church of Scientology Flag Service Organization, Inc., Church of Scientology Flag Ship Service Organization, Inc.. (Potter, Robert) (Entered: 10/24/2013) |
| 11/04/2013 | 92 | STRICKEN PURSUANT TO ORDER 98 RESPONSE to Motion re 90 MOTION to dismiss for lack of jurisdiction filed by Church of Scientology Flag Service Organization, Inc., Church of Scientology Flag Ship Service Organization, Inc.. (Potter, Robert) Modified on 11/14/2013 (DG). (Entered: 11/04/2013) |
| 11/04/2013 | 93 | MEMORANDUM in opposition re 90 Motion to dismiss/lack of jurisdiction filed by Maria Del Rocio Burgos Garcia, Luis A. Garcia Saz. (Attachments: # 1 Exhibit IASA's Annual Corporate Reports, # 2 Exhibit Declaration of Luis Garcia)(McGovern, Amanda) (Entered: 11/04/2013) |
| 11/06/2013 | 94 | MOTION for leave to file ten-page memorandum in resp to defendant FSO and FSSO's resp to the joint motion of other Defendants to Dismiss for Lack of Subject matter jurisdiction by All Plaintiffs. (McGovern, Amanda) (Entered: 11/06/2013) |
| 11/07/2013 | 95 | STRICKEN PURSUANT TO ORDER 98 RESPONSE in Opposition re 94 MOTION for leave to file ten-page memorandum in resp to defendant FSO and FSSO's resp to the joint motion of other Defendants to Dismiss for Lack of Subject matter jurisdiction filed by Maria Del Rocio Burgos Garcia, Luis A. Garcia Saz. (Attachments: # 1 Exhibit A Declaration of Michael Rinder, # 2 Exhibit Exhibit 1-A Introduction to Scientology Ethics, # 3 Exhibit Exhibit 1-B Introduction to Scientology Ethics, # 4 Exhibit Exhibit 1-C Introduction to Scientology Ethics, # 5 Exhibit Exhibit 1-D Introduction to Scientology Ethics)(Babbitt, Theodore) Modified on 11/14/2013 (DG). (Entered: 11/07/2013) |
| 11/08/2013 | 96 | MOTION to Strike 93 Memorandum in opposition to Motion to Dismiss by Church of Scientology Flag Service Organization, Inc., Church of Scientology Flag Ship Service Organization, Inc.. (Potter, Robert) Motions referred to Magistrate Judge Thomas B. McCoun III. (Entered: 11/08/2013) |
| 11/11/2013 | 97 | MOTION to Strike and Certificate of Good Faith by Church of Scientology Flag Service Organization, Inc., Church of Scientology Flag Ship Service Organization, Inc.. (Pope, F.) Motions referred to Magistrate Judge Thomas B. McCoun III. (Entered: 11/11/2013) |
| 11/13/2013 | 98 | ORDER striking 92 Response of Defendants Flag Church and Ship Church to Motion of Other Defendants to Dismiss; striking Plaintiffs' Memorandum in Response; denying as moot 94 Motion for Leave to File; denying as moot 97 Motion to Strike. Signed by Judge James D. Whittemore on 11/12/2013. (KE) (Entered: 11/13/2013) |
| 12/06/2013 | 99 | ORDER ruling deferred 90 Motion to dismiss for lack of jurisdiction. Signed by Judge James D. Whittemore on 12/5/2013. (KE) (Entered: 12/06/2013) |
| 01/15/2014 | 100 | ORDER ruling deferred 8 Motion to compel arbitration; ruling deferred 15 Motion to compel arbitration; ruling deferred 18 Motion to compel arbitration pending resolution of subject matter jurisdiction. Signed by Judge James D. Whittemore on 1/14/2014. (KE) (Entered: 01/15/2014) |
| 03/12/2014 | 101 | Unopposed MOTION for leave to file Leave to File Motion/Memorandum of Law Diversity of Citizenship and Jurisdiction by Church of Scientology Flag Service Organization, Inc., Church of Scientology Flag Ship Service Organization, Inc., Church of Scientology Religious Trust, IAS Administrations, Inc., U.S. IAS Members Trust. (Potter, Robert) (Entered: 03/12/2014) |
| 03/14/2014 | 102 | ORDER granting 101 Defendants' Unopposed Motion for Leave to File Motion/Memorandum of Law Diversity of Citizenship and Jurisdiction. Signed by Judge James D. Whittemore on 3/13/2014. (AO) (Entered: 03/14/2014) |

| | | |
|---|---|---|
| 03/26/2014 | 103 | MOTION to Amend/Correct *Complaint and Memorandum of Law* by All Plaintiffs. (Babbitt, Theodore) (Entered: 03/26/2014) |
| 03/27/2014 | 104 | MEMORANDUM in support re 90 Motion to dismiss/lack of jurisdiction, 102 Order on Motion for Leave to File filed by Church of Scientology Flag Service Organization, Inc., Church of Scientology Flag Ship Service Organization, Inc., Church of Scientology Religious Trust, IAS Administrations, Inc., U.S. IAS Members Trust. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F1, # 7 Exhibit F2, # 8 Exhibit G, # 9 Exhibit H, # 10 Exhibit I1, # 11 Exhibit I2, # 12 Exhibit I3, # 13 Exhibit J, # 14 Exhibit K, # 15 Exhibit M, # 16 Exhibit N, # 17 Exhibit O, # 18 Exhibit P, # 19 Exhibit Q, # 20 Exhibit R, # 21 Exhibit S, # 22 Exhibit T)(Potter, Robert) (Entered: 03/27/2014) |
| 04/01/2014 | 105 | ORDER denying without prejudice 103 motion to amend/correct. Signed by Judge James D. Whittemore on 3/31/2014. (KE) (Entered: 04/01/2014) |
| 04/07/2014 | 106 | MOTION to Amend/Correct *Complaint and Memorandum of Law* by All Plaintiffs. (Attachments: # 1 Exhibit A - Proposed Amended Complain and Demand for Jury Trial) (Babbitt, Theodore) Counsel notified by telephone that this pleading does not have the proper electronic attorney signature. Item terminated. Modified on 4/8/2014 (DG). (Entered: 04/07/2014) |
| 04/07/2014 | 107 | Amended MOTION to Amend/Correct *Complaint and Memorandum of Law* by All Plaintiffs. (Attachments: # 1 Exhibit A - Amended Complaint)(Babbitt, Theodore) Counsel notified by telephone that this item does not have proper electronic attorney signature. Item to be refiled. Item terminated. Modified on 4/8/2014 (DG). (Entered: 04/07/2014) |
| 04/08/2014 | 108 | Second MOTION to Amend/Correct *Amended Renewed Motion to Amend Complaint and Memorandum of Law* by All Plaintiffs. (Attachments: # 1 Exhibit A - Amended Complaint and Demand for Jury Trial)(Babbitt, Theodore) (Entered: 04/08/2014) |
| 04/13/2014 | 109 | Unopposed MOTION for Extension of Time to File Response/Reply *TO DEFENDANT'S SUPPLEMENTAL MEMORANDUM IN SUPPORT OF THEIR MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION* by Luis A. Garcia Saz. (McGovern, Amanda) Motions referred to Magistrate Judge Thomas B. McCoun III. (Entered: 04/13/2014) |
| 04/15/2014 | 110 | MEMORANDUM in opposition re 108 Motion to Amend/Correct filed by Church of Scientology Flag Service Organization, Inc., Church of Scientology Flag Ship Service Organization, Inc.. (Potter, Robert) (Entered: 04/15/2014) |
| 04/16/2014 | 111 | ENDORSED ORDER granting 109 Motion for Extension of Time to File Response In Opposition. Plaintiffs' are granted a 2-day extension of time. Signed by Judge James D. Whittemore on 4/16/2014. (AO) (Entered: 04/16/2014) |
| 04/16/2014 | 112 | MEMORANDUM in opposition re 111 Order on Motion for Extension of Time to File Response/Reply filed by Luis A. Garcia Saz. (McGovern, Amanda) (Entered: 04/16/2014) |
| 05/02/2014 | 113 | ORDER denying as moot 90 Motion to dismiss for lack of jurisdiction; denying as moot 96 Motion to Strike ; granting 108 motion to amend/correct. Signed by Judge James D. Whittemore on 5/2/2014. (KE) (Entered: 05/02/2014) |
| 05/12/2014 | 114 | AMENDED COMPLAINT *and Demand for Jury Trial* against Church of Scientology Flag Service Organization, Inc., Church of Scientology Flag Ship Service Organization, Inc. with Jury Demand. filed by All Plaintiffs.(Babbitt, Theodore) (Entered: 05/12/2014) |
| 05/19/2014 | 115 | ENDORSED ORDER denying as moot 15 MOTION to compel arbitration *and Stay* |

USCA11 Case: 18-13452 Document: 38 Date Filed: 04/09/2019 Page: 22 of 222

| | | *Proceedings* filed by Church of Scientology Religious Trust and denying as moot 38 MOTION to compel arbitration filed by U.S. IAS Members Trust, as these parties are no longer Defendants in this case. Signed by Judge James D. Whittemore on 5/19/2014. (KE) (Entered: 05/19/2014) |
|---|---|---|
| 05/19/2014 | 116 | Unopposed MOTION for Extension of Time to File Response/Reply as to 114 Amended Complaint by Church of Scientology Flag Service Organization, Inc., Church of Scientology Flag Ship Service Organization, Inc.. (Potter, Robert) Motions referred to Magistrate Judge Thomas B. McCoun III. (Entered: 05/19/2014) |
| 05/20/2014 | 117 | ENDORSED ORDER granting 116 Motion for Extension of Time to File Response. Response due by 5/29/2014. Signed by Judge James D. Whittemore on 5/20/2014. (KE) (Entered: 05/20/2014) |
| 06/03/2014 | 118 | AMENDED ORDER amending 117 Order on Motion for Extension of Time to File Response. Defendants' response due by 6/16/14. Signed by Judge James D. Whittemore on 6/3/2014. (KE) (Entered: 06/03/2014) |
| 06/15/2014 | 119 | MOTION to dismiss for lack of jurisdiction *or to certify appeal* by Church of Scientology Flag Service Organization, Inc., Church of Scientology Flag Ship Service Organization, Inc.. (Attachments: # 1 Affidavit Monique Yingling, # 2 Affidavit Glen Stilo, # 3 Affidavit mislav Raos, # 4 Affidavit Peter Mansell, # 5 Affidavit Kenneth Weber, # 6 Affidavit Charmaine Roger, # 7 Exhibit CSRT receipts, # 8 Exhibit Luis Garcia depo, # 9 Affidavit Michelle Villeneuve, # 10 Exhibit USIMT receipts, # 11 Exhibit USIMT receipts, # 12 Exhibit USIMT receipts)(Potter, Robert) (Entered: 06/15/2014) |
| 06/15/2014 | 120 | Amended MOTION to compel arbitration by Church of Scientology Flag Service Organization, Inc., Church of Scientology Flag Ship Service Organization, Inc.. (Potter, Robert) (Entered: 06/15/2014) |
| 07/01/2014 | 121 | MEMORANDUM in opposition re 119 Motion to dismiss/lack of jurisdiction *Plaintiffs' Memorandum in Opposition to Flag and Ship's Motion to Dismiss for Lack of Subject Matter Jurisdiction or, in the Alternative, to Certify the Question for an Immediate Appeal* filed by Luis A. Garcia Saz. (McGovern, Amanda) (Entered: 07/01/2014) |
| 07/03/2014 | 122 | ENDORSED ORDER granting 121 Motion for Extension of Time to File Memorandum. Signed by Judge James D. Whittemore on 7/3/2014. (KE) (Entered: 07/03/2014) |
| 07/09/2014 | 123 | MEMORANDUM in opposition re 119 Motion to dismiss/lack of jurisdiction filed by Maria Del Rocio Burgos Garcia, Luis A. Garcia Saz. (McGovern, Amanda) (Entered: 07/09/2014) |
| 07/25/2014 | 124 | ORDER denying 119 Motion to Dismiss for Lack of Subject Matter Jurisdiction. Signed by Judge James D. Whittemore on 7/24/2014. (AO) (Entered: 07/25/2014) |
| 08/08/2014 | 125 | ORDER Setting Oral Argument on 120 Amended MOTION to compel arbitration: Oral argument scheduled for 9/4/2014 at 2:30 PM in Tampa Courtroom 13B before Judge James D. Whittemore. Signed by Judge James D. Whittemore on 8/8/2014. (KE) (Entered: 08/08/2014) |
| 09/04/2014 | 126 | Minute Entry. Proceedings held before Judge James D. Whittemore: MOTION HEARING held on 9/4/2014 re 120 Amended MOTION to compel arbitration filed by Church of Scientology Flag Service Organization, Inc., Church of Scientology Flag Ship Service Organization, Inc. Court Reporter: Lynann Nicely (AO) (Entered: 09/04/2014) |
| 09/17/2014 | 127 | MOTION for leave to file *Authenticated Copy of Complete 1963 HCO Policy Letter* by Church of Scientology Flag Service Organization, Inc., Church of Scientology Flag Ship Service Organization, Inc.. (Attachments: # 1 Affidavit, # 2 Exhibit)(Potter, Robert) (Entered: 09/17/2014) |

| | | |
|---|---|---|
| 09/24/2014 | 128 | RESPONSE to Motion re 127 MOTION for leave to file *Authenticated Copy of Complete 1963 HCO Policy Letter* filed by Maria Del Rocio Burgos Garcia, Luis A. Garcia Saz. (Babbitt, Theodore) (Entered: 09/24/2014) |
| 09/24/2014 | 129 | TRANSCRIPT of motion hearing held on 9/04/2014 before Judge Whittemore. Court Reporter/Transcriber Lynann Nicely,Telephone number (813) 301-5252. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter.. Redaction Request due 10/15/2014, Redacted Transcript Deadline set for 10/27/2014, Release of Transcript Restriction set for 12/23/2014. (LN) (Entered: 09/24/2014) |
| 09/24/2014 | 130 | NOTICE to counsel of filing of OFFICIAL TRANSCRIPT. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may purchase a copy from the court reporter or view the document at the clerk's office public terminal. Court Reporter: Lynann Nicely. (LN) (Entered: 09/24/2014) |
| 09/25/2014 | 131 | ORDER granting 127 Motion for Leave to File Authenticated Copy of Complete 1963 HCO Policy Letter. Signed by Judge James D. Whittemore on 9/24/2014. (KE) (Entered: 09/25/2014) |
| 10/06/2014 | 132 | NOTICE by Church of Scientology Flag Service Organization, Inc., Church of Scientology Flag Ship Service Organization, Inc. re 131 Order on Motion for Leave to File (Attachments: # 1 Affidavit)(Potter, Robert) (Entered: 10/06/2014) |
| 10/15/2014 | 133 | NOTICE by Maria Del Rocio Burgos Garcia, Luis A. Garcia Saz re 131 Order on Motion for Leave to File *Affidavit In Complianced with Court Order* (Attachments: # 1 Affidavit Affidavit of Michael Rinder)(Babbitt, Theodore) (Entered: 10/15/2014) |
| 10/21/2014 | 134 | MOTION to Strike 133 Notice (Other) *Affidavit of Mike Rinder* by Church of Scientology Flag Service Organization, Inc., Church of Scientology Flag Ship Service Organization, Inc.. (Potter, Robert) Motions referred to Magistrate Judge Thomas B. McCoun III. (Entered: 10/21/2014) |
| 10/22/2014 | 135 | RESPONSE in Opposition re 134 MOTION to Strike 133 Notice (Other) *Affidavit of Mike Rinder* filed by Maria Del Rocio Burgos Garcia, Luis A. Garcia Saz. (Babbitt, Theodore) (Entered: 10/22/2014) |
| 11/06/2014 | 136 | ORDER denying 134 Motion to Strike. Signed by Judge James D. Whittemore on 11/5/2014. (KE) (Entered: 11/06/2014) |
| 11/14/2014 | 137 | ORDER Setting Hearing on Renewed Motion to compel arbitration 120 : Motion Hearing set for 2/18/2015 at 01:30 PM in Tampa Courtroom 13 B before Judge James D. Whittemore. Signed by Judge James D. Whittemore on 11/13/2014. (AO) (Entered: 11/14/2014) |
| 12/05/2014 | 138 | Unopposed MOTION for Bert H. Deixler, Esquire to appear pro hac vice by Church of Scientology Flag Service Organization, Inc., Church of Scientology Flag Ship Service Organization, Inc.. (Attachments: # 1 Exhibit)(Potter, Robert) (Entered: 12/05/2014) |
| 12/10/2014 | | ***PRO HAC VICE FEES paid and Special Admission Attorney Certification Form filed by attorney Bert Howard Deixler, appearing on behalf of Church of Scientology Flag Service Organization, Inc. (Filing fee $10 receipt number TPA27300.) Related document: 138 Unopposed MOTION for Bert H. Deixler, Esquire to appear pro hac vice. (AG) (Entered: 12/10/2014) |

| | | |
|---|---|---|
| 12/11/2014 | 139 | ORDER denying without prejudice 138 motion to appear pro hac vice. Signed by Judge James D. Whittemore on 12/9/2014. (KE) (Entered: 12/11/2014) |
| 12/12/2014 | 140 | Unopposed MOTION for to appear pro hac vice by Church of Scientology Flag Service Organization, Inc., Church of Scientology Flag Ship Service Organization, Inc.. (Attachments: # 1 Exhibit)(Potter, Robert) (Entered: 12/12/2014) |
| 12/12/2014 | 141 | MOTION for protective order *Invoking Rule of Sequestration* by Church of Scientology Flag Service Organization, Inc., Church of Scientology Flag Ship Service Organization, Inc.. (Potter, Robert) Motions referred to Magistrate Judge Thomas B. McCoun III. (Entered: 12/12/2014) |
| 12/16/2014 | 142 | ORDER directing Plaintiffs to respond to 141 MOTION for protective order *Invoking Rule of Sequestration*. Response due by 12/19/2014. Signed by Judge James D. Whittemore on 12/15/2014. (KE) (Entered: 12/16/2014) |
| 12/16/2014 | 143 | ENDORSED ORDER granting 140 motion to appear pro hac vice. Bert H. Deixler, Esq. admitted pro hac vice. Robert V. Potter, Esq. designated local counsel. Counsel are further notified that pursuant to the USDC - Middle District of Florida's Administrative Procedures for Electronic Filing in Civil and Criminal Cases, Section I(A) "... all documents filed in Civil and Criminal cases in this District... shall be filed electronically." Therefore, the attorney(s) being admitted pro hac vice is/are directed to sign up for CM/ECF, enter an email address in their CM/ECF account and electronically file a notice of compliance with this Court's Order within thirty (30) days. Failure to comply with this Order as directed will result in counsel being terminated from the docket sheet without further notice. Signed by Judge James D. Whittemore on 12/16/2014. (KE) (Entered: 12/16/2014) |
| 12/19/2014 | 144 | RESPONSE in Opposition re 141 MOTION for protective order *Invoking Rule of Sequestration* filed by Maria Del Rocio Burgos Garcia, Luis A. Garcia Saz. (McGovern, Amanda) (Entered: 12/19/2014) |
| 12/22/2014 | 145 | ORDER denying 141 Motion for Protective Order. Signed by Judge James D. Whittemore on 12/22/2014. (KE) (Entered: 12/22/2014) |
| 12/31/2014 | 146 | NOTICE by Church of Scientology Flag Service Organization, Inc. *of Compliance* (Deixler, Bert) (Entered: 12/31/2014) |
| 01/16/2015 | 147 | MOTION to Compel Deposition *and Response to Witness, Mike Ellis, Motion for Protective Order and Motion to Extend Discovery Date* by Maria Del Rocio Burgos Garcia, Luis A. Garcia Saz. (Attachments: # 1 Exhibit A Email, # 2 Exhibit B Notice of Filing Affidavit, # 3 Exhibit C Email, # 4 Exhibit D Email, # 5 Exhibit E Email)(Babbitt, Theodore) Motions referred to Magistrate Judge Thomas B. McCoun III. (Entered: 01/16/2015) |
| 01/17/2015 | 148 | NOTICE of *Limited Appearance as local counsel* Appearance by Robert Vernon Potter on behalf of Church of Scientology International and Mike Ellis (Potter, Robert) (Entered: 01/17/2015) |
| 01/17/2015 | 149 | Emergency MOTION for protective order *response to Motion to Compel (Doc. 147) and instanter motion for limited admission* by Church of Scientology International and Mike Ellis. (Attachments: # 1 Affidavit Mike Ellis, # 2 Affidavit Gary Soter)(Potter, Robert) Motions referred to Magistrate Judge Thomas B. McCoun III. (Entered: 01/17/2015) |
| 01/20/2015 | 150 | STIPULATION by Church of Scientology Flag Service Organization, Inc., Church of Scientology Flag Ship Service Organization, Inc.. (Pope, F.) (Entered: 01/20/2015) |
| 01/20/2015 | 151 | NOTICE by Church of Scientology Flag Service Organization, Inc., Church of |

| | | |
|---|---|---|
| | | Scientology Flag Ship Service Organization, Inc., Church of Scientology International and Mike Ellis re 149 Emergency MOTION for protective order *response to Motion to Compel (Doc. 147)and instanter motion for limitedadmission of Resolution of Dispute Regarding Emergency Motion For Protective Order and Motion To Compel* (Potter, Robert) (Entered: 01/20/2015) |
| 01/20/2015 | 152 | MOTION to Appear Telephonically *for Status Conference* by All Plaintiffs. (Babbitt, Theodore) Motions referred to Magistrate Judge Thomas B. McCoun III. (Entered: 01/20/2015) |
| 01/20/2015 | 153 | MOTION to Amend/Correct , MOTION to Compel Deposition *and Response to Witness, Mike Elis, Motion for Protective Order and Motion to Extend Discovery Date* by Maria Del Rocio Burgos Garcia, Luis A. Garcia Saz. (Attachments: # 1 Exhibit A Email, # 2 Exhibit B Notice of Filing Affidavit, # 3 Exhibit C Email, # 4 Exhibit D Email, # 5 Exhibit E Email)(Babbitt, Theodore) Motions referred to Magistrate Judge Thomas B. McCoun III. (Entered: 01/20/2015) |
| 01/21/2015 | 154 | ORDER granting 152 Motion to Appear Telephonically. See order for directions on how to attend via telephone. Signed by Judge James D. Whittemore on 1/21/2015. (KE) (Entered: 01/21/2015) |
| 01/21/2015 | 155 | ORDER directing Defendants to respond to 153 Amended MOTION to Compel Deposition *and Response to Witness, Mike Elis, Motion for Protective Order and Motion to Extend Discovery Date*. Responses due by 1/21/2015 at 5:00 P.M. Signed by Judge James D. Whittemore on 1/21/2015. (KE) (Entered: 01/21/2015) |
| 01/21/2015 | 156 | NOTICE of withdrawal of motion by Maria Del Rocio Burgos Garcia, Luis A. Garcia Saz re 147 MOTION to Compel Deposition *and Response to Witness, Mike Ellis, Motion for Protective Order and Motion to Extend Discovery Date* filed by Maria Del Rocio Burgos Garcia, Luis A. Garcia Saz, 153 MOTION to Amend/Correct MOTION to Compel Deposition *and Response to Witness, Mike Elis, Motion for Protective Order and Motion to Extend Discovery Date* filed by Maria Del Rocio Burgos Garcia, Luis A. Garcia Saz (Babbitt, Theodore) (Entered: 01/21/2015) |
| 01/21/2015 | 157 | ENDORSED ORDER granting 150 construed motion for extension of discovery deadline. Discovery shall be completed by 2/6/15. Signed by Judge James D. Whittemore on 1/21/2015. (KE) (Entered: 01/21/2015) |
| 01/21/2015 | 158 | RESPONSE re 155 Order directing response to motion *to compel* filed by Church of Scientology Flag Service Organization, Inc., Church of Scientology Flag Ship Service Organization, Inc.. (Potter, Robert) (Entered: 01/21/2015) |
| 01/21/2015 | 159 | MOTION to Appear Telephonically *At Status Conference* by Church of Scientology Flag Service Organization, Inc., Church of Scientology Flag Ship Service Organization, Inc.. (Potter, Robert) Motions referred to Magistrate Judge Thomas B. McCoun III. (Entered: 01/21/2015) |
| 01/21/2015 | 160 | ORDER granting 159 Motion to Appear Telephonically. Signed by Judge James D. Whittemore on 1/21/2015. (KE) (Entered: 01/21/2015) |
| 01/21/2015 | 161 | ENDORSED ORDER denying as moot 153 motion to amend/correct. Signed by Judge James D. Whittemore on 1/21/2015. (Whittemore, James) (Entered: 01/21/2015) |
| 01/22/2015 | 162 | Minute Entry. Proceedings held before Judge James D. Whittemore: TELEPHONIC STATUS CONFERENCE held on 1/22/2015. Court Reporter: Lynann Nicely (AO) (Entered: 01/23/2015) |
| 01/23/2015 | 163 | NOTICE OF RESCHEDULING HEARING (AS TO TIME ONLY): The Evidentiary Hearing hearing previously scheduled for February 18, 2015 is rescheduled. New hearing |

| | | |
|---|---|---|
| | | time. Evidentiary Hearing set for 2/18/2015 at 10:00 AM in Tampa Courtroom 13 B before Judge James D. Whittemore. (AO) (Entered: 01/23/2015) |
| 02/09/2015 | 164 | Consent MOTION to allow electronic equipment, specifically laptop computer *prior to and during February 18, 2015 hearing* by Church of Scientology Flag Service Organization, Inc., Church of Scientology Flag Ship Service Organization, Inc., Church of Scientology International and Mike Ellis, Church of Scientology Religious Trust. (Potter, Robert) (Entered: 02/09/2015) |
| 02/09/2015 | 165 | ORDER granting 164 Motion to allow electronic equipment. Signed by Judge James D. Whittemore on 2/9/2015. (KE) (Entered: 02/09/2015) |
| 02/11/2015 | 166 | DEFENDANT'S BRIEF re 137 Order Setting Hearing on Motion *to compel arbitration: regarding arbitration procedures and conscionability* filed by Church of Scientology Flag Service Organization, Inc., Church of Scientology Flag Ship Service Organization, Inc.. (Attachments: # 1 Exhibit deposition Mike Ellis, # 2 Exhibit deposition Luis Garcia, # 3 Exhibit deposition Mike Rinder, # 4 Exhibit deposition Sherman Lenske, # 5 Exhibit deposition Allan Cartwright)(Potter, Robert) (Entered: 02/11/2015) |
| 02/11/2015 | 167 | Witness List by Church of Scientology Flag Service Organization, Inc., Church of Scientology Flag Ship Service Organization, Inc.. (Potter, Robert) (Entered: 02/11/2015) |
| 02/12/2015 | 168 | Witness List by Maria Del Rocio Burgos Garcia, Luis A. Garcia Saz. (Babbitt, Theodore) (Entered: 02/12/2015) |
| 02/16/2015 | 169 | Exhibit List *and Witness List Amended* by Maria Del Rocio Burgos Garcia, Luis A. Garcia Saz. (Babbitt, Theodore) (Entered: 02/16/2015) |
| 02/16/2015 | 170 | TRIAL BRIEF by Maria Del Rocio Burgos Garcia, Luis A. Garcia Saz. (Babbitt, Theodore) (Entered: 02/16/2015) |
| 02/16/2015 | 171 | Exhibit List *Amended and Witness List* by Maria Del Rocio Burgos Garcia, Luis A. Garcia Saz. (Babbitt, Theodore) (Entered: 02/16/2015) |
| 02/16/2015 | 172 | Exhibit List *supplemental* by Church of Scientology Flag Service Organization, Inc., Church of Scientology Flag Ship Service Organization, Inc.. (Potter, Robert) (Entered: 02/16/2015) |
| 02/17/2015 | 173 | MOTION to Strike 170 Trial Brief *filed by Plaintiffs* by Church of Scientology Flag Service Organization, Inc., Church of Scientology Flag Ship Service Organization, Inc.. (Attachments: # 1 deposition Mike Ellis, # 2 Soter letter, # 3 emails)(Potter, Robert) Motions referred to Magistrate Judge Thomas B. McCoun III. (Entered: 02/17/2015) |
| 02/17/2015 | 174 | Exhibit List *for Hearing* by Maria Del Rocio Burgos Garcia, Luis A. Garcia Saz. (Babbitt, Theodore) (Entered: 02/17/2015) |
| 02/17/2015 | 175 | NOTICE by Church of Scientology Flag Service Organization, Inc., Church of Scientology Flag Ship Service Organization, Inc. re 172 Exhibit List *Amended* (Attachments: # 1 Exhibit)(Potter, Robert) (Entered: 02/17/2015) |
| 02/18/2015 | 176 | ENDORSED ORDER denying 173 Motion to Strike. Signed by Judge James D. Whittemore on 2/18/2015. (Whittemore, James) (Entered: 02/18/2015) |
| 02/18/2015 | 177 | Minute Entry. Proceedings held before Judge James D. Whittemore: MOTION HEARING held on 2/18/2015 re 120 Amended MOTION to compel arbitration filed by Church of Scientology Flag Service Organization, Inc., Church of Scientology Flag Ship Service Organization, Inc. Court Reporter: Lynann Nicely (AO) (Entered: 02/19/2015) |
| 02/19/2015 | 178 | Minute Entry. Proceedings held before Judge James D. Whittemore: MOTION HEARING - DAY 2 held on 2/19/2015 re 120 Amended MOTION to compel arbitration |

| | | |
|---|---|---|
| | | filed by Church of Scientology Flag Service Organization, Inc., Church of Scientology Flag Ship Service Organization, Inc. Court Reporter: Lynann Nicely (AO) (Entered: 02/19/2015) |
| 02/19/2015 | 179 | Evidentiary Motion Hearing Exhibit List by Maria Del Rocio Burgos Garcia, Luis A. Garcia Saz. (AO) (Entered: 02/19/2015) |
| 02/19/2015 | 180 | Evidentiary Motion Hearing Exhibit List by Church of Scientology Flag Service Organization, Inc., Church of Scientology Flag Ship Service Organization, Inc. (AO) (Entered: 02/19/2015) |
| 02/19/2015 | 181 | NOTICE of supplemental authority by Maria Del Rocio Burgos Garcia, Luis A. Garcia Saz. (Attachments: # 1 Supplement Supplement Authority)(Quaranta, John) (Entered: 02/19/2015) |
| 02/25/2015 | 182 | NOTICE of supplemental authority re 120 Amended MOTION to compel arbitration by Church of Scientology Flag Service Organization, Inc., Church of Scientology Flag Ship Service Organization, Inc.. (Potter, Robert) (Entered: 02/25/2015) |
| 02/26/2015 | 183 | NOTICE of EXHIBITS placed in the Exhibit Room (2 folders) re: Motion Hearings held 2/18/15 and 2/19/15. (DG) Modified on 2/26/2015 (DG). (Entered: 02/26/2015) |
| 02/26/2015 | 184 | NOTICE of supplemental authority by Maria Del Rocio Burgos Garcia, Luis A. Garcia Saz. (Attachments: # 1 Supplement Supplemental Authority, # 2 Supplement Supplemental Authority)(Quaranta, John) (Entered: 02/26/2015) |
| 02/26/2015 | 185 | NOTICE of supplemental authority re 30 Response in Opposition to Motion *to Compel Arbitration* by Maria Del Rocio Burgos Garcia, Luis A. Garcia Saz. (Attachments: # 1 Exhibit Hernandez v Comm'r)(Babbitt, Theodore) (Entered: 02/26/2015) |
| 02/27/2015 | 186 | ORDER on filing of supplemental authority. Signed by Judge James D. Whittemore on 2/27/2015. (KE) (Entered: 02/27/2015) |
| 02/28/2015 | 187 | NOTICE by Church of Scientology Flag Service Organization, Inc., Church of Scientology Flag Ship Service Organization, Inc. *of filing deposition transcript of Sherman Lenske* (Potter, Robert) (Entered: 02/28/2015) |
| 02/28/2015 | 188 | NOTICE by Church of Scientology Flag Service Organization, Inc., Church of Scientology Flag Ship Service Organization, Inc. *of filing deposition transcript of Mike Ellis* (Attachments: # 1 deposition Mike Ellis, # 2 deposition mike ellis, # 3 deposition Mike Ellis, # 4 deposition mike Ellis)(Potter, Robert) (Entered: 02/28/2015) |
| 03/13/2015 | 189 | ORDER granting 120 Defendants' Renewed Motion to Compel Arbitration and to Stay Proceedings. This case is STAYED pending arbitration. The Clerk is directed to CLOSE this case. Signed by Judge James D. Whittemore on 3/13/2015. (AO) (Entered: 03/13/2015) |
| 03/25/2015 | 190 | NOTICE of filing correspondence from Caesar Alarcon. (Attachments: # 1 Mailing Envelope)(KE) (Entered: 03/25/2015) |
| 04/09/2015 | 191 | MOTION for New Trial */Reconsideration* by Maria Del Rocio Burgos Garcia, Luis A. Garcia Saz. (Babbitt, Theodore) (Entered: 04/09/2015) |
| 04/15/2015 | 192 | Unopposed MOTION for Extension of Time to File Response/Reply *to Plaintiffs' Motion For Reconsideration* by Church of Scientology Flag Service Organization, Inc., Church of Scientology Flag Ship Service Organization, Inc.. (Potter, Robert) Motions referred to Magistrate Judge Thomas B. McCoun III. (Entered: 04/15/2015) |
| 04/20/2015 | 193 | **ENDORSED ORDER granting 192 Motion for Extension of Time to File Response re 191 MOTION for Reconsideration. Response due by 5/11/2015. Signed by Judge** |

4/2/2019        Electronic Case Filing | U.S. District Court - Middle District of Florida

USCA11 Case: 18-13452    Document: 82    Date Filed: 04/04/2019    Page: 28 of 222
James D. Whittemore on 4/20/2015. (AO) (Entered: 04/20/2015)

| | | |
|---|---|---|
| 05/08/2015 | 194 | RESPONSE in Opposition re 191 MOTION for New Trial /*Reconsideration* filed by Church of Scientology Flag Service Organization, Inc., Church of Scientology Flag Ship Service Organization, Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E)(Potter, Robert) (Entered: 05/08/2015) |
| 05/13/2015 | 195 | TRANSCRIPT of Evidentiary Hearing held on 2/18/15 before Judge Whittemore. Court Reporter Lynann Nicely,Telephone number (813) 301-5252. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter.. Redaction Request due 6/3/2015, Redacted Transcript Deadline set for 6/15/2015, Release of Transcript Restriction set for 8/11/2015. (LN) (Entered: 05/13/2015) |
| 05/13/2015 | 196 | TRANSCRIPT of Evidentiary Hearing held on 2/19/15 before Judge Whittemore. Court Reporter Lynann Nicely,Telephone number (813) 301-5252. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter.. Redaction Request due 6/3/2015, Redacted Transcript Deadline set for 6/15/2015, Release of Transcript Restriction set for 8/11/2015. (LN) (Entered: 05/13/2015) |
| 05/13/2015 | 197 | NOTICE to counsel of filing of OFFICIAL TRANSCRIPT. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may purchase a copy from the court reporter or view the document at the clerk's office public terminal. Court Reporter: Lynann Nicely. (LN) (Entered: 05/13/2015) |
| 05/15/2015 | 198 | **ORDER denying 191 Motion for New Trial/Reconsideration. Signed by Judge James D. Whittemore on 5/14/2015. (KE)** (Entered: 05/15/2015) |
| 06/09/2015 | 199 | NOTICE of Appearance by Rebecca Mercier Vargas on behalf of Maria Del Rocio Burgos Garcia (Vargas, Rebecca) (Entered: 06/09/2015) |
| 06/09/2015 | 200 | NOTICE OF APPEAL as to 189 Order on motion to compel arbitration, 198 Order on Motion for New Trial by Maria Del Rocio Burgos Garcia, Luis A. Garcia Saz. Filing fee not paid. (Vargas, Rebecca) (Entered: 06/09/2015) |
| 06/09/2015 | 201 | NOTICE of Appearance by Jane Kreusler-Walsh on behalf of Maria Del Rocio Burgos Garcia, Luis A. Garcia Saz (Kreusler-Walsh, Jane) (Entered: 06/09/2015) |
| 06/09/2015 | 202 | NOTICE of Appearance by Rebecca Mercier Vargas on behalf of Luis A. Garcia Saz and Maria Del Rocio Burgos Garcia.(Vargas, Rebecca) Modified on 6/9/2015 (DG). (Entered: 06/09/2015) |
| 06/10/2015 | 203 | TRANSMITTAL of initial appeal package to USCA consisting of copies of notice of appeal, docket sheet, order/judgment being appealed, to USCA re 200 Notice of appeal. Eleventh Circuit Transcript information form forwarded to pro se litigants and available to counsel at www.flmd.uscourts.gov under Forms and Publications/General. (DG) (Entered: 06/10/2015) |
| 06/16/2015 | | USCA appeal fees received $ 505 receipt number TPA30731 re 200 Notice of appeal filed by Maria Del Rocio Burgos Garcia, Luis A. Garcia Saz (ARC) (Entered: 06/16/2015) |
| 06/16/2015 | | TRANSMITTAL to USCA forwarding certified copy of NEF reflecting the payment of |

| | | |
|---|---|---|
| | | appellate filing fees received by the District Court on 6/16/15 re 200 Notice of appeal. USCA number: 15-12577-D (DG) (Entered: 06/16/2015) |
| 06/17/2015 | 204 | TRANSCRIPT information form filed by Maria Del Rocio Burgos Garcia, Luis A. Garcia Saz re 200 Notice of appeal. USCA number: 15-12577. (Vargas, Rebecca) (Entered: 06/17/2015) |
| 07/30/2015 | 205 | ORDER of USCA: On its own motion, the court DISMISSES the appeal for lack of jurisdiction as to 200 Notice of appeal filed by Maria Del Rocio Burgos Garcia, Luis A. Garcia Saz. EOD: 7/29/15; USCA number: 15-12577-DD. (JNB) (Entered: 07/30/2015) |
| 04/13/2016 | 206 | MOTION to stay *to Lift Stay Because Defendants Waived the Right to Arbitrate* by Maria Del Rocio Burgos Garcia, Luis A. Garcia Saz. (Attachments: # 1 Exhibit Email dated August 18, 2015, # 2 Exhibit Exhibit B Email dated Augsut 24, 2015, # 3 Exhibit Exhibit C - Email dated August 27, 2015, # 4 Exhibit Exhibit D - Email dated September 4, 2015, # 5 Exhibit Exhibit E - Affidavit of Luis Garcia, # 6 Exhibit Exhibit F - Email dated September 4, 2015, # 7 Exhibit Exhibit G - Emails, # 8 Exhibit Exhibit H - Email dated September 15, 2015, # 9 Exhibit Exhibit I - Scientology letter dated September 18, 2015, # 10 Exhibit Exhibit J - Email dated September 23, 2015, # 11 Exhibit Exhibit K Email and correspondence dated October 5, 2015, # 12 Exhibit Exhibit L - Email dated October 9, 2015, # 13 Exhibit Exhibit M Email dated October 21, 2015, # 14 Exhibit Exhibit N Email dated October 22, 2015, # 15 Exhibit Exhibit O Email dated November 4, 2015, # 16 Exhibit Exhibit P Email dated November 5, 2015, # 17 Exhibit Exhibit Q Email and correspondence dated November 30, 2015, # 18 Exhibit Exhibit R Email dated December 11, 2015, # 19 Exhibit Exhibit S Email dated January 12, 2016, # 20 Exhibit Exhibit T Email dated January 18, 2016, # 21 Exhibit Exhibit U Correspondence dated january 19, 2016, # 22 Exhibit Exhibit V Correspondence dated January 27, 2016)(Babbitt, Theodore) (Entered: 04/13/2016) |
| 04/14/2016 | 207 | NOTICE by Maria Del Rocio Burgos Garcia, Luis A. Garcia Saz re 206 MOTION to stay *to Lift Stay Because Defendants Waived the Right to Arbitrate of Filing Exhibit W to Plaintiff's Motion to Lift Stay Because Defendants Waived the Right to Arbitrate* (Attachments: # 1 Exhibit Exhibit W Meet Over 16,000 Scientologists On-Line)(Babbitt, Theodore) (Entered: 04/14/2016) |
| 04/14/2016 | 208 | MOTION for Extension of Time to File Response/Reply *to Plaintiffs' Motion* by Church of Scientology Flag Service Organization, Inc., Church of Scientology Flag Ship Service Organization, Inc.. (Pope, F.) Motions referred to Magistrate Judge Thomas B. McCoun III. (Entered: 04/14/2016) |
| 04/15/2016 | 209 | **ENDORSED ORDER granting 208 Motion for Extension of Time to File Response. Defendants' response is due by 5/16/2016. Signed by Judge James D. Whittemore on 4/15/2016. (SMA)** (Entered: 04/15/2016) |
| 05/16/2016 | 210 | RESPONSE to Motion re 206 MOTION to stay *to Lift Stay Because Defendants Waived the Right to Arbitrate* filed by Church of Scientology Flag Service Organization, Inc., Church of Scientology Flag Ship Service Organization, Inc., Church of Scientology International and Mike Ellis, Church of Scientology Religious Trust. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit, # 9 Exhibit, # 10 Exhibit, # 11 Exhibit, # 12 Exhibit, # 13 Exhibit, # 14 Exhibit, # 15 Exhibit)(Pope, F.) (Entered: 05/16/2016) |
| 07/12/2016 | 211 | STRICKEN per 214 Order - NOTICE of correspondence from Marcel Wenger. (Attachments: # 1 Mailing Envelope)(DG) Modified on 7/27/2016 (BES). (Entered: 07/13/2016) |
| 07/12/2016 | 212 | STRICKEN per 214 Order - NOTICE of correspondence from Cindy Plahuta. |

| | | |
|---|---|---|
| | | (Attachments: # 1 Mailing Envelope)(DG) Modified on 7/27/2016 (BES). (Entered: 07/13/2016) |
| 07/21/2016 | 213 | MOTION to Strike by All Defendants. (Pope, F.) Motions referred to Magistrate Judge Thomas B. McCoun III. (Entered: 07/21/2016) |
| 07/27/2016 | 214 | **ORDER granting 213 Defendants' Unopposed Motion to Strike Letters of Marcel Wenger and Cindy Plahuta. The Clerk is directed to strike Documents 211 and 212 from the record and delete the images. Signed by Magistrate Judge Thomas B. McCoun III on 7/27/2016. (AHA) (Entered: 07/27/2016)** |
| 08/04/2016 | 215 | **ORDER denying 206 Plaintiffs' Motion to Lift Stay. Signed by Judge James D. Whittemore on 8/3/2016. (AO) (Entered: 08/04/2016)** |
| 08/31/2016 | 216 | STATUS report *Advising Status of Arbitration* by Church of Scientology Flag Service Organization, Inc., Church of Scientology Flag Ship Service Organization, Inc.. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit, # 9 Exhibit)(Potter, Robert) (Entered: 08/31/2016) |
| 09/30/2016 | 217 | STATUS report *september 30, 2016* by Church of Scientology Flag Service Organization, Inc.. (Potter, Robert) (Entered: 09/30/2016) |
| 10/31/2016 | 218 | STATUS report *Joint Report for October* by Church of Scientology Flag Service Organization, Inc., Church of Scientology Flag Ship Service Organization, Inc., IAS Administrations, Inc., U.S. IAS Members Trust, Church of Scientology Religious Trust, Church of Scientology International and Mike Ellis. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit)(Potter, Robert) (Entered: 10/31/2016) |
| 11/30/2016 | 219 | STATUS report *November 2016* by Church of Scientology Flag Service Organization, Inc.. (Potter, Robert) (Entered: 11/30/2016) |
| 12/12/2016 | 220 | MOTION for Reconsideration *of Renewed Motion for Order of Waiver of Arbitration* by Maria Del Rocio Burgos Garcia, Luis A. Garcia Saz. (Attachments: # 1 Affidavit Affidavit of Luis Garcia)(Babbitt, Theodore) (Entered: 12/12/2016) |
| 12/19/2016 | 221 | Unopposed MOTION for Extension of Time to File Response/Reply as to 220 MOTION for Reconsideration *of Renewed Motion for Order of Waiver of Arbitration* by All Defendants. (Potter, Robert) Motions referred to Magistrate Judge Thomas B. McCoun III. Modified on 12/20/2016 (DG). Modified on 12/20/2016 (DG). (Entered: 12/19/2016) |
| 12/20/2016 | 222 | **ENDORSED ORDER granting 221 Motion for Extension of Time to File Response/Reply re 220 MOTION for Reconsideration *of Renewed Motion for Order of Waiver of Arbitration* Response due by 9 a.m. 1/16/2017. Signed by Judge James D. Whittemore on 12/20/2016. (SMA) (Entered: 12/20/2016)** |
| 01/04/2017 | 223 | STATUS report *December 30, 2016* by Church of Scientology Flag Service Organization, Inc., Church of Scientology Flag Ship Service Organization, Inc., IAS Administrations, Inc., U.S. IAS Members Trust, Church of Scientology Religious Trust, Church of Scientology International and Mike Ellis. (Potter, Robert) (Entered: 01/04/2017) |
| 01/11/2017 | 224 | RESPONSE to Motion re 220 MOTION for Reconsideration *of Renewed Motion for Order of Waiver of Arbitration* filed by Church of Scientology Flag Service Organization, Inc., Church of Scientology Flag Ship Service Organization, Inc., Church of Scientology International and Mike Ellis, Church of Scientology Religious Trust. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit)(Potter, Robert) (Entered: 01/11/2017) |
| 02/07/2017 | 225 | **ORDER denying 220 MOTION for Reconsideration of Renewed Motion for Order** |

| | | |
|---|---|---|
| | | of Waiver of Arbitration. A Case Management Conference is scheduled for April 6, 2017 at 4:00 p.m. in Courtroom 13-B, United States Courthouse, Tampa, Florida. Signed by Judge James D. Whittemore on 2/7/2017. (LD) (Entered: 02/07/2017) |
| 02/14/2017 | 226 | MOTION for Amanda Sundarsingh to withdraw as attorney *of Record* by Maria Del Rocio Burgos Garcia, Luis A. Garcia Saz. (Attachments: # 1 Text of Proposed Order) (Babbitt, Theodore) (Entered: 02/14/2017) |
| 02/15/2017 | 227 | **ORDER granting 226 Motion to Withdraw as Attorney. Attorney Amanda Sundarsingh terminated. Signed by Judge James D. Whittemore on 2/15/2017. (SMA)** (Entered: 02/15/2017) |
| 03/01/2017 | 228 | MOTION to Take Deposition from Brandon Orlando by Maria Del Rocio Burgos Garcia, Luis A. Garcia Saz. (Attachments: # 1 Exhibit Exhibit A Mike Ellis correspondence dated August 29, 2016, # 2 Exhibit Exhibit B Affidavit of Aaron Smith-Levin)(Babbitt, Theodore) Motions referred to Magistrate Judge Thomas B. McCoun III. (Entered: 03/01/2017) |
| 03/03/2017 | 229 | MOTION to extend time to respond to plaintiffs motion to take deposition *(doc. 228)* by All Defendants. (Potter, Robert) (Entered: 03/03/2017) |
| 03/06/2017 | 230 | **ENDORSED ORDER granting 229 Motion to extend time. Defendants' response is due 3/17/2017. Signed by Judge James D. Whittemore on 3/6/2017. (SMA)** (Entered: 03/06/2017) |
| 03/17/2017 | 231 | RESPONSE in Opposition re 228 MOTION to Take Deposition from Brandon Orlando filed by Church of Scientology Flag Service Organization, Inc., Church of Scientology Flag Ship Service Organization, Inc.. (Potter, Robert) (Entered: 03/17/2017) |
| 03/21/2017 | 232 | **ORDER denying 228 Motion to Take Deposition. Signed by Judge James D. Whittemore on 3/21/2017. (SMA)** (Entered: 03/21/2017) |
| 03/29/2017 | 233 | NOTICE OF RESCHEDULING CASE MANAGEMENT CONFERENCE: The Case Management Conference previously scheduled for April 6, 2017 at 4:00 PM is RESCHEDULED. New date and time: April 7, 2017 at 11:00 AM in Tampa Courtroom 13 B before Judge James D. Whittemore. (LD) (Entered: 03/29/2017) |
| 03/30/2017 | 234 | STATUS report *March 2017* by Church of Scientology Flag Service Organization, Inc., Church of Scientology Flag Ship Service Organization, Inc.. (Attachments: # 1 Exhibit) (Potter, Robert) (Entered: 03/30/2017) |
| 04/07/2017 | 235 | TRANSCRIPT of Status Conference held on 4/7/17 before Judge Whittemore. Court Reporter Lynann Nicely,Telephone number (813) 301-5252. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 4/28/2017, Redacted Transcript Deadline set for 5/8/2017, Release of Transcript Restriction set for 7/6/2017. (LN) (Entered: 04/07/2017) |
| 04/07/2017 | 236 | NOTICE to counsel of filing of OFFICIAL TRANSCRIPT. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may purchase a copy from the court reporter or view the document at the clerk's office public terminal. Court Reporter: Lynann Nicely. (LN) (Entered: 04/07/2017) |
| 04/07/2017 | 237 | Minute Entry. Proceedings held before Judge James D. Whittemore: CASE MANAGEMENT CONFERENCE held on 4/7/2017. Court Reporter: Lynann Nicely |

| 04/10/2017 | 238 | **ORDER directing Defendants to file, within 15 days, an application under Section 5 of the Federal Arbitration Act. Signed by Judge James D. Whittemore on 4/10/2017. (SMA)** (Entered: 04/10/2017) |
|---|---|---|
| 04/25/2017 | 239 | MOTION to Appoint Expert *arbitrator* by Church of Scientology Flag Ship Service Organization, Inc.. (Potter, Robert) Motions referred to Magistrate Judge Thomas B. McCoun III. (Entered: 04/25/2017) |
| 04/28/2017 | 240 | **ENDORSED ORDER directing Plaintiffs to respond to 239 Defendants' Motion for Court to Provide for the Selection of a Scientologist In Good Standing As A Mediator no later than 5/3/2017. Signed by Judge James D. Whittemore on 4/28/2017. (SMA)** (Entered: 04/28/2017) |
| 04/28/2017 | 241 | RESPONSE in Opposition re 239 MOTION to Appoint Expert *arbitrator* filed by Maria Del Rocio Burgos Garcia, Luis A. Garcia Saz. (Babbitt, Theodore) (Entered: 04/28/2017) |
| 05/01/2017 | 242 | **ORDER directing compliance with [238] April 10, 2017 Order, within 10 days. Signed by Judge James D. Whittemore on 5/1/2017. (SMA)** (Entered: 05/01/2017) |
| 05/19/2017 | 243 | **ORDER granting in part and denying in part 239 Motion for Court to Provide for the Selection of a Scientologist in Good Standing as Arbitrator. Signed by Judge James D. Whittemore on 5/18/2017. (SMA)** (Entered: 05/19/2017) |
| 06/02/2017 | 244 | First MOTION for clarification re 243 Order on Motion to Appoint Expert by Church of Scientology Flag Service Organization, Inc., Church of Scientology Flag Ship Service Organization, Inc.. (Attachments: # 1 Exhibit Exhibit 1, # 2 Exhibit Verification)(Pope, F.) (Entered: 06/02/2017) |
| 06/07/2017 | 245 | RESPONSE in Opposition re 244 First MOTION for clarification re 243 Order on Motion to Appoint Expert filed by Maria Del Rocio Burgos Garcia, Luis A. Garcia Saz. (Babbitt, Theodore) (Entered: 06/07/2017) |
| 06/27/2017 | 246 | **ORDER denying 244 Motion for clarification. Signed by Judge James D. Whittemore on 6/26/2017. (SMA)** (Entered: 06/27/2017) |
| 06/28/2017 | 247 | **ORDER with attached letter and Setting Hearing. Hearing to schedule arbitration set for 8/21/2017 at 03:00 PM in Tampa Courtroom 13 B before Judge James D. Whittemore. Signed by Judge James D. Whittemore on 6/28/2017. (Attachments: # 1 Exhibit)(SMA)** (Entered: 06/28/2017) |
| 07/18/2017 | 248 | Unopposed MOTION to Continue *August 21, 2017, Hearing* by Maria Del Rocio Burgos Garcia, Luis A. Garcia Saz. (Attachments: # 1 Exhibit A - Travel itinerary)(Babbitt, Theodore) (Entered: 07/18/2017) |
| 07/27/2017 | 249 | **ORDER granting 248 Motion to Continue to the extent that the hearing is rescheduled for Tuesday, August 15, 2017 at 4:00 P.M. in Courtroom 13B. Signed by Judge James D. Whittemore on 7/27/2017. (SMA)** (Entered: 07/27/2017) |
| 07/28/2017 | | Reset deadlines/hearings: Miscellaneous Hearing set for 8/15/2017 at 04:00 PM in Tampa Courtroom 13 B before Judge James D. Whittemore. (DG) (Entered: 07/28/2017) |
| 08/10/2017 | 250 | Unopposed MOTION for Eric Lieberman to appear pro hac vice by Church of Scientology Flag Service Organization, Inc., Church of Scientology Flag Ship Service Organization, Inc., Church of Scientology International and Mike Ellis, Church of Scientology Religious Trust. (Attachments: # 1 Exhibit Certificate of Good Standing) (Potter, Robert) (Entered: 08/10/2017) |
| 08/10/2017 | 251 | RESPONSE re 249 Order on Motion to Continue *and Directing Parties to Meet and* |

| | | Confer filed by Church of Scientology Flag Service Organization, Inc. Church of Scientology Flag Ship Service Organization, Inc., Church of Scientology International and Mike Ellis, Church of Scientology Religious Trust. (Potter, Robert) (Entered: 08/10/2017) |
|---|---|---|
| 08/14/2017 | 252 | **ENDORSED ORDER granting 250 motion to appear pro hac vice contingent upon counsel's submission of the required Special Admission Attorney Certification form and payment of the $150.00 special admission fee. Failure to submit the form and fee within ten (10) days of the date of this Order shall result in counsel's appearance being stricken from the record. Eric Lieberman ADMITTED *PRO HAC VICE*. F. Wallace Pope and Robert Potter DESIGNATED LOCAL COUNSEL. Counsel are further notified that pursuant to the United States District Court Middle District of Florida Administrative Procedures for Electronic Filing, Section I, "all documents submitted for filing in civil, criminal, and miscellaneous cases must be filed electronically through CM/ECF." Therefore, the attorney(s) being admitted pro hac vice is/are directed to sign up for CM/ECF, enter an email address in their CM/ECF account and electronically file a notice of compliance with this Court's Order within thirty (30) days. Failure to comply with this Order as directed will result in counsel being terminated from the docket sheet without further notice. Signed by Judge James D. Whittemore on 8/14/2017. (SMA) (Entered: 08/14/2017)** |
| 08/14/2017 | | ***PRO HAC VICE FEES paid and Special Admission Attorney Certification Form filed by attorney Eric Lieberman, appearing on behalf of Church of Scientology Flag Service Organization, Inc., Church of Scientology Flag Ship Service Organization, Inc. (Filing fee $150 receipt number TPA045228). (LMD) (Entered: 08/15/2017) |
| 08/15/2017 | 253 | Minute Entry. Proceedings held before Judge James D. Whittemore: MISCELLANEOUS HEARING held on 8/15/2017. Court Reporter: Lynann Nicely (CAB) (Entered: 08/15/2017) |
| 08/15/2017 | | Sealed Document S-262. (CAB) (Entered: 10/12/2017) |
| 08/18/2017 | 254 | **ORDER directing arbitration beginning at 9:00 A.M. on October 23, 2017. Signed by Judge James D. Whittemore on 8/17/2017. (SMA) (Entered: 08/18/2017)** |
| 08/18/2017 | 255 | TRANSCRIPT of Miscellaneous Hearing held on 8/15/2017 before Judge Whittemore. Court Reporter Lynann Nicely,Telephone number (813) 301-5252. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 9/8/2017, Redacted Transcript Deadline set for 9/18/2017, Release of Transcript Restriction set for 11/16/2017. (LN) (Entered: 08/18/2017) |
| 08/18/2017 | 256 | NOTICE to counsel of filing of OFFICIAL TRANSCRIPT. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may purchase a copy from the court reporter or view the document at the clerk's office public terminal. Court Reporter: Lynann Nicely. (LN) (Entered: 08/18/2017) |
| 09/14/2017 | 257 | MOTION for miscellaneous relief, specifically Order requiring the filing of a Certification of Noninterference with the Arbitration Process *and requiring the Defendants to Allow Plaintiffs to have a court reporter and the Rules of the Committee of Evidence do not apply to this arbitration* by Maria Del Rocio Burgos Garcia, Luis A. Garcia Saz. (Babbitt, Theodore) (Entered: 09/14/2017) |
| | | |

| Date | No. | Entry |
|---|---|---|
| 09/27/2017 | 258 | Unopposed MOTION for Extension of Time to File Response/Reply as to 257 MOTION for miscellaneous relief, specifically Order requiring the filing of a Certification of Noninterference with the Arbitration Process *and requiring the Defendants to Allow Plainiffs to have a court reporter and the Rules of the Committee of by Church of Scientology Flag Service Organization, Inc., Church of Scientology Flag Ship Service Organization, Inc..* (Potter, Robert) Motions referred to Magistrate Judge Thomas B. McCoun III. (Entered: 09/27/2017) |
| 09/28/2017 | 259 | **ENDORSED ORDER granting 258 Motion for Extension of Time to File Response re 257 MOTION for miscellaneous relief. Response due by 10/6/2017. Signed by Judge James D. Whittemore on 9/28/2017. (SMA)** (Entered: 09/28/2017) |
| 10/05/2017 | 260 | RESPONSE in Opposition re 257 MOTION for miscellaneous relief, specifically Order requiring the filing of a Certification of Noninterference with the Arbitration Process *and requiring the Defendants to Allow Plaintiffs to have a court reporter and the Rules of the Committee of filed by Church of Scientology Flag Service Organization, Inc., Church of Scientology Flag Ship Service Organization, Inc..* (Pope, F.) (Entered: 10/05/2017) |
| 10/11/2017 | 261 | STRICKEN, PURSUANT TO ORDER 263 STATUS report *Unilateral* by Maria Del Rocio Burgos Garcia, Luis A. Garcia Saz. (Attachments: # 1 Exhibit A - Email of October 9, 2017, # 2 Exhibit B - Email of October 10, 2017, # 3 Exhibit C - Agreement from Defendants)(Babbitt, Theodore) Modified on 10/12/2017 (DG). (Entered: 10/11/2017) |
| 10/12/2017 | 263 | **ORDER striking 261 Plaintiffs' Unilateral Status Report. Signed by Judge James D. Whittemore on 10/12/2017. (SMA)** (Entered: 10/12/2017) |
| 10/12/2017 | 264 | MOTION for Reconsideration *and Determination that the Defendants Have Waived Arbitration* by Maria Del Rocio Burgos Garcia, Luis A. Garcia Saz. (Attachments: # 1 Exhibit A Email to defense counsel, # 2 Exhibit B - Email from defense counsel, # 3 Exhibit C - Agreement, # 4 Exhibit D - Email from defense counsel)(Babbitt, Theodore) (Entered: 10/12/2017) |
| 10/16/2017 | 265 | **ORDER denying 257 Motion for Miscellaneous Relief; denying 264 Motion for Determination that Defendants Have Waived Arbitration. Signed by Judge James D. Whittemore on 10/16/2017. (SMA)** (Entered: 10/16/2017) |
| 10/20/2017 | 266 | CERTIFICATE of compliance *by Theodore Babbitt and* by Maria Del Rocio Burgos Garcia, Luis A. Garcia Saz. (Babbitt, Theodore) (Entered: 10/20/2017) |
| 10/23/2017 | 267 | NOTICE of filing certification by Church of Scientology Flag Service Organization, Inc., Church of Scientology Flag Ship Service Organization, Inc. *Notice of Filing* (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5) (Potter, Robert) Modified text on 10/23/2017 (KMM). (Entered: 10/23/2017) |
| 10/30/2017 | 268 | NOTICE of conclusion of arbitration by Church of Scientology Flag Service Organization, Inc., Church of Scientology Flag Ship Service Organization, Inc., Church of Scientology International and Mike Ellis (Potter, Robert) Modified text on 10/30/2017 (KMM). (Entered: 10/30/2017) |
| 01/03/2018 | 269 | NOTICE by Maria Del Rocio Burgos Garcia *Notice of Change of Firm Name and E-Mail Designations* (Vargas, Rebecca) Modified text on 1/4/2018 (KMM). *** Counsel notified to file a notice of change of address request through the Middle District of Florida website. *** (Entered: 01/03/2018) |
| 01/19/2018 | 270 | *** STRICKEN- per DE# 271 *** MOTION to Vacate *Arbitration Awards and Incorporated Memorandum of Law* by All Plaintiffs. (Attachments: # 1 Exhibit 1, # 2 |

Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5)(Babbitt, Theodore) Modified text
on 1/22/2018 (KMM). (Entered: 01/19/2018)

| | | |
|---|---|---|
| 01/22/2018 | 271 | **ORDER striking 270 Motion to Vacate Arbitration Awards. Signed by Judge James D. Whittemore on 1/22/2018. (SMA)** (Entered: 01/22/2018) |
| 01/23/2018 | 272 | Amended MOTION to Vacate *Arbitration Awards and Incorporated Memorandum of Law* by All Plaintiffs. (Attachments: # 1 Exhibit Exhibit 1 Arbitration Findings Form, # 2 Exhibit Exhibit 2 Arbitration Decision Form, # 3 Exhibit Exhibit 3 Affidavit of Luis A. Garcia Saz, # 4 Exhibit Exhibit 4 Garcia Declare Order, # 5 Exhibit Exhibit 5 Emails of Counsel)(Vargas, Rebecca) (Entered: 01/23/2018) |
| 01/26/2018 | 273 | Unopposed MOTION for Extension of Time to File Response/Reply by All Defendants. (Pope, F.) Motions referred to Magistrate Judge Thomas B. McCoun III. (Entered: 01/26/2018) |
| 01/29/2018 | 274 | **ENDORSED ORDER granting 273 Motion for Extension of Time to File Response/Reply Responses due by 2/20/2018. Signed by Judge James D. Whittemore on 1/29/2018. (SMA)** (Entered: 01/29/2018) |
| 02/20/2018 | 275 | MEMORANDUM in opposition re 272 Motion to Vacate *Arbitration award* filed by Church of Scientology Flag Service Organization, Inc., Church of Scientology Flag Ship Service Organization, Inc.. (Attachments: # 1 Affidavit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit, # 9 Exhibit, # 10 Appendix, # 11 Exhibit)(Pope, F.) (Entered: 02/20/2018) |
| 02/21/2018 | 276 | NOTICE of filing properly marked exhibits to the MEMORANDUM in opposition re 272 Motion to Vacate *Arbitration award* filed by Church of Scientology Flag Service Organization, Inc., Church of Scientology Flag Ship Service Organization, Inc.. (Attachments: # 1 Affidavit Exhibit A, # 2 Exhibit Exhibit A1, # 3 Exhibit Exhibit A2, # 4 Exhibit Exhibit A3, # 5 Exhibit Exhibit A4, # 6 Exhibit Exhibit A5, # 7 Exhibit Exhibit A6, # 8 Exhibit Exhibit A7, # 9 Exhibit Exhibit A8, # 10 Affidavit Exhibit B, # 11 Exhibit Exhibit C)(Pope, F.) Modified text on 2/21/2018 (KMM). (Entered: 02/21/2018) |
| 02/28/2018 | 277 | MOTION for Hearing *Evidentiary on Amended Motion to Vacate Arbitration Award* by Maria Del Rocio Burgos Garcia, Luis A. Garcia Saz. (Babbitt, Theodore) (Entered: 02/28/2018) |
| 02/28/2018 | 278 | MOTION for leave to file Reply to Defendants' Opposition to Motion to Vacate Arbitration Awards by Maria Del Rocio Burgos Garcia, Luis A. Garcia Saz. (Babbitt, Theodore) Modified relief and text on 2/28/2018 (KMM). (Entered: 02/28/2018) |
| 03/14/2018 | 279 | MEMORANDUM in opposition re 278 Motion to affirm secretarys/commissioners decisionMotion for Leave to file document filed by Church of Scientology Flag Service Organization, Inc., Church of Scientology Flag Ship Service Organization, Inc.. (Pope, F.) (Entered: 03/14/2018) |
| 03/14/2018 | 280 | MEMORANDUM in opposition re 277 Motion for Hearing filed by Church of Scientology Flag Service Organization, Inc., Church of Scientology Flag Ship Service Organization, Inc.. (Pope, F.) (Entered: 03/14/2018) |
| 06/29/2018 | 281 | **ENDORSED ORDER denying 278 Motion for Leave to File a Reply. Signed by Judge James D. Whittemore on 6/29/2018. (SMA)** (Entered: 06/29/2018) |
| 07/17/2018 | 282 | **ORDER denying 272 Amended Motion to Vacate Arbitration Awards ; denying 277 Motion for Evidentiary Hearing. Signed by Judge James D. Whittemore on 7/17/2018. (SMA)** (Entered: 07/17/2018) |
| 08/14/2018 | 283 | NOTICE of Appearance by Robert Ernest Johnson on behalf of Maria Del Rocio Burgos |

| 08/15/2018 | 284 | NOTICE OF APPEAL as to 282 Order on Motion to VacateOrder on Motion for Hearing by Maria Del Rocio Burgos Garcia, Luis A. Garcia Saz. Filing fee not paid. (Johnson, Robert) (Entered: 08/15/2018) |
|---|---|---|
| 08/15/2018 | | USCA appeal fees received $ 505 receipt number TPA052485 re 284 Notice of appeal filed by Maria Del Rocio Burgos Garcia, Luis A. Garcia Saz (EA) (Entered: 08/15/2018) |
| 08/16/2018 | 285 | TRANSMITTAL of initial appeal package to USCA consisting of copies of notice of appeal, docket sheet, order/judgment being appealed, and motion, if applicable to USCA re 284 Notice of appeal. Eleventh Circuit Transcript information form forwarded to pro se litigants and available to counsel at www.flmd.uscourts.gov under Forms and Publications/General. (BES) (Entered: 08/16/2018) |
| 08/24/2018 | 286 | NOTICE OF CROSS APPEAL as to 124 Order on motion to dismiss/lack of jurisdiction, 113 Order on motion to dismiss/lack of jurisdictionOrder on Motion to StrikeOrder on Motion to Amend/Correct by Church of Scientology Flag Service Organization, Inc., Church of Scientology Flag Ship Service Organization, Inc.. (Pope, F.) (Entered: 08/24/2018) |
| 08/27/2018 | 287 | TRANSMITTAL of initial appeal package to USCA consisting of copies of notice of appeal, docket sheet, order/judgment being appealed, and motion, if applicable to USCA re 286 Notice of cross appeal. Eleventh Circuit Transcript information form forwarded to pro se litigants and available to counsel at www.flmd.uscourts.gov under Forms and Publications/General. (KMM) (Entered: 08/27/2018) |
| 08/29/2018 | 288 | TRANSCRIPT information form filed by Luis A. Garcia Saz re 284 Notice of appeal. USCA number: 18-13452. (Johnson, Robert) (Entered: 08/29/2018) |
| 08/30/2018 | | USCA appeal fees received $ 505 receipt number tpa052780 re 286 Notice of cross appeal filed by Church of Scientology Flag Service Organization, Inc., Church of Scientology Flag Ship Service Organization, Inc. (ARC) (Entered: 08/30/2018) |
| 10/25/2018 | 289 | MOTION to Withdraw *as Counsel* by Luis A. Garcia Saz. (Weil, Ronald) (Entered: 10/25/2018) |
| 10/26/2018 | 290 | **ORDER granting 289 Motion to Withdraw As Counsel. Signed by Judge James D. Whittemore on 10/26/2018. (SMA)** (Entered: 10/26/2018) |
| 12/07/2018 | | Remark: Plaintiff and Defendant's Exhibit L. Ron Hubbard Book: Introduction to Scientology Ethics placed in Exhibit Room. (BSN) (Entered: 12/07/2018) |
| 03/04/2019 | 291 | ORDER of USCA: Maria Del Rocio Burgos Garcia and Luis. A. Garcia Saz's motion to amend the complaint, pursuant to 28 U.S.C. § 1653, is GRANTED. Church of Scientology Flag Service Organization, Inc. ("FSO") and Church of Scientology Flag Ship Service Organization, Inc.'s ("FSSO") motion to dismiss the appeal is DENIED. SEE ORDER FOR COMPLETE TEXT as to 286 Notice of cross appeal filed by Church of Scientology Flag Service Organization, Inc., Church of Scientology Flag Ship Service Organization, Inc., 284 Notice of appeal filed by Maria Del Rocio Burgos Garcia, Luis A. Garcia Saz. EOD: 3/4/19; USCA number: 18-13452-AA. (KE) (Entered: 03/04/2019) |

| PACER Service Center |
|---|
| **Transaction Receipt** |
| 04/02/2019 11:46:59 |

USCA11 Case: 18-13452 Document: 38 Date Filed: 04/08/2019 Page: 37 of 222

| PACER Login: | PBURLINGTON:2844684:3842196 | Client Code: | garcia |
|---|---|---|---|
| Description: | Docket Report | Search Criteria: | 8:13-cv-00220-JDW-TBM |
| Billable Pages: | 28 | Cost: | 2.80 |

RECEIVED

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

13 JAN 23 AM 8:53

MIDD... ... ....... ... ...
TAMPA, FLORIDA

LUIS A. GARCIA SAZ, and wife, MARIA DEL     Case No.
ROCIO BURGOS GARCIA,

       **Plaintiffs,**

8:13CV 220 T27 TBM

**vs.**

**CHURCH OF SCIENTOLOGY RELIGIOUS
TRUST; CHURCH OF SCIENTOLOGY
FLAG SERVICE ORGANIZATION, INC.;
CHURCH OF SCIENTOLOGY FLAG SHIP
SERVICE ORGANIZATION, INC. d/b/a
Majestic Cruise Lines; IAS
ADMINISTRATIONS, INC; U.S. IAS
MEMBERS TRUST.**

       **Defendants.**

                              /

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs, LUIS A. GARCIA SAZ (hereinafter, "LUIS GARCIA"), and wife,

MARIA DEL ROCIO BURGOS GARCIA (hereinafter, "MARIA GARCIA"), sue

Defendants, CHURCH OF SCIENTOLOGY RELIGIOUS TRUST, a tax exempt trust doing

business in Florida (hereinafter, "CSRT"); CHURCH OF SCIENTOLOGY FLAG SERVICE

ORGANIZATION, INC., a Florida nonprofit corporation (hereinafter, "FLAG"); CHURCH

OF SCIENTOLOGY FLAG SHIP SERVICE ORGANIZATION, INC. d/b/a Majestic Cruise

Lines, a foreign nonprofit corporation doing business in Florida (hereinafter, "SHIP"); IAS

ADMINISTRATIONS, INC., a foreign nonprofit corporation doing business in Florida

(hereinafter, "IAS") and U.S. IAS MEMBERS TRUST a tax exempt trust doing business in



Florida (hereinafter, "USIMT");    [hereinafter, sometimes collectively referred to as "Defendants"], and allege:

## INTRODUCTION

1.    Plaintiffs were formerly members of the Church of Scientology until November of 2010, when they concluded that the Church had lost its spiritual, moral, and financial compass under the leadership of David Miscavige, the self-titled "ecclesiastical leader of the Scientology religion." Through their relationship with Defendants, Plaintiff suffered financial losses caused by Defendants' soliciting contributions for purposes that were never fulfilled and for failing to repay deposits for future services that were never rendered and for fraud as hereinafter alleged.

2.    The Church of Scientology refers to the hierarchical structure of the Scientology religion which is comprised of various corporations and related entities.

3.    The Scientology movement rests entirely upon the writings of one man, L. Ron Hubbard.

4.    The question of whether Scientology is a religion has been disputed since the founding of the Scientology movement.  Plaintiffs are **not** taking a position one way or the other as to the validity of Scientology as a religion.  Rather, Plaintiffs seek to highlight the secular commercial nature of the fraudulent activities and inappropriate business dealings which give rise to this complaint.

5.    David Miscavige is the current leader of the Church of Scientology and its many affiliated organizations, having assumed that role shortly after the death of Scientology founder L. Ron Hubbard in 1986.  His formal title is Chairman of the Board of Religious

Technology Center (RTC), a corporation which controls the trademarked names and symbols of Dianetics and Scientology and which "holds the ultimate ecclesiastical authority regarding the standard and pure application of L. Ron Hubbard's religious technologies." His position is paramount within Scientology. Since assuming the role, set forth above, Miscavige has been faced with ongoing litigation and press accounts alleging illegal and unethical practices. The Church, under the leadership of David Miscavige, has strayed from its founding principles and morphed into a secular enterprise whose primary purpose is taking people's money.

6.     A major activity of Scientology Churches is providing "auditing" and "training" at substantial fees, to persons interested in Scientology. Persons are accepted for auditing and training on the basis of their interest in Scientology and their ability to pay.

7.     Traditionally the Church derived most of its income from four sources: (1) auditing and training (2) sales of E-meters, and of Scientology books and recordings to commercial bookstores as well as to other churches and missions of Scientology.

8.     In more recent years the Church has added large, high pressure fundraising drives as its primary source of generating revenue. Plaintiffs were victims of these drives as hereinafter alleged.

9.     On June 5, 1989 the Supreme Court of the United States announced its opinion in *Hernandez v. Commissioner*, 490 U.S. 680 (1989). The issue in that case was whether contributions to the Church of Scientology qualified as 501(c) (3) charitable contributions. The Supreme Court held that what the Church of Scientology claimed were charitable contributions, involved "quid pro quo" transactions and thus those payments did

not constitute charitable contributions because the giver was receiving a benefit as would occur in a commercial transaction. The Supreme Court of the United States upheld the Internal Revenue Services contention that no contributions to the Church of Scientology qualified for tax deductions and that the Church of Scientology did not enjoy tax exempt status as a charitable organization. That case has never been reversed and is the law of the land.

10.    Subsequently, in 1993, the IRS reversed its position and granted 501(c) (3) status to the Church of Scientology and related entities, recognizing deductibility of donations. Before the Supreme Court in the *Hernandez* case, and later in proceedings before the IRS the Church asserted that a fundamental principle it operates on is "the Doctrine of Exchange" and that this **mandates** return of funds to dissatisfied parishioners. These statements preclude the Church from taking a contrary position in this case.

11.    This case is not an attack on the religious tenets of the Church of Scientology, although arguments abound that the Church no longer functions as a duly-qualified, tax-exempt, religious organization. Nor is the case a referendum on the ecclesiastical constructs for how the Church governs its affairs. Rather, this case concerns something much more fundamental, that is, the rights of individuals to pursue claims through the civil judicial system for injuries and grievances sustained under conventions of civil justice applying legal principles of contract, fraud, misrepresentation and unfair and deceptive sales practices.

## **JURISDICTION AND VENUE**

12.    This Court has original jurisdiction over the parties and the subject matter of this action under 28 U.S.C. § 1332(d) because: (a) there is diversity of citizenship between

Plaintiff and Defendants; and (b) the amount in controversy of at least one of the claims exceeds $75,000.00, exclusive of interest and costs. The Court also has supplemental jurisdiction under 13 U.S.C. § 1367 over other claims related to the claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution, including those involving additional parties. All of the claims arise from a common nucleus of operative facts in that they all relate to Defendants' collective efforts to obtain and retain payments of funds from Plaintiffs through a variety of illegal acts and contrivances.

13.    Venue is proper in this district under 18 U.S.C. § 1391(b) (1) and (3) because a substantial part of the events and omissions giving rise to this action occurred in this district and because Defendants transact business in this district, and because there is no other district in which this action may otherwise be brought.

## PARTIES

14.    Plaintiffs, Luis and Maria Garcia, are citizens and residents of the State of California.

15.    Defendant CSRT is a non-profit trust established to solicit donations for the benefit of Church of Scientology International ("CSI") and its affiliated entities, and has its principal place of business at 319 South Garden Avenue, Clearwater, Florida 33756.

16.    Defendant FLAG is a Florida nonprofit corporation, and has its principal place of business at 503 Cleveland Street, Clearwater, Florida, 33755.

17.    FLAG ministers high levels of services to parishioners from around the world at facilities in Clearwater, Florida.

18.    Defendant SHIP is a foreign non-profit corporation and has its principal place of business at 116 N. Ft. Harrison Avenue, Clearwater, Florida, 33755.

19.    SHIP ministers the highest levels of services to parishioners from around the world aboard a ship operated in the Caribbean as a retreat.

20.    Defendant IAS is a Delaware corporation and has its principal place of business at 210 S. Osceola Avenue, Clearwater, Florida, 33755. The IAS is the official membership organization of Scientology.

21.    Defendant USIMT is, and at all relevant times was, an entity with its principal office in the City of Los Angeles, County of Los Angeles, State of California, but which actively conducts substantial business within the City of Clearwater, State of Florida, through its alter ego, Defendant IAS. Defendant, USIMT is an alter ego of Defendant IAS and is operated, supervised, or controlled by Defendant IAS, which possess a substantial degree of direction over the policies, programs and activities of the USIMT.

## GENERAL ALLEGATIONS COMMON TO ALL COUNTS

22.    Together, Defendants under Miscavige's leadership, management, and control, function as an interrelated and interdependent network of entities that functions to maximize the funds they can collectively extract from Church members like Plaintiffs, by soliciting contributions for purposes that are never fulfilled and by failing to repay deposits for services that were never rendered. The key to the organizational structure - - indeed, the undisputed leader - - is David Miscavige, who exerts complete, unequivocal control over Defendants, including control over how funds are collected, utilized, and disbursed, regardless of their purported "independent" corporate structures and boards. The Church of

Scientology, at Miscavige's direction, publicly proclaimed to the <u>St. Pete Times Newspaper</u> through an affidavit submitted by one of his direct subordinates, Sue Wilhere, that, *"Mr. Miscavige is Scientology."*

23.    At all times material hereto, Defendants acted in concert either as agents or principals of one another, partners, joint venturers, or co-conspirators.

24.    The types of services or initiatives promoted to members, for which contributions and deposits toward payments were made, varied and consisted of three basic types that are material to this action:

    a.  Contributions toward specific capital programs, such as the Church's "Super Power" project in Clearwater, Florida, a Scientology facility that commenced in 1995, and which, 17 years later, remains unopened;

    b.  Contributions toward national and/or global humanitarian initiatives, purportedly pursued to advance causes such as eradicating child pornography websites around the world, helping natural disaster victims, and other causes, for which contributions raised by the Church were never utilized, vastly underutilized or misappropriated; and

    c.  Deposits toward payments for counseling services (also described as "auditing") and training, as well as accommodations in Church owned facilities, that were never repaid despite the fact that services were never rendered.

25.    Although laudatory on their faces to the unsuspecting public, the solicitations for funding from Plaintiffs were false and misleading, as Defendants failed to utilize the

funds for the proposed purposes, and failed to repay the monies when owed to and demanded by Plaintiffs. Instead, Defendants improperly utilized the contributions and deposits, to, among other things, engage ranks of professionals to stifle inquiries into the Church's activities and finances, to intimidate members and ex-members, to finance the lavish lifestyle of Miscavige and to fill the coffers of the Church or its subsidiary/affiliated organizations.

## CSRT – THE "SUPER POWER PROJECT"

26.    In 1990, CSRT purchased an entire block of land adjacent to other Church facilities in Clearwater, Florida and began the process of developing and constructing a Scientology facility, which would later become known as the "Super Power" project.

27.    Since then, CSRT has been aggressively contacting Scientologists and using high-powered sales techniques, extracting money for the "Super Power" project.

28.    CSRT informed the IRS, in its application for tax-exempt status that it intended to raise $40 million for construction of the "Super Power" building. The CSRT has raised at least $200 million for a building for which CSRT spent less than half that amount constructing. Though a groundbreaking ceremony had been held in 1998, 14 years later the facility still sits empty, but aggressive fundraising continues.

29.    To induce plaintiffs to hand over money since at least 2001, CSRT representatives stated at each time the contributions were made by Plaintiffs, that the "Super Power" project was to be completed within that calendar year in which the funds were solicited from Plaintiffs and that the "final amount" of funding was urgently needed to complete construction.

30.    FLAG designates significant space within its facilities to CSRT and its representatives who actively engaged in high pressure solicitation activities.  FLAG also provides housing, food and medical care during CSRT fundraisers.  Plaintiffs' continued receipt of services from FLAG was contingent upon mandatory meetings with CSRT representatives. Plaintiffs, failure to meet with CSRT representatives while at FLAG would have prevented them from continuing their auditing and training services.

31.    With respect to contributions toward capital programs, such as the "Super Power" project of CSRT from Plaintiffs, representations and promises were made to Plaintiffs to induce contributions, including representations about the imminent need for the funding, and the promise that Plaintiffs contributing to the fund would receive approbation and other benefits. Between 1998 and 2005, representatives of CSRT, acting principally through their agent, Charmaine Roger, made repeated requests for funding from Plaintiffs. Such representations included, without limitation, the following:

   a. On October 15, 1998, Ms. Roger, accompanied by Matt Feshbach, introduced the "Super Power Expansion Project" to the Plaintiffs at a dinner, and implored Plaintiffs to become "Cornerstone Members" by contributing $35,000.00, toward this status, for which Plaintiffs would receive: (i) recognition on an "Honor Roll" that would be permanently displayed inside the building; (ii) that Plaintiffs' names would be published in promotional materials; (iii) that Plaintiffs would receive forty percent (40%) discounts on the price of, and special treatment in the delivery of, auditing services to be provided at the Super Power building by FLAG; (iv) that Plaintiffs would

receive preferential seating at the Grand Opening ceremonies; and (v) that Plaintiffs would have access to a lounge reserved for "Cornerstone Members" On this date Plaintiffs' contributed $23,000.00 and then on October 21, 1998 contributed the remaining balance of $12,000.00;

b.  Ms. Roger later continued to solicit further contributions up through August of 2005, promising increasing discounts on services of 50%, and access to another lounge known as the "VIP Lounge," reserved for large donors. During this period of time Plaintiffs gave donations of:

> December 3, 1998 - $35,000.00
> May 18, 1999 - $30,000.00
> July 6, 1999 - $10,000.00
> November 3, 1999 - $30,000.00
> March 16, 2000 - $4,500.00
> October 12, 2000 - $6,000.00
> November 28, 2000 - $2,500.00
> December 26, 2000 - $2,500.00
> May 8, 2001 - $21,500.00 and $23,000.00
> July 7, 2002 - $50,000.00
> July 31, 2002 - $15,000.00
> January 30, 2004 - $10,000.00

c.  On August 25, 2005, Ms. Roger approached Plaintiffs in their hotel room while they were in Clearwater, Florida, and asked Plaintiffs to make a $65,000.00 contribution to purchase a large Cross of Scientology to be affixed to the top of the Super Power building. Roger represented that contractors were standing by to do the work once payment was received.  The Plaintiffs

made the $65,000.00 contribution, but the cross was not affixed until five (5) years later in September 2010; and

32.     The Plaintiffs contributed a total of $340,000.00 to the Super Power building. CSRT consistently represented to Plaintiffs that the delays in opening the building and other specific projects, such as the placement of the cross, were due to lack of funds, but these representations were false.   To this day, seventeen (17) years later, the project allegedly remains "incomplete," and the building has not opened.   CSRT has persistently maintained the project in an "incomplete" state to use it as a shill to induce further payments from members, just as they did with Plaintiffs.

33.     The "Super Power" project is STILL not completed, nor is it opened, as of the date of the filing of this Complaint.   Additionally, Plaintiffs have not received the approbation promised.

34.     In early 2011, the City of Clearwater levied fines in excess of $400,000.00 for delays in constructing the building. Contrary to CSRT's earlier, repeated, representations to Plaintiffs that the opening was delayed for lack of funding, CSRT informed the City that the delays were due to other reasons, including but not limited to: (1) changes in the City's building codes and (2) the complexity of the Church's unique plans. In fact, a certificate of occupancy was issued on June 6, 2009 indicating that the building was complete. Notwithstanding the issuance of the certificate of occupancy, even now, the building remains unoccupied and CSRT continues to aggressively solicit funds from members for completion of the building, just as they did with Plaintiffs.

35.    Plaintiffs requested return of their funds in writing on August 8, 2012, but CSRT refused to return the funds.

36.    On each occasion specified above, Defendant, CSRT, fraudulently induced Plaintiffs to make contributions specifically for the "Super Power" project based upon false representations that Defendant needed the money immediately to fund the completion of the "Super Power" project. Each year that the building did not open, Defendant had a new false explanation as to why the Super Power building was incomplete. The completion of the building and delivery of the approbation at that time was a material basis for Plaintiffs making their specific contributions and the failure to complete the building and deliver the approbation resulted in harm to the Plaintiffs. Plaintiffs' contributions would not have been made had Plaintiffs known the ongoing delay in completion of the building was intentional and that explanations for the delay in completion were false.

37.    Defendant, CSRT, at all times knew that the above representations were false when made, and intended that Plaintiffs rely, to their detriment on these false representations.

38.    Plaintiffs, because of their reliance upon Defendant's false representations made the specified contributions to the "Super Power" project and would not have done so had they known the truth.

**FLAG AND SHIP – AUDITING SERVICES AND ACCOMMODATIONS**

39.    As members of FLAG and SHIP, Plaintiffs were induced to deposit money in advance of partaking in church services, both counseling "auditing" and Scientology training, as well as food and accommodations provided by FLAG and SHIP.   To encourage these

payments, Churches offered discounts for depositing funds in advance of participating in the services, referred to by the Church as "pre-payments."

40.     These "pre-payments" are maintained within each Scientology church on account for the use by church members, including Plaintiffs for hotel accommodations, meals, counseling sessions and Scientology training courses to be taken in the future.

41.     Plaintiffs deposited as pre-payments $37,413.56 on account with FLAG for counseling sessions, meals and hotel accommodations that FLAG never provided.

42.     Plaintiffs deposited $31,445.45 on account with SHIP for counseling services, meals, and hotel accommodations that SHIP never provided. With respect to deposits toward payments for auditing services, the Defendants took advantage of Plaintiffs by inducing them to make substantial deposits of funds to pay for future services with the express understanding that any unused funds would be returned upon demand.

43.     Plaintiffs have been aware since their initial involvement in Scientology that Defendants maintain a policy of returning funds, whether as "refunds" (i.e., a return of monies after service) or for "repayments" (i.e., a return of monies without the service being taken).

44.     The Defendants set forth how they treated the return of funds to members in their representations to the Internal Revenue Service in a form 1023 filing (Application for Recognition of Tax Exempt Status) to justify their gaining exempt status: *"The Church's refund policy is exceedingly fair. If someone isn't happy with Scientology – which is a very small minority of people – he simply has to make a proper request for his donations back, agree to forego further services and his donations will be returned. For the Church, in*

*addition to the fact that this policy aligns with Scientology principles of exchange, it also serves the purpose of allowing our churches and parishioners who are very happy with Scientology, to carry on without the unhappy few in our midst."*

45.     On December 7, 2010, Plaintiffs made a proper request in writing for repayment of their moneys on account with FLAG for counseling sessions, meals and hotel accommodations that were not provided.

46.     Despite the request, FLAG has failed/refused to repay any of the money on account to the Plaintiffs

47.     On December 7, 2010, Plaintiffs made a proper request in writing for repayment of their moneys on account with SHIP for counseling sessions, meals and hotel accommodations that were not provided.

48.     Despite request, SHIP has failed and refused to repay any of the money on account to the Plaintiffs.

49.     Plaintiffs have retained the services of the law firms listed below, agreeing to reasonable fees for their services.

50.     Plaintiffs have met all conditions precedent to bring this action, or such conditions have been waived.

## INITIATIVES OF IAS (USIMT)

51.     The IAS is the official membership organization of Scientology. The IAS was adopted as the official membership organization for the Church of Scientology in 1984. The IAS is a significant fundraising arm of the Church that proclaims to "unite, advance, support

and protect the Scientology religion and scientologists in all parts of the world so as to achieve the aims of Scientology as originated by L. Ron Hubbard".

52.    The USIMT was established in 1993 to raise tax-deductible contributions from IAS members in the United States. Defendant, USIMT is an alter ego of Defendant IAS and is operated, supervised, or controlled by Defendant IAS, which possess a substantial degree of direction over the policies, programs and activities of the USIMT.

53.    On October 5, 1997, an IAS officer contacted Plaintiff, Luis Garcia, and pressured him to donate money citing an "emergency." The Officer said the IAS was funding a huge protest and demonstrations in Berlin, Germany. Money was allegedly needed on an immediate basis to pay for volunteers' airfare, lodging, and other related costs. At the time Plaintiff was induced to contribute money for this cause, the IAS knew, or reasonably should have known, that the monies being solicited were not intended to be used for the stated purpose. As a direct result of, and in, reliance upon, the representations of the IAS, Plaintiff made his $2,000 donation with his American Express card. Plaintiff would not have made this contribution had he known the statements were false.

54.    Plaintiff's October 5, 1997 donation was made for the express purpose of funding the protests in Berlin. The representations made by the IAS on October 5, 1997, regarding the need for and use of the monies solicited were false.

55.    On September 2, 2002, while at FLAG, Plaintiff, Maria Garcia, paid $1,300 to the IAS with her VISA credit card. Michelle Villeneuve, of the IAS, insisted in giving another briefing, which consisted of high pressure solicitations for donations, to Mrs. Garcia, while she was at FLAG in Clearwater, Florida. Villeneuve showed Mrs. Garcia photographs

of gloomy scenes, including starved children in Africa. Villeneuve then told Mrs. Garcia that her donation would go to directly help those children, by introducing Scientology technology to them. Villeneuve explicitly stated the IAS needed the donation urgently, so the program could begin immediately. At the time Plaintiff was induced to contribute money for this cause, the IAS knew, or reasonably should have known, that the monies being solicited were not intended to be used for the stated purpose. As a direct result of, and in, reliance upon, the representations of Villeneuve, Plaintiff made her $1,300 donation with her VISA card. Plaintiff would not have made this contribution had she known the statements were false.

56.    Plaintiff's September 2, 2002 donation was made for the express purpose of funding the relief for starving children in Africa. The representations made by the IAS to Plaintiff on September 2, 2002, regarding the need for and use of the monies solicited were false.

57.    On March 6, 2005 while at FLAG, Michelle Villeneuve, an IAS representative, required Plaintiff, Luis Garcia's presence for a mandatory IAS briefing. Plaintiff was told about the church's massive campaign to help the victims of the tsunami in Sumatra, Indonesia and Sri Lanka. Plaintiff was shown pictures of devastation and asked for a donation so volunteer ministers could be sent in to help those victims. At the time Plaintiff was induced to contribute money for this cause, the IAS knew, or reasonably should have known, that the monies being solicited were not intended to be used for the stated purpose. As a direct result of, and in, reliance upon, the representations of the IAS, Plaintiff made his $500 donation with his American Express card. Plaintiff would not have made this contribution had he known the statements were false.

58.    Plaintiff's March 6, 2005 donation was made for the express purpose of funding the relief for victims of the tsunami in Sumatra, Indonesia and Sri Lanka. The representations made by the IAS to Plaintiff on March 6, 2005, regarding the need for and use of the monies solicited were false.

59.    While at FLAG, On August 30, 2005, Plaintiff, Luis Garcia, and his family were escorted to the IAS office where they were shown a video featuring Tom Cruise, promoting the responsibilities of Scientologists, as "we are the only ones that can help." Following the video, three IAS officers badgered Plaintiffs for a substantial donation to help the IAS in its campaign to eliminate child pornography on the Internet. The IAS Officers said there were over 100,000 illegal sites filled with child pornography for which they claimed Plaintiffs bore responsibility to eradicate, for the sake of Plaintiffs' own children, through donation, which was needed immediately. At the time Plaintiff was induced to contribute money for this cause, the IAS knew, or reasonably should have known, that the monies being solicited were not intended to be used for the stated purpose. As a direct result of, and in, reliance upon, the representations of the IAS Officer, Plaintiff made his $3,000 donation with his VISA card. Plaintiff would not have made this contribution had he known the statements were false.

60.    Plaintiffs' August 30, 2005 donation was made for the express purpose of funding to eradicate child pornography. The representations made by the IAS to Plaintiffs on August 30, 2005, regarding the need for and use of the monies solicited, were false.

61.    On November 20, 2005 an IAS officer met with Plaintiff, Luis Garcia, and told him the IAS needed a donation for a campaign in France. The IAS Officer said the

French government was suppressive and wanted to ban Scientology, and that the IAS was going to investigate the government people involved in order to stop them. The IAS needed the donation immediately, as the funding for this program had to be completed right away for it to be effective. At the time Plaintiff was induced to contribute money for this cause, the IAS knew, or reasonably should have known, that the monies being solicited were not intended to be used for the stated purpose. As a direct result of, and in, reliance upon, the representations of the IAS, Plaintiff made his $1,000 donation on his American Express card. Plaintiff would not have made this contribution had he known the statements were false.

62.    Plaintiff's November 20, 2005 donation was made for the express purpose of funding the campaign in France. The representations made by the IAS to Plaintiff on November 20, 2005, regarding the need for and use of the monies solicited, were false.

63.    On March 27, 2006, while at FLAG in Clearwater, Plaintiff, Luis Garcia, was given a briefing ("donation solicitation") by Michelle Villeneuve. Villeneuve told Plaintiff the IAS was "helping in a big way down in Australia, with the bush fires". She described how the fires were ravaging towns and farms, and the IAS had been funding many volunteer ministers to fly to Australia and help. She said the IAS needed a donation right away from Plaintiff to fund this program. At the time Plaintiff was induced to contribute money for this cause, the IAS knew, or reasonably should have known, that the monies being solicited were not intended to be used for the stated purpose. As a direct result of, and in, reliance upon, the representations of the IAS, Plaintiff made his $640 donation with his MasterCard. Plaintiff would not have made this contribution had he known the statements were false.

64.    Plaintiff's March 27, 2006 donation was made for the express purpose of funding the relief efforts in Australia. The representations made by the IAS to Plaintiff on March 27, 2006, regarding the need for and use of the monies solicited, were false.

65.    On September 30, 2006 while at FLAG in Clearwater, Plaintiff, Luis Garcia, received the customary and mandatory briefing from the IAS. Plaintiff again met with Michelle Villeneuve from the IAS who stated the IAS needed to urgently fund Public Service Announcements and that these announcements would be aired nationally. At the time Plaintiff was induced to contribute money for this cause, the IAS knew, or reasonably should have known, that the monies being solicited were not intended to be used for the stated purpose. As a direct result of, and in, reliance upon, the representations of the IAS, Plaintiff made his $500 donation with his American Express card. Plaintiff would not have made this contribution had he known the statements were false.

66.    Plaintiff's September 30, 2006 donation was made for the express purpose of funding the Public Service Announcements. The representations made by the IAS to Plaintiff on September 30, 2006, regarding the need for and use of the monies solicited, were false.

67.    On June 12, 2007 Plaintiff, Luis Garcia, paid $31,470 to the IAS with his American Express card in two separate transactions. Plaintiff went to the Freewinds Ship operated by SHIP for services. Soon after arrival onboard, Plaintiff was "interviewed" by Ari Lan, Senior SHIP IAS Officer. The IAS stated a substantial donation was needed to help victims of a tornado in Greensburg, Kansas. He said the IAS was funding a huge relief effort and funding volunteer missionaries from Kansas City, Wichita and Dallas. The IAS Officer said the relief effort would be funded in part with immediate donations from Plaintiff. At the

time Plaintiff was induced to contribute money for this cause, the IAS knew, or reasonably should have known, that the monies being solicited were not intended to be used for the stated purpose. As a direct result of, and in, reliance upon, the representations of the IAS, Plaintiff made his $31,470 donation with his American Express card. Plaintiff would not have made this contribution had he known the statements were false.

68.    Plaintiff's June 12, 2007 donation was made for the express purpose of funding the tornado victims' relief efforts in Greensburg. The representations made by the IAS to Plaintiff, regarding the need for and use of the monies solicited, were false.

69.    As to each and every allegation in paragraphs 53 through 68, the IAS misled the Plaintiffs into believing that these specific funds would be spent on these humanitarian projects. In fact, these projects did not actually exist or only a small fraction of the money has been spent to create the appearance of extensive humanitarian activities to support the false statements made by the IAS. The IAS has accumulated in excess of $1 billion while misleading Plaintiffs and others into believing that their funds would be spent on humanitarian projects.

70.    As to each and every allegation in paragraphs 53 through 68, Miscavige was the primary spokesperson/fundraiser for the IAS projects to which Plaintiffs were falsely induced to contribute. He widely, and falsely, promoted these IAS activities, as set forth in the aforementioned paragraphs promoted to Plaintiffs, in internationally televised events. The IAS routinely showed numerous videos, viewed by Plaintiffs, of Miscavige falsely presenting its purported "good works" and repeated requests for every Scientologist, including Plaintiffs

to give money to the IAS. Plaintiffs relied on the false statements of Miscavige in making the above payments.

71.　　The purpose of the fundraising efforts set forth in paragraphs 53 to 68 was not to support the causes for which the funds were solicited but rather to enrich the Church. By using false and misleading promotional materials and pronouncements, Defendants, IAS and USIMT, created the appearance of laudatory church activities, (little or none of which actually exist) as a means of soliciting substantial donations from the Plaintiffs.

72.　　For each and every contribution, as set forth above in paragraphs 53 to 68, the IAS engaged in repeated, high-pressure sales techniques targeting Plaintiffs, including, but not limited to, repeated late night visits and phone calls, refusing to allow them to leave the room until they had made a "contribution," requiring "contributions" to the IAS as a condition of participation in other Scientology services, "mandatory" attendance at "briefings" with compliance enforced through threat of "ethics reports" being made.

73.　　As a means to accomplish these fundraising goals, as set forth above in paragraphs 55 to 60; 63-68, other Scientology affiliated entities, specifically Defendants, FLAG and SHIP, provided facilities to the IAS to conduct fundraising in close proximity to where auditing and training services are offered to its members, including Plaintiffs.

74.　　Defendant FLAG is the "Mecca of Scientology", the largest single Church of Scientology in the world, and the self-described purveyor of advanced Scientology services available at no other location. Eventually, all Scientologists, including Plaintiffs, must travel to FLAG to achieve the promised spiritual enlightenment that Scientology offers. FLAG occupies several buildings in the Clearwater, Florida area, all of which are dedicated to

promoting the goals and objectives of Scientology. Within these facilities FLAG dedicates prominent space to the IAS fundraising activities in close proximity to where FLAG provided specialized auditing and training to the Plaintiffs. IAS promotional materials and videos were prominently displayed throughout FLAG facilities and were seen by Plaintiffs. As specifically set forth in paragraphs 55-60 and 63-66 above, Plaintiffs were aggressively solicited by IAS representatives while attempting to obtain services at FLAG.

75.     FLAG is required to meet certain financial fundraising quotas for the IAS as set by Miscavige.

76.     In order to meet these quotas, FLAG operated in concert with IAS activities with respect to each and every fraudulent solicitation of contributions as set forth in paragraphs 22 through 25, 51 through 76, and 80 through 82. The efforts of the IAS and FLAG constitute a joint enterprise, designed to solicit funds from the Plaintiffs, despite actual knowledge that the funds solicited were not being used for the purposes represented. This joint enterprise was facilitated by requiring that the Plaintiffs undergo involuntary, high pressure sales meetings, sometimes lasting for hours with the IAS, before being eligible to receive further spiritual advancement through the FLAG auditing and training programs.

77.     Defendant SHIP is the Church of Scientology located onboard a Scientology cruise ship, the "Freewinds". SHIP delivers specialized Scientology services available nowhere else. Plaintiffs had to travel to SHIP to achieve the promised spiritual enlightenment that Scientology offers. Aboard the Freewinds, the IAS occupies prominent and large offices dedicated to fundraising efforts. IAS promotional materials and videos soliciting payment to the IAS were displayed on the ship and were seen by Plaintiffs.

78.    SHIP was required to meet certain financial fundraising quotas for the IAS as set by Miscavige.

79.    In order to meet these quotas, SHIP operated in concert with IAS activities with respect to each and every fraudulent solicitation of contributions as set forth in paragraphs 22 through 25, 51 through 73, and 77 through 82.  The efforts of the IAS and SHIP constituted a joint enterprise, designed to solicit funds from the Plaintiffs, despite actual knowledge that the funds solicited were not being used for the purposes represented. This joint enterprise was facilitated by requiring that Plaintiffs, as set forth in paragraphs 67 and 68 above, undergo involuntary, high pressure sales meetings, sometimes lasting for hours with the IAS, before being eligible to receive further spiritual advancement through the SHIP auditing and training programs.

80.    Participation in auditing and training is a fundamental form of participation within the Church. These are required in order for members, including Plaintiffs, to continue to advance within the Church. The Church routinely utilizes the auditing and training process as a forum for high pressure illegal sales tactics, as stated above, to coerce members, including Plaintiffs to contribute to other causes, including the Super Power project and the IAS. During these sessions representations were repeatedly made to Plaintiffs regarding the importance and necessity of funding contributions from Plaintiffs, as a means to achieve their spiritual advancement. Plaintiffs were constantly solicited through the International IAS Events, where Miscavige repeatedly represented to Plaintiffs and members, that IAS sponsored humanitarian activities were in dire need of parishioner's further contributions to fund these efforts, despite the fact that Defendants knew these statements were false and

intended Plaintiffs' to rely on such false statements. Additionally, IAS solicited continuously through the magazine, Impact, which contained repeated references to dire national and global crises that that the IAS was combating, all of which was false and Defendants knew it was false. Plaintiffs relied on these false representations which induced them to give funds.

81.    As to each and every allegation in Paragraphs 51 through 82, the statements set forth in those paragraphs made by the Defendants to induce the Plaintiffs to make contributions were false in that Defendants knew that the requested donations would not be used to fund the campaigns which formed the basis for which the contributions were requested.  Defendants knew that these statements were false and Plaintiffs relied upon these false statements of the Defendants in making the contributions.  Plaintiffs would not have made the contributions had they known Defendants' statements were false.  The statements were material to the Plaintiffs and Defendants knew that they were material in making the false statements.  Plaintiffs were harmed by the false statements because the contributions never would have been made had Plaintiffs known that Defendants' statements were false.

82.    Plaintiffs requested their funds be returned on August 8, 2012, but the IAS and USIMT refused to refund the funds.

## COUNT I: CSRT
### FRAUD - "SUPER POWER" PROJECT

83.    This is an action by Plaintiffs against defendant, CSRT for damages for fraud in connection with the "Super Power" project.

84.    Plaintiffs reallege and incorporate herein by reference Paragraphs 1 through 38.

85.    Plaintiffs contributed a total of $340,000.00 to the CSRT to fund the "Super

Power" project.

86.    As alleged herein, Defendant CSRT made materially false statements, representations and omissions to Plaintiffs regarding the ongoing need to obtain substantial funding, far in excess of the actual cost required, and utilized, to complete the project. Defendant, CSRT had no intention at the time these materially false statements, representations and omissions were made to Plaintiffs to timely complete the project and provide the benefits and services promised to Plaintiffs when they were induced to make these specific donations. Rather, the statements, representations and omissions were made solely for the purpose of continuing to collect revenue for the Church. As such, these statements, representations and omissions were false at the time they were made and Defendant, CSRT knew or should have known they were false.

87. The Defendant, CSRT, intended Plaintiffs to rely upon the statements, representations and omissions.

88. Plaintiffs reasonably relied to their detriment upon the statements, representations and omissions by the Defendant, CSRT, as more particularly described above, in contributing $340,000.00 to the CSRT for the "Super Power" project.

89. As a direct and proximate result, Plaintiffs have been damaged in that their money was taken under false pretenses and never would have been given if Plaintiffs had known of Defendant's material misrepresentations.

WHEREFORE, Plaintiffs demand judgment against the Defendant, CSRT, for compensatory and punitive damages, and costs.

**COUNT II: CSRT**
ACTION FOR UNFAIR AND DECEPTIVE TRADE PRACTICES – "SUPER POWER"
PROJECT

90. This is an action by the Plaintiffs against Defendant, CSRT, for damages and equitable injunctive relief for unfair and deceptive trade practices in connection with the "Super Power" project.

91. Plaintiffs reallege and incorporate herein by reference Paragraphs 1 through 38.

92. The Defendant, CSRT, engaged in "trade or commerce" through the fund-raising activities, advertisements, promotions, and solicitations in connection with the "Super Power" project, and Plaintiffs are "consumers," as defined under § 501.203, Florida Statutes.

93. The Defendant, CSRT, willfully engaged in unfair and deceptive acts and practices by representing to Plaintiffs that there was an ongoing need to obtain substantial funding far in excess of the actual cost required and utilized to complete the "Super Power" project. Defendant, CSRT had no intention at the time these unfair deceptive acts and practices were made to timely complete the project and provide the benefits and services promised to Plaintiffs when they were induced to make these specific donations. Rather, unfair deceptive acts and practices were made solely for the purpose of continuing to collect revenue for the Church. Defendant, CSRT, knew or should have known these practices were unfair, deceptive, or unconscionable, or prohibited by law.

94. Unless the Defendant, CSRT, is permanently enjoined from engaging further in the acts and practices alleged herein, the continued activities of this Defendant will result in irreparable injury to the public, for which there is no adequate remedy at law.

95. The Defendant, CSRT, acting individually or in concert with others, has engaged

in representations, acts, practices, or omissions in trade or commerce which are material, and which were likely to mislead consumers, including Plaintiffs acting reasonably under the circumstances; or the Defendant, CSRT, has engaged in acts or practices in trade or commerce which offend established public policy and are unethical, oppressive, unscrupulous or substantially injurious to consumers.

96. As a direct and proximate result of the Defendant, CSRT's acts or practices, Plaintiffs have been damaged in the amount of $340,000.00

WHEREFORE, Plaintiffs demand judgment against the Defendant, CSRT that:

    a.  Awards damages against the Defendant, CSRT;

    b.  Declares that the unfair and deceptive acts or practices of the Defendant, CSRT are prohibited by law;

    c.  Enters a temporary injunction, pending final adjudication and the granting of permanent relief, and thereafter a permanent injunction, enjoining the Defendant, CSRT, from engaging in the unfair and deceptive acts or practices;

    d.  Awards reasonable attorney's fees;

    e.  Awards costs; and

    f.  Orders such other relief as the Court deems appropriate.

### COUNT III: FLAG
FRAUD- "SUPER POWER" PROJECT

97. This is an action by Plaintiffs against defendant, FLAG for damages for fraud in connection with the Super Power project.

98. Plaintiffs reallege and incorporate herein by reference Paragraphs 1 through 38.

99. Plaintiffs contributed a total of $340,000 to fund the "Super Power" project.

100.    FLAG operated in concert with CSRT activities with respect to each and every fraudulent statement, representation and omission to Plaintiffs as set forth in paragraphs 22 through 38.  The efforts of the CSRT and FLAG constitute a joint enterprise, designed to solicit funds from the Plaintiffs, despite actual knowledge that the funds solicited were not being used for the purposes represented.

101.    Defendant FLAG intended Plaintiffs to rely upon the fraudulent statements, representations and omissions.

102.    Plaintiffs reasonably relied to their detriment upon the statements, representations and omissions to their detriment.

103.    As a direct and proximate result, Plaintiffs have been damaged in that their money was taken under false pretenses and never would have been given if Plaintiffs had known of Defendants' material misrepresentations.

## COUNT IV: FLAG
### ACTION FOR BREACH OF CONTRACT – FLAG

104.    This is an action by the Plaintiffs against Defendant FLAG for damages for breach of contract.

105.    Plaintiffs reallege and incorporate herein by reference Paragraphs 1 through 25 and 39 through 50.

106.    Plaintiffs deposited funds in excess of $37,413.56 with FLAG to be held on account until Plaintiffs elected to use the funds to pay for counseling services and/or accommodations.

107.    Defendant FLAG had represented in its policy and publications that "pre-

payments" would be repaid to Plaintiffs when Plaintiffs so requested them.

108.    Plaintiffs requested that Defendant FLAG repay the funds held on account, but Defendant FLAG has refused to repay the funds, despite a proper written request for return.

109.    As a direct and proximate result of Defendant FLAG's breach, Plaintiffs have been damaged.

WHEREFORE, Plaintiffs demand judgment against Defendant FLAG for compensatory damages and costs.

## <u>COUNT V: SHIP</u>
### ACTION FOR BREACH OF CONTRACT – SHIP

110.    This is an action by the Plaintiffs against Defendant SHIP for damages for breach of contract.

111.    Plaintiffs reallege and incorporate herein by reference Paragraphs 1 through 25 and 39 through 50.

112.    Plaintiffs deposited funds in excess of $31,445.45 with SHIP to be held in trust until Plaintiffs elected to use the funds to pay for counseling services and/or accommodations.

113.    Defendant SHIP had represented in its policy and publications that "pre-payments" would be repaid to Plaintiffs "at once," when Plaintiffs so requested them.

114.    Plaintiffs requested that Defendant SHIP repay the funds held in trust, but Defendant SHIP has failed and refused to repay the funds.

115.    As a direct and proximate result of Defendant SHIP's breach, Plaintiffs have been damaged.

WHEREFORE, Plaintiffs demand judgment against Defendant SHIP for compensatory damages and costs.

## COUNT VI: IAS AND USIMT
### FRAUD - HUMANITARIAN INITIATIVE OF IAS

116.    This is an action by Plaintiffs against the Defendants, IAS and USIMT for damages for fraud in connection with the so-called humanitarian initiatives of IAS.

117.    Plaintiffs reallege and incorporate herein by reference Paragraphs 1 through 25 and 51 through 82.

118.    Plaintiffs were fraudulently induced to contribute a total of $40,410.00 to the IAS for fraudulent humanitarian projects.

119.    As set forth hereinabove, the Defendant, IAS, created a sales pitch to solicit huge amounts of money from the Plaintiffs, by promising that the funds collected would be used for specific altruistic purposes.  In fact, monies collected by the IAS were either not utilized for the stated projects at all, or only minimally so, in order to create the appearance of such efforts. Instead, the IAS went to extraordinary lengths to create the fiction of IAS funded efforts through the use of photos, videos, promotional materials and repeated pronouncements, awards ceremonies and the like,  all of which had a single purpose to solicit an ongoing stream of money. As a result, the IAS and the USIMT have amassed a fortune, exceeding $1 billion in cash, the vast percentage of which has never been used for humanitarian initiatives.  Instead, the funds are hoarded and/or used to finance the lavish lifestyle of persons within the Church, such as Miscavige and/or to destroy critics and fund elaborate investigations of potential critics. As such, these statements, representations and omissions were false at the time they were made and Defendant, IAS knew they were false

and likely to mislead Plaintiffs and others.

120.    The Defendants, IAS and USIMT intended Plaintiffs to rely upon the representations and omissions made by the IAS.

121.    Plaintiffs reasonably relied to their detriment upon the material, false representations and omissions by the Defendant, IAS, as more particularly described above, in contributing $40,410.00 to the IAS for various humanitarian projects which they would not have contributed had they known that the statements were false.

122.    As a direct and proximate result, Plaintiffs have been damaged.

WHEREFORE, Plaintiffs demand judgment against the Defendants, IAS and USIMT, for compensatory and punitive damages, and costs.

## COUNT VII: IAS AND USIMT
ACTION FOR UNFAIR AND DECEPTIVE TRADE PRACTICES –HUMANITARIAN INITIATIES OF THE IAS

123.    This is an action against the Defendants, IAS and USIMT for damages and equitable relief for unfair and deceptive trade practices in connection with the so-called humanitarian initiatives of the IAS.

124.    Plaintiffs reallege and incorporate herein by reference Paragraphs 1 through 25 and 51 though 82.

125.    The Defendant, USIMT, by and through its alter ego, Defendant IAS, and the IAS, engaged in "trade or commerce" through the fund-raising activities, advertisements, promotions, and solicitations in connection with the so-called humanitarian initiatives of the "IAS," and Plaintiffs are "consumers," as defined under § 501.203, Florida Statutes.

126.    The Defendant, USIMT, by and through its alter ego, Defendant IAS, willfully

engaged in unfair or deceptive acts and practices that they knew, were unfair, deceptive, unconscionable, or prohibited by law.

127.    Unless the Defendants, IAS and USIMT are permanently enjoined from engaging further in the acts and practices alleged herein, the continued activities of Defendants will result in irreparable injury to the public, for which there is no adequate remedy at law.

128.    The Defendants, acting individually or in concert with each other, have engaged in representations, acts, practices, or omissions in trade or commerce which are material, and which are likely to mislead consumers acting reasonably under the circumstances; or the Defendants have engaged in acts or practices in trade or commerce which offend established public policy and are unethical, oppressive, unscrupulous or substantially injurious to consumers.

129.    As a direct and proximate result of the Defendants' acts or practices, Plaintiffs have been damaged in the amount of $40,410.00.

## COUNT VIII: FLAG
### FRAUD - HUMANITARIAN INITATIVES OF IAS

130.    This is an action by Plaintiffs against the Defendant, FLAG for damages for fraud in connection with the so-called humanitarian initiatives of IAS and USIMT.

131.    Plaintiffs reallege and incorporate herein by reference Paragraphs 1 through 25, 51 through 76 and 80 through 82.

132.    Plaintiffs contributed a total of $40,410.00 to fund the so-called fraudulent humanitarian initiatives of the IAS.

133.    As a means to accomplish the IAS fundraising goals, other Scientology

affiliated entities, specifically Defendant, FLAG, not only provided dedicated facilities to the IAS to conduct its' fundraising in close proximity to where auditing and training services are offered to its members, but also made receipt of such services contingent upon meeting with IAS representatives who engaged in high pressure illegal sales tactics, as stated above, to solicit money from Plaintiffs. In this regard, FLAG and IAS operated a joint enterprise which was designed to solicit funds from church members, including Plaintiffs, despite actual knowledge that the funds solicited are not being used for the express purposes represented as set forth hereinabove. Instead, these funds are being used simply to enrich the Church.

134.    As stated above, while at FLAG, on numerous occasions, Plaintiffs were fraudulently induced, to donate to IAS.

135.    As a direct and proximate result, Plaintiffs have been damaged.

WHEREFORE, Plaintiffs demand judgment against the Defendant, FLAG, for compensatory and punitive damages, and costs.

### COUNT IX: SHIP
FRAUD - HUMANITARIAN INITATIVES OF IAS

136.    This is an action by Plaintiffs against the Defendant, SHIP for damages for fraud in connection with the so-called humanitarian initiatives of IAS and USIMT.

137.    Plaintiffs reallege and incorporate herein by reference Paragraphs 1 through 25, 51 through 73, and 77 through 82.

138.    Plaintiffs contributed a total of $40,410 to fund the so-called humanitarian initiatives of the IAS.

139.    As a means to accomplish the IAS fundraising goals, other Scientology affiliated entities, specifically Defendant, SHIP, not only provided dedicated facilities to the

IAS to conduct its' fundraising in close proximity to where auditing and training services are offered to its members, but also made receipt of such services contingent upon meeting with IAS representatives who engaged in high pressure illegal sales tactics, as stated above, to solicit money from Plaintiffs. In this regard, SHIP and IAS operated a joint enterprise which was designed to solicit funds from church members, including Plaintiffs, despite actual knowledge that the funds solicited are not being used for the express purposes represented. Instead, these funds are being used simply to enrich the Church.

140.    As stated above, while aboard SHIP, on June 12, 2007, Plaintiff was fraudulently induced to donate $31,470.00 to IAS.

141.    As a direct and proximate result, Plaintiffs have been damaged.

WHEREFORE, Plaintiffs demand judgment against the Defendant, SHIP, for compensatory and punitive damages, and costs.

## DEMAND FOR JURY TRIAL

Plaintiffs demand trial by jury of all issues so triable.

By _____

Theodore Babbitt, Esq.
Florida Bar No. 091146
**BABBITT JOHNSON OSBORNE**
**& LE CLAINCHE, P.A.**
1641 Worthington Road
Suite 100
West Palm Beach, Florida 33409
Telephone:  (561) 684-2500
Facsimile:  (561) 684-6308
tedbabbitt@babbitt-johnson.com

By _____

Ronald P. Weil, Esq.
Florida Bar No. 169466
**Weil Quaranta, P.A.**
200 South Biscayne Boulevard
Suite 900
Miami, FL 33131
Phone: 305-372-5352
Fax: 305-372-5355
E-mail: rpw@weillaw.net

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

LUIS A. GARCIA SAZ and wife, MARIA DEL     Case No. 8:13-CV-220-T27 TBM
ROCIO BURGOS GARCIA,

      Plaintiffs,

vs.

CHURCH OF SCIENTOLOGY FLAG
SERVICE ORGANIZATION, INC.; CHURCH
OF SCIENTOLOGY FLAG SHIP SERVICE
ORGANIZATION, INC., d/b/a Majestic Cruise
Lines;

      Defendants.

_____/

## AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs, LUIS A. GARCIA SAZ ("LUIS GARCIA") and wife, MARIA DEL

ROCIO BURGOS GARCIA ("MARIA GARCIA"), sue Defendants CHURCH OF

SCIENTOLOGY FLAG SERVICE ORGANIZATION, INC., a Florida nonprofit

corporation ("FLAG"); and CHURCH OF SCIENTOLOGY FLAG SHIP SERVICE

ORGANIZATION, INC., d/b/a Majestic Cruise Lines, a foreign nonprofit corporation doing

business in Florida ("SHIP") and allege as follows:

## INTRODUCTION

1.      This suit arises out of a systemic and unfair practice orchestrated against, among

others, Plaintiffs by the Defendants and facilitated by the concerted, fraudulent conduct of

each of them. Through deceptive acts in the form of representations and omissions which

Defendants knew were likely to mislead Plaintiffs to their detriment, Plaintiffs suffered

financial losses caused by Defendants' soliciting contributions for purposes that were never fulfilled and for failing to repay deposits for future services that were never rendered and for fraud as hereinafter alleged.

2.     As detailed below, Defendants directly owed duties to Plaintiffs, including duties of full disclosure, to accurately and truthfully represent the nature and purpose of the solicited funds that Plaintiffs transferred for the Defendants' benefit. Plaintiffs' agreement to transfer their funds was predicated on the trust and confidence Plaintiffs believed they had with Defendants, and the mistaken belief that FLAG and SHIP would not defraud Plaintiffs as Defendants have, in fact, done. The loss of Plaintiffs' funds is a direct and proximate cause of Defendants' wrongful actions.

3.     Plaintiffs were formerly members of the Church of Scientology until November of 2010, when they concluded that the Church had lost its spiritual, moral, and financial compass under the leadership of David Miscavige, the self-titled "ecclesiastical leader of the Scientology religion."

4.     The Church of Scientology refers to the hierarchical structure of the Scientology movement, which is comprised of various corporations and related entities, operating under the leadership of David Miscavige. These form a complicated web of entities, trusts and acronyms intended to make it difficult, if not impossible, to "follow the money." While the various entities make some efforts to appear distinct, they are not in fact separate, with employees of FLAG and SHIP performing the functions of nominal entities, even directing Plaintiffs and others to make out checks to bank accounts in other entities' names.

5.     The victims of Defendants' fraud are often left without recourse because Defendants,

through the control and direction of Miscavige, have contrived an arbitration process wholly controlled by the Church of Scientology, which it wrongfully claims is the proper vehicle to assess the fraudulent conduct. These legal tools are nothing more than artificial barriers to impede the challenge of the victims – like Plaintiffs in this case – to Defendants' misconduct.

6.    The Scientology movement rests entirely upon the writings of one man, L. Ron Hubbard, but the current operations of all church entities are controlled by David Miscavige.

7.    David Miscavige is the current leader of the Church of Scientology and its many affiliated organizations, having assumed that role shortly after the death of Scientology founder L. Ron Hubbard in 1986. His formal title is Chairman of the Board of Religious Technology Center (RTC), a corporation which controls the trademarked names and symbols of Dianetics and Scientology and which "holds the ultimate ecclesiastical authority regarding the standard and pure application of L. Ron Hubbard's religious technologies." His position is paramount within Scientology. Since assuming the role, set forth above, Miscavige has been faced with ongoing litigation and press accounts alleging illegal and unethical practices. Under the leadership of David Miscavige, the Church of Scientology has strayed from its founding principles and morphed into a secular enterprise whose primary purpose is taking people's money.

8.    Scientology Churches provide "auditing" and "training" at substantial fees, to persons interested in Scientology. Persons are accepted for auditing and training on the basis of their interest in Scientology and their ability to pay.

9.    Traditionally the Church derived most of its income from two sources: (1) auditing, and training (2) sales of E-meters, and of Scientology books and recordings to commercial

bookstores as well as to other churches and missions of Scientology.

10.    In more recent years, the Church has added large, high pressure fundraising drives as its primary source of generating revenue. Plaintiffs were victims of these drives as hereinafter alleged.

11.    On June 5, 1989, the Supreme Court of the United States announced its opinion in *Hernandez v. Commissioner*, 490 U.S. 680 (1989).  The issue in that case was whether contributions to the Church of Scientology qualified as 501(c) (3) charitable contributions. The Supreme Court held that what the Church of Scientology claimed were charitable contributions, involved "quid pro quo" transactions and thus those payments did not constitute charitable contributions because the giver was receiving a benefit as would occur in a commercial transaction. The Supreme Court of the United States upheld the Internal Revenue Services contention that no contributions to the Church of Scientology qualified for tax deductions and that the Church of Scientology did not enjoy tax exempt status as a charitable organization.  That case has never been reversed and is the law of the land.

12.    Subsequently, in 1993, the IRS reversed its position and granted 501(c)(3) status to the Church of Scientology and related entities, recognizing deductibility of donations. Before the Supreme Court in the *Hernandez* case, and later in proceedings before the IRS the Church asserted that a fundamental principle it operates on is "the Doctrine of Exchange" and that this mandates return of funds to dissatisfied parishioners. This case is not an attack on the religious tenets of the Church of Scientology, although arguments abound that the Church no longer functions as a duly-qualified, tax-exempt, religious organization.  Nor is the case a referendum on the ecclesiastical constructs for how the Church governs its affairs. Rather,

this case concerns something much more fundamental, that is, the rights of individuals to pursue claims through the civil judicial system for injuries and grievances sustained under conventions of civil justice applying legal principles of contract, fraud, misrepresentation and unfair and deceptive sales practices.

## JURISDICTION AND VENUE

13.     This Court has original jurisdiction over the parties and the subject matter of this action under 28 U.S.C. § 1332(d) because: (a) there is diversity of citizenship between Plaintiff and Defendants; and (b) the amount in controversy of at least one of the claims exceeds $75,000.00, exclusive of interest and costs. The Court also has supplemental jurisdiction under 13 U.S.C. § 1367 over other claims related to the claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution, including those involving additional parties. All of the claims arise from a common nucleus of operative facts in that they all relate to Defendants' collective efforts to obtain and retain payments of funds from Plaintiffs through a variety of illegal acts and contrivances.

14.     Venue is proper in this district under 18 U.S.C. § 1391(b) (1) and (3) because a substantial part of the events and omissions giving rise to this action occurred in this district and because Defendants transact business in this district, and because there is no other district in which this action may otherwise be brought.

## PARTIES

15.     Plaintiffs, LUIS and MARIA GARCIA, are citizens and residents of the State of California.

16.     Defendant FLAG is a Florida nonprofit corporation and has its principal place of business at 503 Cleveland Street, Clearwater, Florida 33755.

17.     FLAG administers high levels of services to parishioners from around the world at facilities in Clearwater, Florida.

18.     Defendant SHIP is a foreign non-profit corporation and has its principal place of business at 116 N. Ft. Harrison Avenue, Clearwater, Florida 33755.

19.     SHIP administers the highest levels of services to parishioners from around the world aboard a ship operated in the Caribbean as a retreat.

## GENERAL ALLEGATIONS COMMON TO ALL COUNTS

20.     Defendants, under Miscavige's leadership, management, and control, function as an interrelated and interdependent network of entities that functions to maximize the funds they collectively extracted from Plaintiffs, and others, by soliciting contributions for purposes that are never fulfilled and by failing to repay deposits for services that were never rendered.  The key to the organizational structure – indeed, the undisputed leader –is David Miscavige, who exerts complete, unequivocal control over Defendants, including control over how funds are collected, utilized, and disbursed, regardless of their purported "independent" corporate structures and boards. The Church of Scientology, at Miscavige's direction, publicly proclaimed to the St. Pete Times Newspaper through an affidavit submitted by one of his direct subordinates, Sue Wilhere, that, *"Mr. Miscavige is Scientology."*

21.     At all times material hereto, Defendants acted in concert either as agents or principals of one another, partners, joint venturers, or co-conspirators.

22.     The types of services or initiatives promoted to members, for which contributions and

deposits toward payments were made, varied and consisted of three basic types that are material to this action:

    a. Contributions toward specific capital programs, such as the Church's "Super Power" project in Clearwater, Florida, a Scientology facility that commenced in 1995, and which only opened 18 years later in response to Plaintiffs filing their original complaint;

    b. Contributions toward national and/or global humanitarian initiatives, purportedly pursued to advance causes such as eradicating child pornography websites around the world, helping natural disaster victims, and other causes, for which contributions raised by the Church were never utilized, vastly underutilized or misappropriated; and

    c. Deposits toward payments for counseling services (also described as "auditing") and training, as well as accommodations in Church owned facilities, that were never repaid despite the fact that services were never rendered.

23. Although laudatory on their faces to the unsuspecting public, the solicitations for funding from Plaintiffs were false and misleading, as Defendants failed to utilize the funds for the proposed purposes, and failed to repay the monies when owed to and demanded by Plaintiffs. Instead, Defendants improperly utilized the contributions and deposits to, among other things, engage ranks of professionals to stifle inquiries into the Church's activities and finances, to intimidate members and ex-members, to finance the lavish lifestyle of Miscavige and to fill the coffers of the Church or its subsidiary/affiliated organizations.

## THE "SUPER POWER PROJECT"

24.          In 1990, an entire block of land was purchased by the Church of Scientology

adjacent to other Church facilities in Clearwater, Florida, for the purpose of developing and

constructing a Scientology facility, which would later become known as the "Super Power"

project.

25.          Since then, FLAG facilities and employees utilized aggressive solicitation of

funds from Plaintiffs and other Scientologists, including the use of high-powered sales

techniques, for the purpose of extracting money for the "Super Power" project.

26.          The Church of Scientology informed the IRS, in its application for tax-exempt

status that it intended to raise $40 million for construction of the "Super Power" building.

Through extensive fundraising hosted by FLAG, it has raised at least $200 million for a

building which cost less than half to construct. Though a groundbreaking ceremony had been

held in 1998, 15 years later the facility still sat empty, but aggressive fundraising continued.

27.          To induce Plaintiffs to hand over money since at least 2001, FLAG

representatives stated each time the contributions were made by Plaintiffs, that the "Super

Power" project was to be completed within that calendar year in which the funds were

solicited from Plaintiffs and that the "final amount" of funding was urgently needed to

complete construction.

28.          Specifically, FLAG designates significant space within its facilities to

specially appointed fundraising representatives who actively engaged in high pressure

solicitation activities for a variety of different "causes", most prominently including Super

Power and global humanitarian objectives. FLAG provides housing, food, and medical care,

to these fundraisers, and on information and belief, they are contracted employees of FLAG (even though they may claim to be "staff members" of other entities, an internal Scientology designation that has no legal significance but is designed to deceive Plaintiffs and others). Plaintiffs' continued receipt of services from FLAG was contingent upon mandatory meetings with FLAG fundraising representatives. Plaintiffs failure to meet with these representatives while at FLAG would have prevented them from continuing their auditing and training services.

29.     With respect to contributions toward capital programs, such as the "Super Power" project, representations and promises were made by FLAG to Plaintiffs to induce contributions, including representations about the imminent need for the funding and the promise that Plaintiffs would receive approbation and other benefits. Between 1998 and 2005, representatives of FLAG made repeated requests for funding from Plaintiffs. Such representations included, without limitation, the following:

d.   On or around October 15, 1998, after being subjected to FLAG solicitation tactics for a donation of $35,000.000 to the Super Power Expansion Project, Plaintiffs were promised: (i) recognition on an "Honor Roll" that would be permanently displayed inside the building; (ii) publication of their names in promotional materials; (iii) forty percent (40%) discounts on the price of, and special treatment in the delivery of, auditing services to be provided at the Super Power Building by FLAG; (iv) preferential seating at the Grand Opening ceremonies; and (v) access to a lounge reserved for "Cornerstone Members". Plaintiffs contributed $23,000.00

and later the remaining balance of $12,000.00;

e.   FLAG continued to solicit further contributions from Plaintiffs, promising increased discounts on services of 50% and access to another lounge known as the "VIP Lounge," reserved for large donors. Plaintiffs gave donations of:

| | |
|---|---|
| December 3, 1998 | $35,000.00 |
| May 18, 1999 | $30,000.00 |
| July 6, 1999 | $10,000.00 |
| November 3, 1999 | $30,000.00 |
| March 16, 2000 | $4,500.00 |
| October 12, 2000 | $6,000.00 |
| November 8, 2000 | $2,500.00 |
| December 26, 2000 | $2,500.00 |
| May 8, 2001 | $21,500.00 and $23,000.00 |
| July 7, 2002 | $50,000.00 |
| July 31, 2002 | $15,000.00 |
| January 30, 2004 | $10,000.00 |

On or about August 25, 2005, FLAG representatives later approached Plaintiffs in their hotel room while they were in Clearwater, Florida, and asked Plaintiffs to make a $65,000.00 contribution to purchase a large Cross of Scientology to be affixed to the top of the Super Power Building. Plaintiffs were advised that contractors were standing by to do the work once payment was received.  Plaintiffs made the $65,000.00 contribution, but the cross was not affixed for years afterwards until 2010.

30.    Plaintiffs contributed a total of $340,000.00 to the Super Power Building.  FLAG

consistently represented to Plaintiffs that the delays in opening the building and other specific projects, such as the placement of the cross, were due to lack of funds, but these representations were false. For eighteen (18) years, FLAG persistently maintained that the project was in an "incomplete" state in order to use it as a shill to induce further payments from members, just as they did with Plaintiffs.

31.     Now the "Super Power" building has been opened, which Plaintiffs believe was in response to the filing of their original complaint, it is fully and exclusively occupied by FLAG and they continue to conduct special fundraising within it, but are also selling auditing, training and books and meters as a moneymaking venture. It is now known as the "Flag Building."

32.         Plaintiffs never received the approbation promised.

33.         In early 2011, the City of Clearwater levied fines in excess of $400,000.00 for delays in constructing the building. Contrary to FLAG representatives' earlier, repeated, representations to Plaintiffs that the opening was delayed for lack of funding, FLAG representatives informed the City that the delays were due to other reasons, including but not limited to: (1) changes in the City's building codes, and (2) the complexity of the Church's unique plans. In fact, a certificate of occupancy was issued on June 6, 2009, indicating that the building was complete. Notwithstanding the issuance of the certificate of occupancy, the building continued to remain unoccupied and FLAG representatives continued to aggressively solicit funds from members for completion of the building until November 2013, just as they did with Plaintiffs.

34.         Plaintiffs requested return of their funds in writing on August 8, 2012, but

FLAG representatives refused to return the funds.

35.     On each occasion specified above, FLAG fraudulently induced Plaintiffs to make contributions specifically for the "Super Power" project based upon false representations that Defendants needed the money immediately to fund the completion of the "Super Power" project. Each year that the building did not open, FLAG created a new false explanation as to why the Super Power Building was incomplete. The completion of the building and delivery of the approbation at that time was a material basis for Plaintiffs making their specific contributions, and the failure to complete the building and deliver the approbation resulted in harm to the Plaintiffs.

36.     Plaintiffs' contributions would not have been made had Plaintiffs known the ongoing delay in completion of the building was intentional and that explanations for the delay in completion were false.

37.     FLAG, at all times knew that the above representations were false when made, and intended that Plaintiffs rely, to their detriment on these false representations.

38.     Plaintiffs, because of their reliance upon Defendant's false Representations made the specified contributions to the "Super Power" Project, and would not have done so had they known the truth.

## FLAG AND SHIP – AUDITING SERVICES AND ACCOMMODATIONS

39.     As members of FLAG and SHIP, Plaintiffs were induced to deposit money in advance of partaking in church services, both counseling "auditing" and Scientology training, as well as food and accommodations provided by FLAG and SHIP.

40.     To encourage these payments Defendants offered discounts for depositing

funds in advance of participating in the services, referred to as "pre-payments."

41.        These "pre-payments" are maintained within each Scientology Church on account for the use by church members, including Plaintiffs, for hotel accommodations, meals, counseling sessions and Scientology training courses to be taken in the future.

42.        Plaintiffs deposited as pre-payments $37,413.56 on account with FLAG for counseling sessions, meals and hotel accommodations that FLAG never provided.

43.        Plaintiffs deposited $31,445.45 on account with SHIP for counseling services, meals, and hotel accommodations that SHIP never provided. With respect to deposits toward payments for auditing services, Defendants took advantage of Plaintiffs by inducing them to make substantial deposits of funds to pay for future services with the express understanding that any unused funds would be returned upon demand.

44.        Plaintiffs have been aware since their initial involvement in Scientology that Defendants maintain a policy of returning funds, whether as "refunds" (*i.e.*, a return of monies after service) or for "repayments" (*i.e.*, a return of monies without the service being taken).

45.        Defendants set forth how they treated the return of funds to members in their representations to the Internal Revenue Service in a form 1023 filing (Application for Recognition of Tax Exempt Status) to justify their gaining exempt status: *"The Church's refund policy is exceedingly fair. If someone isn't happy with Scientology – which is a very small minority of people – he simply has to make a proper request for his donations back, agree to forego further services and his donations will be returned. For the Church, in addition to the fact that this policy aligns with Scientology principles of exchange, it also*

*serves the purpose of allowing our churches and parishioners who are very happy with Scientology, to carry on without the unhappy few in our midst."*

46.     On December 7, 2010, Plaintiffs made a proper request in writing for repayment of their moneys on account with FLAG for counseling sessions, meals and hotel accommodations that were not provided.

47.     Despite the request, FLAG has failed/refused to repay any of the money on account to Plaintiffs

48.     On December 7, 2010, Plaintiffs made a proper request in writing for repayment of their moneys on account with SHIP for counseling sessions, meals and hotel accommodations that were not provided.

49.     Despite request, SHIP has failed and refused to repay any of the money on account to Plaintiffs.

50.     Plaintiffs have retained the services of the law firms listed below, agreeing to reasonable fees for their services.

51.     All conditions precedent for this action have been satisfied, performed, excused or waived, or have otherwise occurred.

## DEFENDANTS FLAG AND SHIP PROMOTE AND SPONSOR FUNDRAISING INITIATIVES

52.     Defendant FLAG is the "Mecca of Scientology", the largest single Church of Scientology in the world, and the self-described purveyor of advanced Scientology services available at no other location. Eventually, all Scientologists, including Plaintiffs, must travel to FLAG to achieve the promised spiritual enlightenment that Scientology offers. FLAG occupies several buildings in the Clearwater, Florida area, all of which are dedicated to

promoting the goals and objectives of Scientology. Within these facilities FLAG dedicates prominent space to the fundraising activities in close proximity to where FLAG provided specialized auditing and training to Plaintiffs. Promotional materials and videos were prominently displayed throughout FLAG facilities and were seen by Plaintiffs. As specifically set forth in paragraphs 55-60 and 63-66 above, Plaintiffs were aggressively solicited by FLAG representatives while attempting to obtain services at FLAG.

53.     Defendant SHIP is the Church of Scientology located onboard a Scientology cruise ship, the "Freewinds". SHIP delivers specialized Scientology services available nowhere else. Plaintiff LUIS GARCIA had to travel to SHIP to achieve the promised spiritual enlightenment that Scientology offers. Aboard the Freewinds, SHP representatives occupy prominent and large offices dedicated to fundraising efforts. Promotional materials and videos soliciting payment were displayed on the ship and were seen by Plaintiffs.

54.     Participation in auditing and training is a fundamental form of participation within the Church. These are required in order for members, including Plaintiffs, to continue to advance within the Church. The Church, specifically Defendants, routinely utilize the auditing and training process as a forum for high pressure illegal sales tactics, as stated above, to coerce members, including Plaintiffs to contribute to other causes, including the Super Power project. During these sessions, representations were repeatedly made to Plaintiffs regarding the importance and necessity of funding contributions from Plaintiffs, as a means to achieve their spiritual advancement. Plaintiffs were constantly solicited through the international events, where Miscavige repeatedly represented to Plaintiffs and members, that sponsored humanitarian activities were in dire need of parishioner's further contributions

to fund these efforts, despite the fact that Defendants knew these statements were false and intended Plaintiffs' to rely on such false statements.

55.     In addition to solicitations about the Super Power project, FLAG and SHIP sponsored fundraising activities for the International Association of Scientologists (IAS) which specifically targeted Plaintiffs.

56.     The IAS is a significant fundraising arm of the Church, working out of Defendants FLAG and SHIP, all under the direction of David Miscavige, to advance the cause of Scientology across the world.   FLAG is required to meet certain financial fundraising quotas as set by Miscavige.   In order to meet these quotas, FLAG and SHIP sponsored fundraising activities with respect to each and every fraudulent solicitation of Plaintiffs' contributions to the IAS. The efforts of Defendant FLAG, with respect to IAS activities, were designed and specifically tailored to solicit funds from Plaintiffs, despite actual knowledge that the funds solicited were not being used for the purposes represented. This fraudulent enterprise was facilitated by requiring that the Plaintiffs undergo involuntary, high pressure sales meetings, sometimes lasting for hours at FLAG facilities, before being eligible to receive further spiritual advancement through the FLAG auditing and training programs.

57.     On or about October 5, 1997, FLAG representatives contacted LUIS GARCIA and pressured him to donate money citing an "emergency." The Officer said the IAS was funding a huge protest and demonstrations in Berlin, Germany, and money was allegedly needed on an immediate basis to pay for volunteers' airfare, lodging, and other related costs. At the time Plaintiff was induced to contribute money for this cause, FLAG knew, or

reasonably should have known, that the monies being solicited were not intended to be used for the stated purpose. As a direct result of, and in, reliance upon, the representations of the IAS, Plaintiff made his $2,000 donation with his American Express card. Plaintiff would not have made this contribution had he known the statements were false.

58.      Plaintiff's October 5, 1997 donation was made for the express purpose of funding the protests in Berlin. The representations made by the IAS on October 5, 1997, regarding the need for and use of the monies solicited were false.

59.      On September 2, 2002, while at FLAG, Plaintiff, Maria Garcia, paid $1,300 to the IAS with her VISA credit card. Michelle Villeneuve, one of the FLAG fundraising representatives of the IAS, insisted on giving another briefing, which consisted of high pressure solicitations for donations, to Mrs. Garcia, while she was at FLAG in Clearwater, Florida. Villeneuve showed Mrs. Garcia photographs of gloomy scenes, including starved children in Africa. Villeneuve then told Mrs. Garcia that her donation would go to directly help those children, by introducing Scientology technology to them. Villeneuve explicitly stated the donation was needed urgently, so the program could begin immediately.  At the time Plaintiff was induced to contribute money for this cause, FLAG knew, or reasonably should have known, that the monies being solicited were not intended to be used for the stated purpose. As a direct result of, and in, reliance upon, the representations of Villeneuve, Plaintiff made her $1,300 donation with her VISA card. Plaintiff would not have made this contribution had she known the statements were false.

60.      Plaintiff's September 2, 2002 donation was made for the express purpose of funding the relief for starving children in Africa. The representations made by FLAG to

Plaintiff on September 2, 2002, regarding the need for and use of the monies solicited were false.

61.     On March 6, 2005 while at FLAG, Michelle Villeneuve, one of FLAG's special IAS representatives, required Plaintiff, Luis Garcia's presence for a mandatory IAS briefing. Plaintiff was told about the church's massive campaign to help the victims of the tsunami in Sumatra, Indonesia and Sri Lanka. Plaintiff was shown pictures of devastation and asked for a donation so volunteer ministers could be sent in to help those victims. At the time Plaintiff was induced to contribute money for this cause, the IAS knew, or reasonably should have known, that the monies being solicited were not intended to be used for the stated purpose. As a direct result of, and in, reliance upon, the representations of the IAS, Plaintiff made his $500 donation with his American Express card. Plaintiff would not have made this contribution had he known the statements were false.

62.     Plaintiff's March 6, 2005 donation was made for the express purpose of funding the relief for victims of the tsunami in Sumatra, Indonesia and Sri Lanka. The representations made by FLAG to Plaintiff on March 6, 2005, regarding the need for and use of the monies solicited were false.

63.     While at FLAG, On August 30, 2005, Plaintiff, Luis Garcia, and his family were escorted to the special fundraising office for the IAS where they were shown a video featuring Tom Cruise, promoting the responsibilities of Scientologists, as "we are the only ones that can help." Following the video, three IAS fundraisers badgered Plaintiffs for a substantial donation to help the IAS in its campaign to eliminate child pornography on the Internet. The fundraisers said there were over 100,000 illegal sites filled with child

pornography for which they claimed Plaintiffs bore responsibility to eradicate, for the sake of Plaintiffs' own children, through donation, which was needed immediately. At the time Plaintiff was induced to contribute money for this cause, FLAG knew, or reasonably should have known, that the monies being solicited were not intended to be used for the stated purpose. As a direct result of, and in, reliance upon, the representations of FLAG, Plaintiff made his $3,000 donation with his VISA card. Plaintiff would not have made this contribution had he known the statements were false.

64.      Plaintiffs' August 30, 2005 donation was made for the express purpose of funding to eradicate child pornography. The representations made by FLAG to Plaintiffs on August 30, 2005, regarding the need for and use of the monies solicited, were false.

65.      On November 20, 2005 an IAS fundraiser met with Plaintiff, Luis Garcia, and told him the IAS needed a donation for a campaign in France. The fundraiser said the French government was suppressive and wanted to ban Scientology, and that the IAS was going to investigate the government people involved in order to stop them.  The donation was needed immediately, as the funding for this program had to be completed right away for it to be effective. At the time Plaintiff was induced to contribute money for this cause, FLAG knew, or reasonably should have known, that the monies being solicited were not intended to be used for the stated purpose. As a direct result of, and in, reliance upon, the representations of the IAS fundraising representatives, Plaintiff made his $1,000 donation on his American Express card. Plaintiff would not have made this contribution had he known the statements were false.

66.      Plaintiff's November 20, 2005 donation was made for the express purpose of

funding the campaign in France. The representations made by FLAG to Plaintiff on November 20, 2005, regarding the need for and use of the monies solicited, were false.

67.     On March 27, 2006, while at FLAG in Clearwater, Plaintiff, Luis Garcia, was given a briefing ("donation solicitation") by Michelle Villeneuve. Villeneuve told Plaintiff the IAS was "helping in a big way down in Australia, with the bush fires". She described how the fires were ravaging towns and farms, and the IAS had been funding many volunteer ministers to fly to Australia and help. She said the IAS needed a donation right away from Plaintiff to fund this program. At the time Plaintiff was induced to contribute money for this cause, Defendant FLAG reasonably should have known, that the monies being solicited were not intended to be used for the stated purpose. As a direct result of, and in, reliance upon representations Defendant FLAG knew were false, Plaintiff made his $640 donation with his MasterCard. Plaintiff would not have made this contribution had he known the statements were false.

68.     Plaintiff's March 27, 2006 donation was made for the express purpose of funding the relief efforts in Australia. The representations made by FLAG to Plaintiff on March 27, 2006, regarding the need for and use of the monies solicited, were false.

69.     On September 30, 2006 while at FLAG in Clearwater, Plaintiff LUIS GARCIA received the customary and mandatory briefing from FLAG fundraisers. Plaintiff again met with Michelle Villeneuve who stated the IAS needed to urgently fund Public Service Announcements and that these announcements would be aired nationally. At the time Plaintiff was induced to contribute money for this cause, Defendant FLAG knew, or reasonably should have known, that the monies being solicited were not intended to be used

for the stated purpose. As a direct result of, and in, reliance upon such representations, Plaintiff made his $500 donation with his American Express card. Plaintiff would not have made this contribution had he known the statements were false.

70.      Plaintiff's September 30, 2006 donation was made for the express purpose of funding the Public Service Announcements. The representations made to Plaintiff on September 30, 2006, regarding the need for and use of the monies solicited, were false.

71.      On June 12, 2007 Plaintiff, Luis Garcia, paid $31,470 to the IAS with his American Express card in two separate transactions. Plaintiff went to the Freewinds Ship operated by SHIP for services. Soon after arrival onboard, Plaintiff was "interviewed" by Ari Lan, Senior SHIP fundraiser. Mr. Garcia was told that a substantial donation was needed to help victims of a tornado in Greensburg, Kansas. He said that SHIP and its agents were funding a huge relief effort and funding volunteer missionaries from Kansas City, Wichita and Dallas. The SHIP Officer said the relief effort would be funded in part with immediate donations from Plaintiff. At the time Plaintiff was induced to contribute money for this cause, Defendant SHIP knew, or reasonably should have known, that the monies being solicited were not intended to be used for the stated purpose. As a direct result of, and in, reliance upon, the representations of the SHIP, Plaintiff made his $31,470 donation with his American Express card. Plaintiff would not have made this contribution had he known the statements were false.

72.      Plaintiff's June 12, 2007 donation was made for the express purpose of funding the tornado victims' relief efforts in Greensburg. The representations made to Plaintiff, regarding the need for and use of the monies solicited, were false.

73.          As to each and every allegation in paragraphs 57 through 72, the Defendants FLAG and SHIP misled the Plaintiffs into believing that these specific funds would be spent on these humanitarian projects. In fact, these projects did not actually exist or only a small fraction of the money has been spent to create the appearance of extensive humanitarian activities to support the false statements made by fundraisers for Defendants. Through substantial efforts of Defendants FLAG and SHIP, they accumulated in excess of $1 billion while Plaintiffs and others were fraudulently induced into believing that their funds would be spent on humanitarian projects.

74.          As to each and every allegation in paragraphs 57 through 72, Miscavige was the primary spokesperson/fundraiser for the projects to which Plaintiffs were falsely induced to contribute. He widely, and falsely, promoted these activities, as set forth in the aforementioned paragraphs promoted to Plaintiffs, in internationally televised events shown at FLAG and SHIP facilities. Defendants and their agents routinely showed numerous videos, viewed by Plaintiffs, of Miscavige falsely presenting its purported "good works" and repeated requests for every Scientologist, including Plaintiffs to give money to support Defendants.  Plaintiffs relied on the false statements of Miscavige in making the above payments.

75.          The purpose of the fundraising efforts set forth in paragraphs 57 to 72 was not to support the causes for which the funds were solicited but rather to enrich the Church. By using false and misleading promotional materials and pronouncements, Defendants FLAG and SHIP created the appearance of laudatory church activities (little or none of which actually exist) as a means of soliciting substantial donations from the Plaintiffs.

76.     For each and every contribution, as set forth above in paragraphs 57 to 68, Defendants FLAG and SHIP spearheaded and sponsored the activities and engaged in repeated, high-pressure sales techniques targeting Plaintiffs, including, but not limited to, repeated late night visits and phone calls, refusing to allow them to leave the room until they had made a "contribution," requiring "contributions" as a condition of participation in other Scientology services, "mandatory" attendance at "briefings" with compliance enforced through threat of "ethics reports" being made.

77.     Specifically, as a means to accomplish these fundraising goals, as set forth in paragraphs 57 to 68 herein, Defendants, FLAG and SHIP provided facilities and supported the staff to conduct fundraising in close proximity to where auditing and training services are offered to its members, including Plaintiffs.

78.     Defendants made each and every one of the statements set forth above in order to induce Plaintiffs to make contributions. These statements were false in that Defendants knew that the requested donations would not be used to fund the campaigns which formed the basis for which the contributions were requested.  Defendants knew that these statements were false and Plaintiffs relied upon these false statements of the Defendants in making the contributions.  The statements were material to the Plaintiffs and Defendants knew that they were material in making the false statements.  Plaintiffs were harmed by the false statements because the contributions never would have been made had Plaintiffs known that Defendants' statements were false.

79.     Plaintiffs requested their funds be returned on August 8, 2012, but Defendants refused to refund the funds.

**COUNT I: FLAG**
FRAUD - "SUPER POWER" PROJECT

80.        This is an action by Plaintiffs against Defendant FLAG for damages for fraud in connection with the Super Power project.

81.        Plaintiffs re-allege and incorporate herein by reference Paragraphs 1 through 79.

82.        Plaintiffs contributed a total of $340,000 to fund the "Super Power" project.

83.    FLAG sponsored "Super Power Project" activities with respect to each and every fraudulent statement, representation and omission to Plaintiffs.  The efforts of FLAG were specifically designed to fraudulently solicit funds from the Plaintiffs, despite actual knowledge that the funds solicited were not being used for the purposes represented.

84.        Defendant FLAG intended Plaintiffs to rely upon the fraudulent statements, representations, and omissions.

85.        Plaintiffs reasonably relied to their detriment upon the statements, representations, and omissions.

86.        As a direct and proximate result, Plaintiffs have been damaged in that their money was taken under false pretenses and never would have been given if Plaintiffs had known of Defendants' material misrepresentations.

**COUNT II: FLAG**
ACTION FOR BREACH OF CONTRACT – FLAG

87.        This is an action by the Plaintiffs against Defendant FLAG for damages for breach of contract.

88.        Plaintiffs re-allege and incorporate herein by reference Paragraphs 1 through

79.

89.        Plaintiffs deposited funds in excess of $37,413.56 with FLAG to be held on

account until Plaintiffs elected to use the funds to pay for counseling services and/or

accommodations.

90.        Defendant FLAG had represented in its policy and publications that "pre-

payments" would be repaid to Plaintiffs when Plaintiffs so requested them.

91.        Plaintiffs requested that Defendant FLAG repay the funds held on account,

but Defendant FLAG has refused to repay the funds, despite a proper written request for

return.

92.        As a direct and proximate result of Defendant FLAG's breach, Plaintiffs have

been damaged.

        **WHEREFORE,** Plaintiffs demand judgment against Defendant FLAG for

compensatory damages and costs.

## COUNT III: SHIP
ACTION FOR BREACH OF CONTRACT – SHIP

93.        This is an action by the Plaintiffs against Defendant SHIP for damages for

breach of contract.

94.        Plaintiffs re-allege and incorporate herein by reference Paragraphs 1 through

79.

95.        Plaintiffs deposited funds in excess of $31,445.45 with SHIP to be held in

trust until Plaintiffs elected to use the funds to pay for counseling services and/or

accommodations.

96.        Defendant SHIP had represented in its policy and publications that "pre-

payments" would be repaid to Plaintiffs "at once," when Plaintiffs so requested them.

97.          Plaintiffs requested that Defendant SHIP repay the funds held in trust, but

Defendant SHIP has failed and refused to repay the funds.

98.          As a direct and proximate result of Defendant SHIP's breach, Plaintiffs have

been damaged.

      **WHEREFORE**, Plaintiffs demand judgment against Defendant SHIP for

compensatory damages and costs.

**COUNT IV: FLAG**
FRAUD - HUMANITARIAN INITATIVES

99.          This is an action by Plaintiffs against the Defendant, FLAG for damages for

fraud in connection with the so-called humanitarian initiatives.

100.          Plaintiffs re-allege and incorporate herein by reference Paragraphs 1 through

79.

101.          Plaintiffs contributed a total of $40,410.00 to fund the so-called fraudulent

humanitarian initiatives of the IAS.

102.          As a means to accomplish the fundraising goals, other Scientology affiliated

entities, specifically Defendant FLAG, not only provided dedicated facilities to the IAS to

conduct its fundraising in close proximity to where auditing and training services are offered

to its members, but also made receipt of such services contingent upon meeting with FLAG

representatives who engaged in high pressure illegal sales tactics, as stated above, to solicit

money from Plaintiffs. In this regard, FLAG operated an enterprise which was designed to

solicit funds from church members, including Plaintiffs, despite actual knowledge that the

funds solicited are not being used for the express purposes represented as set forth

Page 26 of 30

hereinabove. Instead, these funds are being used simply to enrich the Church.

103.        As stated above, while at FLAG, on numerous occasions, Plaintiffs were

fraudulently induced, to donate to FLAG and its agents.

104.        As a direct and proximate result, Plaintiffs have been damaged.

        **WHEREFORE,** Plaintiffs demand judgment against Defendant FLAG for

compensatory and punitive damages, and costs.

## <u>COUNT V: SHIP</u>
FRAUD - HUMANITARIAN INITATIVES

105.        This is an action by Plaintiffs against the Defendant SHIP for damages for

fraud in connection with the so-called humanitarian initiatives.

106.        Plaintiffs re-allege and incorporate herein by reference Paragraphs 1 through

79.

107.        Plaintiffs contributed a total of $40,410 to fund the so-called humanitarian

initiatives of FLAG representatives.

108.        As a means to accomplish the fundraising goals, other Scientology affiliated

entities, specifically Defendant SHIP, not only provided dedicated facilities to conduct its

fundraising in close proximity to where auditing and training services are offered to its

members, but also made receipt of such services contingent upon meeting with SHIP

representatives who engaged in high pressure illegal sales tactics, as stated above, to solicit

money from Plaintiffs. In this regard, SHIP operated an enterprise which was designed to

solicit funds from church members, including Plaintiffs, despite actual knowledge that the

funds solicited are not being used for the express purposes represented. Instead, these funds

are being used simply to enrich the Church.

109.        As stated above, while aboard SHIP, on June 12, 2007, Plaintiffs were fraudulently induced to donate $31,470.00.

110.        As a direct and proximate result, Plaintiffs have been damaged.

**WHEREFORE,** Plaintiffs demand judgment against the Defendant SHIP for compensatory and punitive damages, and costs.

## COUNT VI: FLAG AND SHIP
### ACTION FOR UNFAIR AND DECEPTIVE TRADE PRACTICES

111.        This is an action against the Defendants FLAG and SHIP for damages and equitable relief for unfair and deceptive trade practices in connection with the so-called humanitarian initiatives and the Super Power project.

112.        Plaintiffs re-allege and incorporate herein by reference Paragraphs 1 through 79.

113.        Defendants FLAG and SHIP engaged in "trade or commerce" through the fund-raising activities, advertisements, promotions, and solicitations in connection with the so-called humanitarian initiatives and the Super Power project and Plaintiffs are "consumers," as defined under § 501.203, Florida Statutes.

114.        Defendants FLAG and SHIP willfully engaged in unfair or deceptive acts and practices that they knew were unfair, deceptive, unconscionable, or prohibited by law.

115.        Unless Defendants FLAG and SHIP are permanently enjoined from engaging further in the acts and practices alleged herein, the continued activities of Defendants will result in irreparable injury to the public, for which there is no adequate remedy at law.

116.        Defendants, acting individually and/or in concert with each other, have engaged in representations, acts, practices, or omissions in trade or commerce which are

material, and which are likely to mislead consumers acting reasonably under the

circumstances; or the Defendants have engaged in acts or practices in trade or commerce

which offend established public policy and are unethical, oppressive, unscrupulous or

substantially injurious to consumers.

117.         As a direct and proximate result of the Defendants' acts or practices, Plaintiffs

have been damaged.

          Dated:   May 12, 2014

                              Respectfully submitted,

                              /s/   Theodore Babbitt

                              Theodore Babbitt, Esq.
                              Florida Bar No:  091146
                              Babbitt Johnson Osborne & LeClainche, P.A.
                              1641 Worthington Road, Suite 100
                              West Palm Beach, FL  33409
                              Phone:  561-684-2500
                              Fax:  561-684-6308
                              tedbabbitt@babbitt-johnson.com

                                   -and-

                              Ronald P. Weil, Esq.
                              Florida Bar No:  169966
                              Amanda M. McGovern
                              Florida Bar No:  964263
                              Weil Quaranta McGovern, P.A.
                              Southeast Financial Center, Suite 900
                              200 South Biscayne Blvd.
                              Miami, FL  33131
                              Phone:  305-372-5352
                              Fax:  305-372-5355
                              RPW@weillaw.net
                              amcgovern@weillaw.net

                              Counsel for Plaintiffs Luis A. Garcia Saz and
                              Maria Del Rocio Burgos Garcia

                              Page 29 of 30

## CERTIFICATE OF SERVICE

We hereby certify that, on May 12, 2014, we electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  We also certify that the foregoing document is being served this day on all counsel or pro se parties identified below in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filings.

F. Wallace Pope, Jr., Esq.
FBN 124449
Johnson Pope Bokor Ruppel
& Burns, LLP
911 Chestnut Street
Clearwater, FL  33757
Phone:  (727) 461-1818
Fax:  (727) 462-0365
E-mail:  wallyp@ipfirm.com
Counsel for Flag Church & Ship
Church

Of Counsel:

Eric Lieberman
Rabinowitz, Boudin, Standard, Krinsky
& Lieberman, P.C.
Suite 1700
45 Broadway
New York, NY  10006
(212) 254-1111

Marie Tomassi, Esq.
FBN 772062
Trenam Kember Scharf Barkin Frye
        O'Neill & Mullis, P.A.
Bank of America Building
200 Central Avenue, Suite 1600
St. Petersburg, FL  33701
Phone:  (727) 820-3952
Fax:  (727) 820-3972
E-mail:  mtomassi@trenam.com
Counsel for IAS Administrations, Inc.
And U.S. IAS Members Trust

Nathan M. Berman, Esq.
FBN 329230
E-mail:  nberman@zuckerman.com
Lee Fugate, Esq.
FBN 170928
E-mail:  lfugate@zuckerman.com
Jack E. Fernandez, Esq.
FBN 843751
E-mail:  jfernandez@zuckerman.com
Mamie V. Wise, Esq.
FBN 65570
E-mail:  mwise@zuckerman.com
Zuckerman Spaeder, LLP
101 E. Kennedy Blvd., Suite 1200
Tampa, FL  33602
Phone:  (813) 221-1010
Fax:  (813) 223-7961
Counsel for Church of Scientology
        Religious Trust

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

LUIS A. GARCIA SAZ, and wife, MARIA
DEL ROCIO BURGOS GARCIA,

        Plaintiffs,

vs.                                CASE NO. 8:13-CV-220-T27 TBM

CHURCH OF SCIENTOLOGY RELIGIOUS
TRUST; et al

        Defendants.
_____/

## JOINT MOTION AND MEMORANDUM OF SERVED DEFENDANTS TO COMPEL ARBITRATION AND TO STAY PROCEEDINGS

Defendants, Church of Scientology Flag Service Organization, Inc. (Flag Church), Church of Scientology Flag Ship Service Organization, Inc. (Ship Church), and IAS Administrations, Inc. (IASA), by their undersigned counsel, pursuant to the provisions of 9 U.S.C. § 1, *et seq.*, move the Court for the entry of an order compelling arbitration of the claims asserted against all defendants and staying this action pending conclusion of such arbitration.

In support of this motion defendants attach the Declarations of Peter J. Mansell (Exhibit 1), Anne Cox (Exhibit 2), Kenneth Weber (Exhibit 3), Monique E. Yingling (Exhibit 4), and Kenneth D. Long (Exhibit 5) and submit the following memorandum.

## MEMORANDUM OF LAW

### INTRODUCTION

This is the second lawsuit plaintiffs have brought seeking refunds of donations they made to Scientology churches and affiliated religious organizations. In September 2011, plaintiffs (the Garcias) filed an action in the Circuit Court for Pinellas County, Florida, against Flag Church and Ship Church, seeking return of donations plaintiffs made to those churches in contemplation

of participating in Scientology religious services. *See* Exhibit 6.  Shortly before a scheduled hearing on a motion to dismiss or to compel arbitration, the Garcias voluntarily dismissed that action (Exhibit 7), and on the same day filed this lawsuit against Flag Church, Ship Church, and three other Church of Scientology religious entities, CSRT, IASA and USIMT.  The complaint here re-alleges the same claims against Flag Church and Ship Church as plaintiffs alleged in the state court action, and adds additional claims against all defendants.

The Garcias became Scientologists in 1982.  For 28 years, the Garcias actively engaged in the life of their Church and religion, and extensively participated in Scientology's unique and central religious practices of auditing and training.  As explained in the Declaration of Peter Mansell, "auditing" is a form of spiritual counseling that seeks to remove barriers to spiritual progress.  Auditing addresses such barriers from a person's current and past lives (a Scientology religious tenet is that each individual is an immortal spiritual being with successive physical lives). "Training" is the study of Scientology scriptures, which consist of the Scientology-related writings, lectures, tapes and films of Scientology founder L. Ron Hubbard, and are the basis of the religion. (Mansell Declaration, Ex. 1, ¶¶ 2-8.)

As discussed below, the Garcias learned and accepted the Scientology religious tenet that all disputes between and among fellow Scientologists and/or Scientology churches and affiliated religious organizations should be resolved by use of Scientology's internal dispute resolution and justice system, including ultimately, if necessary, submission of all such disputes to arbitration before followers of the Scientology religion who are knowledgeable in the Scientology Scripture. *See generally* Mansell Declaration, Ex. 1, ¶¶ 9-20.  Despite the fact that the Garcias agreed in writing to abide by this tenet on numerous occasions throughout their participation in the Scientology religion, they now have ignored their commitments to do so and filed this lawsuit,

2

seeking return of charitable, tax-deductible donations they made under varying circumstances to the defendants over the course of many years.

Defendants by this motion seek to enforce the numerous agreements the Garcias made to submit all disputes with Scientologists or Scientology religious organizations to arbitration.

## PLAINTIFFS' COMPLAINT

Plaintiffs seek return of donations they made to defendants over the course of their membership and participation in the Scientology religion.   The Complaint alleges the various donations they made, to which defendants, and the purported basis for their claims.

As noted, plaintiffs re-allege the claims they made against Flag Church and Ship Church in their prior state court lawsuit.  *See* Complaint, ¶¶ 39-50, and Counts IV (¶¶ 104-109) and V (¶¶ 110-115).  These claims, founded on a theory of breach of contract, seek return of donations of $37,413.56 plaintiffs made to Flag Church and $31,445.45 they made to Ship Church at unspecified times in contemplation of participating in auditing or training.   The claims rest explicitly on what plaintiffs allege is the "policy" of the defendants.  *See, e.g.,* Complaint ¶ 43 (resting claim on allegation that "Defendants maintain a policy of returning funds"); ¶ 42 (alleging Ship Church induced donations "with the express understanding" that they would be returned upon demand);  ¶ 44 (resting claims on alleged Scientology "principles of exchange");  ¶¶ 107 and 113 (resting contract claims on alleged "represent[ations] in [their] policy and publications").

Plaintiffs also seek to recover donations they made to defendant, CSRT, between 1998 and 2005 (Complaint ¶ 31) to support construction of the so-called "Super Power" building in Clearwater, Florida.  Plaintiffs allege that they were fraudulently induced to contribute to the project by representations that CSRT needed the money to complete the project on an immediate basis, that the building still has not been completed, and that the contributions for it were diverted

for other purposes. (*Id.*, ¶¶ 32-36, 86, and 93.) Based on these allegations, plaintiffs have alleged counts against CSRT and Flag Church (on a theory of joint enterprise) for fraud (Counts I and III) and Unfair and Deceptive Trade Practices (Counts II and IV).

Finally, plaintiffs seek return of donations totaling $40,410 they made to IAS and USIMT from 1997-2007 to support specific humanitarian projects sponsored by those organizations (Complaint ¶¶ 53-68). Plaintiffs allege that they made the donations based on representations that the money would be used to further those projects, but that the money contributed was not used for that purpose. (*Id.*, ¶ 69). These allegations form the basis for claims for fraud against defendants IAS and USIMT (Count VI); claims for fraud against defendants Flag Church and Ship Church on a theory of joint enterprise (Counts VIII and IX); and a claim for Unfair and Deceptive Trade Practices against IAS and USIMT (Count VII).

## STATEMENT OF RELEVANT FACTS

### The Scientology Religion's Internal Dispute Resolution Doctrine And Structure

As set forth in the Mansell Declaration (Ex. 1), it is a central tenet of the Scientology religion that Scientologists and Scientology churches must raise and resolve all disputes between and among each other by use of the Scientology internal justice system. The reasons for this religious doctrine include:

A.      A core part of Scientology is an elaborate code of ethics and morals that reflect unique principals of the religion. In resolving disputes among themselves and/or their churches, Scientologists must apply Scientology ethics and morality, which the Church believes and requires can only be done through its internal ethics and justice system. This is more fully explained in Mr. Mansell's declaration at paragraphs 9-10. (Ex.1).

B.      Scientology provides a justice and dispute resolution system that Scientologists

believe works far more efficiently and with less random uncertainty than the civil justice system, and certainly is far less expensive.

C.     Many of the issues that may arise in such disputes inevitably will require application of Scientology policy and doctrine, especially its doctrines of ethics and justice which are central to its belief system.  Only Scientologists would have the understanding of and background in Scientology policy necessary to do so.  Indeed, as discussed *post* at 12-14, the First Amendment precludes civil courts from inquiring into or resolving religious law or ethics.

The Scientology doctrine that any dispute between Scientologists and/or their churches will be submitted to and resolved by the Scientology internal justice system, and not the civil courts, is hardly unique.  Similar provisions apply in many religions.  *See, e.g., Hosanna-Tabor Evangelical Lutheran Church and School v. EEOC,* 565 U.S. ___, 132 S.Ct. 694, 709 (2012) (noting rule of Lutheran Church that all disputes between parishioners or between parishioners and church be submitted to internal dispute resolution) and 715 (Alito, J., concurring)("Hosanna–Tabor discharged respondent because she threatened to file suit against the church in a civil court. This threat contravened the Lutheran doctrine that disputes among Christians should be resolved internally without resort to the civil court system and all the legal wrangling it entails").  *See also Karo, J., Code of Jewish Law:  Laws of the Judges* 26:1 (El Hamekoroth 1955) at 1565 (Prevailing view of Jewish Law, codified in the "Code of Jewish Law," is that Jews must seek resolution of disputes before rabbinical courts applying Jewish law, not a secular court); 1 *Corinthians* 6:1–7 ("If any of you has a dispute with another, dare he take it before the ungodly for judgment instead of before the saints?").

Indeed, civil courts have not hesitated to enforce provisions requiring religious arbitration of even secular law disputes.  *See Jenkins v. Trinity Evangelical Lutheran Church,*

356 Ill.App.3d 504, 825 N.E.2d 1206, 1214 (2005) (enforcing Lutheran Church doctrine mandating church-based arbitration of disputes); *General Conference of Evangelical Methodist Church v. Evangelical Methodist Church of Dalton, Georgia, Inc.,* 807 F.Supp.2d 1291, 1294-95 (N.D. Ga. 2011) (enforcing church rules that "believers should resolve disputes among themselves or within the Church wherever possible," that members would resolve disputes "among themselves without resort to the courts," and "by means of Christian conciliation, mediation or arbitration"); *Easterly v. Heritage Christian School, Inc.,* 2009 WL 2750099 (S.D. Ind. 2009) (Teachers' contracts with Christian School agreed to resolution "of differences" by "following the biblical pattern of Matthew 18:15-17," including "biblically based mediation" followed by arbitration in accordance with "Rules of Procedure for Christian Conciliation," and waived right to file lawsuit); *Meshev v. Ohev Sholom Talmud Torah,* 869 A.2d 343, 364 (D.C. Cir. 2005)(ordering arbitration of dispute between members and their synagogue according to Jewish law).

The Scientology internal justice system is quite developed and detailed. As described by Mr. Mansell, it includes the right to request the convening of a Committee of Evidence to engage in fact finding and render decisions, the right to petition a Board of Review to "cancel an action, directive or order" that has resulted in an injustice or violates basic Scientology policy, the right of "any one individual . . . to petition in writing any [Church] senior [executive] or official" for a "redress of wrongs," the right to appeal to the Scientology International Justice Chief, and the right to obtain compulsory arbitration of a dispute before three individual Scientologists in good standing. (Ex. 1, ¶¶ 14-19).

The doctrine requiring submission of all disputes to the Scientology internal justice system is not trivial. Every Scientologist who wishes to participate in either of Scientology's

6

two central practices – auditing and religious training – must commit himself or herself in writing to that doctrine each and every time he or she undertakes such participation, by initialing and signing a "Religious Services Enrollment Application, Agreement and General Release" which sets forth the requirement of internal dispute resolution.  Mansell Dec. ¶¶11,25 *et seq.*

**The Garcias Repeatedly Agreed to Submit Disputes to Scientology Arbitration**

The Garcias executed such agreements and agreed to submit disputes between themselves and Scientology organizations or other Scientologists to Scientology arbitration at least two dozen times. Luis A. Garcia Saz executed 18 separate agreements between 1986 and 2008 with the Church of Scientology of Orange County, California (Cox Declaration, Ex. 2, Composite Attachment A), and two separate agreements with the Advanced Organization Los Angeles ("AOLA Church") (Long Declaration, Ex. 5, Composite Attachment A).  During the same time, Maria Del Rocio Burgos Garcia ("Rocio Garcia") executed two separate agreements with the Orange County Church of Scientology (Composite Attachment B to the Cox Declaration).

On August 5, 2004, August 21, 2005, and March 19, 2006, Luis Garcia executed such agreements with Flag Church (Mansell Declaration, Ex. 1, Composite Attachment B).   On June 8, 2007, Mr. Garcia executed such an agreement with Ship Church (Weber Declaration, Ex. 3, Attachment A).  On June 28, 2002 and August 21, 2005, Rocio Garcia executed such agreements with Flag Church (Ex. 1, Composite Attachment C).

All of the foregoing agreements set forth requirements for resolving disputes pursuant to the Church's internal religious policies and procedures, including specific procedures for seeking a return of a charitable donation "under particular and compelling circumstances."

In addition to setting forth the commitment to internal resolution procedures, the Agreements specifically address the question of refunds of certain kinds of charitable donations

to churches, including internal dispute resolution with respect to such requests.   In the Scientology religion, parishioners can make tax deductible donations for the general welfare of the church or to further specific purposes such as building construction, and they also make tax deductible donations at the time they participate in Scientology auditing or training or in contemplation of doing so in the future.   Such donations are fixed in amount for the particular services involved.

The United States Internal Revenue Service for many years has recognized that such payments qualify as gifts or donations entitling the donor to deductions under 26 U.S.C. § 170[1] (Mansell Decl., Ex. 1,   ¶ 30; Weber Declaration, Ex. 3, ¶ 5).   Similarly, the IRS has long recognized as tax-deductible those donations made to entities of other religions which enable the donors to participate in the religious services of their church or synagogue, such as membership dues, tithes, pew rentals, or High Holy Days tickets.   In permitting a donor to deduct his donation despite the fact that it enables him to participate in religious services, the IRS has acknowledged

---

[1]      Plaintiffs falsely allege that in *Hernandez v. Commissioner*, 490 U.S. 682 (1989), the Supreme Court held that "no contributions to the Church of Scientology qualified for tax deductions and that the Church of Scientology did not enjoy tax exemption." Complaint, ¶ 9. Neither statement is true. First, the question of tax exemption was not before the *Hernandez* Court; indeed, the IRS had stipulated that Scientology churches were tax exempt. Second, *Hernandez* did not disallow deductibility of all contributions; the only question involved donations in contemplation of receiving Scientology religious services. And while *Hernandez* did hold that such donations were not deductible, the Court declined to resolve two key issues that it left open for consideration under a different or fuller record. First, the Court declined to resolve the so-called "administrative inconsistency" issue -- the claim that the IRS had treated Church of Scientology fixed donations more harshly than comparable payments in other religions, such as payments for dues, tithes, payments for masses, etc. *Id.* at 700-703. Second, the Court declined to address the "closely related" argument that Church of Scientology fixed donations should be deductible because Congress had acquiesced in the Service's administrative practice of allowing deductions for comparable payments to other churches. *Id.* at 703.
      Subsequent litigation in the Tax Court specifically raised those issues, *Garrison v. Commissioner*, U.S. Tax Court, Docket No. 18956-88, and the IRS settled the case by agreeing to permit Scientology parishioners to claim deductions as gifts or donations for the payments in question. The IRS publicly explained its change of position by issuing Rev. Rul. 93-73, 1993-2 C.B. 75, declaring obsolete Rev. Rul. 78-189, 1978-1 C.B. 68, its prior ruling that underlay its litigation of *Hernandez*.
      Thus, for more than nineteen years, donations by Scientologists to Scientology churches in contemplation of participating in auditing or training have been recognized and acknowledged by the IRS to be fully deductible gifts under §170.

that the "benefits" a donor receives by participating in such religious services are spiritual in nature, are incapable of monetary evaluation, and are "merely incidental to the general public benefit that is served" by providing for the deduction of such gifts. Revenue Ruling 71-580, 1971-2 C.B. 235, 236. Accordingly, Scientology churches and entities, including defendants, regularly provide year-end statements to parishioners who have made donations, including payments in advance of participating in Scientology religious courses or services, and inform them that they may deduct such payments on their income tax returns. Flag Church and Ship Church provided such statements to plaintiffs when they made advance donations. (Mansell Declaration, Ex. 1, ¶ 30, Attachment D; Weber Declaration, Ex. 3 ¶ 10, Attachment B).

In the Scientology religion, written religious policy clearly identifies any such payments as donations, makes clear that they are recognized by the IRS as tax deductible, and specifies that the donor has no right under civil law to a return of any part of such a payment or donation. Scientology Policy Directive 13 March 1996, a copy of which is attached to the Mansell Declaration. (Ex. 1, ¶ 31, Attachment E). The Policy Directive is called to the specific attention of every parishioner who participates in Scientology religious services when he executes the Religious Enrollment Agreement referred to above, and every parishioner acknowledges in writing that he or she has read the Policy Directive. Plaintiffs did so on numerous occasions when they enrolled in Scientology religious courses or practices with any Scientology church, including the Church defendants. (Mansell Declaration, Ex. 1, ¶¶ 31, 33, Attachments B-C; Weber Dec., Ex. 3, ¶ 6).

Unlike most churches or charitable organizations, however, Scientology policy and religious law provides a limited mechanism by which a parishioner, "under particular and compelling circumstances," may seek to obtain a return of a donation by submitting the request,

pursuant to church mandated procedures, to an ecclesiastical body called the Claims Verification Board, which can determine whether to grant the request within its sole and entire discretion. Thus, the same Scientology Policy Directive 13, March 1996, provides that "Under certain circumstances, the Church of Scientology to which the parishioner made his or her donation may return all or a portion of the person's donation to him provided his request is approved by the Claims Verification Board." The Policy Directive emphasizes that "such returns are purely at the Church's discretion." (Mansell Declaration, Ex. 1, ¶ 32, Attachment E.)   As explained above, however, should a Scientologist have a remaining dispute with the determination of the Claims Verification Board, he or she is entitled to invoke the general internal dispute resolution procedures of the church, including ultimately the arbitration procedures outlined above.  *See* Declaration of Peter Mansell, Ex. 1, ¶ 34.

### CSRT, IASA and USIMT Espouse, Present, Propagate and Practice Scientology

The defendants CSRT, IASA and USIMT are each an "organization which espouses, presents, propagates or practices the Scientology religion" as that phrase is used in the numerous enrollment forms that the Garcias signed over a 22 year period, from 1986 through 2008. (Yingling Declaration[2], Ex. 4, ¶¶6, 10, 14 and 18).

First, the Church of Scientology Religious Trust (CSRT) is a Trust recognized as tax exempt by the IRS.  In its Form 1023 exemption application to the IRS, CSRT stated "that its purpose is to devote Trust property to propagating the doctrines, tenets, practices and beliefs of

---

[2] Attorney Monique E. Yingling has represented the defendants and other Church of Scientology entities for more than 25 years regarding tax and corporate matters. Her declaration is attached as Exhibit 4.  She is intimately familiar with the corporate and legal structure, the financial affairs and the fundraising practices of the defendants. She represented these defendants and other Scientology churches and related organizations in a series of administrative proceedings with the Internal Revenue Service (IRS) that in 1993 resulted in the formal recognition of their separate, tax-exempt status, including the defendants, Flag Church, Ship Church, USIMT, IASA and CSRT.

the religion of Scientology and to the accomplishment of its goals." (Yingling Declaration, Ex.

4, ¶ 7). Similarly, Article 7 of CSRT's Declaration of Trust states:

> The Trust is organized exclusively for religious purposes and shall always be operated exclusively for religious purposes.  More particularly, the purpose of the Trust is to devote and apply Trust property, including both the corpus of the Trust and income therefrom, to *propagating the doctrines, tenets, practices and beliefs of the religion of Scientology and to the accomplishment of its goals*. (Yingling Declaration, Ex. 4, ¶ 9)(Emphasis added.) *See generally* Yingling Declaration, ¶¶ 7-10.

By the express terms of its creation, to "propagat[e] the doctrines, tenets, practices and

beliefs of the religion of Scientology and to the accomplishment of its goals," CSRT is clearly an

"organization which espouses, presents, propagates or practices the Scientology religion," as that

phrase is used in the numerous enrollment forms that plaintiffs signed between 1986 and 2008.

(Yingling Declaration, Ex. 4, ¶10).

Second, the U.S. IAS Members Trust (USIMT) was established by the International

Association of Scientologists (IAS)[3] to serve as a qualified recipient of deductible charitable

contributions from U.S. taxpayers.  USIMT's Declaration of Trust states that it is organized and

operated for exactly the same purposes as the IAS:  (1) to advance, protect and defend the

religion of Scientology and (2) to assist, protect and defend individual Scientologists from

religious persecution. Its Form 1023 application to the IRS explains that it carries out these

purposes "by making grants to or for the benefit of churches of Scientology and Scientology-

related organizations" as well as by conducting "its own programs or activities to accomplish

these purposes."  USIMT is thus plainly an "organization which espouses, presents, propagates

or practices the Scientology religion," as that phrase is used in the numerous enrollment forms

---

[3] The IAS is an unincorporated association formed under the laws of the United Kingdom in 1984 to serve as the membership organization for Scientologists and Scientology organizations worldwide.  The IAS Constitution states that its purposes are "to advance, protect and defend the religion of Scientology and to assist, protect and defend its members throughout this planet." (Yingling Declaration, Ex. 4, ¶11.)

that the Garcias signed.  (Yingling Declaration, Ex. 4).

Third, IAS Administrations, Inc. (IASA) was originally a Netherlands Antilles Foundation named "Foundation Membership Services Administrations," doing business as "IAS Administrations" or "IASA."  In 2007, pursuant to Delaware statutory authority, IASA was domesticated in Delaware and is treated for all purposes as a continuation of the former Netherlands Antilles Foundation.   IASA's original Netherlands Antilles Articles of Incorporation, which were part of the record upon which the IRS issued IASA its 1993 exemption, states that its object is "to operate exclusively for the religious purposes of espousing, presenting, propagating, practicing, ensuring and maintaining the purity and integrity of the religion of Scientology."(Yingling Declaration, Ex. 4, ¶ 17.)

Thus, IASA is clearly an "organization which espouses, presents, propagates or practices the Scientology religion" as that phrase is use in the numerous enrollment forms that the Garcias signed.  (Yingling Declaration, Ex. 4, ¶ 18.)

**ARGUMENT**

I.   **SUBMISSION OF THIS CASE TO RELIGIOUS ARBITRATION PROVIDES PLAINTIFFS A REMEDY THEY OTHERWISE DO NOT HAVE BECAUSE THE FIRST AMENDMENT ABSTENTION DOCTRINE FORBIDS CIVIL COURT REVIEW OF RELIGIOUS LAW AND POLICY**

It is hornbook law that "A gift inter vivos may not be revoked by the donor [.]"  28 FLA. JUR.2d *Gifts* § 4 (2011).  *See* 38A CORPUS JURIS SECUNDUM, *Gifts* §64 ("A completed inter vivos gift cannot be revoked by the donor once the gift is delivered and accepted by the donee"); *Ritter v. Shamas*, 452 So. 2d 1057, 1059 (Fla. 3d DCA 1984) ("In order for there to be a valid gift, there must be a complete and irrevocable surrender of dominion over the res, coupled with an intent then and there to pass title."); *Baptist Foundation for Christian Education v. Baptist College at Charleston*, 282 S.C. 53, 58, 317 S.E.2d 453, 457 (1984) ("An inter vivos gift …

operates ... immediately and irrevocably"). Here, the Agreements explicitly state that "No Scientology church is under any duty or obligation whatsoever to return any portion of any religious donation I make," and that "the Church is under no duty whatsoever to return any portion of any religious donation received from me." The IRS recognizes that the donations are irrevocable gifts by permitting them to be deducted under the Internal Revenue Code. Only irrevocable gifts are deductible under 26 U.S.C. §170. *See Walker v. Commissioner of Internal Revenue*, 91 F.2d 297 (5th Cir. 1937). Thus, any claim by plaintiffs that they are entitled to a return of their donations does not arise under civil law, but is exclusively a matter of Scientology policy and religious law. As set forth below, determination of any such question of religious law is beyond the cognizance of a civil court, but is solely a matter for the appropriate ecclesiastical authorities.

As early as 1871, the Supreme Court, applying federal common law, made clear that matters internal to religious organizations "which concern[] theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required of them" are beyond the ken of judicial authorities, and that those who participate in such religious bodies do so subject to the internal rules of those bodies. *Watson v. Jones*, 80 U.S. (13 Wall.) 679, 733-34 (1871).

> The judicial eye cannot penetrate the veil of the church for the forbidden purpose of vindicating the alleged wrongs of excised members; when they became members they did so upon the condition of continuing or not as they and their churches might determine, and they thereby submit to the ecclesiastical power and cannot now invoke the supervisory power of the civil tribunals.

*Id.* at 731 (internal citations omitted). *See Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church*, 344 U.S. 94, 115-16 (1952) (*Watson* principle is mandated by the First Amendment).

In other cases, the Court has made clear that the judiciary has no role in the resolution of disputes concerning the interpretation or application of religious doctrine. *Presbyterian Church*

*v. Mary Elizabeth Blue Hull Memorial Presbyterian Church,* 393 U.S. 440, 450 (1969)(First Amendment "forbids [a] civil court[]" from "mak[ing] its own interpretation of the meaning of church doctrines"); *New York v. Cathedral Academy,* 434 U.S. 125, 133 (1977) ("The prospect of church and state litigating in court about what does or does not have religious meaning touches the very core of the constitutional guarantee against religious establishment[.]"). It is the Church authorities' explanation and description of the beliefs and practices of the religion that must be accepted by the Court, lest the judiciary become entangled in a religious dispute as to what is the nature and content of a religion. *In re Holy Spirit Ass'n for the Unification of World Christianity v. Tax Comm'n of the City of New York,* 55 N.Y.2d 512, 518 (N.Y. 1982).

These principles were emphasized in *Serbian Eastern Orthodox Diocese v. Milivojevich,* 426 U.S. 696 (1976). In *Serbian,* the Court reversed a state court decision that the church in that case improperly removed a Bishop in an internal religious proceeding because the proceedings were arbitrary, in violation of Church law and procedure. The Supreme Court held that the decision of the Serbian Diocese authorities was beyond civil court review. The Court held:

> [N]o "arbitrariness" exception in the sense of an inquiry whether the decisions of the highest ecclesiastical tribunal of a hierarchical church complied with church laws and regulations is consistent with the constitutional mandate that civil courts are bound to accept the decisions of the highest judicatories of a religious organization of hierarchical polity on matters of discipline, faith, internal organization, or ecclesiastical rule, custom, or law.

*Id.* at 713.

While defendants at this time have not moved to dismiss the complaint on First Amendment grounds precisely because they have moved to compel arbitration, it is highly relevant that plaintiffs' claims ultimately cannot be properly placed before a civil court. The Scientology churches have provided a meaningful internal dispute resolution system to permit grievances to be raised before the only bodies capable and permitted to consider them. Without

the internal ecclesiastical remedies provided to plaintiffs, they would have no remedy at all.

## II.   THE ARBITRATION PROVISIONS REPEATEDLY AGREED TO BY EACH OF THE PLAINTIFFS WERE VALID AND SHOULD BE ENFORCED

### A.  The Federal Arbitration Act Governs This Case

The Federal Arbitration Act, 9 U.S.C. §1, *et. seq.* (FAA) governs all arbitration agreements involving interstate commerce. 9 U.S.C. § 2. The FAA mandates that agreements to arbitrate "be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." *Id.* The FAA reflects a "liberal policy favoring arbitration." *AT&T Mobility, LLC v. Concepcion*, 131 S.Ct. 1740, 1745 (2011); *citing Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 103 S.Ct. 927, 941 (1983) ("Section 2 is a congressional declaration of a liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary.").

It is "Congress' clear intent, in the Arbitration Act, to move the parties to an arbitrable dispute out of court and into arbitration as quickly and easily as possible." *Moses H. Cone Mem'l Hosp.*, 103 S.Ct. at 940. The FAA reflects a "statutory policy of rapid and unobstructed enforcement of arbitration agreements." *Id.* at 941. Agreements to arbitrate "now receive near universal approval." *Pilitz v. Bluegreen Corp.*, 2011 WL 3359641 *2 (M.D. Fla. 2011).

Here, the acts, transactions, and agreements between the Garcias, California residents, and Flag Church and Ship Church, Florida residents, are part of commerce among the several states and are therefore governed by the FAA.

### B.  Under the FAA and Florida Arbitration Law, the Agreements to Submit to Arbitration Must be Applied Broadly and Comprehensively

Both Federal and Florida (Fla. Stat., Ch. 682 (2011)) arbitration laws follow the "separability doctrine." The "separability doctrine" holds that arbitration clauses are separable

from the contracts in which they are included.  *Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395 (1967); *John B. Goodman Ltd. v. THF Construction, Inc.,* 321 F.3d 1094 (11th Cir. 2003); *Ronbeck Constr. Co. v. Savanna Club Corp.*, 592 So. 2d 344 (Fla. 4th DCA 1992).  Under the "separability doctrine" once a court determines that the parties entered into a valid arbitration clause, all other matters, such as whether a party fraudulently induced another to enter into the overall contract, are referred to the arbitrator.  *Prima Paint,* 388 U.S. at 402-04.

In *Ronbeck Constr. Co.,* a written contract mandated that "all claims or disputes arising out of the contract or the breach thereof" be decided by arbitration.  592 So. 2d at 346.  There was a later oral contract related to the same transaction, and the plaintiffs alleged claims for fraud, conversion, civil theft and conspiracy related to the later oral contract.  The Court held that the arbitration agreement applied to the later oral contract:

> As the federal courts do with comparable provisions under the United States Arbitration Act, 9 U.S.C. sections 1-14 (1982), we too should resolve all doubts about the scope of an arbitration agreement as well as any questions about waivers thereof in favor of arbitration, rather than against it. . . . In this case, the agreement was to arbitrate "all claims or disputes arising out of this Contract or the breach thereof." . . . [W]e construe the term "or the breach thereof" to cover even a dispute relating to the May 1988 [oral] agreement, for it *arose* from the original contract. . . . Moreover, all of the owner's fraud, conversion, conspiracy and civil theft damages claims against Ronbeck arose from the original contract, because the basis for these alleged claims lies in obligations accruing or resulting from it. Hence these claims come within the arbitration provision. *Id.* at 346-47.

Here, the Garcias' entire relationship with all of the defendants herein is governed by a series of 28 agreements that the Garcias entered into over a 22 year period.  In those agreements the Garcias repeatedly agreed to arbitration of "any dispute, claim or controversy" that might "arise between me and the Church, any other Scientology church, any other organization which espouses, presents, propagates or practices the Scientology religion."  Both federal and Florida laws strongly favor arbitration such that this Court's only inquiry is whether the parties entered

16

into an arbitration provision within a contract.  Once that determination is made, and there are no

other impediments to arbitration, *all* disputes go to the arbitrators for resolution.  *Mims v. Global*

*Credit and Collection Corp.,* 803 F.Supp.2d 1349, 1353 (S.D. Fla. 2011).[4]

Finally, there can be no legitimate argument that courts should not enforce agreements to

arbitrate between religious organizations and their members or among followers of a religion.

Such agreements are regularly enforced throughout the nation in a variety of circumstances.  *See,*

*e.g.,* cases cited, *ante* at 5-6.   Indeed, Florida's Third District Court of Appeal has specifically

recognized that agreements to arbitrate disputes before a religious tribunal applying religious law

are well known and enforceable:

> The beginnings of Jewish arbitral institutions are traceable to the middle of the second
> century. Throughout the centuries, thereafter, in every country in which Jews have been
> domiciled, Jewish judicial authority has existed, via the institute of arbitration conducted
> by special rabbinical courts. Orthodox Jews, prompted by their religious, national
> feelings, accepted Jewish judicial authority by resorting to the arbitration procedure of
> their own free will (Elon, *Principles of Jewish Law,* Arbitration, p. 566). This method of
> arbitration has the imprimatur of our own judicial system, as a useful means of relieving
> the burdens of the inundated courts dealing with civil matters. Through Talmudic sages,
> it is learned that special rules or procedures have been provided under which the
> rabbinical courts function as a Din Torah (literally translated as Torah judgment), with
> Judaic or Torah law as its basis.

*Ainsworth v. Schoen,* 606 So. 2d 1275, 1276 (Fla. 3d DCA 1992).

## C.   **The Court Should Order Arbitration of All of Plaintiffs' Claims, including Those Asserted Against CSRT, IASA and USIMT**

Because plaintiffs have not served CSRT and USIMT and they are not currently parties to

the case, they of course have not joined in this motion.  The claims plaintiffs assert against these

un-served defendants, however, necessarily are encompassed in the claims they assert against

Flag Church and Ship Church because the latter claims seek to impose liability, on a joint

enterprise theory, for the acts of the un-served defendants. Thus, any arbitration proceeding that

---

[4]      Florida has adopted the same approach. *Jackson v. The Shakespeare Foundation, Inc.,* 2013 WL
362786 (Fla. 2013).

hears plaintiffs' claims against Flag Church and Ship Church necessarily must decide plaintiffs' claims against CSRT and USIMT. Thus an order compelling arbitration of plaintiffs' claims against Flag Church and Ship Church will encompass all claims in the case.

Equally important, IASA has and CSRT and USIMT will have standing to enforce the arbitration provisions of the agreements because they are third party beneficiaries of the arbitration provisions. The Garcias agreed to arbitrate "any dispute, claim or controversy" arising "between me and the church, *any other Scientology church, any other organization which espouses, presents, propagates or practices the Scientology religion, or any person employed by any such entity.*" CSRT, IASA and USIMT are organizations that espouse, present, propagate or practice the Scientology religion.

Whether one is an intended third party beneficiary of a contract is, under the FAA, a question of state contract law. *Patriot Mfg. Inc. v. Dixon,* 399 F. Supp. 2d 1298, 1301 (S.D. Ala. 2005). Under Florida law, CSRT, IASA and USIMT are entitled to invoke the benefits of the agreements as third party beneficiaries:

> Florida law looks to [the] nature or terms of a contract to find the parties' clear or manifest intent that it be for the benefit of a third party, when determining whether a third-party beneficiary contract has been created; *the question of intent is generally regarded as one of construction of the contract.* [emphasis added]

> The intention of the parties in determining whether a third party was an intended beneficiary of a contract is determined by the terms of the contract as a whole, construed in the light of the circumstances under which it was made and the apparent purposes that the parties are trying to accomplish.

11 FLA. JUR. 2D, CONTRACTS § 202 (2011); *M-I LLC v. Utility Directional Drilling, Inc.*, 872 So. 2d 403 (Fla. 3d DCA 2004); *Carvel v. Godley*, 939 So. 2d 204 (Fla. 4th DCA 2006).

The question of intent to benefit a third party is a question of law. *Carvel v. Godley,* 939 So. 2d 204, 207-08 (Fla. 4th DCA 2006). "The language used in a contract is the best evidence of

the intent and meaning of the parties." *Jenne v. Church & Tower, Inc.*, 814 So. 2d 522, 524 (Fla. 4th DCA 2002); *M-I LLC*, 872 So. 2d at 405.   Here, the parties' mutual intent, as expressly stated in the numerous, mutually executed agreements, is that plaintiffs promised and are bound to arbitrate any dispute they have with any Scientology entity anywhere.   Further, the plain meaning of the words – "any dispute" and "any other Scientology church" and "any other organization which espouses, presents, propagates or practices the Scientology religion" – must be "construed in the light of the circumstances under which [the agreement] was made and the apparent purpose that the parties are trying to accomplish." *Moyer v. Graham*, 285 So. 2d 397, 402 (Fla. 1973); *Carvel v. Godley*, 939 So. 2d at 208.

The parties' purpose plainly was to insure that all disputes regarding their religion would be resolved internally according to Scientology principles, and the parties stated in the very same paragraph in which they agreed to arbitration that disputes would be resolved "[i]n accordance with the discipline, faith, internal organization and ecclesiastical rule, custom, and law of the Scientology religion." (Agreements, ¶¶ 6(d).)   It would be anomalous for the parties to have agreed, on the one hand, that any disputes between the plaintiffs and Flag Church and Ship Church involved questions that must be resolved according to ecclesiastical rule and procedure, but, on the other hand, not to have agreed that any similar or identical disputes involving "other churches of Scientology" or "other organizations" that "espouse, present, propagate or practice" the Scientology religion need not be so resolved.   The plain meaning of the terms used in the agreements is fully supported by the surrounding language and the context of the agreements. Under these circumstances, CSRT, IASA and USIMT are third party beneficiaries of the multiple agreements that plaintiffs executed with Flag Church and Ship Church. *Zac Smith & Co., Inc. v. Moonspinner Condo Ass'n, Inc.*, 472 So. 2d 1324, 1325 (Fla. 1st DCA 1985) ("We

hold that Section 682.03, Fla. Statutes 1983, applies to third-party beneficiaries to a contract containing an arbitration clause such as in the instant case, and subjects the third party beneficiary to the arbitration agreement.")

### D.   There are no Legal Constraints to the Enforcement of The Arbitration Agreements.

In the state court action (Ex. 6), the Garcias asserted that the arbitration agreements were "unconscionable."  That defense must be rejected.  The agreements to submit to religious arbitration are entirely proper as a matter of law.

Pursuant to the FAA, an arbitration agreement is "valid, irrevocable, and enforceable, *save upon such grounds as exist at law or in equity for the revocation of any contract*." 9 U.S.C. § 2 (emphasis added).  This "savings clause" in Section 2 of the FAA "permits agreements to arbitrate to be invalidated by 'generally applicable contract defenses, such as fraud, duress, or unconscionability,' but not by defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue." *AT&T Mobility, LLC v. Concepcion*, 131 S.Ct. at 1740, 1746 (2011).  State law governs whether contract defenses apply that arise *at the formation of the contract* and may operate to invalidate an arbitration agreement. *Id.*; *see also Senior Serv. of Palm Beach LLC v. ABCSP Inc.*, 2012 WL 2054971 *2 (S.D. Fla. 2012). Unconscionability must be measured as of the time an agreement was made. *Steinhardt v. Rudolph*, 422 So. 2d 884, 889 (Fla. 3d DCA 1982) ("'[I]f a contract or term thereof is unconscionable at the time the contract is made a court may refuse to enforce the contract, or may enforce the remainder of the contract without the unconscionable term, or may so limit the application of any unconscionable term as to avoid any unconscionable result.'")(quoting RESTATEMENT (SECOND) OF CONTRACTS §208 (1979)).

To invalidate a contract as unconscionable, Florida law requires a contract to be both

procedurally and substantively unconscionable. *Vince v. Specialized Services, Inc.*, 2011 WL 4599824 *3 (M.D. Fla. 2011). "The party seeking to avoid the arbitration provision has the burden to establish unconscionability." *Estate of Perez v. Life Care Centers of Am., Inc.*, 23 So. 3d 741, 742 (Fla. 5th DCA 2009). Procedural unconscionability "relates to the manner in which the contract was entered and it involves consideration of such issues as the relative bargaining power of the parties and their ability to know and understand the disputed contract terms." *Pilitz*, 2011 WL 3359641 * 3 (M.D. Fla. 2011); *citing Powertel, Inc. v. Bexley*, 743 So. 2d 570, 574 (Fla. 1st DCA 1999). Substantive unconscionability "requires an assessment of whether the contract terms are so outrageously unfair as to shock the judicial conscience." *Id., citing Bland v. Health Care & Retirement Corp. of Am.*, 927 So. 2d 252, 256 (Fla. 2d DCA 2006); *Kohl v. Bay Colony Club Condo., Inc.*, 398 So. 2d 865, 868 (Fla. 4th DCA 1981).

A court must determine whether a contract is procedurally unconscionable by looking to the "manner in which the contract was entered into and consider[ing] factors such as whether the complaining party had a realistic opportunity to bargain regarding the terms of the contract or whether the terms were merely presented on a take-it-or-leave-it basis; and whether he or she had a reasonable opportunity to understand the terms of the contract." *Perez*, 23 So. 3d at 742 (citing *Weston*, 857 So. 2d at 284; internal quotations omitted). "A party to a contract is not permitted to avoid the consequences of a contract freely entered into simply because he or she elected not to read and understand its terms before executing it, or because, in retrospect, the bargain turns out to be disadvantageous." *Id.* (citing *Weston, supra*).

Here, plaintiffs were entirely free to enter into the Agreements or not, as they saw fit. Plaintiffs signed several such agreements with Flag Church dating back to 2004, and also signed similar agreements containing similar provisions with a Scientology church in California (their

local church) dating back to 1986. Thus, at least after the first agreement the Garcias signed in 1986, the Garcias knew what the agreements contained and had years to consult anyone they wanted. While as a matter of Scientology religious law they could not enroll in Scientology courses or services without agreeing to be bound by Scientology Policy Directive 13 March 1996, or the agreements' dispute resolution provisions, no one could or did compel them to participate in the Scientology religion or to make their donations. Any "harm" they might have suffered by not participating in the religion is entirely spiritual and religious, and beyond the power of a civil court to determine.

Because the agreements are not procedurally unconscionable, this Court need not – indeed should not -- even address the question of substantive unconscionability. But if the Court chooses to do so, the Court again must reject any such arguments.

To assess the substantive unconscionability of a contract, "a court must look to the terms of the contract, and determine whether they are so outrageously unfair as to shock the judicial conscience." *Weston*, 857 So. 2d at 284-85 (citations and internal quotations omitted). *See also Powertel*, 743 So. 2d at 574 (substantive unconscionability "focuses on the agreement itself"); *Kohl v. Bay Colony Club Condominium, Inc.*, 398 So. 2d 865, 868 (Fla. 4th DCA 1981)(a case is made out for substantive unconscionability by showing that "the terms of the contract are unreasonable and unfair"). Florida courts define substantive unconscionability in reference to an agreement that "'no man in his senses and not under delusion would make on the one hand, and as no honest and fair man would accept on the other.'" *Belcher v. Kier*, 558 So. 2d 1039, 1044 (Fla. 2d DCA 1990) (quoting *Hume v. United States*, 132 U.S. 406 (1889)).

In the state court action, the Garcias complained that the Scientology internal justice procedures were substantively unconscionable because they required adjudication by the

International Justice Chief, a senior Scientology official, and by a panel of Scientologists. That complaint must be rejected. First, plaintiffs would have no remedy at all to seek a return of their irrevocable donations, but for the availability of Scientology's dispute resolution system and religious policy. Significantly, in their claims for return of donations made to Flag Church and Ship Church as advance payments for religious services, plaintiffs base their claims precisely upon *their* interpretation of the Scientology religious policy, as set forth in the Agreements by which the plaintiffs agreed to submit to religious arbitration. *See, e.g.*, Complaint ¶43 (resting cause of action on allegation that "Defendants maintain a policy of returning funds"), ¶42 (alleging Ship Church induced donations "with the express understanding" that they would be returned upon demand), ¶44 (resting claims on alleged Scientology "principles of exchange"), ¶¶107 and 113 (resting contract claims on defendants' alleged "represent[ations] in [their] policy and publications"). Without the Agreements and the Scientology Policy upon which they are based, plaintiffs would have no basis to request a return of such donations. A civil court may not determine whether plaintiffs' interpretation of church policy and law is correct and the church's interpretation incorrect. Certainly, a court could not conclude that "no man in his senses and not under delusion" would make such an agreement. Plaintiffs rely on the refund religious policy, incorporated in the Agreements, to argue that they have a "right" to return of their donations. It follows that they are bound by the dispute resolution and arbitration provisions in those Agreements.

Even aside from the religious context and First Amendment considerations, plaintiffs cannot defeat enforcement of the agreements to arbitrate on the basis of speculation that the proceeding might turn out to be unfair. Certainly, the fact that the arbitrators may apply Scientology religious policy and principles to their consideration of the dispute is not and cannot be a disqualifying factor. Thus, in both *General Conference of Evangelical Methodist Church* ,

23

807 F.Supp.2d at 1294-95, and *Easterly v. Heritage Christian School, Inc.,* 2001 WL 2750099 (S.D. Ind. 2009), federal district courts recently have upheld arbitration agreements providing for the application of Christian biblical principles and policies.  Similarly those cases rejected claims that the arbitrators would be inherently biased because of their religious beliefs and affiliations. *General Conference of Evangelical Methodist Church,* 807 F.Supp.2d at 1301 ("The Supreme Court has repeatedly counseled that the [under the] FAA . . . courts should not presume, absent concrete proof to the contrary, that arbitration systems will be unfair or biased," quoting *Easterly,* 2009 WL 2750099 at*3, in turn citing *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 30 (1991)).  *See also Jenkins v. Trinity Evangelical Lutheran Church,* 356 Ill.App.3d 504, 825 N.E.2d at 1214 (2005)(rejecting partiality argument based on fact that "the dispute resolution procedure calls for arbitrators who are either members or employees of the [defendant] Synod," because "Plaintiff has not pointed to any specific prejudice he would suffer under the bylaws, but only a generalized fear of partiality. This anxiety is insufficient to overturn the LCMS arbitration process").

In *BDO Seidman, LLP v. Bee*, 970 So. 2d 869 (Fla. 4th DCA 2007), a former partner sued an accounting firm over retirement benefits after he was terminated for cause.  The former partner argued that he was not bound by the arbitration clause in the partnership agreement because it provided for an arbitration panel consisting exclusively of other BDO regular partners. Applying New York law, but emphasizing that "New York law on unconscionability analysis is similar to Florida's analysis," the Fourth District held that the arbitration provision was not substantively unconscionable because "[i]t has long been the policy of New York courts to interfere as little as possible with the freedom of consenting parties." *Id.* at 876-77.

Furthermore, it would be premature at this stage for a court to deny enforcement of the

arbitration provisions.  Any claim by the Garcias that all Scientologists are biased against them would be mere speculation and, indeed, would demonstrate a biased judgment *against* Scientologists.  The Court should allow the arbitration to proceed.  In *BDO Seidman, supra.*, the court observed that "an arbitration award can always be challenged [after the fact] based upon the 'evident partiality' of the arbitrators[,]' *Id.* at 877, and held that the trial court "ruled appropriately," *Id.*, when it declined to find that the panel was biased in the absence of evidence of "actual bias."  *Id.* at 873.

**E.    <u>Defendants Are Entitled to a Stay of Proceedings Pending Arbitration</u>**

Defendants' right to a stay pending arbitration is found at 9 U.S.C. § 3.

## CONCLUSION

The Court should enter its order compelling the arbitration of all of plaintiffs' claims and, pursuant to 9 U.S.C. § 3, staying this cause until the arbitration has concluded.

I HEREBY CERTIFY that on March 6, 2013, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:  RONALD P. WEIL, ESQ., rpw@weillaw.net, and THEODORE BABBITT, ESQ., tedbabbitt@babbitt-johnson.com, attorney for plaintiffs.

JOHNSON, POPE, BOKOR,
RUPPEL & BURNS, LLP

/s/ F. Wallace Pope, Jr.
F. Wallace Pope, Jr.
Florida Bar No. 0124449
wallyp@jpfirm.com
Post Office Box 1368
Clearwater, Florida 33757
(727) 461-1818; (727) 462-0365-fax
Attorneys for Flag Church & Ship Church
1346330

TRENAM, KEMKER, SCHARF, BARKIN,
FRYE, O'NEILL & MULLIS, P.A.

/s/ Marie Tomassi
Marie Tomassi
Florida Bar No. 772062
mtomassi@trenam.com
200 Central Avenue, Suite 1600
St. Petersburg, FL  33701
(727) 820-3952; (727) 820-0835-fax
Attorneys for IASA

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

LUIS GARCIA, and wife,
ROCIO GARCIA,

      Plaintiffs,

Vs.                                                    CASE NO. 8:13-CV-220-T27 TBM

CHURCH OF SCIENTOLOGY RELIGIOUS
TRUST; CHURCH OF SCIENTOLOGY FLAG
SERVICE ORGANIZATION, INC.; CHURCH
OF SCIENTOLOGY FLAG SHIP SERVICE
ORGANIZATION, INC d/b/a MAJESTIC
CRUISE LINES; U.S. IAS MEMBERS TRUST.

      Defendants
_____/

## PLAINTIFFS' RESPONSE AND MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' JOINT MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS

Plaintiffs, Luis Garcia and Rocio Garcia (hereinafter the "Garcia Plaintiffs") for their Response in Opposition to Defendant's Consolidated Motion to Compel Arbitration and Stay Proceedings [D.E. 8] ("hereinafter MC&S") hereby state as follows:

## I.     INTRODUCTION

At the outset, it should be clear that none of the claims asserted by Plaintiffs here are in any way dependent upon a written contract which also requires arbitration. Plaintiffs' claims are for fraud, violations of Florida's Deceptive and Unfair Trade Practices Act and breach of contract for failure to return deposits for advanced deposits for religious services. Nothing about the subject agreements' titles (Enrollment Applications), or the stated purpose of those agreements as being required on each occasion Plaintiffs' were enrolled and then approved to receive specific "religious services" reasonably provides a connection to the claims asserted

here.  Nothing about the religious services purchased provides any credible connection for Plaintiffs to have abandoned all manner of civil claims and the forums in which such claims would be brought regardless of whether those claims relate in any way to the services Plaintiffs purchased.

Defendants' MC&S is also curious in that expansive argument is presented that each of Defendants and collectively all of them are immune to civil suit as religious bodies. Their motion however, anamolously states that they *are not* seeking a ruling on that issue at this time.  Instead, they suggest that, along with many traditional churches, they prescribe and allow for arbitration of "non-ecclesiastical" disputes as opposed to doctrinal or religious disputes.  Whether the complaint states a proper cause of action for return of funds solicited by false and misleading practices, and whether first amendment protections apply, are irrelevant distractions as neither are currently before the Court.

While arbitration clauses are sometimes used by traditional churches to resolve commercial or non-ecclesiastical matters, Defendants are a far cry from a traditional church or religion routinely resolving such disputes in a predictable, fair or impartial manner.   In fact, as is set forth in the supporting declarations of Plaintiffs[1], former Scientologists such as Plaintiffs are viewed as "Suppressive Persons," and are barred from further communications with church members, inclusive of family members, who retain their church affiliation. Unlike traditional churches which promote "non-ecclesiastical" arbitrations, Defendants cannot point to a single arbitration proceeding initiated and concluded pursuant to a prescribed set of rules and procedures.  That is because there have been no arbitrations and there are no defined arbitral rules or procedures which have ever been previously defined or employed.

---

[1] Hereinafter, all citations to the Declarations filed in support of Plaintiffs' Motion, including the Declarations of Luis Garcia, Mark Rathbun, Christie Collbran, Bert Schippers, Donald Koon, Nancy Roby Wise, Randall C. Wise, Haydn James, Karry S. Campbell, and Scott E. Campbell shall be noted as "([Last Name] Decl. at ¶ ___)".

Plaintiffs' supporting declarations make clear that the absence of an arbitration history is not emblematic of some abiding contentment with Defendants' organizations. There have been no arbitrations, nor are there set and established arbitration procedures or principles precisely because a panel of Scientology arbitrators must by definition also subscribe to the doctrinal belief that a claimant or litigant is a Suppressive Person who is no longer permitted to communicate in any fashion with any church member. (Rathbun Decl. at ¶ 10). Whatever else may be said about other "non-ecclesiastical" arbitrations promoted by other more traditional churches, none of those churches declare the litigant an apostate and subject their families to retaliation for any breach of a non-communication protocol.  Defendants have a lengthy and well documented history, as well as corroborating published bulletins of their doctrine, which demonstrate that even a commercial or non-ecclesiastical claim is a call to arms and an attack on the doctrine of Scientology itself.  Disaffected former Scientologists are termed "Suppressive Persons."  An arbitration process presided over by Scientologist panelists holding the same doctrinal views, under the same threat of "suppressive personhood," whose families are also subject to the same harassment and threats, without rules and procedures of any kind other than those mandating Scientologist panelists, is not authorized by the Federal Arbitration Act and respectfully should not be authorized by this Court.  "Evident partiality," another standard referenced by several of Defendants authorities as being required to annul a commitment to arbitrate, is palpable here.  It is not the product of speculation or surmise.

Defendants mention the 28 or so Enrollment Applications and the arbitration clause contained in each.  They fail to clarify which one(s) allegedly applies to this dispute, or whether as they appear to suggest, that they all do. (MC&S at p. 16).  They also fail to mention that virtually all were executed in California, or that they *are not uniform* in addressing the mandated

subjects of arbitration.  The later forms attempt to bar not just claims that are bound to the contract or "arise from" it, but "any dispute or controversy" with unrelated parties and involving matters having nothing at all to do with the specific religious services obtained when each Enrollment Application is signed.

California law applies to the interpretation and enforceability of these arbitration clauses as the vast majority were executed in California.  However, under either California's or Florida's governing standards for determining the validity of such arbitration clauses, they are, in all of their various iterations, "procedurally" and "substantively unconscionable" and unenforceable. They are "contracts of adhesion," utilizing boilerplate language prepared by Defendants, presented for execution to Plaintiffs as "non-negotiable" only after Plaintiffs had already paid for those services.  They wrongfully purport to limit Plaintiffs' civil remedies and recourse to any court or arbitration panel for unrelated "non-ecclesiastical" controversies simply because Plaintiffs at some time had contracted and paid for certain "religious services" from Defendants.

## II.   THE ARBITRATION CLAUSE IS SUBSTANTIVELY AND PROCEDURALLY UNCONSCIONABLE

The Federal Policy favoring arbitration is not without limits.  Arbitration may only be compelled where there is an actual agreement to do so.  *In re Managed Care Litig.,* 2003 U.S. Dist. LEXIS 23035, *19-21 (S.D. Fla.) ("Whether a matter is within the scope of an arbitration provision is a matter of the parties' intent. . . .Even though there is a strong federal policy favoring it, arbitration is a matter of contract, and parties can only be required to submit disputes to arbitration if they agreed to do so." *Eassa Props. v. Shearson Lehman Bros., In*c., 851 F.2d 1301, 1304 n.7 (11th Cir. 1988) ("While federal law may govern the interpretation and enforcement of a valid arbitration agreement, state law governs the question of whether such an agreement exists in the first instance.").

## A.     California Contract Law Applies to the Construction and Interpretation of the Arbitration Clause

Defendants' reliance on Florida law is misplaced. "A federal district court sitting in diversity must apply the choice of law rules of the forum state." *See, e.g. Boardman Petroleum, Inc. v. Federated Mut. Ins. Co.*, 135 F.3d 750, 752 (11th Cir. 1998)*; United States Fid. & Guar. Co. v. Liberty Surplus Ins. Corp.*, 2007 U.S. Dist. LEXIS 80554 (M.D. Fla. 2007). Under Florida law, the rights and liabilities of parties to a contract are governed by the law of the place where the contract was executed. *Id; State Farm Mut. Auto. Ins. Co. v. Roach*, 945 So.2d 1160, 1163 (Fla. 2006). Of the more than 28 form Enrollment Applications executed by Plaintiffs, the vast majority were executed in Orange County, California.  (Garcia Decl. at ¶ 10).  In this diversity action, the determination of the validity of the current arbitration clause, its interpretation and meaning is governed by state law, and here the law of the state in which the contract was made was California.  Although Plaintiffs' claims do not arise under that agreement, Defendants contend the agreement controls and therefore an analysis of the agreement under California law is required.   Plaintiffs submit that Florida law is in rough accord with each of the applicable contract principles that govern here.[2]

## B.     Under California Law the Arbitration Clauses are Procedurally Unconscionable

Under California law, arbitration agreements are valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation any contract. *See, e.g., Alvarez v. T-Mobile USA, Inc*., 822 F. Supp. 2d 1081, 1085 (E.D. Cal. 2011); *Pokorny v. Quixtar, Inc*., 601 F.3d 987, 994 (9th Cir. 2010).   If the arbitration provisions incorporated in an adhesive agreement are also unforeseeably broad, and violate the party's reasonable

---

[2]   None of the agreements at issue contain a governing state law provision.

expectations, they are not enforceable. *Bruni v. Didion*, 160 Cal. App. 4th 1272, 73 Cal. Rptr. 3d 395 (Cal. App. 4th Dist. 2008), as modified, (Mar. 24, 2008) and review denied, (June 18, 2008); *Parada v. Superior Court*, 176 Cal. App. 4th 1554 (Cal. App. 4th Dist. 2009) (procedural unconscionability found in part because Plaintiff, as the party in the weaker bargaining position, would not reasonably expect prohibitively expensive arbitration fees and a prohibition on consolidation or joinder in the arbitration agreement) ; *Lima v. Gateway, Inc*., 886 F. Supp. 2d 1170 (C.D. Cal. 2012). (Finding arbitration provision substantively unconscionable where Plaintiff's claims, "based on Gateway's advertising and marketing, have little to do with the Limited Warranty…[I]t is completely unexpected that an adhesive consumer warranty would require arbitration of *all* disputes between the parties – including those beyond the scope of the warranty coverage."); *Thompson v. Toll Dublin, LLC*, 165 Cal. App. 4th 1360 (Cal. 1st Dist. 2008) (holding that it would be substantively unconscionable to construe arbitration provision in "Title 7 Addendum" to apply beyond the context of Title 7 claims and to Plaintiffs' fraud-based claims, as "[t]he purported inclusion of non-Title 7 claims in the arbitration …rendered the scope of the arbitration provisions unforeseeably broad, which would not have been within the reasonable expectations of plaintiffs… to uphold defendants' interpretation that these provisions in fact included fraud-related claims would undoubtedly 'shock the conscience.'") In determining whether a contract is in keeping with the party's "reasonable expectations," it is relevant to consider whether the arbitration clauses are in the same type face, lack prominence and are no more conspicuous than the remaining terms of the agreement, and whether there are any articulated rules governing the arbitration that have been provided as part of the agreement. *Trived v. Curexo Technology Corp*., 189 Cal. App. 4th 387; 116 Cal. Rptr. 3d 804 (Cal. App. 1st Dist. 2010).

The concept of contract of adhesion has developed in recent decades "as a basis for modifying or nullifying harsh terms which defeat the reasonable expectations of the parties." (1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 23,  p. 53.) Though originating in insurance cases, the concept has gained general application in contract law. (*San Francisco Newspaper Printing Co. v. Superior Court (1985) 170 Cal. App. 3d 438, 216 Cal. Rptr. 462* [agency contract]; *Chretian v. Donald L. Bren Co. (1984) 151 Cal. App. 3d 385, 388, 198 Cal. Rptr. 523* [employment contract]; *Wilson v. San Francisco Fed. Sav. & Loan Assn. (1976) 62 Cal. App. 3d 1, 132 Cal. Rptr. 903* [banking contract].) *Neal v. State Farm Ins. Cos. (1961) 188 Cal. App. 2d 690, 694, 10 Cal. Rptr. 781*, provides the classic definition of a contract of adhesion: "The term signifies a standardized contract, which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it."

*Armendariz v. Foundation Health Psychcare Services, Inc*., 68 Cal. App. 4th 374, 387 (Cal. App. 1st Dist. 1998)

Apart from the confusion of which of the more than 28 Enrollment Applications are to govern here, the reasonable expectation of Plaintiffs when committing to the "religious services" they purchased from Defendants was to be bound to certain rules pertaining to the course work and services they were about to take.  (Garcia Decl. at ¶ 11). They are each deployed just as the services which have already been purchased are to be given.  (Garcia Decl. at ¶ 10). They are given as a condition to receive each of those services.  (Garcia Decl. at ¶ 10). Nothing about their title, "Religious Services Enrollment Application Agreement and Release" or in the earlier versions of the form, simply titled "Enrollment Application," or the stated purpose of each form repeated in multiple paragraphs—the signatory's voluntary commitment to participate in the religious services—fairly gave warning of a commitment for all time to arbitrate disputes concerning something other than those "religious services."  (Garcia Decl. at ¶ 11).  Yet, as Defendants would have it, the clause(s) absorb "any dispute or controversy" regardless of how distantly removed in time or place or unrelated to the services they had provided.  Absorbed in the "any dispute" category would presumably include injuries on their premises resulting from

negligent maintenance, automobile collisions in their parking lots, a defalcation of funds by their

agents, as well as alleged defamatory publications they might chose to disseminate, to name just

a few examples.  By Defendants' logic, this would be true for even a limited or one time

exposure to Scientology "religious services." The payment of course fees, and the execution of

the Enrollment Application would constitute a permanent bar to litigation and a permanent,

indelible mandate to arbitrate any manner of criminal, negligent, or intentional wrongdoing by

Defendants. The construction of the arbitration clauses to encompass literally "any dispute"

regardless of whether the dispute is related to services administered following the execution of

each Enrollment Application is illogical, unfairly overreaching, and surely not within the

reasonable expectation of consumers such as Plaintiffs at any time such applications were

presented for signature.  (Garcia Decl. at ¶ 11).

California courts like those in Florida[3] apply both a procedural and substantive test for a

determination of whether a clause is unconscionable and therefore will not be

enforced.  "Procedural unconscionability" focuses on some oppression or surprise in reaching the

agreement due to unequal bargaining power.  *See, e.g., Little v. Auto Stiegler, Inc*., 29 Cal. 4th

---

[3] Under Florida Law a party must show that a contract is procedurally and substantively unconscionable. *Murphy v. Couresy Ford, LLC*, 944 So.2d 1131, 1134 (Fla. DCA 2006). The procedural component of unconscionability concerns the manner in which the contract was entered. It involves consideration of…the relative bargaining power of the parties and their ability to understand the contract terms." *Orkin Exterminating Co. v. Petsch*, 872 So.2d 259, 265 (Fla. 2d DCA 2004). To determine whether an agreement to arbitrate is procedurally unconscionable, the Court looks at the following four factors: (1) the manner in which the contract  was entered into; (2) the relative bargaining power of the parties and whether the complaining party had a meaningful choice at the time the contract was entered into; (3) whether the terms were merely presented on a "take-it-or-leave-it" basis; and (4) the complaining party's ability and opportunity to understand the disputed terms of the contract. *Pendergast v. Sprint Nextel Corp*., 592 F.3d 1119, 1135 (11th Cir. 2010). "One of the hallmarks of procedural unconscionability is the absence of any meaningful choice on the part of the consumer." *Powertel, Inc. v. Bexley*,  743 So.2d 570, 575 (Fla. 1st D.C.A. 1999).  Substantive unconscionability "focuses on the agreement itself" and whether the terms of the agreement are "unreasonable and unfair." *Id.* An arbitration agreement will be found to be unconscionable if the terms are "so outrageously unfair as to shock the judicial conscience." *Bland ex. Rel. Coker v. Health Care and Ret. Corp. of Am.*, 927 So.2d 252, 256 (Fla. 2d DCA 2006). The existence of substantive unconscionability further turns on "whether the disputed terms limit available remedies, exclude punitive damages, prevent equitable relief, impose substantial costs, or lack mutuality of obligation with respect to the arbitration of disputes*." EEOC v. Taco Bell of Am., Inc*., 2007 U.S. Dist. LEXIS 18292 at *4 (M.D. Fla. 2007) (cited in *Dorward v. Macy's, Inc*., 2011 U.S. Dist. LEXIS 78639 (M.D. Fla. 2011).

1064, 130 Cal. Rptr. 2d 892, 63 P.3d 979 (Cal. 2003).  It is has similar elements to a "contract of adhesion," which is usually imposed and drafted by the party of superior bargaining strength, leaving no room for negotiation but solely allowing for either rejection or acceptance of the proposed terms.  *Id.*; *Parada*, 176 Cal. App. 4th at 1570.  "Substantive unconscionability" focuses on the actual terms of the agreement evaluating whether they are so one-sided or harsh as to otherwise "shock the conscience." *Young Seok Suh v. Superior Court*, 181 Cal. App. 4th 1504, 105 Cal. Rptr. 3d 585 (Cal. App. 2d Dist. 2010); *Kinney v. United Healthcare Servs.,* 70 Cal. App. 4th 1322, 1330-1331 (Cal. App. 4th Dist. 1999).  These elements, however, need not be present to the same degree. *Compton v. Superior Court*, 214 Cal. App. 4th 873 (Cal. App. 2d Dist. 2013); *Ajamian v. CantorCO2e, L.P.*, 203 Cal. App. 4th 771, 795 (Cal. App. 1st Dist. 2012); *Szetela v. Discover Bank*, 97 Cal. App. 4th 1094, 118 Cal. Rptr. 2d 862 (4th Dist. 2002). Slight evidence of procedural unconscionability coupled with more compelling evidence of the oppressive, unfair or overreaching terms of the clause are sufficient to demonstrate that the arbitration clause is unconscionable.  *See, e.g., Lima v. Gateway, Inc*., 886 F. Supp. 2d 1170, 1181 (C.D. Cal. 2012) ("[T]he more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa." (internal citations omitted).)[4]

### 1. The Evidence of Procedural Unconscionability

Defendants publish a price list which they refer to as "donations" for the "services" they offer. It lists the specific prices and discounts which will apply to each service identified.  A copy of a sample "Price List" is attached as Exhibit 5 to the Declaration of Luis Garcia. The

---

[4] Florida Courts have also found it appropriate to utilize a balancing or sliding scale approach, "and to tip the scales in favor of unconscionability," where "a certain quantum of procedural plus a certain quantum of substantive unconscionability" is found. See, e.g. *Romano v. Manor Care, Inc*., 861 So.2d 59 (Fla. 4th DCA 2003*); Pendergast v. Sprint Nextel Corporation*, 592 F.3d 1119 (11th Cir. 2010).

price list identifies "auditing" and "training" services which may be purchased in discounted packages or "intensives" to be provided at the purchaser's request. (Garcia Decl. ¶¶ 8-9).  These "services" are in fact sessions with trained personnel of the Church of Scientology.  (Garcia Decl. ¶¶ 8-9).

Importantly, the Price List did not alert Plaintiffs or any prospective consumer to a later requirement that in order to consume the services purchased, an Enrollment Application was also to be executed. (Garcia Decl. ¶ 8).  Nonetheless, once Plaintiffs had made their selection and paid for the services they ordered, they made arrangements to attend personalized sessions.  The vast majority of those sessions occurred in Orange County, California[5].  The Enrollment Application, as it was originally called or, as referred to in the more recent iterations "Religious Services Enrollment Application Agreement and Release" (both of which are collectively referred to as "Enrollment Application" herein), containing varying arbitration clauses were only then presented to Plaintiffs as each course session was to commence.  (Garcia Decl. ¶ 10).   In multiple places, even the more recent versions of these Enrollment Applications emphasized that their purpose was to commit the purchaser to signifying that they had voluntarily agreed to participate in the "religious services" that had already been purchased:

> … I am voluntarily signing and submitting to CHURCH OF SCIENTOLOGY OF ORANGE COUNTY (hereinafter the Church), THIS RELIGIOUS SERVICES ENROLLMENT APPLICATON, AGREEMENT AND GENERAL RELESASE (hereinafter "this Contract") so that upon its acceptance by the Church, I may participate in Religious Services of the Scientology religion under the terms, conditions, covenants, waivers and releases, I agree to by signing the Contract.
>
> *****

---

[5] Plaintiffs' claims here do not involve dissatisfaction with or returns or refunds sought in connection with religious services they obtained pursuant to any Enrollment Application they executed.

2. This Contract is my statement of personal, self-determined desire to participate in the Religious Services of the Scientology religion.

****

4. This Contract is my commitment that I desire to participate in Scientology Religious Services exclusively for spiritual purposes in accordance with the belief and practices of the Scientology religion.

****

5. This Contract memorializes my intention to participate in Scientology Religious Services only for purposes of self-improvement and spiritual development.

*****

7. This Contract is my good faith application to participate in Scientology Religious Services.

(Garcia Decl. Exh. 5; Defendants' MC&S Exh. 5 [D.E. 8-5] at pp. 9-13)

The pre-printed Enrollment Applications were also non-negotiable. The sole option was to sign, otherwise Defendants advised that the services that had already been paid for would be declined as well. (Garcia Decl. ¶ 10). The latest versions of these Enrollment Applications elaborated on the process to obtain a "return of donations" inclusive of the services then to be administered. (Garcia Decl. Exh. 7; Defendants' MC&S Exh. 5 [D.E. 8-5] at p. 11).

5(c). No Scientology church is under any duty or obligation whatsoever to return any portion of any religious donation I make, however, I have read Scientology Policy Directive 13 March 1996, Return of Donations, and understand that under certain circumstances identified in published ecclesiastical policies such as that Scientology Directive, a return of donations may be obtained through my strict compliance with those published policies and procedures relating to the Claims Verification Board. I further understand, acknowledge, and agree that:

i.      such procedures require my direct participation to the exclusion of any third parties, including but not limited to, attorneys;

ii.     returns of donations are exclusively within the ecclesiastical authority and sole discretion of the Claims Verification Board;

11

> iii.      any violation of, or derivation from, such published policies by me voids any possibility of my receiving a return of donation; and
>
> iv.      should I, at any time, ever request a refund or repayment of donations, such refund or repayment will be given if and only if I have followed the exact procedures of the Claims Verification Board and this Contract, and that in exchange for refund or repayment of such donations as determined by the Claims Verification Board, I execute a complete release, quitclaim and waiver of claims as provided by an authorized Church representative."

As appears in the next section regarding Substantive Unconscionability, even if the Enrollment Application was executed, it provides an illusory remedy to those, like Plaintiffs who publicly criticize Defendants or Scientology, publicly depart the Church, retain counsel to press their claims or seek relief through the Courts and are then denounced by Defendants as "Suppressive Persons." The refusal to be bound by the rigors of the Enrollment Application or church doctrine in resorting to civil court processes was and remains a disqualifying factor in receiving a refund. It is no more and no less than a doctrinal "gotcha."

The elements of surprise, oppression and the absence of "real negotiation" or a meaningful choice in the making of this agreement are all evident here. (James Decl. at ¶3: "No parishioner is allowed to raise objections as to the content of the Enrollment Agreement. Any objection or disagreement as to content would be seen as an attack against the church and would be dealt with harshly…") *American Software, Inc. v. Ali*, 46 Cal. App. 4th 1386, 1390-1391 (Cal. App. 1st Dist. 1996); *See also Armendariz v. Foundation Health Psychcare Services, Inc*., 68 Cal. App. 4th 374; 80 Cal. Rptr. 2d 255 (Cal. App. 1st Dist. 1998) holding:

> We have no hesitation concluding, as a matter of law, that the arbitration clause here was a contract of adhesion and that the plaintiffs were the weaker parties to the contract. The arbitration clause, as it appeared in the employment application and the 'Employee Arbitration Agreement,' was 'a standardized contract,' drafted by the employer, that relegated to the prospective employee 'only the opportunity to adhere to the contract or reject it.'(*Neal v. State Farm Ins. Cos.*, supra, 188 Cal. App. 2d at p. 694.) The clause in fact expressly required the prospective employee to agree

'as a condition of my employment.' While the employee could reject the job rather than sign the arbitration agreement, the employer still possessed the 'superior bargaining strength' requisite to bring the clause within the concept of a contract of adhesion.  *Neal v. State Farm Ins. Cos.*, supra, at p. 694; see *Stirlen v. Supercuts, Inc.*, supra, 51 Cal. App. 4th at pp. 1533-1534.).

Under California law Defendants' arbitration clauses, any of their iterations, or all of them collectively are the very portrait of adhesion contracts and are procedurally unconscionable where: 1) the purchase price is paid pursuant to a Published Price list; 2) only then, after the dollars change hands, as condition to acquire the purchased services is the so called Enrollment Application deployed in 'take it or leave it' fashion to the consumer; 3) where the governing clause and agreement were prepared by Defendants; 4) where the clauses are not conspicuous in size or appearance and 5) where there are no arbitral rules which are provided or otherwise disclosed at the time of contract execution or at any time thereafter..

### C.    Defendants' Published Church Doctrine Alone Establishes the Element of Substantive Unconscionability

Under Defendants' vernacular, Plaintiffs were "declared" as "Suppressive Persons" in November 2010. (Garcia Decl. ¶ 4) "Suppressive Persons" are former Scientologists, defined by Defendants' published doctrine as persons engaged in any number of acts defined as hostile to Defendants.  (Garcia Decl. ¶ 6(b)-(c); Collbran Decl. ¶ 3)   Defendants' published doctrinal statements identify Plaintiffs as Suppressive Persons for among other reasons because Plaintiffs: 1) are seeking relief in this Court;  2) have retained legal counsel to pursue those claims; and 3) and because Plaintiffs have committed what Defendants refer to as the "high crime of publicly departing this Church." (Garcia Decl. at ¶ 6(b)(1)-(4)).

However, the Court need look no further than Defendants' own doctrine quoted in bold below to conclude that Defendants' scheme of "Internal Ethics" which their arbitration clause

promises ("I will pursue resolution of the dispute, claim or controversy solely and exclusively through Scientology's Internal Ethics, just and binding religious arbitration procedures." (Garcia Decl., Exh. 7, ¶6(d), "Enrollment Agreement") is not available to Suppressive Persons and hence unavailable to Plaintiffs.

> **Suppressive Persons or groups relinquish their rights as Scientologists by their very actions and may not receive the benefit of the Codes of the Church.** (emphasis supplied) (Rathbun Decl. at ¶ 12(b); Garcia Decl. at ¶ 6(a); Collbran Decl. at ¶ 5(b)).

> Suppressive persons have no rights as Scientologists. (Collbran Decl. at ¶5(f); Garcia Decl. ¶ 6(b)(4)). **Civil court action against [Suppressive Persons] to effect collection of monies owed may be resorted to, as they are not entitled to Scientology ethics procedures.** (emphasis supplied) (Rathbun Decl. at ¶ 12(e); Collbran Decl. at ¶ 5(e)).

> **They are considered insane individuals** ("…true psychotics no matter how 'sane' they sound…" and "…are just very sick people…") (emphasis supplied). (Collbran Decl. at ¶ 5(a); Rathbun Decl. at ¶ 12(a)) and are practically regarded as enemies with whom Scientologists are at war. (Garcia Decl. at ¶ 6(c); Collbran Decl. at ¶ 5(h).

> ****

> A return of donation is neither a legal right of a parishioner, nor a legal obligation of any Church. To the Church, the issue of a return of donation is one of integrity rather than a contractual matter, based on ethics rather than law." (Garcia Decl. at ¶ 7).

> A truly suppressive person may be deprived of property or injured by any means by any Scientologist without discipline of the Scientologist. (Garcia Decl. at ¶ 6(c) ("SPs are at war. Pleasant conduct, mean conduct, any conduct at all is simply more war. So wage the back action as battle.")

Contrary to the MC&S and Defendants' sworn declarations submitted to this Court, there is no arbitral process of any kind, much less a fair one, which awaits Plaintiffs. (James Decl. at ¶ 6; Rathbun Decl. at ¶ 13; Koon Decl. at ¶ 5). Defendants may not simply retract or soften well established and caustic Church doctrine and rhetoric to suit this moment, and credibly promote any type of arbitral process they have repeatedly stated is unavailable to Suppressive Persons and

therefore not available to Plaintiffs.  Excerpted Church doctrine below makes abundantly clear

that retaliation and harassment will follow any unauthorized contact with Suppressive Persons:

> It is a suppressive act to deal with a declared suppressive person unless you are the named terminal to deal with the SP…continued adherence to a person or group accurately pronounced a suppressive person or group by HCO is a suppressive act." (Collbran Decl. at Exh E and ¶ 5(c), (i); James Decl. at Exh. B and ¶ 5; Schippers Decl. at Exh. A; Rathbun Decl. at ¶ 12(c), (j) ).

> To maintain a line with, offer support to, or in any way grant credence to such a person indicates nothing more than agreement with that person's destructive intentions and acts.  Such dealings in fact act as covert or overt attempt [sic] to undermine and negate the ethics and justice strengths of our ecclesiastical structure…to deal with a suppressive is a suppressive act." (Collbran Decl. at Exh. E and ¶ 5(i); James Decl. at Exh. B and ¶ 5; Schippers Decl. at Exh. A; Rathbun Decl. at ¶ 12(j)).

> …[T]o deal with [a Suppressive Person] constitutes no less than a Suppressive Act. Such an act is cause to have levied against you the same per [sic] policy Church justice procedures afforded any Suppressive Person. Full ethics penalties will be applied. (James Decl. at Exh. B; Collbran Decl. at Exh. E; Schippers Decl. at Exh. A).

The significance of these published doctrines is the obvious hostility to former members

of this church who, like the Garcias, were declared to be suppressive persons. (*See, e.g.,* James

Decl. at ¶ 7(a); Collbran Decl. at ¶ 4(a), (b); K. Campbell Decl. at ¶ 8, Garcia Decl. at Exh. 1 and

¶ 4; Schippers Decl. at ¶¶ 3-7; Koon Decl. at ¶ 4(a)-(d). *See generally* N. Wise Decl; R. Wise

Decl.). Former Scientologist Christie Collbran describes the following consequences flowing

from being declared a "suppressive person":

> …After leaving the Sea Organization, and being declared by the church a suppressive person, my father, mother, brother and sister have all severed all forms of communication with me…I have sent letters and packages to my parents in an attempt to reestablish contact with them.  I have received no reciprocal correspondence from them.  I now have a child, their grandchild, whom they have never met.  I even travelled to their home in Los Angeles, on two occasions, unable to see them either time, despite being aware that neighbors believed them to be at home.  (Collbran Decl. at ¶ 4(a), (b)).

15

Were Plaintiffs even permitted to participate in such an arbitral process, it takes no speculative leap to glean the outcome. The hostility of any Scientologists on that panel is not speculation—it is church doctrine.  The arbitrators themselves must subscribe to church doctrine that has already sat in judgment of Plaintiffs. They are parties whose interest in the outcome is clear. It also requires no logical leap to discern that such panelists would obviously risk jeopardizing their own standing, risk retaliation to their families and ultimately disconnection from their families (S. Campbell Decl. at ¶ 6; Collbran Decl. at ¶ 7; James Decl. at ¶ 7) by daring to issue a ruling in favor of Plaintiffs.[6] There is no case law, and certainly none cited by Defendants which compels arbitration under a system of 'justice' and 'ethics' in which the sole arbitration panelists are also Scientologists required by church doctrine to brand Plaintiffs as virtual outlaws, "insane" and unentitled to receive any benefits of a system of "justice" and "ethics" they might otherwise dispense to non-Suppressive Persons.

Under California law, the courts have not hesitated to characterize markedly less biased and one-sided processes than are so obvious here as "illusory" and "unconscionable".  In *Graham v. Scissor-Tail, Inc.* (1981) 28 Cal.3d 807, 826-828 (Cal. 1981), an arbitration process which required union members to arbitrate before their union was rejected as illusory and unconscionable.

As the United States Supreme Court has said in a related context, 'Congress has put its blessing on private dispute settlement arrangements, but it was anticipated, we are sure,

---

[6] *Easterly v. Heritage Christian School, Inc.*  2001 WL 2750099 (S.D. Ind. 2009), *Jenkins v. Trinity Evangelical Lutheran Church,* 356 Ill App. 3d 504, 825 N.E. 2d at 1214 (2005), *General Conference of Evangelical Methodist Church v. Evangelical Methodist Church of Dalton, Georgia, Inc.,* 807 F. Supp. 2d 1291 (W.D. Ga. 2011) upon which Defendants rely at p. 24 through 25 of their MS&C do no more than support the notion that ecclesiastically based arbitrations may be enforced, **absent substantive evidence** of "evident partiality".  In each, the mere apprehension of unfairness or speculated anxiety about the inherent bias regarding an arbitral process presided over by the remaining members of the church hierarchy or congregation was rejected as insufficient and dismissed as unsubstantiated speculation.

that the contractual machinery would operate within some minimum levels of integrity.' (*Hines v. Anchor Motor Freight (1976) 424 U.S. 554, 571 [47 L.Ed.2d 231, 245, 96 S.Ct. 1048].*)

*****

As the *Cross & Brown* case indicates, an entity or body which by its nature is incapable of 'deciding' on the basis of what it has "heard" -- as, in that case, one of the principal parties to the contract -- does not qualify.  **"Unless we close our eyes to realities," the court there said, "the agreement here becomes, not a contract to arbitrate, but an engagement to capitulate." (***167 N.Y.S.2d at p. 576***.) The same result would follow, the court there suggests, when one "so identified with the party as to be in fact, even though not in name, the party" is designated. (***Id***.) In such cases as this, the agreement to *arbitrate* is essentially illusory. Here, clearly, "minimum levels of integrity" are not achieved, and the "agreement to arbitrate" should be denied enforcement on grounds of unconscionability.**

There is we think a second basis, related to that just discussed, for denying enforcement on such grounds.  The fact that an entity or body designated by contract to act as arbitrator of contractual disputes is one capable of acting as a *tribunal* -- i.e., in the sense of *hearing* a dispute and *deciding* fairly and rationally on the basis of what it has heard -- is of little consequence if it proceeds under rules which deny a party the fair opportunity to present his side of the dispute.  Thus, **if a party resisting arbitration can show that the rules under which arbitration is to proceed will operate to deprive him of what we in other contexts have termed the common law right of fair procedure, the agreement to arbitrate should not be enforced...**When it can be demonstrated, however, that the clear effect of the established procedure of the arbitrator will be to deny the resisting party a fair opportunity to present his position, the court should refuse to compel arbitration.

*Id.* (emphasis supplied). Defendants' announced hostility toward Plaintiffs and other "suppressive persons" is an admission of substantive unconscionabiliy in that Scientologist panelists must subscribe to the same doctrine.  *See Sanchez v. Western Pizza Enterprises, Inc.*, 172 Cal. App. 4th 154 (Cal. 2d Dist. 2009) (invalidating arbitration provision permitting an employer to designate the sole "panel" member of arbitrators).  In *Zaborowski v. MHN Gov't Servs.*, 2013 U.S. Dist. LEXIS 48536, *13-14 (N.D. Cal. Apr. 3, 2013), a clause which allowed one party to maintain unilateral control over the pool of potential arbitrators was struck down as

17

substantively unconscionable:

> …[T]he arbitration clause allows MHN to unilaterally choose the pool of arbitrators. The arbitration agreement provides that "MHN shall provide Provider [MFLC] with a list of three neutral arbitrators from which Provider shall select its choice of arbitrator for the arbitration." FAC, Ex. A ¶ 20. This allows for creation of a very one-sided arbitration process, since MHN has the opportunity to choose the three most sympathetic arbitrators it can find, and the MFL Consultant will not be presented with a meaningful choice. MHN argues that this clause should be construed to mean that the MFL Consultant would choose an arbitrator from the AAA's list. However, that is not what the terms of the clause state. Under the plain meaning of the Agreement, MHN can select any three arbitrators it wishes, as long as the arbitrators are licensed to practice law. This term is substantively unconscionable. *See Pokorny v. Quixtar, Inc*., 601 F.3d 987, 1003 (9th Cir. 2010) (finding an arbitrator selection process substantively unconscionable where the employer hand-selected a pool of five arbitrators that it had specially trained, from which the plaintiff could choose its arbitrator). *Id.*

The example of the Lutheran Church in *Jenkins v. Trinity Lutheran Church*, 356 Ill. App. 3d 504, 509 (Ill. App. Ct. 2005), *supra*, which Defendants seek to compare their religiously based arbitration, is very misplaced.  In *Jenkins,* the Lutheran Church evenly sought to apply "neutral principles" to arbitrations involving non-ecclesiastical disputes:

> When plaintiff became a pastor, he agreed to abide by the constitution and the bylaws of the LCMS. Article VIII of the bylaws requires that ecclesiastical disagreements be settled by the "Synodical Dispute Resolution" procedure. **However, LCMS bylaws give civil courts jurisdiction over contract disputes as long as they do not involve ecclesiastical issues. The bylaws appear to adopt the "neutral principles" doctrine developed by the civil courts**. See *Jones v. Wolf, 443 U.S. 595, 99 S. Ct. 3020, 61 L. Ed. 2d 775 (1979)*. Thus, we must examine whether the alleged agreement fits within neutral principles that would allow a civil court to hear the claim. (Emphasis supplied).

*Id.* Defendants reject such "neutral principles", and proclaim hostility and enmity to any Scientologists who seek to assert their claims in civil courts against them under such principles.

Also, quite unlike *Jenkins,* Defendants have no published arbitration rules of any kind. The absence of published and governing standards or the arbitrary ability of one party to unilaterally alter or change them is itself an independent basis for a finding of unconscionability. Arbitral forums which are termed inherently one-sided do not provide for meaningful dispute

resolution, are invalid and will not be enforced.  *See, e.g., Hooters of Am. Inc. v. Phillips*, 173

F.3d 933 at 938-940 (4th Cir. 1999):

> Under the rules, Hooters is free to devise lists of partial arbitrators who have existing
> relationships, financial or familial, with Hooters from placing its managers themselves on
> the list. Further, nothing in the rules restricts Hooters from punishing arbitrators who rule
> against the company by removing them from the list. Given the unrestricted control that
> one party (Hooters) has over the panel, the selection of an impartial decision maker
> would be a surprising result…. **Moreover, Hooters reserves the right to modify the
> rules, "in whole or in part," whenever it wishes and "without notice" to the
> employee . . . Nothing in the rules even prohibits Hooters from changing the rules in
> the middle of an arbitration proceeding…**We hold that the promulgation of so many
> biased rules -- especially the scheme whereby one party to the proceeding so controls the
> arbitral panel -- breaches the contract entered into by the parties. The parties agreed to
> submit their claims to arbitration -- a system whereby disputes are fairly resolved by an
> impartial third party **Hooters by contract took on the obligation of establishing such a
> system. By creating a sham system unworthy even of the name of arbitration,
> Hooters completely failed in performing its contractual duty.** (Emphasis supplied.)

The absence of defined rules or procedures governing the substantive work of the

arbitration panel, coupled with the obvious bias to Plaintiffs as so called Suppressive Persons, is

the very definition of a vacant and arbitrary process which offers an illusory remedy, is a sham

and is therefore unenforceable.[7] *See, e.g.*, *Walker v. Ryan Family Steak House*, Inc., 289 F. Supp.

---

[7] Neither the older nor the more recent versions of the Enrollment Agreements incorporate or specify any rules to
govern discovery or other procedural aspects of the arbitration proceedings once said proceedings have been
initiated:

> All arbitrators shall be Scientologists in good standing with the mother Church and shall conduct the
> arbitration in a fair and equitable manner to the end that justice to both parties shall be done. [1986
> Enrollment Agreement, D.E. 8-5, p. 8, ¶8(5)].

> Any dispute, claim or controversy which still remains unresolved after review by the IJC shall be submitted
> to binding religious arbitration in accordance with the arbitration procedures of Church of Scientology
> International…[further specifying the process for arbitrator selection] [2002 Enrollment Agreement, D.E.
> 8-5, p. 12, ¶6(e)].

Even if Defendants maintained and applied formally promulgated rules to the arbitration proceedings, their failure to
show said rules to Plaintiffs at the time Plaintiffs signed the Enrollment Agreements warrants a finding of procedural
unconscionability under California law. *See, e.g., Trivedi v. Curexo Technology Corp., 189 Cal. App. 4th 387, 393
(Cal. App. 1st Dist. 2010)* (citing *Fitz v. NCR Corp.* (2004) 118 Cal.App.4th 702, 721 [13 Cal. Rptr. 3d 88] [NCR's
"employee-dispute resolution policy, known as Addressing Concerns Together (ACT)," incorporated "arbitration
rules that were not attached and require[d] the other party to go to another source in order to learn the full
ramifications of the arbitration agreement"]; *Harper v. Ultimo* (2003) 113 Cal.App.4th 1402, 1406–1407 [7 Cal.

2d. 916, 930-931 (M.D. Tenn. 2003) (finding employer's arbitral forum to be an "inappropriate substitute for the judicial forum" due in part to institutional bias apparent in employer's ability to "modify and craft the rules that govern [the agreement to arbitrate]…"The Court held that [w]ithout a definite set of procedures, EDSI's promise to provide an arbitral forum was illusory, thereby lacking mutuality of obligation and defeating consideration."); *Murray v. UFCW Int'l, Local 400,* 289 F.3d 297 (4th Cir. 2002) (Refusing to enforce arbitration agreement so clearly skewed in one party's favor).

## CONCLUSION

Defendants' MC&S should be denied.  The Enrollment Applications and the subsisting arbitration clauses in them are the very definition of procedurally unconscionable contracts of adhesion unrelated to the reasonable expectation of any person agreeing to receive Defendants' religious services.  Plaintiffs' complaint is neither an attack on Scientology as a supposed religion nor, in any way related to the religious services they paid for.

An arbitral process under which Plaintiffs are ineligible, as "declared" outcasts, is illusory and a sham and no more than an agreement to "capitulate" rather than resolve Plaintiffs' wholly unrelated claims.  There is no precedent for enforcing what amounts to unmitigated "tribal prejudices" under the guise of arbitration.  There is no precedent for enforcing this substantively unconscionable process to compel arbitration of the instant disputes.

---

Rptr. 3d 418] ["inability to receive full relief is artfully hidden by merely referencing the Better Business Bureau arbitration rules, and not attaching those rules to the contract for the customer to review," which forced the customer to go to another source to learn that the arbitration agreement curtailed his ability to receive full relief]; *Gutierrez v. Autowest, Inc*., 114 Cal.App.4th at pp. 84, 89 [*Gutierrez* "never given or shown a copy of the arbitration rules of the American Arbitration Association (AAA), the designated arbitration provider" nor required to initial arbitration clause]; *Patterson v. ITT Consumer Financial Corp.* (1993) 14 Cal.App.4th 1659, 1665 [18 Cal. Rptr. 2d 563] [at signing, "borrowers were not given a copy of the procedural rules of the National Arbitration Forum (NAF)—the rules were sent to the borrowers only once ITT had initiated a claim against them"].).

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that on this 22nd day of April, 2013, we electronically filed the

foregoing document with the Clerk of the Court using CM/ECF.  We also certify that the

foregoing document is being served this day on all counsel of record or pro se parties identified

below in the manner specified, either via transmission of Notices of Electronic Filing generated

by CM/ECF or in some other authorized manner for those counsel or parties who are not

authorized to receive electronically Notices of Electronic Filings.

F. Wallace Pope, Jr., Esq.
FBN 124449
Johnson, Pope, Bokor, Ruppel
& Burns, LLP
P.O. Box 1368
Clearwater, FL 33757
Phone: (727) 461-1818
Fax: (727) 462-0365
E-mail: wallyp@ipfirm.com
*Counsel for Defendants*

Nathan M. Berman, Esq.
FBN 329230
E-mail: nberman@zuckerman.com
Lee Fugate, Esq.
FBN 170928
E-mail: lfugate@zuckerman.com
Jack E. Fernandez, Esq.
FBN 843751
E-mail: jfernandez@zuckerman.com
Mamie V. Wise, Esq.
FBN 65570
E-mail: mwise@zuckerman.com
Zuckerman Spaeder LLP
101 E. Kennedy Blvd., Suite 1200
Tampa, FL 33602
Phone: (813) 221-1010
Fax: (813) 223-7961
*Counsel for Church of Scientology Religious Trust*

Marie Tomassi, Esq.
FBN 772062
Trenam Kember Scharf Barkin Frye,
O'Neill & Mullis, P.A.
Bank of America Building
200 Central Avenue, Suite 1600
St. Petersburg, FL 33701
Phone: (727) 820-3952
Fax: (727) 820-3972
E-mail: mtomassi@trenam.com
*Counsel for IAS Administrations, Inc.
and U.S. IAS Members Trust*

Respectfully submitted:

    s/ Ronald P. Weil
Ronald P. Weil, Esq.
Florida Bar No: 169966
E-mail: RPW@weillaw.net
**WEIL QUARANTA, P.A.**
Southeast Financial Center, Suite 900
200 South Biscayne Boulevard
Miami, Florida  33131
Office:  305-372-5352
Fax:  305-372-5355


    s/ Theodore Babbitt
Theodore Babbitt, Esq.
Florida Bar No: 091146
**Babbitt Johnson Osborne &**
**LeClainche, P.A.**
Suite 100
1641 Worthington Road
West Palm Beach, FL  33409
Phone: (561) 684-2500
Fax: (561) 684-6308
Email: tedbabbitt@babbitt-johnson.com


*Counsel for Plaintiffs, Luis Garcia and Rocio Garcia*

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

LUIS A. GARCIA SAZ, and wife, MARIA
DEL ROCIO BURGOS GARCIA,

      Plaintiffs,

vs.                                                    CASE NO. 8:13-CV-220-T27 TBM

CHURCH OF SCIENTOLOGY RELIGIOUS
TRUST; et al

      Defendants.

_____/

## RENEWED MOTION TO COMPEL ARBITRATION AND TO STAY PROCEEDINGS OF FLAG CHURCH AND SHIP CHURCH REGARDING AMENDED COMPLAINT

Defendants, Church of Scientology Flag Service Organization, Inc. ("Flag Church") and Church of Scientology Flag Ship Service Organization, Inc. ("Ship Church") by their undersigned counsel, in response to the amended complaint filed by the plaintiffs (Dkt.114) renew their arguments to compel arbitration as set forth in the Joint Motion and Memorandum of Served Defendants to Compel Arbitration and to Stay Proceedings (Dkt.8) filed on 3/6/13 and as further supported by Defendant's Response to Court Order Regarding Arbitration Procedures (Dkt. 91) filed on 10/24/13.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on June 15, 2014, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:  RONALD P. WEIL, ESQ., rpw@weillaw.net, and THEODORE BABBITT, ESQ., tedbabbitt@babbitt-johnson.com, and Amanda McGovern, ESQ., amcgovern@weillaw.net Attorneys for Plaintiffs.

JOHNSON, POPE, BOKOR,

RUPPEL & BURNS, LLP

/s/  Robert V. Potter
Robert V Potter
Florida Bar No. 0363006
bobp@jpfirm.com
F. Wallace Pope, Jr.
Florida Bar No. 012444
wallyp@jpfirm.com
Post Office Box 1368
Clearwater, Florida 33757
(727) 461-1818; (727) 462-0365-fax
Attorneys for Flag Church & Ship Church

1838867

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**MARIA DEL ROCIO BURGOS GARCIA,**
**and LUIS A. GARCIA SAZ,**

**Plaintiffs,**

**vs.**                                                        Case No. 8:13-cv-220-T-27TBM

**CHURCH OF SCIENTOLOGY FLAG**
**SERVICE ORGANIZATION, INC.,**
**CHURCH OF SCIENTOLOGY FLAG**
**SHIP SERVICE ORGANIZATION, INC.,**

**Defendants.**
_____/

### ORDER

**BEFORE THE COURT** is the Renewed Motion to Compel Arbitration and to Stay

Proceedings of Flag Church and Ship Church Regarding Amended Complaint (Dkt. 120). On

September 4, 2014, oral argument was heard on the motion and on February 19, 2015, an evidentiary

hearing was conducted limited to two subjects: (1) Plaintiffs' defense of unconscionability and (2)

the existence of arbitration procedures of the Church of Scientology International applicable to

Plaintiffs' claims (Dkt. 137). Upon consideration, Defendants' motion is **GRANTED**. Plaintiffs'

claims are subject to binding Scientology arbitration pursuant to various Enrollment Applications

Plaintiffs signed which contain enforceable arbitration clauses.[1]

### I.      Background

Plaintiffs are former members of the Church of Scientology. They brought this action

_____

[1] Maria Del Rocio Burgos Garcia signed at least two Enrollment Applications with Flag Church.  Plaintiffs do
not argue that she is not subject to the arbitration clause, if found to be enforceable.

1

alleging they were fraudulently induced into contributing significant sums to Defendants for a building project known as the "Super Power Project" and various humanitarian initiatives.[2] Plaintiffs allege that Defendants solicited those funds knowing the funds were not being used for those projects. Plaintiffs also allege that they paid deposits towards counseling services, training, and accommodations that were never provided and that Defendants refused to refund these funds in breach of their refund policy.[3]

The Amended Complaint asserts claims of fraud against Flag Church relating to the "Super Power" project (Count I), breach of contract against Flag Church relating to the counseling services and accommodations (Count II), breach of contract against Ship Church relating to the counseling services and accommodations (Count III), fraud against Flag Church relating to the humanitarian initiatives (Count IV), fraud against Ship Church relating to the humanitarian initiatives (Count V), and unfair and deceptive trade practices against Flag Church and Ship Church (Count VI) (Dkt. 114).

Defendants move to compel arbitration of the claims, relying on arbitration clauses in several "Religious Services Enrollment Applications, Agreements and General Releases" signed by Luis Garcia between October 2002 and September 2008 when he was, in his own words, a "committed Scientologist." Garcia signed approximately 40 Enrollment Applications," twenty-one of which were introduced as Defendants' composite Exhibit #1 during the evidentiary hearing. Although there is some variation in the wording of the various arbitration clauses, there are no substantive differences.

---

[2] The Super Power Project involved the construction of a Scientology facility in Clearwater, Florida (Dkt. 114, ¶ 24). Plaintiffs allege they contributed $340,000 to this project (*id.,* ¶ 30). The humanitarian initiatives involved funding for various church campaigns and relief efforts (*id.,* ¶¶ 52-72). Plaintiffs allege they contributed $40,410 to these humanitarian initiatives (*id.,* ¶ 101).

[3] Plaintiffs allegedly deposited $37,413.56 with Flag Church and $31,445.45 with Ship Church for these services and accommodations (Dkt. 114, ¶¶ 42-43).

2

Luis Garcia signed Enrollment Applications with Flag Church on August 5, 2002, August

21, 2005, and March 19, 2006 and an Enrollment Application with Ship Church on June 8, 2007.[4]

These Enrollment Applications include arbitration clauses substantially similar to the following:

6.   d.   In accordance with the discipline, faith, internal organization, and ecclesiastical rule, custom, and law of the Scientology religion, and in accordance with the constitutional prohibitions which forbid governmental interference with religious services or dispute resolution procedures, should any dispute, claim or controversy arise between me and the Church, any other Scientology church, any other organization which espouses, presents, propagates or practices the Scientology religion, or any person employed by any such entity, which cannot be resolved informally by direct communication, I will pursue resolution of that dispute, claim or controversy solely and exclusively through Scientology's Internal Ethics, Justice and binding religious arbitration procedures, which include application to senior ecclesiastical bodies, including, as necessary, final submission of the dispute to the International Justice Chief of the Mother Church of the Scientology religion, Church of Scientology International ("IJC") or his or her designee.

     e.   Any dispute, claim or controversy which still remains unresolved after review by the IJC shall be submitted to binding religious arbitration in accordance with the arbitration procedures of Church of Scientology International, which provide that:

     i.   I will submit a request for arbitration to the IJC and to the person or entity with whom I have the dispute, claim or controversy;

     ii.   in my request for arbitration, I will designate one arbitrator to hear and resolve the matter;

     iii.   within fifteen (15) days after receiving my request for arbitration, the person or entity with whom I have the dispute, claim or controversy will designate an arbitrator to hear and resolve the matter. If the person or entity with whom I have the dispute, claim or controversy does not designate an arbitrator within that fifteen (15) day period, then the IJC will designate the second arbitrator;

     iv.   the two arbitrators so designated will select a third arbitrator within

---

[4] During oral argument, Defendants' counsel represented that Defendants rely solely on the agreements Luis Garcia executed in 2002, 2004, and 2006 with Flag Church, as well as a separate agreement with Ship Church. Defendants' composite Exhibit #1 includes those agreements.

> > fifteen (15) days after the designation of the second arbitrator. If the arbitrators are unable to designate a third arbitrator within the fifteen (15) day period, then the IJC will choose the third arbitrator;

> v.     consistent with my intention that the arbitration be conducted in accordance with Scientology principles, and consistent with the ecclesiastical nature of the procedures and the dispute, claim or controversy to which those procedures relate, it is my specific intention that all such arbitrators be Scientologists in good standing with the Mother Church.

Defendants contend that the Enrollment Applications define the Garcias' entire relationship with the Church, are not limited to disputes arising from the Enrollment Applications themselves, and require arbitration of the Garcias' claims. Plaintiffs contend that the arbitration clauses are unconscionable and therefore unenforceable.

## II.     Standard

Arbitration is a matter of contract. *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 67 (2010). Under the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.*, a written arbitration agreement "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. "This provision 'reflect[s] both a liberal federal policy favoring arbitration, and the fundamental principle that arbitration is a matter of contract.'" *Inetianbor v. CashCall, Inc.*, 768 F.3d 1346, 1349 (11th Cir. 2014) (*quoting AT & T Mobility LLC v. Concepcion*, —— U.S. ——, ——, 131 S.Ct. 1740, 1745 (2011)) (quotation marks and citation omitted); *Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 24 (1983). Federal courts are to place arbitration clauses "on equal footing with other contracts." *Solymar Invs., Ltd. v. Banco Santander, S.A.*, 672 F.3d 981, 988 (11th Cir. 2012) (citing *Rent-A-Center*, 561 U.S. at 67). Importantly, for purposes of this case, arbitration agreements are to be rigorously enforced

4

*according to their terms. Am. Express Co. v. Italian Colors Restaurant*, ——U.S. ——, ——, 133 S.Ct. 2304, 2309 (2013) (emphasis added).

Under the FAA, a party seeking to compel arbitration must demonstrate that "(a) the plaintiff entered into a written arbitration agreement that is enforceable 'under ordinary state-law' contract principles and (b) the claims before the court fall within the scope of that agreement." *Lambert v. Austin Ind.*, 544 F.3d 1192, 1195 (11th Cir. 2008); *Caley v. Gulfstream Aerospace Corp.*, 428 F.3d 1359, 1368 (11th Cir. 2005) ("state law governs whether an enforceable contract or agreement to arbitrate exists"). In making this determination, "generally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements." *Doctor's Associates, Inc. v. Casarotto*, 517 U.S. 681, 687 (1996).

Similarly, in Florida, a party seeking to compel arbitration must demonstrate (1) a valid written agreement to arbitrate exists, and (2) an arbitrable issue. *VoiceStream Wireless Corp. v. U.S. Communications, Inc.*, 912 So.2d 34, 39 (Fla. 4th DCA 2005). Only the first element is challenged by Plaintiffs, that is, whether an enforceable arbitration agreement exists between the parties.

## III.    Discussion

### A.    Choice of Law

Plaintiffs contend that California law applies to the interpretation and enforceability of the arbitration clauses because a "vast majority were executed in California" (Dkt. 30 at 5). Defendants rely on Florida law. In determining which state's law applies, Florida follows the rule of *lex loci contractus*. *State Farm Mut. Auto. Ins. Co. v. Roach*, 945 So. 2d 1160, 1163 (Fla. 2006). Under that rule, the contractual rights and liabilities of parties are governed by the law of the place where the contract was executed, that is, "where the last act necessary to complete the contract was done."

5

*Prime Ins. Syndicate, Inc. v. B.J. Handley Trucking, Inc.*, 363 F.3d 1089, 1093 (11th Cir. 2004) (quotation omitted). Applying this rule, it is apparent that Florida law governs.[5]

Each of the Enrollment Applications provide that "[t]his Contract will become a legally binding agreement between me and the Church upon its acceptance by the Church or upon my commencing my participation in a Scientology Religious Service, whichever occurs first." There is a space for the Church of Scientology to sign, indicating its acceptance of the applicant for participation in the particular Scientology Religious Services (*id.* at 10). Flag Church and Ship Church are located in Clearwater, Florida (*see* Dkt 114, ¶¶ 17-18). It can therefore be inferred that the acceptance of the various Garcia applications occurred in Florida, where the last act necessary to consummate the contract was accomplished. *See Prime Ins. Syndicate, Inc.*, 363 F.3d at 1093. Florida law will therefore control whether the arbitration agreements are enforceable

**B.    Religious Arbitration**

As an initial matter, the parties agree that the Church of Scientology is a religious organization and that the dispute between the parties as to whether Plaintiffs' claims are subject to arbitration raises First Amendment implications. As one writer has observed, "[a]rbitration in a religious forum has long been recognized as a valid approach to dispute resolution." Steven C. Bennett, 64-JAN Disp. Resol. J. 24, 26 (2010). *See Serbian Eastern Orthodox Diocese for the*

---

[5] Notably, the Garcias concede for purposes of their unconscionability defense that California and Florida law is the same (Dkt. 30 at 4). This appears to be accurate.

> Under California law, an arbitration agreement, like any other contractual clause, is unenforceable if it is both procedurally and substantively unconscionable. California courts apply a "sliding scale" analysis in making this determination: "the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa."

*Pokorny v. Quixtar, Inc.*, 601 F.3d 987, 996 (9th Cir. 2010) (internal quotations and citations omitted). As discussed *infra*, Florida law also analyzes both procedural and substantive unconscionability using a sliding scale approach.

*United States of America & Canada v. Milivojevich,* 426 U.S. 696, 708 (1976). And where parties agree to submit a dispute to religious arbitration, they thereby agree to abide by the rules and procedures of the chosen arbitration forum. *See Tal Tours (1996) Inc. v. Goldstein,* 2005 WL 2514967, 808 N.Y.S.2d 920 (N.Y. Sup. 2005).

Pointing to the express language in the arbitration clauses, Defendants urge that Plaintiffs' sole remedy is through Scientology's ecclesiastical dispute resolution procedures, which include binding arbitration, and that the court may not interpret those procedures without violating the First Amendment. Defendants correctly contend that the "First Amendment Abstention Doctrine" prohibits judicial review of religious doctrine, citing a long line of Supreme Court cases recognizing that the Free Exercise Clause prohibits courts from resolving internal disputes concerning the interpretation or application of religious doctrine. *See Milivojevich*, 426 U.S. at 708 (Free Exercise Clause precludes civil courts "from adjudicating church fights that require extensive inquiry into matters of 'ecclesiastical cognizance.' "); *Jones v. Wolf,* 443 U.S. 595, 602 (1979); *New York v. Cathedral Acad.*, 434 U.S. 125, 133 (1977); *Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 450 (1969); *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 115 (1952); *Watson v. Jones*, 80 U.S. 679, 733 (1871).

Moreover, the Establishment Clause of the First Amendment prohibits judicial intrusion into disputes involving religious organizations when those disputes affect religious doctrine, church polity, or church administration. *Milivojevich,* 426 U.S. at 710. And the Free Exercise Clause requires courts to defer to the decisions of the highest tribunals of hierarchical religious organizations on matters of religious doctrine, discipline, faith, and ecclesiastical rule, custom, or law. *Kedroff,*

7

344 U.S. at 115; *see also Watson*, 80 U.S. at 727. Notwithstanding, civil courts have jurisdiction to resolve disputes involving religious organizations so long as "neutral principles of law" are applied and the judicial decision is not based on "consideration of doctrinal matters, whether the ritual and liturgy of worship or the tenets of faith." *Jones*, 443 U.S. at 602.

Here, the central question on Defendants' motion to compel arbitration is whether the parties have an enforceable agreement to arbitrate. Neutral principles of Florida law can be applied in determining the enforceability of the arbitration clauses without consideration of Scientology doctrine. It follows that the First Amendment does not prevent the court from resolving the instant motion according to "objective, well-established, neutral principles of law." *See Meshel v. Ohev Sholom Talmud Torah*, 869 A.2d 343, 354 (D.C. 2005).[6] Indeed, neither party contends that the Court cannot make this determination. Even where, as here, church documents must be examined, the "neutral principles" approach avoids the constitutional prohibition against entanglement in questions of religious doctrine, polity, and practice, since the neutral principle of law approach relies on objective, well-established concepts of law that are familiar to lawyers and judges. *Jones*, 443

---

[6] The District of Columbia Court of Appeals has recognized the authority of civil courts to resolve actions to compel religious arbitration even when the underlying dispute is ecclesiastical in nature:

> Although the underlying dispute between the parties goes to the heart of the governing structure of Ohev Sholom and therefore may be beyond the jurisdiction of a civil court, the resolution of appellants' action to compel arbitration will not require the civil court to determine, or even address, any aspect of the parties' underlying dispute. Instead, the court will have to do no more than make the two findings that are required any time a court considers an action to compel arbitration pursuant to the District of Columbia Uniform Arbitration Act—namely, whether the parties have an enforceable agreement to arbitrate and, if so, whether the underlying dispute between the parties falls within the scope of the agreement.

*Meshel*, 869 A.2d at 354.

8

U.S. at 603.[7]

### C.    Unconscionability

Plaintiffs contend that the arbitration clauses in the Enrollment Applications are both substantively and procedurally unconscionable and therefore unenforceable.[8] Under Section 2 of the FAA, an arbitration agreement may be invalidated by contract defenses such as fraud, duress, or unconscionability. *Rent–A–Center*, 561 U.S. at 68. In Florida, to invalidate an arbitration clause, a party must establish both procedural and substantive unconscionability. *Basulto v. Hialeah Auto.*, 141 So. 3d 1145, 1159 (Fla. 2014); *Pendergast v. Sprint Nextel Corp.*, 592 F.3d 1133 (11th Cir. 2010).  Procedural unconscionability relates to making of the contract and the parties' relative bargaining power and ability to understand the contractual terms. *Premier Real Estate Holdings, LLC v. Butch,* 24 So. 3d 708, 711 (Fla. 4th DCA 2009). Substantive unconscionability requires a determination that the contractual  terms are "so 'outrageously unfair' as to 'shock the judicial conscience.'" *Id.* (*quoting Bland v. Health Care & Retirement Corp. of Am.,* 927 So. 2d 252, 256 (Fla. 2d DCA 2006)) (citations omitted). "Substantive unconscionability focuses on whether the terms of the contract are 'unreasonably favorable' to the other party and 'whether the terms of the contract are so unfair that enforcement should be withheld.'" *Basulto*, 141 So. 3d at 1158 n.4 (quoting *Williams v. Walker-Thomas Furniture Co.*, 350 F.2d 445, 449-50 (D.C. Cir. 1965)).  In making that assessment, the court "asks whether the more powerful party overreached and 'gained an unjust and undeserved advantage which it would be inequitable to permit him to enforce.'" *Id.*

---

[7] As will be discussed, however, at least one of Plaintiffs' objections to Scientology arbitration would necessarily involve consideration of "questions of religious doctrine, polity, and practice," that is, whether the Garcias, as former members of Scientology who have been as declared suppressive, can receive a fair arbitration of their disputes

[8] Plaintiffs challenge the arbitration provision as opposed to the Enrollment Application itself.  Accordingly, the Court, not the arbitrator, must resolve this challenge. *See Rent-A-Center*, 561 U.S. at 70.

(quoting *Steinhardt v. Rudolph*, 422 So. 2d 884, 889 (Fla. 3d DCA 1982)).

The Florida Supreme Court recently adopted a "balancing, or sliding scale, approach" to the unconscionability analysis. *Basulto*, 141 So. 3d at 1159. "This approach recognizes that although the concept of unconscionability is made up of both a procedural component and a substantive component, it often involves an evaluation in which the two principles are intertwined." *Id.* at 1160. The Court explained that "both the procedural and substantive aspects of unconscionability must be present, although not necessarily to the same degree, and both should be evaluated interdependently rather than as independent elements." *Id.* at 1161.

### i.    Procedural Unconscionability

The central question with respect to the procedural component of unconscionability "is whether the complaining party lacked a meaningful choice when entering into the contract." *Basulto*, 141 So. 3d at 1157 n.3. It is  undisputed that the terms of the Enrollment Applications, which included the arbitration provisions, were non-negotiable, and a Scientologist's  failure or refusal to sign the application would prevent receipt of services which had already been paid for. As such, the Enrollment Applications were presented on a "take-it-or-leave-it" basis.

In support of their contention that the arbitration clauses are procedurally unconscionable, Plaintiffs initially argued that the Enrollment Applications are contracts of adhesion. And Defendants acknowledged  during oral argument that these agreements are adhesive. Luis Garcia explained that although he generally paid for the services embodied in the applications weeks or months in advance, he was required to sign the Enrollment Applications immediately before participating in the services as a condition to receiving the services. During oral argument, however, Plaintiffs conceded that since they signed numerous versions of the Enrollment Applications over the course of many years,

10

they are not in a position to argue surprise or lack of choice. Indeed, Luis Garcia confirmed in his testimony that he read the applications and generally understood what they said when he signed them, was aware of the Committee on Evidence and how it "worked," and had successfully completed a required Ethics Specialist Course during which he studied the procedures of the Committee on Evidence, as well as Scientology ethics and justice matters.

Plaintiffs now contend that because the Enrollment Applications are contracts of adhesion, they must be more closely examined. Indeed, while "[t]he fact that a contract is one of adhesion is a strong indicator that the contract is procedurally unconscionable because it suggests an absence of meaningful choice, . . . the presence of an adhesion contract alone does not require a finding of procedural unconscionability." *VoiceStream Wireless Corp.*, 912 So. 2d at 40 (internal citations and quotations omitted). There must, therefore, be an aspect of the agreements, other than their adhesive character, that makes them procedurally unconscionable. In this regard, Plaintiffs largely rely on their contention there are no rules or procedures governing Scientology arbitration, rendering the agreements unconscionable. This contention was the focus of the evidentiary hearing.

a.     Arbitration rules and procedures

Plaintiffs' next argument is that the arbitration clauses are unconscionable because there are no rules or procedures governing Scientology arbitration.[9] Defendants counter by contending that International Justice Chief Mike Ellis determined that the Committee on Evidence provides the rules and procedures governing Scientology arbitration. Whether Scientology Arbitration rules and

---

[9] Plaintiffs also argue that Scientology arbitration would be unfairly one-sided due to the absence of published arbitral rules or procedures, urging that Defendants could unilaterally create or change the rules in the midst of the arbitration process. In light of my rejection of Plaintiffs' argument that the absence of rules and procedures renders the arbitration agreements unenforceable, this argument likewise has no merit.

procedures exist was the focus of much of the evidentiary hearing and briefing.

Defendants failed to present any convincing evidence supporting their strained contention that the Committee on Evidence constitutes the rules and procedures governing arbitration. First, the arbitration agreements make no reference to the Committee on Evidence. Second, the word "arbitration" cannot be found in the Committee on Evidence or in L Ron Hubbard's book. And while the HCO Policy Letter of 1963 (Defendants' Exhibit # 11) provides: "This system is for use in all matters of Justice in Scientology," Defendants point to no Church documents which identify arbitration as being within "matters of Justice in Scientology." Rather, they rely on the testimony of Mike Ellis that he determined, as the International Justice Chief, that the Committee on Evidence constitute the rules and procedures governing arbitration in the Church. Defendants contend that the court must defer to Ellis' determination as a matter of ecclesiastical doctrine.

Defendants are correct that "civil courts are bound to accept the decisions of the highest judicatories of a religious organization of hierarchical polity on matters of discipline, faith, internal organization, or ecclesiastical rule, custom, or law." *Milivojevich*, 426 U.S. at 713. This principle, however, does not mean that the court is bound by the Ellis' testimony. The ecclesiastical abstention principle, when applied to hierarchical polities, mandates deference only to *adjudications* by the highest authority within hierarchies. *Milivojevich*, 426 U.S. at 713 (emphasis added). As the Seventh Circuit explains:

> The language "highest judicatories" is derived from *Watson*, (citation omitted), which referred to the "highest ... church judicatories to which the matter has been carried." In other words, it refers to the body internal to the church which made the final disposition of the matter which subsequently gave rise to the case at hand. It does not mean that a civil court need only defer to the "highest" decision-making body of the church and may ignore the others. Rather, it means that the civil court must defer to the highest body to which the matter had been carried prior to reaching

12

the civil court.

*Young v. Northern Illinois Conference of United Methodist Church*, 21 F.3d 184, 187 n. 2 (7th Cir.), *cert. denied*, 513 U.S. 929 (1994). Ellis' testimony and purported prior determinations do not constitute an adjudicatory determination to which a secular court must defer.[10]

Moreover, even a superficial comparison of the arbitration agreements with the provisions in the Committee on Evidence supports Plaintiffs' contention that the Committee on Evidence could not, absent an *ad hoc* determination, provide the rules and procedures of arbitration. As Plaintiffs point out and even Ellis acknowledged, numerous irreconcilable inconsistencies exist between them. For example, the arbitration agreements provide for binding arbitration before three arbitrators, while the Committee on Evidence policy letter refers to a recommendation of discipline by a "convening authority." And as Defendants acknowledge, there has never been an arbitration in the Church,

---

[10] Nor did Ellis' September 30, 2014 correspondence to Mr. Ramsey (Defendants' Exhibit # 14) constitute an adjudicatory determination. It was, according to Ellis, a response to Ramsey's inquiry about the procedure for obtaining a refund of his deceased father's contributions for services he never received. In any event, the Court gives no weight to that correspondence. Ellis could recall little about circumstances giving rise to Ramsey's letter and his response, even though his responset was written only a few months before the evidentiary hearing. Moreover, the timing of the letter raises a compelling inference that it was conveniently written only after Defendants had represented to the Court that Ellis had "ruled" that the Committee on Evidence applied to Scientology arbitration and the Court directed Defendants to submit proof of that representation (Dkt. 131). A mere six days passed between that Order (Dkt. 131) and the Ramsey letter.

Likewise, the testimony of the Church of Scientology International's corporate lawyer Sherman Lenkse is not persuasive, to the extent Defendants offered it to support its contention that Lenkse incorporated Scientology principles into the arbitration clauses he drafted. His original notations and revisions (Defendants' Exhibit # 16) are substantially different from the enrollment applications signed by Luis Garcia.

Finally, to the extent Defendants contend that Ellis made a prior determination that the Committee on Evidence applies to Scientology arbitration during what he and Alan Cartwright described as a casual conversation with LeAnna Wyland five to ten years before, that testimony was not credible. LeAnna Wyland did not testify, which may or may not have corroborated Ellis and Cartwright. And there is no documentation memorializing any such conversation or the circumstances in which it occurred. Even if it did occur, that would not have constituted an adjudicatory determination by Ellis to which deference would be owed. And it too was disclosed only after Defendants had taken the position that Ellis had "ruled" and the court directed Defendants to submit evidence of that ruling, likewise removing any weight which might otherwise be given to it.

13

further supporting Plaintiffs' arguments that no rules and procedures for conducting arbitration exist.

Notwithstanding, for the reasons discussed, the absence of particularized rules and procedures for conducting arbitration do not render the arbitration clauses unenforceable. While neither party cites binding authority on point, the case law does provide guidance as to the essential requirements of an enforceable arbitration agreement. After consideration of these authorities, I find that the procedures set forth in the Enrollment Application are minimally sufficient.

Generally, in Florida, "[p]rovisions in a contract providing for arbitration must be definite enough so that the parties *at least have some idea* as to what particular matters are to be submitted to arbitration and set forth some procedures by which arbitration is to be effected." *Malone & Hyde, Inc. v. RTC Transp., Inc.*, 515 So. 2d 365, 366 (Fla. 4th DCA 1987) (emphasis added) (citing *G & N Construction Co. v. Kirpatovsky*, 181 So. 2d 664 (Fla. 3d DCA 1966)); *See also Spicer v. Tenet Florida Physician Services, LLC*, 149 So. 3d 163, 165-66 (Fla. 4th DCA 2014); *Creative Tile Mktg., Inc. v. SICIS Int'l, S.r.L.*, 922 F. Supp. 1534, 1539 (S.D. Fla. 1996). The question, therefore, is whether the Enrollment Applications include the essential terms of the arbitration agreement such that the Garcias had some idea of what disputes would be subject to arbitration and the manner of effecting arbitration.

The essential terms of an enforceable arbitration agreement include "the form and procedure for arbitration, the number of arbitrators, how the arbitrators were to be selected, or . . . the issues to be decided by arbitration." *Greenbrook NH, LLC v. Estate of Sayre, ex rel. Raymond*, 150 So. 3d 878, 881 (Fla. 2d DCA 2014) (quoting *Malone & Hyde, Inc.*, 515 So. 2d at 366). In summary, therefore, an enforceable arbitration agreement will include: (1) the manner of selecting the arbitrators, (2) the number of arbitrators, (3) the matters to be arbitrated, and (3) whether the

14

arbitration is binding or nonbinding. *See Malone*, 515 So. 2d at 366; *Greenbrook NH, LLC*, 150 So.

3d at 881; *Davis v. Hearthstone Senior Communities, Inc.*, No. 2D14-2079, 2015 WL 292039, at \*2,

--- So. 3d --- (Fla. 2d DCA Jan. 23, 2015). While these factors are not exhaustive, they do serve as

an outline of the basic terms to be included. *Id.*

Applying these principles, I find that the arbitration clauses in the Enrollment Applications

satisfy the essential requirements of an enforceable arbitration agreement under Florida law, meaning

that the Garcias had "some idea" of what disputes were subject to arbitration and the procedures by

which arbitration was to be effected.

First, the agreements outline how the arbitrators are to be selected and the number of

arbitrators. Second, the agreements clearly identify what matters are to be submitted to arbitration:

"any dispute, claim or controversy [that] arise[s] between me and the Church, any other Scientology

church, any other organization which espouses, presents, propagates or practices the Scientology

religion, or any person employed by any such entity . . .". Third, the agreements expressly provide

for "binding religious arbitration."

To the extent Plaintiffs point to the absence of specific rules and procedures governing how

an arbitration is conducted, the agreements do fall somewhat short in that regard. But that is not to

say that the agreements are thereby rendered unenforceable. Again, the test in Florida is whether the

"terms are definite enough that the parties have some idea as to what matters are to be arbitrated and

some procedure by which arbitration is to be conducted." *Davis*, 2015 WL 292039, at \*2. Detailed

rules and procedures are not essential requirements of enforceable arbitration agreements.

Moreover, by virtue of the ecclesiastical nature of the dispute resolution procedures set forth

in the Enrollment Applications, the Garcias, as "committed" Scientologists, necessarily would have

15

"some idea" of the procedures by which arbitration is to be conducted.[11]  Indeed, Luis Garcia

testified that he successfully completed the "Ethics Specialist Course," during which he studied,

among other things, the Committee on Evidence and its procedures, as well as the Scientology

Justice System. He agreed to arbitrate any disputes that might arise "in accordance with the

arbitration procedures of Church of Scientology International." From a secular perspective, one can

only assume that they had "some idea" of what those procedures were. *See Malone & Hyde, Inc.,*

515 So. 2d at 366.

Since the Enrollment Applications unequivocally evidence the parties' intent to arbitrate any

disputes between them "in accordance with the arbitration procedures of Church of Scientology

International," a secular court must give effect to that contractual provision. *See Inetianbor*, 768 F.3d

at 1346 (court must give effect to parties intent to "structure their arbitration agreements as they see

fit.") (citations and quotations omitted).

In summary, the arbitration clauses in the Enrollment Applications include the essential terms

of an enforceable arbitration agreement under Florida law. They describe how the Garcias initiate

arbitration ("I will submit a request for arbitration to the IJC . . ."), identify the matters which would

be arbitrated ("any dispute, claim or controversy . . ."), describe the selection and number of

arbitrators (you designate one, we designate one, and those two designate a third),[12] identify the

qualifications of the arbitrators (Scientologists in good standing), and provide that arbitration is

---

[11] As noted, the agreements provide that "[i]n accordance with the discipline, faith, internal organization, and ecclesiastical rule, custom, and law of the Scientology religion . . ," disputes with the Church are to be resolved "exclusively through Scientology's internal Ethics, Justice and binding religious arbitration procedures . . . in accordance with the arbitration procedures of Church of Scientology International." By joining voluntary religious organizations, individuals like the Garcias consent to their governing structures, policies, and doctrines and bind themselves to submit to the organization's rules. *Watson*, 80 U.S. at 728-29.

[12] There is also a backup procedure for selecting the second and third arbitrators if the designation procedure fails--the IJC selects them.

binding. Plaintiffs have not cited a case requiring an arbitration agreement to include more detailed procedures or rules by which the arbitration is to be conducted, and independent research has not disclosed one.[13] Accordingly, the absence of detailed rules and procedures for conducting arbitration does not render the agreement to arbitrate unenforceable.

        b.    Scope

Plaintiffs next argue that the arbitration agreements are overly broad and therefore procedurally unconscionable in that they could not have reasonably expected the arbitration clauses to cover disputes unrelated to the Enrollment Applications, such as their fraud claims. Plaintiffs' contention is unpersuasive, since broad arbitration agreements are enforceable, consistent with the parties' intent. *See Brown v. ITT Consumer Fin. Corp.*, 211 F.3d 1217, 1221 (11th Cir. 2000) (internal quotation and citation omitted) ("It is well established that arbitration is a creature of contract and neither party can be compelled to arbitrate when he has not agreed to do so. . . . A party cannot avoid arbitration, however, because the arbitration clause uses general, inclusive language, rather than listing every possible specific claim.").

---

[13] *Spicer v. Tenet Florida Physician Services, LLC, supra,* might be read to require inclusion of detailed arbitration procedures in an agreement to arbitrate. *Spicer* is distinguishable, however. There, the plaintiff signed an employment agreement that stated that all employment disputes would be subject to the "Tenet Fair Treatment Process [FTP], which includes final and binding arbitration," but failed to incorporate the FTP. It failed to define the matters to be arbitrated and failed to include "any procedures for arbitration." *Id.* at 166. Unlike the employment agreement in *Spicer,* the Enrollment Applications signed by Luis Garcia identified the matters to be arbitrated, included procedures for invoking the arbitration process and the selection of the arbitrators, and provided that arbitration would be final and binding.

Nor does *Premier Real Estate Holdings, LLC v. Butch, supra,* dictate a contrary result. There, unlike here, the parties' agreement left blank the identity of the arbitration organization whose rules were to apply to the arbitration. The court reasoned that Florida law, Chapter 682 of the Florida Administrative Code, filled the "gaps" and provided the method of selecting the arbitrator since the agreement provided that it would be construed under Florida law. *Id.* at 710 ("Chapter 682, Florida Statutes, sets forth the rules and procedures for arbitration in the event an arbitration clause is silent on such matters."). And that court found that the parties' "failure to designate the 'rule' under which the arbitration would be governed did not invalidate the arbitration clause," reasoning that the Florida Arbitration Code did not require an arbitration clause to set forth the "rules governing the arbitration." *Id.*

In *Brown*, the language of the arbitration clause was brief, unequivocal and all-encompassing, stating that "any dispute between them or claim by either against the other" was subject to arbitration. *Id.* The court concluded: "By using this inclusive language, the parties agreed to arbitrate any and all claims against each other, with no exceptions. An arbitration agreement is not vague solely because it includes the universe of the parties' potential claims against each other." *Id.*[14] I reach a similar conclusion here.

The relevant arbitration clauses in the Enrollment Applications Luis Garcia signed provide broad, inclusive language similar to that discussed in *Brown*.[15] As noted, he signed more than forty Enrollment Applications containing substantially the same language. The majority of those contained the broad "any dispute" language in the arbitration clauses: "should *any* dispute, claim, or controversy arise between me and the Church . . . I will pursue resolution of that dispute, claim or controversy solely and exclusively through Scientology's Internal Ethics, Justice and binding religious arbitration procedures . . . ." (Defendants' Exhibit #1). "Any" plainly means "all." *Anders v. Hometown Mortg. Serv., Inc.*, 346 F.3d 1024 (11th Cir. 2003) (arbitration agreement covering "any action, dispute, claim, counterclaim or controversy" means all disputes, because any means all.)

---

[14] *See also Doe v. Princess Cruise Lines, Ltd.*, 657 F.3d 1204, 1218 (11th Cir. 2011) ("If the cruise line had wanted a broader arbitration provision, it should have left the scope of it at 'any and all disputes, claims, or controversies whatsoever' instead of including the limitation that narrowed the scope to only those disputes, claims, or controversies 'relating to or in any way arising out of or connected with the Crew Agreement, these terms, or services performed for the Company.'").

[15] At least three versions of the arbitration clause are in the various Enrollment Applications signed by Luis Garcias (Defendant's Exhibit #1). The first version, signed by Garcia in the 1980's, states: "I agree that any claim or controversy I may have with the Church arising out of or relating to any Scientology or Dianetics services or activities shall first be submitted to the International Justice Chief ("IJC") at Flag. If the claim or controversy is not resolved . . . then the matter shall be submitted to arbitration . . . ." The second version is substantially the same as the third version in that it does not limit arbitrable disputes to those arising out of or relating to any Scientology or Dianetics services or activities. This change in the language further undermines Plaintiffs' argument that the broad scope of the arbitration agreement could not have been reasonably expected.

(citing *Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1186 (11th Cir. 1997) ("the adjective 'any' is not ambiguous … 'any' means all")). Plaintiffs' agreement to arbitrate any dispute with the Church is therefore not restricted to disputes arising from or relating to the Enrollment Applications.

### ii. Substantive Unconscionability

#### a. Fair and Neutral Arbitration

Plaintiffs argue that the arbitration agreements are substantively unconscionability because they have both been declared "Suppressive" by the Church and according to Church doctrine, have no rights as Scientologists and are not eligible for the benefits of the Codes of the Church.[16] Plaintiffs argue that it will be impossible for them to receive a fair and neutral arbitration because Scientologists in good standing are prohibited by Church doctrine from communicating with suppressive individuals, a process referred to as "disconnection" in L. Ron Hubbard's book. (Defendants' Exhibit #3, Introduction to Scientology Ethics, Chap. 8, p. 206) ("The term disconnection is defined as a self-determination decision made by an individual that he os not going to be connected to another. It is severing of a communication line."). In support of this contention, over Defendants' objection, Plaintiffs presented testimony from Hayden James and Christie Collbran demonstrating how declared Suppressive individuals are essentially shunned by the Church and its members, including family members. Plaintiffs urge therefore that an arbitrator who is a Scientologist in good standing will necessarily be biased against them based on church doctrine, and therefore participation in Scientology arbitration would be an illusory exercise.[17] Mike Ellis testified

---

[16] Plaintiffs' contentions mirror the principles in L. Ron Hubbard's Introduction to Scientology Ethics, Chap. 12, p. 320 ("A truly Suppressive Person or group has no rights of any kind as Scientologists.").

[17] According to the HCO Policy Letter of 7 March 1965RB, a "suppressive person" is defined as "one that actively seeks to suppress or damage Scientology or a Scientologist by suppressive acts" (Plaintiffs' Exhibit #10). "Suppressive persons or groups relinquish their rights as Scientologists by their very actions and may not receive the

that this would not be the case, essentially because the arbitrators would be instructed to be fair and neutral.

As compelling as Plaintiffs' argument might otherwise be, the First Amendment prohibits consideration of this contention, since it necessarily would require an analysis and interpretation of Scientology doctrine. That would constitute a prohibited intrusion into religious doctrine, discipline, faith, and ecclesiastical rule, custom, or law by the court. *Kedroff,* 344 U.S. at 115. Indeed, Plaintiffs earlier acknowledged that "[t]he hostility of any Scientologists on [the arbitration panel] is . . . church doctrine" (Dkt. 30 at 16). Accordingly, the Court has no jurisdiction to consider this argument.[18]

Accordingly, I find that the arbitration clauses are not procedurally or substantively

---

benefits of the Codes of the Church" (*id.*); (Defendants' Exhibit #3, Introduction to Scientology Ethics, Chap. 12, p. 309).

[18] At oral argument, Defendants raised for the first time the argument that the United Nations Convention on Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention") preempts the defense of unconscionability as to Luis Garcia's agreement to arbitrate with Ship Church, citing *Lindo v. NCL (Bahamas), Ltd.*, 652 F.3d 1257, 1261 (11th Cir. 2011). According to Defendants, Ship Church is operated from a ship which was in Aruba at the time Luis Garcia signed the Enrollment Application.

There are four jurisdictional prerequisites that must be met for the New York Convention to apply:

(1) there is an agreement in writing within the meaning of the Convention; (2) the agreement provides for arbitration in the territory of a signatory of the Convention; (3) the agreement arises out of a legal relationship, whether contractual or not, which is considered commercial; and (4) a party to the agreement is not an American citizen, or that the commercial relationship has some reasonable relation with one or more foreign states.

*Lindo*, 652 F.3d at 1272 n.10 (quoting *Bautista v. Star Cruises*, 396 F.3d 1289, 1294 n.7 (11th Cir. 2005)); *see also* 9 U.S.C. § 202. Defendants advanced no argument that Luis Garcia's agreement with Ship Church is a commercial contract or that Ship Church is not a United States citizen. Plaintiffs allege that Ship Church has its principal place of business in Florida (Dkt. 114, ¶ 18). Defendants do not contend otherwise. "For the purpose of [section 202] a corporation is a citizen of the United States if it is incorporated or has its principal place of business in the United States." *See* 9 U.S.C. § 202. And, Defendants have not established a "commercial relationship [that] has some reasonable relation with one or more foreign states." *Lindo*, 652 F.3d at 1272 n.10; 9 U.S.C.A. § 202. As such, Defendants fail to satisfy their burden of establishing the third and fourth prerequisites. *See Singh v. Carnival Corp.*, 550 Fed. App'x 683, 685 (11th Cir. 2013) *cert. denied*, 134 S. Ct. 2729 (2014) ("The party seeking to compel arbitration . . . bears the burden of proving each of these jurisdictional prerequisites.").

unconscionable. Defendants' Renewed Motion to Compel Arbitration and to Stay Proceedings (Dkt.

120) is **GRANTED**.  This case is **STAYED** pending arbitration. The Clerk is directed to **CLOSE**

this case.

**DONE AND ORDERED** this __13ᵗʰ__ day of March, 2015.

JAMES D. WHITTEMORE
United States District Judge

Copies to: Counsel of Record

21

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION


LUIS A. GARCIA SAZ and Wife,
MARIA DEL ROCIO BURGOS
GARCIA,

                Plaintiffs,                      CASE NO:  8:13-CV-220-T27 TBM

vs.

CHURCH OF SCIENTOLOGY FLAG
SERVICE ORGANIZATION, INC., and
CHURCH OF SCIENTOLOGY FLAG SHIP
SERVICE ORGANIZATION, INC.,

                Defendants.
_____/


## PLAINTIFFS' AMENDED MOTION TO VACATE ARBITRATION AWARDS AND INCORPORATED MEMORANDUM OF LAW

The Plaintiffs, LUIS A. GARCIA SAZ and MARIA DEL ROCIO BURGOS GARCIA, under 9 U.S.C. § 10(a) (2012), file this Amended Motion to Vacate the Arbitration Awards and Incorporated Memorandum of Law.  The Arbitration Awards are dated October 23, 2017, and signed by the arbitration panel on October 24, 2017 (Ex. 1 Arbitration Findings Form & Ex. 2 Arbitration Decision Form).

1.      The Plaintiffs have a statutory right to move to vacate an arbitration award when:  (1) the award was "procured by corruption, fraud, or undue means;" (2) the arbitrators acted with "evident partiality or corruption"; or (3) the arbitrators engaged in "misconduct in . . . refusing to hear evidence pertinent and material to the controversy" or "any other misbehavior by which the rights of any party have been prejudiced."  9 U.S.C. § 10(a).  The Plaintiffs move to vacate based upon sections 10(a)(2) and 10(a)(3).  While the ability of courts

to review ecclesiastical arbitrations is limited, the Defendants (the "Church")[1] agreed that the Plaintiffs have the right to file a motion to vacate on the grounds authorized by section 10(a) (DE196:87 Tr. 2/19/15).

2.      Under section 10(a)(3), this Court should vacate the arbitration award because the arbitration panel engaged in misconduct by refusing to hear any evidence critical of the Church (Ex. 3 Garcia Aff. at 4-5, 9-10, 13-15, 17).

3.      In conjunction with the motion to compel arbitration, the Church presented the testimony of the International Justice Chief ("IJC") Mike Ellis, who told this Court that the Plaintiffs would have a full opportunity to "present evidence" and "originate whatever [they] wanted . . . to present [their] side of the story" (DE188-3:176-78 Dep. Mike Ellis).  When this Court later denied the Plaintiffs' motion for miscellaneous relief, it relied upon this testimony that the Plaintiffs would have the opportunity to present their evidence: "For example, [IJC] Ellis has testified that . . . [the Plaintiffs] would be able to 'originate whatever [they] wanted to' in order to present their side of story . . . ."  (DE265:3, n.4 Order 10/16/17).

4.      Directly contrary to this representation, the IJC and arbitration panel refused to allow the Plaintiffs to present any witnesses or evidence at all because the IJC deemed the Plaintiffs' evidence to be "entheta" (Ex. 3 Garcia Aff. at 4-5, 9-10, 13-15, 17).  "Entheta" is a Scientology term meaning critical of the Church (*Id.* at 4).

5.      The Plaintiffs alleged claims against the Church for fraud, breach of contract,

---

[1]  The Defendants are the CHURCH OF SCIENTOLOGY FLAG SERVICE ORGANIZATION, INC. and the CHURCH OF SCIENTOLOGY FLAG SHIP SERVICE ORGANIZATION, INC.  This motion refers to the Defendants collectively as "the Church."  All emphasis is supplied unless otherwise indicated.  This motion refers to documents filed in this Court by docket entry number (DE[docket entry number]:[page number]).

and violations of the Deceptive and Unfair Trade Practices Act (DE114 Am. Compl. 5/12/14). The Plaintiffs alleged that the Church extracted funds from them by soliciting contributions for purposes that were never fulfilled and failing to repay deposits for services that were never rendered (*Id.* at 1-4, 7-29). The Plaintiffs could not prove these claims without submitting evidence critical of the Church (Ex. 3 Garcia Aff. at 4-10, 13-15, 17).

6.     Before this Court compelled arbitration, the Church also told this Court that whether the Plaintiffs requested a refund by filling out a form with the Claims Verification Board (CVB) would not be dispositive of the issues in this suit (DE196:88-89 Tr. 2/19/15). The Church stated the claims verification board process does not apply to persons, like the Plaintiffs, who have been declared by the Church to be suppressive persons (*Id*. at 89; DE188-3:147-48, 151 Dep. Mike Ellis).

7.     At arbitration, the IJC reversed course and stated that the **only** issues for arbitration were whether the Plaintiffs followed the correct procedure to request return of funds from the Church by filling out a CVB form (Ex. 3 Garcia Aff. at 11, 13-14). The IJC and arbitrators refused to consider the Plaintiffs' fraud claims and the issues raised in the lawsuit (*Id.*). The only questions the arbitrators asked the Plaintiffs involved whether they had filled out a CVB form (*Id.* at 12-18).

8.     The issues presented in the Plaintiffs' lawsuit are much broader than whether they filled out a CVB form (DE114 Am. Compl. 5/12/14; Ex. 3 Garcia Aff. at 4-10, 13-15, 17).

9.     The Plaintiffs tried to submit over 900 pages of evidence supporting their claims, but the IJC redacted all information critical of the Church (Ex. 3 Garcia Aff. at 5, 7-

10).  The IJC presented the arbitration panel with only 70 of the pages the Plaintiffs submitted (Ex. 3 Garcia Aff. at 9).  The IJC heavily redacted the few pages that the IJC allowed the Plaintiffs to give the arbitrators (*Id.* at 9-11).  As an example, the Plaintiffs asked the IJC to present to the arbitration panel an accounting summary of the Orange County Ideal Org (*Id.* & Attached Ex. F Unredacted accounting summary proffered by the Plaintiffs).  The IJC redacted all but a few lines of the accounting summary before giving it to the arbitrators (Ex. 3 Garcia Aff. at 9-11 & Attached Ex. G Accounting summary as redacted by IJC before presenting it to arbitrators).  The redacted accounting summary no longer contained any information related to the Plaintiffs' fraud claims.  (*Id.* & *Compare* Ex. F Unredacted summary *with* Ex. G Redacted summary). The IJC refused to allow the Plaintiffs to present letters from former Church members with similar requests for the Church to return donations, statements published on the Church's website, the Church's promotional materials, and copies of Church policies that demonstrated the Church's fraud (*Id.* & Ex. H Church flyer the IJC excluded from evidence).

10.     This Court should also vacate the arbitration award because the panel engaged in misconduct by allowing the IJC to have ex parte contact with the arbitration panel and present evidence outside the Plaintiffs' presence.

11.     The arbitration panel engaged in further misconduct in refusing to allow the Plaintiffs' counsel to attend the arbitration, but allowing the Church to have counsel present (Ex. 3 Garcia Aff. at 6-7, 10 & Attached Ex. B Screen Shot showing wireless network "Gary Soter's iPhone" 10/23/17).  This contradicted the Church's representations to this Court that the Plaintiffs' counsel had the right to attend the arbitration (DE188-4:194-95 Dep. Mike Ellis).

12.     The arbitration panel also engaged in misconduct by failing to provide written

4

findings sufficient for this Court to review the arbitration awards (Ex. 1 Arbitration Findings Form & Ex. 2 Arbitration Decision Form).  This Court asked counsel for the Church, "Will there be a record of the proceeding if I'm asked to review it"?  (DE196:87 Tr. 2/19/15).  The Church's counsel repeatedly assured this Court that the arbitration panel would create a written report sufficient for this Court to rule on a motion to vacate (DE196:88-89 Tr. 2/19/15; DE255:9 Tr. 8/15/17).  Directly contrary to the Defendants' repeated representations to this Court, the only written documents the arbitration panel provided were checklists prepared on October 23, 2017, the day before the arbitration began and signed on the day the arbitration actually took place, October 24, 2017 (Ex. 1 Arbitration Findings Form & Ex. 2 Arbitration Decision Form).  Nothing in the checklists gives this Court any explanation of what evidence the panel considered or how the findings were determined (*Id.*).

13.     In addition, under 9 U.S.C. § 10(a)(2), this Court should vacate the arbitration award because "there was evident partiality or corruption in the arbitrators, or either of them." Again, the Defendants represented to this Court that the IJC would instruct the arbitration panel to "treat everyone impartially regardless of who they are" (DE188-2:80, Dep. Mike Ellis; *see id.* at 81; DE188-3:161, 177; DE188-4:222).

14.     This Court relied on this evidence when it rejected the Plaintiffs' argument that because the Church had declared them to be "Suppressive Persons," it would be impossible for them to receive a fair and neutral arbitration from a panel of arbitrators comprised of Scientologists in "good standing" (DE189:19-20 Order Compelling Arbitration 3/13/15; Ex. 4 Church Order Garcia Suppressive Persons Declare 11/20/10).  This Court found that IJC "Mike Ellis testified that this would not be the case, essentially because the arbitrators would be

instructed to be fair and neutral." (*Id.*).

15.   That did not happen.  Instead, outside the Plaintiffs' presence, IJC Mike Ellis "hatted" the arbitration panel (Ex. 3 Garcia Aff. at 4-6, 12).  "Hatting" is a Scientology term for "training" them (Ex. 3 Garcia Aff. at 4).  Contrary to the IJC's representations to this Court, this "hatting" did not merely consist of instructing the arbitrators to be fair and neutral.  Outside the presence of the Plaintiffs, the IJC gave the arbitration panel several documents to review, including church policies, the complaint, and the 10-page report from the Claims Verification Board (CVB report) (*Id.* at 4-9 & Attached Ex. E CVB report).  This report was tantamount to a directed verdict for the Church (*Id.* at 8-9, 15 & Attached Ex. E CVB report).  The Plaintiffs had never seen the CVB report before and had no opportunity to respond to it (*Id.* at 8-9, 15).  The arbitration panel gave the IJC unfettered access and the right to present evidence outside the Plaintiffs' presence.  This disparate treatment demonstrated the evident partiality of the arbitration panel.

16.   Members of the arbitration panel also made numerous statements demonstrating their evident partiality.  The Chairman of the arbitration panel, Peter Sokoloff, told the Plaintiffs that once they were declared "Suppressive Persons," they ceased to have any rights as Scientologists (Ex. 3 Garcia Aff. at 16).  He told the Plaintiffs their payments to the church were charitable donations and, therefore, non-refundable (*Id.*).

17.   These payments, and the Church's fraudulent statements to induce the payments, formed the basis for the Plaintiffs' lawsuit (DE114 Am. Compl. 5/12/14).  The statements of Chairman Sokoloff demonstrated that the arbitration panel had already decided the dispute in favor of the Defendants, before even meeting the Plaintiffs (Ex. 3 Garcia Aff. at

12-13).  The evident partiality of the arbitration panel requires this Court to vacate the arbitration awards.

18.  The Plaintiffs opposed the Church's motion to compel arbitration on the grounds of procedural and substantive unconscionability (DE30 Pls. Resp. Opposing Arbitration 4/22/13; DE170 Pls. Trial Brief 2/16/15; DE191 Pls. Mot. for Reconsideration 4/9/15).  The Plaintiffs argued, vigorously, that as persons declared "Suppressive" by the Church, they could never receive a fair hearing before an arbitration panel composed of Scientologists in "good standing" (DE30; DE170; DE191; Ex. 4 Garcia Declare Order).  The events during the arbitration proved the Plaintiffs correct on the unconscionability of the arbitration procedure.  This Court should grant the Plaintiffs' motion to vacate the arbitration awards and order trial on the merits of the claims in Plaintiffs' lawsuit.

## MEMORANDUM OF LAW

**A.**     **The arbitration awards should be vacated because of the arbitrators' misconduct in refusing to hear material evidence critical of Scientology and allowing the IJC to present evidence outside the Plaintiffs' presence.**

This Court should vacate an arbitration award "where the arbitrators were guilty of **misconduct** . . . in **refusing to hear evidence pertinent and material to the controversy**; or of any other **misbehavior** by which the **rights of any party** have been **prejudiced**."  9 U.S.C. § 10(a)(3).  The arbitrators' evidentiary rulings "must give the parties a fundamentally fair hearing."  *Rosenweig v. Morgan Stanley & Co.*, 494 F.3d 1328, 1333 (11th Cir. 2007) (citing *Tempo Shain Corp. v. Bertek, Inc.*, 120 F.3d 16, 20 (2d Cir. 1997)).  This Court should vacate the arbitration award when the "arbitrator's refusal to hear pertinent and material evidence prejudices the rights of the parties."  *Id.* (quoting *Hoteles Condado Beach, La Concha & Conv.*

*Ctr. v. Union De Tronquistas Local 901*, 763 F.2d 34, 40 (1st Cir. 1985)).

Every representation the Defendants made to the Court about how the arbitration would be conducted has proven to be false.  This Court relied on these representations.  The orders directing arbitration and ruling on the Plaintiffs' multiple motions were fatally infected by those misrepresentations.  The awards should be vacated.

This Court took great pains to prohibit both parties from contacting the arbitrators before the start of the arbitration.  At the April 7, 2017, hearing, this Court warned that it would not countenance anyone attempting to influence the arbitrators before the arbitration (DE235:11-14 Tr. 4/7/17).  This Court ordered the parties "**not [to] contact**, attempt to contact, or respond to any contact by **any individual** listed by Defendants or **selected to serve as an arbitrator by the Court**."  (DE238:3 Order 4/10/17).

Despite this warning, on October 23, 2017, before the arbitration began, the Defendants spent an entire day with the arbitrators without the Plaintiffs (Ex. 3 Garcia Aff. at 4-6, 8-9, 12).  This directly violated this Court's order directing the parties "**not [to] contact**, attempt to contact, or respond to any contact by **any individual** listed by Defendants or **selected to serve as an arbitrator by the Court**."  (DE238:3 Order 4/10/17).   No Court should countenance this behavior, which makes a mockery of fair arbitration procedure and allows the IJC to dictate a decision to the arbitrators.

The IJC told the Plaintiffs that he had to "hat" the arbitration panel, a scientology term for "training" the arbitration panel, outside the Plaintiffs' presence (Ex. 3 Garcia Aff. at 4-6, 12).  During the "hatting," the IJC gave the arbitration panel numerous documents to review, including the report from the Claims Verification Board (CVB report) (*Id.* at 4-9 & Attached

Ex. E CVB report).  The CVB report was dated that day—October 23, 2017—and the Plaintiffs

had never seen it before (*Id.*).  The CVB report stated that the IJC had "referred" the Plaintiffs'

request for arbitration to the CVB "for response" (Ex. 3 Garcia Aff., Attached Ex. E CVB

report at 1).

The CVB report read like an expert opinion of someone who had conducted an

extensive investigation into the Plaintiffs (Ex. 1 Garcia Aff. at 8-9 & Attached Ex. E CVB

report).  The CVB, in no uncertain terms, told the arbitration panel how to rule for the Church:

"There is no written evidence supporting the Garcias' claims that their donations for building

campaigns were made as a result of false promises" (Ex. 1 Garcia Aff., Attached Ex. E at 7;

*see id.* at 9).  "Policy is clear that if it is not written it is not true" and "that the Church is not

responsible for statements made by individual staff" (*Id.* at 7 & 9).  "Luis Garcia seeks a refund

for services he elected not to participate in" and "admitted he was well aware of the Church's

policy on Return of Donations and his responsibility pursuant to the enrollment forms he

signed multiple times" (*Id.* at 10).  According to the CVB:

> The Garcias failed to follow the steps of dispute resolution set
> forth in the Enrollment Forms and failed to follow the full
> procedures of the Claims Verification Board with respect to their
> claims for refund or repayment of donations for services, and
> therefore do not qualify for a refund.  Building donations and
> membership donations are not refundable.

(*Id.*).

The IJC also gave the arbitration panel two reports from Mr. Garcia's confidential

"Priest/penitent Ethics file" (Ex. 3 Garcia Aff. at 8-9).  These confidential reports were

completely irrelevant to the arbitration and the IJC intended only to intimidate and harass the

Plaintiffs (*Id.*).

The IJC is not just another Scientologist.  As shown from the record, the IJC enforces the dictates of the Church and, on his word alone, any one of the arbitrators could be "declared Suppressive," thereby losing his or her ability to speak to his or her spouse, losing his or her livelihood, and losing all Scientologist friends (DE188-1:17-18; DE188-3:138-41, 157, 159-60, 193; DE188-4:184-85, 199, Dep. Mike Ellis).  How could any Court believe that it is appropriate for the IJC to spend the entire day telling the arbitrators how to proceed with arbitration in the absence of the Plaintiffs?  While the Court permitted the IJC to instruct the arbitrators on the arbitration process, the Court could not have possibly intended that this instruction permitted the admission of evidence outside the Plaintiffs' presence for an entire day before arbitration began.  Based on what the IJC represented, the Court reasonably expected the IJC would, in the presence of the plaintiffs, tell the arbitrators to be fair, explain the procedure, and then step aside for the arbitrators to take over (DE188-2:80-81; DE188-3:161, 177; DE184-4:222, Dep. Mike Ellis).  Instead, the IJC completely controlled the arbitrators and their decision.

The Defendants also told this Court that the Plaintiffs would be given a chance to present their case (DE255:13 Tr. 8/15/17; DE188-3:176-78 Dep. Mike Ellis; DE196:88, 102 Tr. 2/19/15).  In the Order denying the Plaintiffs' motion for miscellaneous relief, this Court repeated the Defendants' representations that the Plaintiffs would be given an opportunity to present their case (DE265:3, n.4 Order 10/16/17) ("For example, [IJC] Ellis has testified that . . . [the Plaintiffs] would be able to 'originate whatever [they] wanted to' in order to present their side of story . . . .").  Yet, the arbitrators refused to allow the Plaintiffs to call any witnesses (Ex. 3 Garcia Aff. at 3, 17).  In fact, no one besides the Plaintiffs themselves was even allowed

on the premises (*Id.* at 2-3, 10, 17; Ex. 5 E-mails from the Church's counsel regarding attendance of the Plaintiffs' counsel at arbitration). Mr. Garcia has a medical condition that makes reading extremely difficult (Ex. 3 Garcia Aff. at 2-3 & Attached Ex. A, letter from Mr. Garcia's doctor). The Church refused to allow Mr. Garcia's assistant, who helps him read documents, attend (*Id.* at 2-3).

In their Amended Complaint, the Plaintiffs allege the Defendants used high-pressure, illegal sales tactics to fraudulently solicit large contributions from the Plaintiffs (DE114 Am. Compl. 5/12/14). The Plaintiffs brought several claims, including fraud, violations of the Deceptive and Unfair Trade Practices Act, and breach of contract (*Id.*). During the arbitration, the Defendants took the position that the arbitrators were not allowed to hear anything about fraud because it was considered "entheta" (Ex. 3 Garcia Aff. at 4-5, 9-10, 13-15, 17). That is a word that means Scientologists cannot hear anything critical of the Church, even if factual and true (*Id.* at 4).

Mr. Garcia gave the IJC over 900 pages of documents to present to the arbitration panel (Ex. 3 Garcia Aff. at 5, 7-10). The IJC redacted all information he felt was "entheta," critical of the Church, and gave the arbitration panel only 70 of the pages the Plaintiffs requested (*Id.* at 9). He rejected the rest as "irrelevant and/or 'entheta.'" (*Id.*). Most of the documents the IJC allowed constituted copies of commendations the Plaintiffs received for their contributions (*Id.*). Other pages were highly redacted (*Id.* at 9-11 & *Compare* Attached Ex. F unredacted accounting summary of the Orange County Ideal Org. proffered by the Plaintiffs *with* Ex. G the version of this document the IJC redacted and presented to the arbitration panel).

When Mr. Garcia finally got a chance to speak to the arbitration panel, and mentioned

his claims of fraud, the IJC cut him off and shouted, "WHAT YOU ARE SAYING IS 'ENTHETA.'" (Ex. 3 Garcia Aff. at 13).  The IJC even refused to allow Mr. Garcia to show the arbitration panel a Church flyer as evidence of false statements made in promotional material (*Id.* & Attached Ex. H Church flyer).  When Mr. Garcia protested that his claims involve fraud, the IJC said they were "**not here to discuss any lawsuit or any claims** in it, but to find out whether or not [the Plaintiffs] followed proper church procedure and policy in requesting a refund." (*Id.* at 13).  The Chairman of the arbitration panel admonished the Plaintiffs, "we **don't want to hear anything about fraud** because it has **nothing to do with the purpose of this arbitration**" (*Id.* at 14).

No reasonable person could find that the Plaintiffs had an adequate remedy for their fraud claim when they were precluded from ever mentioning it at arbitration.  No Court would hold that an arbitration where the Plaintiffs' claims could not even be mentioned is an adequate substitute for a civil action.  Such a holding would completely immunize the Church against any civil wrong that criticizes the Church.  For example, if the Church's truck ran over someone in the parking lot, the Church could exclude all evidence of the accident as critical of the Church.  The proceeding here was a sham that does not deserve to be called arbitration.  This was a star chamber proceeding, completely controlled from start to end by the Church, with no ability for the Plaintiffs to present their case.

The Church told the Court at the hearing on February 19, 2015, that it was not relying upon the CVB form because it did not apply to this case:

> THE COURT:  But they haven't filed this voucher thing
> yet.
>
> MR. POPE:  Bill of particulars?

THE COURT:  No, voucher.  Remember the witness yesterday told us that before you can get an arbitration, you have to submit this voucher thing.  And if you don't do that --

MR. POPE:  No, Your Honor, **that actually doesn't apply to persons who are declared**.  You mean the, what do you call it, **claims verification board [CVB].  That process does not apply to people who are declared.**

THE COURT:  So we can bypass that.

MR. POPE:  You bypass that.  You go straight to the international justice chief.  And first they pick an arbitrator, the church picks one, the two of them pick a third, and those people get together and form the process that is compatible with arbitration under the Committee of Evidence, interviewing -- it's an informal process, but it does result in a final report.

(DE196:88-89 Tr. 2/19/15).

As it turns out, nothing could be further from the truth.  At the beginning of the arbitration, the IJC told the Plaintiffs that the only issue to be arbitrated was whether they followed the right procedure for requesting a refund from the Church (Ex. 3 Garcia Aff. at 11, 13-14).  The only questions the arbitrators asked Mr. Garcia pertained to why he did not fill out the CVB form (Ex. 3 Garcia Aff. at 12-18).  The so-called findings of the arbitrators refer only to the Plaintiffs' failure to fill out the CVB form (Ex. 1 Arbitration Findings Form; Ex. 2 Arbitration Decision Form).

The Plaintiffs could not have filled out the CVB form because they had been declared suppressive persons (DE188-3:147-48, 151, Dep. Mike Ellis; Ex. 4 Garcia Declare Order).  The form has to be filled out on church property and once declared, the Plaintiffs were not permitted to go on Church property (DE188-3:147-48, 151; Ex. 4 Garcia Declare Order at 3).  This "Catch 22" makes it impossible for anyone declared suppressive to follow the CVB

procedure (*Id.*; Ex. 3 Garcia Aff. at 16 & Attached Ex. D Letter from Cara Golashesky, Flag Land Base Justice Chief, denying Janet Akpobome's request for return of donations 9/17/13). Thus, no refunds, ever.

The Defendants misled this Court. The Court specifically asked whether there was any sense to order arbitration if the Defendants were going to take the position that the failure to fill out that form was dispositive (DE196:88-89 Tr. 2/19/15). The Defendants responded that this Court should order arbitration because the form was inapplicable (*Id.*). Yet, that was the only matter the arbitrators considered (Ex. 3 Garcia Aff. at 11, 12-18). This was a fraud on the Court and should not be countenanced by confirming the arbitration awards.

The arbitrators' evidentiary rulings excluded all evidence critical of the Church and relevant to the Plaintiffs' claims for fraud, deceptive and unfair trade practices, and breach of contract. This deprived the Plaintiffs of a fundamentally fair hearing. *See*, *e.g.*, *Rosenweig v. Morgan Stanley & Co.*, 494 F.3d 1328, 1333 (11th Cir. 2007); *Tempo Shain Corp. v. Bertek, Inc.*, 120 F.3d 16, 20 (2d Cir. 1997); *Hoteles Condado Beach, La Concha & Conv. Ctr. v. Union De Tronquistas Local 901*, 763 F.2d 34, 40 (1st Cir. 1985). The decisions in *Tempo Shain* and *Hoteles*, which the Eleventh Circuit cited in *Rosenweig*, demonstrate that the arbitrators' misconduct in excluding evidence requires this Court to vacate the arbitration award.

In *Tempo Shain Corp.*, the arbitration panel refused to continue the proceedings to allow the testimony of a witness temporarily unavailable due to his wife's illness. 120 F.3d at 17-18. The decision reasoned, "although not required to hear all the evidence proffered by a party, an arbitrator 'must give each of the parties to the dispute an adequate opportunity to

present its evidence and argument.'" *Id.* at 20 (quoting *Hoteles*, 763 F.2d at 39). There was no reasonable basis for the panel's conclusion that the testimony would be cumulative because the unavailable witness handled the contract negotiations. No other witness could testify to support the fraudulent inducement claims. *Id.*

The same is true here. The misconduct of the arbitration panel in excluding all evidence critical of the Church left the Plaintiffs unable to present any evidence material and relevant to their claims for fraud, deceptive and unfair trade practices and breach of contract. The arbitrators' misconduct prejudiced the Plaintiffs and requires this Court to vacate the arbitration awards.

> **B.     The arbitration awards should be vacated because of the arbitrators' misconduct refusing the Plaintiffs' request to have counsel present, while allowing the Defendants' counsel to be present.**

This Court may vacate an arbitration award "where the arbitrators were guilty of **misconduct** . . . or of any other **misbehavior** by which the **rights of any party** have been **prejudiced**." 9 U.S.C. § 10(a)(3). At his deposition, the IJC Mike Ellis testified that while the Plaintiffs' counsel would not be permitted to take an active part in the proceedings, he would be able to be present to advise the Plaintiffs (DE188-4:194-95 Dep. of Mike Ellis). In this Court's Order denying the Plaintiffs' motion for miscellaneous relief, this Court relied on this testimony: "For example, Ellis has testified that an attorney may be present, but may not 'represent' the Plaintiffs" (DE 265 Order 10/16/17 at 3 n.3).

Shortly before the arbitration, the Church reversed its position, stating:

> The arbitration will be conducted in accordance with Church ecclesiastical justice procedures and **those procedures do not contemplate participation by an attorney.**

> The arbitrators will be instructed by the International Justice
> Chief on the application of Scientology principles to arbitrate
> this dispute in a neutral and fair manner.

(Ex. 5 at 2, E-mail to the Plaintiffs' counsel from Bob Potter, sent on behalf of F. Wallace

Pope, 10/10/17).  A week later, defense counsel reiterated that the Plaintiffs' counsel could not

participate in the arbitration:

> As we have stated repeatedly and as the court has just reiterated,
> the arbitration is an "ecclesiastical arbitration" and the conduct
> and procedures of the arbitration are within the control and
> discretion of the IJC in "accordance with Church ecclesiastical
> procedures [and] principles."  **It is not a matter to be
> negotiated with between the civil lawyers, who have no role
> to play at the arbitration**.  If Mr. Garcia has a question about
> the arbitration, he should address it to the IJC at that time.

(Ex. 5 at 4, E-mail to Plaintiffs' counsel from Bob Potter, sent on behalf of F. Wallace Pope,

10/18/17).  The Plaintiffs' counsel did not attend the arbitration because he was not allowed

(Ex. 3 Garcia Aff. at 10).

Attorney Gary Soter, who represented the IJC during his deposition, was present in the

building to advise the Church and the IJC during the arbitration.  The Defendants did not reveal

this, but Mr. Garcia, in an attempt to use his phone, found Mr. Gary Soter's iPhone in the

building broadcasting as a potential "hot spot" (Ex. 3 Garcia Aff. at 6-7, 10 & Attached Ex. B

Screen Shot).  When the IJC was confronted with this fact, he admitted that Mr. Soter was

there to advise the Church (*Id.* at 10).  It was fundamentally unfair to permit the Defendants to

have their lawyer present to advise them, but to deny the Plaintiffs a similar right to counsel

(*Id.*; Ex. 5 at 2-4, E-mails from the Church's counsel to the Plaintiffs' counsel 10/10/17 &

10/18/17).  The IJC refused to allow Mr. Garcia even the presence of an assistant to help him

read (Ex. 3 Garcia Aff. at 2-3).  Mr. Garcia needs assistance reading due to a medical condition

(*Id.* at 3 & Attached Ex. A letter from Mr. Garcia's doctor). This arbitration was a sham. The Church's misconduct prejudiced the Plaintiffs, requiring this Court to vacate the arbitration awards.

### C.   The arbitration awards should be vacated because the arbitration panel engaged in misconduct by failing to provide written findings.

On February 19, 2015, this Court specifically asked the Defendants what would be provided in the way of findings that this Court could review (DE196:87-89). This Court asked, "Will there be a record of the proceeding if I'm asked to review it" by either party? (DE196:87 Tr. 2/19/15). This Court asked for assurance there would "be some memorialization of whatever the arbitrators decide" and that the Court would "**get something in writing signed by these three arbitrators saying here are the facts, here's our conclusions, and we agree or disagree with the Garcias**." (*Id.* at 88). Defense counsel assured this Court that "a **report is written up** with a binding decision" (*Id.).* According to defense counsel, "There is a report that comes out of the process." (*Id.*) "[I]t does result in a final report and decision." (*Id.* at 89). As late as August 2017, defense counsel assured the Court, "they wind up producing a report." (DE255:9 Tr. 8/15/17).

Thus, the Court was under the impression there would be formal findings and conclusions for this Court to review and decide whether there was misconduct or inherent prejudice of the arbitrators. In fact, no such findings were rendered. To the contrary, the only documents are checklists prepared on October 23, 2017, the day before the arbitration began, and signed the day the arbitration ended, on October 24, 2017 (Ex. 1 Arbitration Findings Form; Ex. 2 Arbitration Decision Form). While the arbitration was set for October 23, nothing happened that day except for the Defendants' ex parte communications with the arbitrators,

which violated this Court's April 10, 2017, order (Ex. 3 Garcia Aff. at 2-10; DE238:3 Order 4/10/17).

Nothing in the checklists tells the Court anything about the testimony received or how the "findings" were determined. The Plaintiffs have no idea what the Defendants discussed with the arbitrators other than what was revealed in the conversation with the IJC, set forth in Mr. Garcia's affidavit (Ex. 3 Garcia Aff. at 2-10).

Defense counsel, in response to the Court at the February 19, 2015, hearing, agreed this Court has the right to review the arbitration proceedings when determining whether to vacate the arbitration award (DE196:87-89 Tr. 2/19/15). In order to ensure the ability to review a motion to vacate, this Court asked whether the arbitrators would make specific findings:

> THE COURT:   **Will there be a record of this proceeding** if I'm asked to review it by you on behalf of your client or Mr. Babbitt on behalf of his? What am I going to review?
>
> MR. POPE:  Well, as I understand the process, it is less formal than would be required under the Florida Arbitration Code. There are **-- the witnesses are interviewed, the facts are gathered from them over a period of time, documents are looked at**. In this case he's got a claim for fraud. **He comes in, he puts out, he brings whatever witnesses**, he **testifies himself or gets interviewed** on the subject, **and a report is written up** with a binding decision and that's what would come back to you as the court compelling the arbitration.
> THE COURT:  So you do contemplate that there would be some memorialization of whatever the arbitrators decide?
> . . . .
> **Am I going to get something in writing signed by these three arbitrators saying <u>here are the facts, here's our conclusions, and we agree or disagree with the Garcias?</u>**
>
> MR. POPE:  **That was the import of what Mr. Ellis**

18

said.  **There is a report that comes out of the process**.

(DE196:86-88 Tr. 2/19/15).  Mr.Pope reiterated, "[I]t **does result in a final report**." (*Id.* at

89).  None of this happened.

The Defendants assured this Court that the CVB form "doesn't apply to persons who

are declared" and would not be dispositive of the arbitration (DE196:88-89 Tr. 2/19/15;

DE188-3:147-48, 151 Dep. Mike Ellis).  Instead, the CVB provided the arbitrators with a 10-

page report that can only be described as highly prejudicial to the Plaintiffs' case (Ex. 3 Garcia

Aff. at 8-9, 15 & Attached Ex. E CVB report).  The CVB told the arbitration panel how to rule

for the Church: "There is no written evidence supporting the Garcias' claims that their

donations for building campaigns were made as a result of false promises" (Ex. 3 Garcia Aff.,

Attached Ex. E CVB report at 7; *see id.* at 9).  According to the CVB, "Policy is clear that if it

is not written it is not true" (*Id.* at 7 & 9).  The CVB concluded the Plaintiffs "failed to follow

the steps of dispute resolution set forth in the Enrollment Forms and failed to follow the full

procedures of the Claims Verification Board [CVB] with respect to their claims for refund or

repayment of donations for services, and therefore do not qualify for a refund" (*Id.* at 10).

Further, "Building donations and membership donations are not refundable." (*Id.*).

This Court rejected the Plaintiffs' request for a court reporter (DE265 Order 10/16/17).

The Plaintiffs believe the Court's decision was influenced, in part, by the Defendants'

representation that the arbitrators would prepare formal findings for this Court to review (*Id.*;

DE255:9 Tr. 8/15/17; DE196-86 Tr. 2/19/15).  At the August 15, 2017 hearing, the Defendants

reiterated that the arbitrators "wind up producing a report" (D255:9 Tr. 8/15/17).   The

Defendants' false representations fatally infected the Court's decision not to allow a court

reporter.  As a result, there is no record of the arbitration proceedings.  This misconduct, coupled with the lack of findings, warrants this Court vacating the arbitration awards.

> **D.    The arbitration awards must be vacated due to evident partiality of the arbitrators.**

This Court may vacate an arbitration award "where there was evident partiality or corruption in the arbitrators."  9 U.S.C. § 10(a)(2).  "This rule is meant to be applied stringently" because courts are "'even more scrupulous to safeguard the impartiality of arbitrators than judges, since the former have completely free rein to decide the law as well as the facts and are not subject to appellate review.'"  *Univ. Commons-Urbana, Ltd. v. Universal Constructors, Inc.*, 304 F.3d 1331, 1338 (11th Cir. 2002) (quoting *Commonwealth Coatings Corp. v. Cont'l Cas. Co.*, 393 U.S. 145, 149 (1968)).

Evident partiality is shown if "either (1) an actual conflict exists, or (2) the arbitrator knows of, but fails to disclose, information which would lead a reasonable person to believe that a potential conflict exists."  *Id.* at 1339.  In other words, "'evident partiality' within the meaning of 9 U.S.C. § 10 will be found where a reasonable person would have to conclude that an arbitrator was partial to one party to the arbitration."  *Morelite Constr. Corp. v. New York City Dist. Council Carpenters Benefit Funds*, 748 F.2d 79, 84 (2d Cir. 1984); *see Middlesex Mut. Ins. Co. v. Levine*, 675 F.2d 1197, 1200-02 (11th Cir. 1982) (affirming an order vacating an arbitration award where the arbitrator failed to disclose a substantial dispute with a party that resulted in a bar grievance against the arbitrator).  These questions are fact-intensive and require an evidentiary hearing upon a showing of a "mere appearance of bias or partiality."  *Univ. Commons-Urbana*, 304 F.3d at 1340-41 & 1345.  Based on Luis Garcia's affidavit and the evidence cited in this motion, this Court should, at a minimum, order an

evidentiary hearing on the Plaintiffs' motion to vacate.

The Court at the hearing on February 19, 2015, observed that if "one of the arbitrators has been bought off, paid off," then any Court would review the findings (DE196:87 Tr. 2/19/15).  While we cannot say that the arbitrators were bought off for money, they were certainly bought off by the Church's undue influence.  The arbitrators' evident partiality here requires this Court to vacate the arbitration award.

The partiality began at the outset of the arbitration when IJC Mike Ellis told the Plaintiffs that he was "hatting" the arbitration panel, a Scientology term for "training" them outside the Plaintiffs' presence (Ex. 3 Garcia Aff. at 4-5, 12).  Outside the Plaintiffs' presence, the IJC gave the arbitration panel numerous documents to review, including church policies, the complaint, and the 10-page report from the Claims Verification Board (CVB) (*Id.* & Attached Ex. E CVB report).  Before the arbitration, the Defendants had assured this Court that the CVB form would not be dispositive of the arbitration (DE196:88-89 Tr. 2/19/15; DE188-3:147-48, 151).  The CVB report read like an expert opinion of someone who had conducted an extensive investigation into the Plaintiffs and they could not respond (Ex. 3 Garcia Aff. at 8-9, 15 & Attached Ex. E CVB report).

The fact that the IJC had unfettered ex parte contact with the arbitration panel, to "hat" or train them and provide numerous documents, demonstrates the evident partiality of the arbitrators.  As discussed above, Plaintiffs had no opportunity to present evidence or their case to the arbitration panel (Ex. 3 Garcia Aff. at 4-5, 9-10, 13-15 & 17).  The Chairman of the arbitration panel, Peter Sokoloff, told the Plaintiffs that, once they were declared Suppressive Persons, they ceased to have any rights as a Scientologist (Ex. 3 Garcia Aff. at 16).  He told

the Plaintiffs their payments to the Church were charitable donations and, therefore, non-refundable (*Id.*).

At the end of the arbitration, Mr. Garcia protested that the IJC and arbitrators refused to allow the Plaintiffs to present any evidence, witnesses, or their own experiences because the arbitrators did not want to hear about "alleged fraud." (Ex. 3 Garcia Aff. at 17). Mr. Garcia explained in his affidavit:

> Chairman Sokoloff then exploded in a long platitude that lasted almost five minutes. He kept talking on and on without the slightest interruption by Mr. Ellis. Here are some things Mr. Sokoloff said:
>
> "I am the wrong guy to talk to about that. You don't know anything about me. **I am a big proponent of the Ideal Org program** and when you showed us that **flyer I know what it says is true. I know the numbers! I know the Truth!** We are making a better planet! For some stroke of luck the judge chose me out of a list of 500 people. And I know what is happening here: **there are a lot of SPs [Suppressive Persons] out there trying to destroy our church** and one of those SPs has fed you all these lies. **One of your compadres, Ned McCrink, sent me a bunch of sh\*t. I checked it out and it was sh\*t! It was sh\*t!** [I distinctly recall he said that word three times. I had no idea what he was referring to, and "Compadres" means friend in Spanish]. So don't you go telling me that I don't know what is going on because I do know! You have been sold a bill of goods! **What you should do is recant and atone, come back to the church and support it like before!"**

(Ex. 3 Garcia Aff. at 17-18). Chairman Sokoloff's statements demonstrate his evident partiality.

In their Amended Complaint, the Plaintiffs allege the Defendants used high-pressure, illegal sales tactics to fraudulently solicit large contributions from the Plaintiffs (DE114). The Plaintiffs brought several claims, including fraud, violations of the Deceptive and Unfair Trade

Practices Act, and breach of contract (*Id.*).  Before the arbitration began, Chairman Sokoloff

stated he was "**a big supporter of the Ideal Org program**" (Ex. 3 Garcia Aff. at 12).

Chairman Sokoloff's statements demonstrate his evident partiality.

The Defendants were not satisfied that they had three arbitrators who were inherently

prejudiced and at risk of their own immortal souls, livelihoods, friends and family by deciding

this case (DE188-4:199 Dep. Mike Ellis).  The statements the arbitrators themselves made

during the proceeding show the arbitrators had no ability to be fair and impartial and were

unquestionably prejudiced against the Plaintiffs before the arbitration ever started.  The

Defendants' conduct eliminated any semblance of a fair arbitration.  The Defendants made

sure that even devout Scientologists, who were inherently incapable of giving the Plaintiffs a

fair hearing, were made even more prejudiced against the Plaintiffs.  The arbitration was a

mockery that no judge should countenance.  This Court should vacate the arbitration award.

> ### E.    This Court should order a trial on the merits because the arbitration was procedurally and substantively unconscionable.

This Court should order a trial on the Plaintiffs' claims instead of ordering arbitration

before a new panel.  Plaintiffs opposed the Church's motion to compel arbitration as both

procedurally and substantively unconscionable (DE30 Pls. Resp. Opposing Arbitration;

DE170 Pls. Trial Brief; DE191 Pls. Mot. for Reconsideration).  The Plaintiffs argued that an

arbitration before three Scientologists in "good standing" could never be a fair proceeding

because the Church had declared the Plaintiffs to be "Suppressive" persons (Ex. 4 Garcia

Declare Order; DE30; DE170; DE191).

The events during the arbitration proved the Plaintiffs correct.  The arbitration was both

procedurally and substantively unconscionable.  For the reasons discussed in this motion and

the Plaintiffs' motions opposing arbitration, the arbitration was unconscionable and fundamentally flawed.  This Court should grant the Plaintiffs' motion to vacate the arbitration awards and order a trial on the merits of the claims in the Plaintiffs' lawsuit.

Theodore Babbitt, counsel for the Plaintiffs, certifies that he has conferred with the Church's counsel, F. Wallace Pope, and counsel for the parties cannot agree on the resolution of this Motion to Vacate the Arbitration Award.

DATED:  This 23rd day of January, 2018.

Respectfully submitted,

By: /s/ *Theodore Babbitt*
Theodore Babbitt
Fla. Bar No:  091146
Babbitt & Johnson, P.A.
1641 Worthington Road, Suite 100 (33409)
P. O. Box 4426
West Palm Beach, FL  33402-4426
T:  (561) 684-2500; F: 561-684-6308
tedbabbitt@babbitt-johnson.com
        -and-
Jane Kreusler-Walsh
Fla. Bar No:  272371
Rebecca Mercier Vargas
Fla. Bar No:   0150037
Kreusler-Walsh Vargas & Serafin, P.A.
501 South Flagler Drive, Suite 503
West Palm Beach, FL  33401-5913
T:  (561) 659-5455; F:  (561) 820-8762
Primary:        janewalsh@kwvsappeals.com
                rvargas@kwvsappeals.com
Secondary:      eservice@kwvsappeals.com
        -and-

Ronald Weil
Fla. Bar No: 169966
Weil Law Firm, P.A. Southwest Financial
Center, Suite 900
200 South Biscayne Blvd.
Miami, FL 33131
T: (305) 372-5352; F: (305) 372-5355
rweil@weillawfirm.net

## CERTIFICATE OF SERVICE

We hereby certify that, on January 23rd, 2018, we electronically filed the foregoing document with the Clerk of the Court using CM/ECF. We also certify that the foregoing document is being served this day on all counsel or pro se parties identified below in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filings.

By: /s/ Theodore Babbitt
Theodore Babbitt, Esq.
Florida Bar No: 091146

F. Wallace Pope, Jr., Esq.
FBN: 124449
Robert Vernon Potter, Esq.
FBN: 363006
Johnson Pope Bokor Ruppel & Burns, LLP
911 Chestnut Street
Clearwater, FL 33757
Phone: (727) 461-1818
Fax: (727) 462-0365
E-mail: wallyp@jpfirm.com
        bobp@jpfirm.com
Counsel for Flag Church & Ship Church

Eric M. Lieberman
NYBN: 105543
Rabinowitz, Boudin, Standard, Krinsky &
Liberman, P.C.
45 Broadway, Suite 1700
New York, NY 10006
Phone: (212) 254-1111
Fax: (212) 674-4614
E-mail: elieberman@rbskl.com
Counsel for Flag Church & Ship Church

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

LUIS A. GARCIA SAZ, and wife, MARIA
DEL ROCIO BURGOS GARCIA,

       Plaintiffs,

vs.                              CASE NO. 8:13-CV-220-T-27TBM

CHURCH OF SCIENTOLOGY FLAG
SERVICE ORGANIZATION, INC.,
CHURCH OF SCIENTOLOGY FLAG
SHIP SERVICE ORGANIZATION, INC.

       Defendants.

_____/

## DEFENDANTS' OPPOSITION TO MOTION TO VACATE ARBITRATION AWARDS

### INTRODUCTION

Much of what the plaintiffs present in their account of the arbitration proceedings is inaccurate and misleading, as set forth below in the Account of Arbitration Proceedings. Even more importantly, the plaintiffs' attempts to entangle the court in a review of the facts and circumstances of a religious arbitration to which the plaintiffs agreed is doomed to failure. As the court recently explained in denying plaintiffs' prior "Motion for Miscellaneous Relief":

> By joining Scientology, Plaintiffs consented to its governing structures, policies, and doctrines and bound themselves to submit to its rules. Specifically, they agreed to arbitrate their dispute "in accordance with the arbitration procedures of Church of Scientology International." … [T]he Church has advised Plaintiffs … that "[t]he conduct of the religious arbitration will be decided by the IJC at the appropriate time during the arbitration, that arbitration will be conducted in accordance with Church ecclesiastical justice procedures," and that "[t]he arbitrators will be instructed by the [IJC] on the application of Scientology principles to arbitrate this dispute in a neutral and fair manner."
>
> While Plaintiffs may disagree with the IJC's determination of how arbitration will be conducted, the Free Exercise Clause prohibits this Court from resolving internal disputes concerning the interpretation or application of religious doctrine. *See, e.g.,*

1

> *Watson v. Jones*, 80 U.S. (l3Wall.) 679, 727 (whenever questions of "ecclesiastical rule, custom or law have been decided by the highest ... church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them"). As the Supreme Court has instructed, "[c]onstitutional concepts of due process, involving secular notions of 'fundamental fairness' or impermissible objectives, are . . . hardly relevant to such matters of ecclesiastical cognizance." *Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S.696, 715 (1976).

Order of October 16, 2017 (internal docket references omitted).

## ACCOUNT OF ARBITRATION PROCEEDINGS

### I.   What Really Happened

1.       The Garcias submitted claims for arbitration to the IJC not only against the only defendants named in their Amended Complaint, Church of Scientology Flag Service Organization ("FSO") and Church of Scientology Flag Ship Service Organization ("FSSO"), but also against the parties they had sued in their original Complaint, but then dropped from their Amended Complaint to avoid dismissal: Church of Scientology Religious Trust ("CSRT"), IAS Administrations ("IASA") and U.S. IAS Members' Trust ("USIMT"). Plaintiffs emphasized to the IJC that their claims against both current and former defendants "are as set forth in the **original** complaint." (Exhibit A, Ellis Dec.,[1] Sub-Ex. 1.) In addition, the Garcias requested arbitration of claims against a separate entity never named in and not part of the instant case, the Church of Scientology of Orange County, California.[2] (See Ex. A(1).) Since the Garcias are permitted under church law to seek arbitration of any dispute, the IJC and the arbitrators addressed the latter claims as a matter of

---

[1] Mr. Ellis has submitted a declaration (Ex. A) authenticating several specific documents, designated as Sub-Exhibits. References to the Sub-Exhibits hereinafter shall be as "Ex. A(_)."

[2] Plaintiffs made claims for (a) return of a $10,000 donation in contemplation of future religious services; (b) return of a donation of $510,000 for a building fund for the acquisition and restoration of a new church facility in Orange County, called an "Ideal Org," which opened on June 2, 2012. The latter claim was based on alleged false predictions that, based on similar history with other "Ideal Orgs," the new church would experience significant growth in the future.

internal Scientology justice and law, but those claims were separate and distinct from and not part of the instant case.[3]

2.      The arbitration commenced as scheduled and at the designated time and place on October 23, 2017. The Garcias brought with them Pauline Lombard, a vocal public critic of the Church, who was not permitted to enter the property. Mr. Garcia asked the IJC to permit Ms. Lombard to attend to help him read documents, stating that he had a vision problem.[4]  (Garcia Affidavit at Doc. 272-3, p.2, l.19 - 3, l. 19.) The IJC declined but made clear that the Church would provide someone to help him read or present materials. (*Id.* at 3, ll.18-19).  See also Exhibit C, internet posting of Luis Garcia. The Garcias never asked for such assistance.

3.      No attorney accompanied the Garcias. The Garcias claim that their attorney was excluded. That is false. Mr. Babbitt never showed up. In the IJC's earlier testimony, the court noted in its October 16, 2017 Order[5], the Church parties made clear that Mr. Babbitt was free to attend and could consult with his client, but that, according to Church ecclesiastical procedures, he would not be able to perform functions at the arbitration itself. Had he attended, Mr. Babbitt could have advised his client, helped him review evidence, or communicated with him privately in whatever manner desired.

---

[3] It is significant that the Garcias stated that their claims are based on their original complaint, which named as defendants several organizations which destroyed diversity jurisdiction. Likewise, any claim against the Church of Scientology of Orange County destroys jurisdiction. By doing so, the Garcias effectively conceded that the amended complaint was filed solely to avoid dismissal for lack of subject matter jurisdiction and is based on pretextual allegations. Indeed, the court may consider again whether to dismiss the entire action for lack of subject matter jurisdiction.

[4] We note that in his affidavit in support of the instant motion, Mr. Garcia states that "I could not understand how the arbitrators could take so long in reading, or 'studying' as Mr. Ellis said, just 28 pages of policies.  I read them all in about 20 minutes." Garcia Affidavit at 6, ll. 18-20. See also para 4, *post* at 4, showing that the arbitrators had far more to read and incorporate than merely reading the policies.

[5] "For example, Ellis has testified that an attorney may be present, but may not 'represent' the plaintiffs (Ellis Dep. at 15:24-16:9)." Dkt. 265 at 3, n.4.

4.      On the first day of the arbitration, the IJC provided the arbitrators with written instructions setting forth the nature of the proceedings.  The instructions stated in bold letters, "**You are to conduct this arbitration in a fair and neutral manner, notwithstanding the Garcias have been declared**." (Ex. A(3) at 2, original bold).  The IJC also provided the arbitrators (and the Garcias) with relevant Scientology written religious justice policies, a copy of the Garcias' Statement of Claims, including their original complaint in this action, and copies of the enrollment agreements signed by the Garcias. The arbitrators had a lot to study as they had never read the Garcias' request for arbitration or the Garcias' complaint (attached to the request for arbitration), nor had they studied the Church policies governing Scientology ecclesiastical justice procedures to be applied to the arbitration.

Later that day the IJC provided both the arbitrators and the Garcias with a letter from the Claims Verification Board (Ex. A(2)) which was the response by the church parties to the Garcias' claims.  (Ex. A, paras. 6,7,8.)[6]

5.      The Garcias presented the IJC with 54 documents, totaling 268 pages, that they wished to introduce.[7] The IJC "went through each of these documents carefully and determined,

---

[6] The CVB letter specifically stated that its purpose was to set forth the "CVB position" with respect to plaintiffs' claims. *Id.* at 6. The letter set forth the religious policies governing return of donations, and examined whether evidence supported the Garcias' claims.  It included a statement by Luis Garcia acknowledging that at the very time the Garcias made a donation of $350,000 to the Orange County Church for building the "Ideal Org" church building, which the Garcias claim was induced by false representations from unspecified persons, Mr. Garcia actually held the position of "Fundraising in Charge" for that very project (*id.*).

[7] A dispute arose when the IJC stated he would exclude the use of irrelevant "entheta."  In their motion, the Garcias assert that "entheta" is a Scientology term that means anything critical of the Church, and that the IJC excluded all their evidence under that rubric.  They are wrong on both counts.  First, as Mr. Garcia conceded in an internet post immediately after the arbitration, the term has a broader and more nuanced meaning, to wit, in Mr. Garcia's words, "irrational or confusing or destructive thought." (Ex. C, internet posting of Mr. Garcia following the arbitration, October 24, 2017.) In the context of an arbitration, that definition is similar to the legal concepts of irrelevance, incompetence, immateriality, and likely to be misleading and unduly prejudicial.  Second, the IJC did not exclude a single piece of evidence exclusively on the basis that it was "entheta"; rather the only two items deemed entheta were also found to be irrelevant or hearsay. (Ex. A(4)(Nos. 28, 58), a Religious Arbitration Exhibit Form, on which the IJC

4

in accordance with Scientology Justice Procedures, whether each exhibit should be allowed or disallowed." (Ex. A, para. 9.)  In doing so, the IJC prepared a document showing each exhibit offered by the churches and by the Garcias, a brief description of the exhibit, whether it was allowed or not and the grounds for disallowance. (Ex. A(4).)  The exhibits he "excluded were things like newspaper articles and internet postings having nothing to do with the Garcias' claims, incomplete documents, and Church policies with notations by Mr. Garcia.  [He] admitted 22 of the exhibits proposed by the Garcias and provided them to the arbitrators." (Ex. A  para. 9.)  Garcia also sought to introduce certain irrelevant church religious policies, and several policies – including the governing policy letter SPD 13 March 1996 RETURN OF DONATIONS, which had already been provided to the arbitrators in its original form – with his own annotations on them attacking them as not genuine ("squirrel," a Scientology term denoting something not in keeping with Church doctrine) or unauthorized or as departures from doctrine. (Ex. A(5).) [8]

6.     Not a single document, whether allowed or rejected, pertained in the slightest manner to the Garcias' claim that they were defrauded into making contributions to the International Association of Scientologists for humanitarian causes. Plaintiffs do not argue or claim otherwise in their motion. And no document provided evidence supporting the Garcias' claims that over a period of several years they were defrauded into making contributions to the Church parties to build the Flag Building (also called the Super Power building) in Clearwater,

---

described each exhibit offered by both sides, whether allowed or not, and the grounds of disallowance, if applicable.) We note that in his motion to vacate, Garcia does not raise an issue about the exclusion of those two exhibits.

[8]  The intended purpose of these altered documents was to support Garcia's argument that governing church law and policy was not what the Church said it was, but what he said it was. The IJC excluded them because it was his function to instruct the arbitrators what church policy and law are, which he had done, as well as provided plaintiffs with both the instructions and the policies.

Florida and that the contributions were misused for other purposes. Once again, plaintiffs have submitted no argument or evidence to the contrary here.

7.      In their motion, the Garcias assert that they asked the IJC when they could present witnesses. (Garcia Affidavit at 3.)  They do not claim, nor could they, that they brought witnesses either day of the arbitration, and to this day have identified no one whom they wished to call. The Garcias were invited to submit any evidence, subject to admissibility, and could have submitted written statements or declarations from witnesses. (Ex. A, paras. 12, 16.) If the arbitrators wished they could have asked to question the authors of such statements.

8.      By the end of the first day, the IJC had spent about an hour in the presence of the arbitrators and a similar amount of time in the presence of the Garcias. (Ex. A, para. 11.)

9.      On the second day, the arbitrators met with the Garcias. The IJC attended and briefed everyone on the procedure. (Ex. A, para 12).  "The arbitrators asked questions of the Garcias in accordance with Scientology justice procedures which included asking the Garcias at the conclusion of the questioning if they had anything else they wished to say or present.  They did not do so." *Id.*  In not doing so, the Garcias failed to provide any support for their claims that they had made contributions to the International Association of Scientologists ("IAS") based on promises that the donations would be used for certain humanitarian purposes and that those promises were false and not fulfilled.  Likewise, at no time during their appearance before the arbitrators did the Garcias make *any* mention of their claims that over a period of several years they had made donations to the Super Power project to build the Flag Building in Clearwater based upon allegedly false promises that the money was needed to complete the project, and that it was diverted to other uses. Finally, at no time did the Garcias make any attempt to show that, under

relevant and applicable Church policy, they were entitled to a return of any donations they had made to defendants FSO or FSSO in contemplation of future participation in religious services.

10.    The Garcias said they were not going to stay while the arbitrators made their findings. Mr. Garcia said they were leaving and asked to have the findings mailed to them. (Ex. A, para. 13.)

11.    The IJC presented the arbitrators with two documents (Ex. A, para. 14): (1) a Religious Arbitration Findings Form, which allowed the arbitrators to address and make findings with respect to the relevant questions to be decided at the arbitration. The form is similar to interrogatory verdict forms used by juries in state and federal litigation (Ex. A(6)); (2) a Religious Arbitration Decision Form, which allowed the arbitrators to deliver a decision with respect to each of the specific claims set forth by the Garcias in the arbitration. (Ex. A(7).) The arbitrators proceeded to complete the forms and render their decision accordingly.

12.    With respect to the Garcias' claims for return of donations in contemplation of religious services to FSO and FSSO, the arbitrators found that the Garcias had signed the requisite enrollment forms; had agreed to the application of Scientology Policy Directive of 13 March 1996, RETURN OF DONATIONS; had agreed that the enrollment forms required strict compliance with published religious policies and that determination of whether to permit a return of donation was "exclusively within the ecclesiastical authority and sole discretion of the Claims Verification Board"; and had agreed to use only ecclesiastical justice procedures to resolve any dispute with any Church of Scientology. They further found that the Garcias had not made a request for return of donations to the CVB within three months following their last religious service; had sought a return of donations only after their public resignation and departure from Scientology; did not complete the CVB routing form; did not otherwise attempt to resolve their disputes by invoking

Scientology internal ethics and justice procedures including submitting a request to the IJC, as required under paragraph 6(d) of the enrollment agreement; and involved third parties and attorneys in their attempts to obtain a return of donations.[9]

With respect to the Garcias claims for return of donations to the IAS and the USIMT for support of humanitarian projects, and also with respect to the Garcias' claims for return of donations to CSRT in support of the Super Power Building Project, the arbitrators found that the Garcias had signed donation forms and other documents stating that such donations were not refundable; had not submitted written evidence in support of their allegations; did not attempt to resolve their disputes by invoking Scientology internal ethics and justice procedures including submitting a request to the IJC, as required under paragraph 6(d) of the enrollment agreement; and that the Garcias' allegations that they were misled by fundraisers were not credible.[10]

It is highly significant that in their current motion to vacate, the Garcias make no argument and point to no evidence showing that any of the arbitrators' findings were erroneous.

13.     On the Religious Arbitration Decision Form, the arbitrators found that the Garcias were not entitled to return of any of their donations, but were entitled to a return of $18,495.36 for payments for unused accommodations at facilities at FSO and FSSO.

---

[9] While not part of this case, the arbitrators made similar findings with respect to the Garcias' claims for return of donations of $10,000 they had made to the Church of Scientology of Orange County with respect to future religious services.

[10] While not part of this case, the arbitrators made similar findings with respect to the Garcias' claims for return of donations they had made to the Church of Scientology of Orange County for building of the new church known as the "Ideal Org."

II.     **What Did Not Happen**

Many statements in the Motion and Garcia affidavit are false and misleading, as shown in the above discussion. Given the limited scope of review and reasonable page limitations, defendants highlight just a few of the most significant here.

1.     The arbitrators "refus[ed] to hear any evidence critical of the Church." Motion at 2, no. 2.  False.  The arbitrators reviewed written evidence critical of the Church where relevant, including the Garcias' original complaint and request for arbitration;  substantial portions of a document prepared by the Garcias entitled "Detailed Timeline"; a letter from Lynne Hoverson and Bert Schippers critical of the CSRT's fundraising for the Super Power building; a Policy Letter from 1977 upon which Garcia wrote comments intended to show that the Church's reliance on Scientology Policy Directives was a departure from doctrine; letters from Church officials denying refunds to others; a multi-page document containing email correspondence between Luis Garcia and Church officials containing extremely critical and uncomplimentary comments from Garcia; letters from Luis Garcia to FSSO critical of its refusal to refund his donations and threatening legal action; and another timeline critical of the church's fundraising for the Super Power project. (Ex. A(4), Nos. 1, 8, 31, 44-56, 59-61.) The plaintiffs made no effort to offer oral evidence or statements to the arbitrators, despite repeatedly being asked if they wished to do so.

2.     The arbitrators "refused to allow the Plaintiffs to present any evidence or witnesses at all." Motion at 2, no. 4.  False. Plaintiffs offered 54 documents into evidence; 22 were admitted. The remainder were rejected on grounds of relevance, competence, or hearsay. (Ex. A(4).) Plaintiffs neither identified nor brought prospective witnesses to the arbitration. As noted, plaintiffs did not offer oral evidence or statements to the arbitrators, despite repeatedly being asked if they wished to do so. (Ex. A, paras. 12, 16.)  In particular, the plaintiffs offered no evidence in

9

support of their claims that they were fraudulently induced to make donations to the IASA for humanitarian projects or to make donations to CSRT to support construction of the Super Power Flag building in Clearwater. Nor did they offer evidence as to why they were entitled, under the governing Scientology religious policy as set forth in the enrollment agreements and the Scientology Policy Directive of 13 March 1996 RETURN OF DONATIONS, to return of their donations to FSO or FSSO in contemplation of future religious services. That policy specifies that a return of donations was rare, was to be granted only in specific and unusual circumstances, requires strict compliance with certain rules and procedures, and was entirely a matter of ecclesiastical discretion. Instead, the Garcias attempted to argue that those policy directives were illegitimate and a departure from Church doctrine. (*See* Ex. A(5).)

3.      "The IJC and arbitrators refused to consider the plaintiffs' fraud claims and the issues raised in the lawsuit." Motion at 3, no. 5. False. As noted, the Garcias did not seek to introduce evidence supporting their fraud claims, relating to donations they made to the IAS or Super Power project. The "fraud" claims they tried to argue were that the entire Church and religion is a fraud and a deception; it was those efforts that were rejected by the IJC and the arbitrators as irrelevant and hearsay.

4.      "The panel engaged in misconduct by allowing the IJC to have ex parte contact with the arbitration panel and present evidence outside the Plaintiffs' presence." Motion at 4, no. 10.  False and misleading. The IJC met separately with the arbitrators and with the Garcias for short periods, pursuant to Scientology justice procedures. He instructed the arbitrators as to the procedures and the nature of the dispute. He presented to the arbitrators the written claims of the Garcias and the written response of the Church. He provided the arbitrators with the governing religious policies, and with those of the Garcias' documents that he found to be admissible. He did

not present any evidence of his own; he only forwarded to them the evidence presented by the parties.

5.     The arbitration panel did not refuse to allow Mr. Babbitt to attend the arbitration. Mr. Babbitt never showed up, despite the opportunity to do so to consult with his client. Gary Soter, a Church attorney, played no role in the arbitration and never spoke to the arbitrators. He was there in case legal questions were raised by Mr. Babbitt in anticipation that he would attend the arbitration. See Declaration of Gary Soter (Ex. B.)

6.     Plaintiffs assert, "That did not happen," referring to the IJC's statements that he would instruct the arbitrators to be fair and neutral. False; the IJC provided written and oral instructions precisely stating that. (Ex. A, para. 8 and Ex. A(2).) Moreover, the IJC did not "train" the arbitrators. He spent no more than an hour with them over the total of the two days, and merely instructed them as to their role, the dispute, and the procedures and provided them with applicable written religious policy. (Ex. A, paras. 11, 12.)

7.     "The defendants spent an entire day with the arbitrators without the Plaintiffs." Motion at 8.  False. The IJC was the only church official to meet with the arbitrators, for periods totaling about an hour over two days. He did not discuss with them the merits of the dispute, but only provided them with the necessary information to make the arbitration proceed. (Ex. A.)

8.     The CVB told the arbitration panel how to rule.  Motion at 9.  False. The CVB letter was the churches' response to the claims and allegations of the Garcias. It properly described the ecclesiastical policy that applies, a question that is solely within the Church's authority and not a matter for internal debate, and argued that the Garcias did not qualify for return of any of their donations. The arbitrators were instructed to decide those issues themselves, and were free to come

11

to whatever decision they thought appropriate. (Ex. A(3).)  Indeed, the arbitrators awarded the Garcias a return of over $18,000 in payments they had made for accommodations, despite the CVB's argument that they be awarded nothing.

9.     Plaintiffs had "no opportunity to respond to" the letter and exhibits from the CVB setting forth the churches' position on the Garcias' claims. Mot. at 6. False. Plaintiffs could have responded when repeatedly asked by the arbitrators if they wished to be heard further.

**ARGUMENT**

As this court repeatedly has emphasized, this was a religious arbitration to which the plaintiffs agreed in writing numerous times over the course of their experiences in Scientology. The role of a civil court in reviewing such an arbitration is extremely limited.

Indeed, even in a secular context, the scope of judicial review of arbitration proceedings and determinations is "among the narrowest known to law," *Dominion Video Satellite, Inc. v. Echostar Satellite LLC,* 430 F.3d 1269, 1275 (10th Cir. 2005), precisely to further the purposes of the Federal Arbitration Act.[11] As the Supreme Court explained:

> Under the FAA, courts may vacate an arbitrator's decision "only in very unusual circumstances." *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 942. That limited judicial review, we have explained, "maintain[s] arbitration's essential virtue of resolving disputes straightaway." *Hall Street Associates, L.L.C. v. Mattel, Inc.,* 552 U.S. 576, 588 (2008). If parties could take "full-bore legal and evidentiary appeals," arbitration would become "merely a prelude to a more cumbersome and time-consuming judicial review process." *Ibid.*

---

[11] See *Ultracashmere House, Ltd. v. Meyer,* 664 F.2d 1176, 1179 (11th Cir.1981)("[t]he purpose of the Federal Arbitration Act was to relieve congestion in the courts and to provide parties with an alternative method for dispute resolution that would be speedier and less costly than litigation").

*Oxford Health Plans LLC v. Sutter,* 569 U.S. 564 (2013).  See also *id.* at 572-73 ("All we say is that convincing a court of an arbitrator's error—even his grave error—is not enough. . . . The potential for those mistakes is the price of agreeing to arbitration.")

Thus, a court may not vacate an arbitration decision because the arbitrators did not issue an opinion explaining their reasons:

> The arbitrators' decision fails to provide any explanation for their conclusion that O.R. is liable to PPA. It is well-settled, however, that arbitrators are not required to explain their reasons for an award. "[T]o allow a court to conclude that it may substitute its own judgment for the arbitrator's whenever the arbitrator chooses not to explain the award would improperly subvert the proper functioning of the arbitral process...."

*O.R. Securities, Inc. v. Professional Planning Associates, Inc.,* 857 F.2d 742, 747 (11th Cir. 1988).

*O.R. Securities* further observed that "Courts have repeatedly condemned efforts to depose members of an arbitration panel to impeach or clarify their awards." *Id.* Likewise, a court may not engage in a review of the factual record to determine if the arbitration panel erred:

> A federal court may not conduct a reassessment of the evidentiary record, as did the district court here, upon the principle that an arbitral award may be vacated when it runs contrary to strong evidence favoring the party bringing the motion to vacate the award. Instead, whatever the weight of the evidence considered as a whole, if a ground for the arbitrator's decision can be inferred from the facts of the case, the award should be confirmed. Only this approach to the evidentiary record is consistent with the great deference which must be paid to arbitral panels by federal courts.

*Wallace v. Buttar,* 378 F.3d 182, 193 (2d Cir. 2004)(internal quotations and citations omitted).

And even in a secular context, a court will not look beyond the choices made by the parties to determine whether the arbitrators were partial:

> [T]he "parties to an arbitration choose their method of dispute resolution, and can ask no more impartiality than inheres in the method they have chosen." *Delta Mine Holding Co. v. AFC Coal Properties,* 280 F.3d 815, 821 (8th Cir. 2001). "[W]here the parties have expressly agreed to select partial party arbitrators, the award should be confirmed unless the objecting party proves that the arbitrator's partiality prejudicially affected the award." *Id.*

*Winfrey v. Simmons Food, Inc.,* 495 F.3d 549, 551 (8th Cir. 2007). *Accord, National Football League Management Council v. National Football League Players Ass'n,* 820 F.3d 527, 548 (2d Cir. 2016)(Tom Brady Deflategate Case). And the standard for finding partiality of an arbitrator based on his conduct at an arbitration is extremely high, and cannot be met here. *See McCabe, Hannity & Remington, Co. v. ILWU,* 557 F.Supp. 1171, 1182 (D.Hawaii 2008) (Arbitrator expressed sympathy with one party's situation (stating that he should have received a "hero's welcome") and stated that the parties were receiving a judgment "with a vengeance!" Held: "The Arbitrator's expressions of sympathy and anger are an insufficient basis for vacating his award"); *Spector v. Torenberg,* 852 F. Supp. 201 (S.D.N.Y. 1994)("An arbitrator is not precluded from developing views regarding the merits of a dispute early in the proceedings, and an award will not be vacated because he expresses those views. In addition, what petitioners characterize as the coaching of witnesses, this Court views as in keeping with the relative informality of arbitral proceedings").

Whatever limited scope of review applies in the context of secular arbitration is virtually eliminated when the issue concerns religious arbitration. *Lang v. Levi,* 16 A.3d 980, 989 (Md. Ct. Spec. App. 2011)**("The standard for vacating an arbitrator's decision is a narrow standard to begin with. The addition of the religious context further narrows the standard to make our intervention nearly impossible**")(emphasis added). As this court recognized in its October 16 Order, under the cases of *Watson v. Jones* and *Serbian Eastern*, "the First and Fourteenth Amendments mandate that civil courts shall not disturb the decisions of the highest ecclesiastical tribunal within a church of hierarchical polity, but must accept such decisions as binding on them, in their application to the religious issues of doctrine or polity before them." *Serbian*, 426 U.S. at 709.

Indeed, courts must accept decisions of religious tribunals even if arbitrary: "We have concluded that no 'arbitrariness' exception -- in the sense of an inquiry whether the decisions of the highest ecclesiastical tribunal of a hierarchical church complied with church laws and regulations -- is consistent with the constitutional mandate that civil courts are bound to accept the decisions of the highest judicatories of a religious organization of hierarchical polity on matters of discipline, faith, internal organization, or ecclesiastical rule, custom, or law." Rather, "it is the essence of religious faith that ecclesiastical decisions are reached and are to be accepted as matters of faith, whether or not rational or measurable by objective criteria. Constitutional concepts of due process, involving secular notions of 'fundamental fairness' or impermissible objectives, are therefore hardly relevant to such matters of ecclesiastical cognizance." *Id.*

While the question of judicial review of religious arbitrations has not often arisen, no doubt because of the clear doctrinal authority disapproving substantive or procedural review, the few decisions extant have scrupulously applied the limitations of the *Watson/Serbian* line of cases. *See, e.g.*, *Berg v. Berg,* 2008 WL 415562 at *9 (N.Y. Sup.Ct. 2008)(First Amendment precludes court from "deciding whether religious law has been violated"); *Lang v. Levi,* 16 A.3d at 985 (court "cannot delve into whether under Jewish law there is legal support" for arbitrator's decision); *Lieberman v. Lieberman,* 149 Misc.2d 983, 987 (N.Y. Kings Cty.1991)(rejecting motion to vacate on ground that wife was coerced to participate by threat of a "Sirov," a religious decree "that subjects the recipient to shame, scorn, ridicule, and public ostracism by … religious community. While the threat of a Sirov may constitute pressure, it cannot be said to constitute duress"); *American Union of Baptists, Inc. v. Trustees of Particular Primitive Baptist Church,* 335 Md. 564, 578 (1994)("This dispute cannot be resolved ... without inquiries into the religious doctrine and

custom of the Primitive Baptist faith. The constitution will not permit such inquiries, and we will therefore not review the award of the arbitrators in the instant case").

Whether through the lens of the limited review of secular arbitrations, or properly viewed through the lens of the constitutional principles enunciated by the Supreme Court, none of the grounds propounded by plaintiffs justify vacatur of the determination of the arbitration panel.

Nor have plaintiffs provided support for their request that the court vacate its Order compelling arbitration, a request they have made numerous times. They have not presented new law that requires reconsideration. The only "new facts" presented relate to their misleading, incomplete and incorrect account of the arbitration hearing itself. Section 10(b) of the FAA provides that if an award is vacated, the court "may, in its discretion, direct a rehearing by the arbitrators." While neither necessary nor appropriate here, that is the only remedy the statute authorizes upon vacation of an arbitration award.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on February 20, 2018, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following: THEODORE BABBITT, ESQUIRE, tedbabbitt@babbitt-johnson.com, and other counsel of record.

> JOHNSON, POPE, BOKOR, RUPPEL & BURNS, LLP
> /s/ F. Wallace Pope, Jr.
> F. Wallace Pope, Jr.
> Florida Bar No. 124449
> wallyp@jpfirm.com
>
> Robert V. Potter
> Florida Bar No.  363006
> bobp@jpfirm.com
> Post Office Box 1368
> Clearwater, Florida 33757
> (727) 461-1818; (727) 462-0365-fax
>
> Eric M. Lieberman
> Rabinowitz, Boudin, Standard,
>    Krinsky & Lieberman, P.C.
> 61 Broadway, 18th floor
> New York, NY 10006
> elieberman@rbskl.com
>
> *Attorneys for Church of Scientology Flag Service Organization, Inc. and Church of Scientology Flag Ship Service Organization, Inc.*

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

**MARIA DEL ROCIO BURGOS GARCIA,**
**and LUIS A. GARCIA SAZ,**

Plaintiffs,

vs.                                                     **Case No. 8:13-cv-220-T-27TBM**

**CHURCH OF SCIENTOLOGY FLAG**
**SERVICE ORGANIZATION, INC.,**
**CHURCH OF SCIENTOLOGY FLAG**
**SHIP SERVICE ORGANIZATION, INC.,**

Defendants.
_____/

## ORDER

**BEFORE THE COURT** are Plaintiffs' Amended Motion to Vacate Arbitration Awards

(Dkt. 272) and Defendants' response (Dkt. 275). Upon consideration, Plaintiffs' Motion is DENIED.

Ecclesiastical arbitration of the Garcias' claims for fraud, breach of contract, and violations

of the Deceptive and Unfair Trade Practices Act took place on October 23 and 24, 2017 before a

panel of three Scientologists in good standing.[1] On the first day, the International Justice Chief

("IJC") provided the arbitrators with written instructions (Dkt. 275-3), Scientology policies on justice

procedures, a copy of the Garcias' statement of claims and complaint (Dkt. 275-2), the letter from

the Claims Verification Board ("CVB") denying the Garcias' claims for refunds of payments for

services and a return of donations (Dkt. 275-2), and copies of the enrollment agreements signed by

---

[1] Specifically, the Garcias claimed that the Church solicited contributions from them for purposes that were never fulfilled and failed to repay deposits for services that were never provided and for accommodations that were never used. (*See* Amended Complaint, Dkt. 114).

1

the Garcias. (Declaration of Mike Ellis, Dkt. 275-1 at ¶¶ 6-8).

The instructions listed the Garcias' claims as follows:

I.    Returns of advance donations (repayment) for services and payments for accommodations, as follows:

    A.    $37,413.56 from the Church of Scientology Flag Service Org (FSO) for services and religious retreat accommodations the Garcias did not avail themselves of.

    B.    $31,445.45 from the Church of Scientology Flag Ship Service Org (FSSO) for services and religious retreat accommodations the Garcias did not avail themselves of.

    C.    $10,000 from the Church of Scientology of Orange County (Orange County Org) for donations for services the Garcias did not avail themselves of.

II.   $40,410 from the International Association of Scientologists (IAS) and US IAS Members Trust (USIMT) for membership donations.

III.  $340,000 from the Church of Scientology Religious Trust (CSRT) for donations to the Super Power project (Flag building).

IV.   $510,000 from Orange County Org for donations to the Ideal Org fund.

The arbitrators were instructed that the arbitration was "to be conducted in strict accordance with Scientology ethics and justice policies," and were provided the relevant policies. (Dkt. 275-4 at 1). They were instructed "to determine whether the Garcias followed the refund procedures required by policy," that the key policy was the "RELIGIOUS SERVICES ENROLLMENT APPLICATION AGREEMENT AND GENERAL RELEASE (the Enrollment Form)," and to determine whether the Garcias' requests for refunds were valid, and if so, in what amount. (*Id.*) The IJC was to operate as a terminal for Suppressive Persons, like the Garcias, and resolve any questions of relevance of information submitted to the arbitrators. (*Id.* at 2). The arbitrators were instructed to

2

"conduct th[e] arbitration in a fair and neutral manner, notwithstanding the Garcias have been declared.") (*Id.*)

The Garcias proffered a number of documents to the IJC as evidence in support of their claims for consideration by the arbitrators. Consistent with Church policy, the IJC resolved the relevance of Plaintiffs' documents, and disallowed or redacted several of those documents. (Dkt. 275-1 at ¶9; Affidavit of Luis Garcia, Dkt. 272-3 at 9-10). On the second day, the arbitrators met with the Garcias, questioned them, and permitted them to address the panel and present, if they wished. (Dkt. 275-1 at ¶ 12; Dkt. 272-3 at 11-16).

The IJC provided the arbitrators with two forms to complete, a "Religious Arbitration Findings Form" on which to answer "yes" or "no" to specific questions about the Garcias' claims, and a "Religious Arbitration Decision Form" on which to answer "yes" or "no" to the questions of whether they were entitled to repayments and refunds of donations and advance payments, and if so, the amount. (Dkt. 275-1 at ¶ 14; Dkts. 275-6, 275-7).

The arbitrators awarded the Garcias $18,495.36 for repayments for accommodations at religious retreats they did not avail themselves of. (Dkt. 275-7 at 2). The IJC accepted the decision, which was mailed to the Garcias with two checks, on October 26, 2017.[2]

The Garcias move to vacate the arbitration award pursuant to 9 U.S.C. § 10(a)(2) & (3), contending that the arbitration panel acted with evident partiality and engaged in misconduct. Specifically, they contend that the arbitrators exhibited partiality because they met with the IJC outside their presence, were provided the CVB's letter, and made numerous statements demonstrating they had already decided the dispute in favor of the Church. They contend that the

---

[2] The checks were from Flag Ship Service Organization, Inc. and Flag Service Organization.

3

arbitrators engaged in misconduct by: (1) refusing to hear evidence or witnesses critical of the Church; (2) refusing to consider their fraud claims; (3) allowing the IJC to have ex parte conduct with the panel; (4) refusing to allow their counsel to attend the arbitration; and 5) failing to provide sufficient written findings for the Court to review.

### Discussion

"There is a presumption under the FAA that arbitration awards will be confirmed, and federal courts should defer to an arbitrator's decision whenever possible." *Frazier v. CitiFinancial Corp., LLC*, 604 F.3d 1313, 1321 (11th Cir. 2010) (quotation omitted). Under 9 U.S.C. § 10, a district court may vacate an arbitration award only on four narrow grounds:

(1)     where the award was procured by corruption, fraud, or undue means;

(2)     where there was evident partiality or corruption in the arbitrators, or either of them;

(3)     where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or

(4)      where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

Judicial review of arbitration awards under the Federal Arbitration Act ("FAA") is extremely limited. *Booth v. Hume Publishing, Inc.*, 902 F.2d 925, 932 (11th Cir. 1990); *Bamberger Rosenheim, Ltd., (Israel) v. OA Dev., Inc., (United States)*, 862 F.3d 1284, 1286 (11th Cir. 2017) ("Because arbitration is an alternative to litigation, judicial review of arbitration decisions is among the narrowest known to the law.") (quotation omitted). And where, as here, a religious arbitration award

4

is challenged, judicial review is even more limited, as the Garcias acknowledge. (Dkt. 272 at p. 2).[3]

In the context of secular arbitration, "'[a]n arbitration award may be vacated due to the "evident partiality" of an arbitrator only when either (1) an actual conflict exists, or (2) the arbitrator knows of, but fails to disclose, information which would lead a reasonable person to believe that a potential conflict exists.'" *Johnson v. Directory Assistants Inc.*, 797 F.3d 1294, 1300 (11th Cir. 2015) (quoting *Univ. Commons–Urbana, Ltd. v. Universal Constructors, Inc.*, 304 F.3d 1331, 1339 (11th Cir. 2002)). And while a claim of evident partiality may warrant an evidentiary hearing, *see Univ. Commons–Urbana, Ltd.*, 304 F.3d at 1341-42, evidentiary inquiry is unnecessary here because the Garcias agreed to arbitrate in accordance with Scientology arbitration procedures, including the selection of arbitrators in good standing with the Church, whose partiality was a given.

As has been noted, and bears repeating here, particularly considering the many arguments advanced by the Garcias challenging the manner in which the arbitration was conducted:

> By joining Scientology, Plaintiffs consented to its governing structures, policies, and doctrines and bound themselves to submit to its rules. Specifically, they agreed to arbitrate their dispute "in accordance with the arbitration procedures of Church of Scientology International." (Dkt. 189 at 16). The Church has maintained throughout these proceedings that IJC Mike Ellis is the official charged with deciding these internal matters, including the arbitration procedures. (citation and note omitted). While the rules governing Scientology arbitration may not be entirely clear on the record, the Church has advised Plaintiffs, though e-mails between counsel, that "[t]he conduct of the religious arbitration will be decided by the IJC at the appropriate time during the arbitration" (Dkt. 264-4), that arbitration will be conducted in accordance with Church ecclesiastical justice procedures," and that "[t]he arbitrators will be instructed by the [IJC] on the application of Scientology principles to arbitrate this dispute in a neutral and fair manner" (Dkt. 264-2).

---

[3] As one district court has noted, "the standard for vacating an arbitrator's decision is a narrow standard to begin with. The addition of the religious context further narrows the standard to make our intervention nearly impossible. As has been clear since secular courts were first faced with intrachurch property disputes, courts have jurisdiction over these cases, but are prohibited from interpreting the underlying religious dogma." *Lang v. Levi*, 198 Md. App. 154, 169, 16 A.3d 980, 989 (2011).

(Dkt. 265).

In their enrollment agreements, the Garcias expressly agreed to arbitrate in accordance with Scientology principles and procedures, and that the arbitrators selected would be in good standing with the Church. To the extent, therefore, they challenge the partiality of the arbitrators because of their standing with the Church, they agreed to inherent partiality in their agreements. "Where an agreement entitles the parties to select interested arbitrators, 'evident partiality' cannot serve as a basis for vacating an award under § 10(a)(2) absent a showing of prejudice." *Winfrey v. Simmons Foods, Inc.*, 495 F.3d 549, 551 (8th Cir. 2007). It therefore follows that comments by the arbitrators demonstrating their commitment to the Church and agreement with its policies, which the Garcias interpret as prejudice, cannot serve as a basis for vacating the award.[4]

Plaintiffs' argument that the award should be vacated because of misconduct is likewise unpersuasive. With respect to the IJC's disallowance and redaction of the exhibits the Garcias wanted to present, Scientology justice procedures specify that the IJC would determine how the arbitration was to be conducted and that he would instruct the arbitrators. Under his authority to determine the arbitration procedures, the IJC considered the documentary evidence submitted by Plaintiffs, recorded a description of each exhibit with an exhibit number, and determined whether the exhibit would be allowed or disallowed, and the grounds for disallowance (irrelevance, hearsay,

---

[4] Plaintiffs contend that the CVB letter, which denied their claims for refunds of payments for services and a return of donations, was "tantamount to a directed verdict." According to Defendants, this report was their response to Plaintiffs' claims submitted to the arbitrators. While the letter explains Church policy, applies it to Plaintiffs' claims, and states the Church's position that Plaintiffs should be awarded nothing, the arbitrators were instructed to make independent findings and decisions as to Plaintiffs' claims. The arbitration award of more than $18,000 demonstrates that the arbitrators made an independent finding.

6

Entheta,[5] or Other) on the "Religious Arbitration Exhibit Form." (Dkt. 275-5). And once arbitration

commenced, any ex parte contact between the IJC and the arbitrators (the "hatting") was consistent

with Church policy that the IJC would instruct the arbitrators, and therefore does not provide a basis

for vacating the award. And the Garcias' contention that their attorney was not permitted to attend

is disingenuous. They had been advised by the Church, and the Court, that their attorney could be

present at the arbitration, but could not "represent" them. (*See* Dkt. 265 at 3 n.4 (citing Ellis Dep.

at 15:24-16:9)).[6] There is no evidence that their attorney attempted to attend but was turned away.

Finally, the "Religious Arbitration Findings Form" and "Religious Arbitration Decision

Form" belie the Garcias' contention that the arbitrators refused to consider their fraud claims and

failed to provide sufficient written findings. Both forms include their claims for $340,000 from the

Church of Scientology Religious Trust (CSRT) for donations to the Super Power project (Flag

Building) and $510,000 from Orange County Org for donations to the Ideal Org fund. (Dkt. 275-6).

According to the Findings Form, the arbitrators found that the Garcias' claims that they were misled

by Church fundraisers were not credible with respect to the Super Power project and the Ideal Org

fund.[7] (*Id.* at ¶¶ 31, 36, 39). The arbitrators checked "no" on the Decision Form, indicating their

decision that the Garcias were not entitled to refunds for these donations. That is a sufficient finding.

*See O.R. Sec., Inc. v. Prof'l Planning Assocs., Inc.*, 857 F.2d 742, 747 (11th Cir. 1988)

---

[5] Plaintiff assert that "entheta" is a Scientology term that means anything critical of the Church, and that the IJC excluded all their evidence under that rubric. According to Defendants, "[i]n the context of an arbitration, that definition is similar to the legal concepts of irrelevance, incompetence, immateriality, and likely to be misleading and unduly prejudicial." Only two exhibits were disallowed on this ground.

[6] Ellis testified that an attorney may be present, but may not "represent" the plaintiffs (Ellis Dep. at 15:24-16:9), that the plaintiffs would be "interviewed" by the arbitrators, that they would be able to "originate whatever [they] wanted to" in order to present their side of the story, and would be able to speak to the arbitrators (*id.* at 47:7-22).

[7] Plaintiffs' donations to the Super Power project and humanitarian initiatives through the Ideal Org fund constitute the basis of their fraud claims. (*See* Dkts. 1, 114, 275-2).

("[A]rbitrators are not required to explain their reasons for an award.").

## Conclusion

The Garcias' challenges to the arbitration award involve matters of religious doctrine, specifically Scientology principles and procedures, including the authority of the IJC. While they may disagree with how the arbitration was conducted, their arguments raise secular notions of due process. And the Free Exercise Clause prohibits this Court from resolving their disputes concerning the interpretation or application of Scientology doctrine. *See, e.g., Watson v. Jones,* 80 U.S. (13 Wall.) 679, 727, 20 L.Ed. 666 (1872) (whenever questions of "ecclesiastical rule, custom or law have been decided by the highest ... church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them"). Significantly, the Supreme Court has observed that "[c]onstitutional concepts of due process, involving secular notions of 'fundamental fairness' or impermissible objectives, are . . . hardly relevant to such matters of ecclesiastical cognizance." *Serbian E. Orthodox Diocese for U. S. of Am. & Canada v. Milivojevich*, 426 U.S. 696, 715, 96 S. Ct. 2372, 2383, 49 L. Ed. 2d 151 (1976).

Within the narrow scope of review of an arbitration award under the FAA, further limited by the First Amendment, there is no basis to vacate the arbitration award. Accordingly, Plaintiffs' Amended Motion to Vacate Arbitration Awards (Dkt. 272) is **DENIED**. Plaintiffs' Motion Requesting Evidentiary Hearing on Amended Motion to Vacate Arbitration Awards (Dkt. 277) is likewise **DENIED**.

**DONE AND ORDERED** this _17th_ day of July, 2018.

_____
**JAMES D. WHITTEMORE**
**United States District Judge**

Copies to: Counsel of Record